**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-CR-20114-KMW**

**UNITED STATES OF AMERICA**

**vs.**

**CARLOS RAMON POLIT FAGGIONI,**

       **Defendant.**

---

**GOVERNMENT'S TRIAL BRIEF AND MEMORANDUM IN SUPPORT OF**
**GOVERNMENT'S OMNIBUS MOTION IN LIMINE**

---

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:  Michael N. Berger
     Assistant United States Attorney

GLENN S. LEON
CHIEF, FRAUD SECTION

By:  Jil Simon
     Trial Attorney
     Alex Kramer
     Assistant Chief

# Contents

I.    INTRODUCTION ............................................................................... 3

II.   BACKGROUND ................................................................................ 3

III.  THE CHARGES ............................................................................... 6

IV.  EVIDENTIARY MATTERS ................................................................ 8

    A.   The Court Should Admit the Emails and Text Messages Sent by the Defendant as Party Admissions under FRE 801(d)(2)(A) ................................................... 9

    B.   The Court Should Admit Recordings of the Defendant Made by Witnesses under FRE 801(d)(2)(A) ................................................................................. 10

    C.   The Court Should Admit Emails and Text Messages Sent by Co-Conspirator 1 and Statements Made by Co-Conspirator 1 as Co-Conspirator Statements under FRE 801(d)(2)(E) ........................................................................................ 11

    D.   The Court Should Admit Emails Relating to Co-Conspirator 1's Financial Transactions as Business Records Admissible under FRE 803(6) .............................. 17

    E.   The Court Should Admit Emails Sent by Odebrecht Representatives Relating to Various Financial Transactions as Business Records under FRE 803(6) ..................... 19

    F.   The Court Should Admit Domestic and Foreign Bank Account Records as Business Records under FRE 803(6) .............................................................. 21

    G.   The Court Should Admit State of Florida Corporate Records as Certified Public Records under FRE 902 ........................................................................... 23

    H.   The Court Should Admit Foreign Resolutions and Press Releases as Public Records under FRE 803(8) ....................................................................... 24

    I.   The Court Should Admit the Government's Summary Exhibits ........................... 25

    J.   If the Defendant Testifies, the Court Should Allow the Government to Admit the Defendant's Ecuadorian Fraud Conviction under FRE 609 ............................... 29

    K.   The Court Should Preclude Testimony About the Defendant's Prior Commission of Good Acts or Prior Non-Commission of Bad Acts ....................................... 31

    L.   The Defendant Should be Precluded from Making Improper Arguments that Politicize the Case ................................................................................. 32

V.   CONCLUSION ................................................................................ 36

## I.   <u>INTRODUCTION</u>

The United States, by and through undersigned counsel, hereby submits the following trial memorandum addressing the charges and the following evidentiary matters: (A) the admissibility of emails and text messages sent by the defendant; (B) the admissibility of recordings of the defendant made by witnesses; (C) the admissibility of emails, attachments, and text messages sent by co-conspirators; (D) the admissibility of emails and text messages relating to various financial transactions; (E) the admissibility of emails sent by Odebrecht representatives relating to various financial transactions; (F) the admissibility of domestic bank records and foreign bank records; (G) the admissibility of Florida State corporate records; (H) the admissibility of foreign Resolutions issued by the Ecuadorian Comptroller General's Office and a foreign press release issued by the Ecuadorian State Attorney General's Office; (I) the admissibility of government summary exhibits; (J) the admissibility of the defendant's Ecuadorian public corruption conviction should he elect to testify or otherwise open the door; (K) the inadmissibility of testimony about the defendant's prior commission of good acts or prior non-commission of bad acts; and (L) the inadmissibility of improper arguments that politicize the case.

## II.   <u>BACKGROUND</u>

On March 25, 2022, a federal grand jury in the Southern District of Florida returned an Indictment charging the defendant with one count of conspiring to launder money, in violation of 18 U.S.C. § 1956(h), three substantive counts of money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2, and two substantive counts of engaging in transactions in criminally derived property, in violation of 18 U.S.C. §§ 1957 and 2.  [DE 1.]  The Indictment includes for all counts that the "specified unlawful activity" is "an offense against a foreign nation, specifically

Ecuador, involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official."

The Indictment arises from the defendant's solicitation and receipt of over $11 million in bribe payments while serving as the Comptroller General of Ecuador from approximately 2010 until at least 2017.  As the Comptroller General of Ecuador, the defendant had the responsibility to prevent fraud and corruption relating to the use of Ecuador's public funds and had the power to audit, initiate investigations, impose fines, and prepare reports relating to the misuse of public funds.  In furtherance of the scheme, the Indictment alleges that the defendant sought to unlawfully enrich himself by accepting bribe payments in exchange for using his official position as Comptroller General of Ecuador to provide improper business advantages, including the removal of monetary fines and penalties as well as influencing the award of government contracts.  With the help of co-conspirator 1, the defendant promoted the bribery scheme and concealed the proceeds through financial transactions that occurred, in part, in the United States.

*Odebrecht Scheme*

Between approximately 2010 and continuing until at least 2014, the defendant received and solicited bribes from co-conspirator 2, a senior manager at Odebrecht S.A., a Brazilian holding company that conducted business in multiple industries, including engineering, construction, and infrastructure. In exchange, the defendant used his official position and influence as Comptroller General of Ecuador to remove significant fines and prevent the imposition of other fines on Odebrecht relating to Odebrecht's construction projects in Ecuador. During the relevant time period, Odebrecht paid the defendant approximately $8 million in cash bribes and at least another $3 million in bribes via wire transfers. During the course of this scheme, the defendant informed co-conspirator 2 that the defendant used co-conspirator 1 to make the cash "disappear."  In order

4

to conceal that the bribery proceeds were for the benefit of the defendant and his family, co-conspirator 1 offered loans to certain non-U.S. companies (Inmobiliaria Cosani S.A., Plastiquim S.A., and Italcom S.A.) purporting to be from co-conspirator 1's U.S. company (Venture Overseas). The defendant then directed Odebrecht to transfer his bribe payments directly to those non-U.S. companies, in order to fund the loans that co-conspirator 1 had offered. Subsequently, those non-U.S. companies transferred the bribery proceeds to co-conspirator 1's U.S. company, as repayment of the loans. The bribery proceeds were then used by co-conspirator 1 to purchase real estate and other assets in the Southern District of Florida and elsewhere for the benefit of the defendant and his family.

*Seguros Sucre Scheme*

Additionally, in or around 2015, the defendant solicited and received a bribe of approximately $500,000 from co-conspirator 3 in exchange for the defendant using his official position and influence to assist co-conspirator 3 in obtaining contracts from Seguros Sucre, the state-owned insurance company of Ecuador. The defendant directed co-conspirator 3 to coordinate payment of the bribe with co-conspirator 1. On or about December 2, 2015, co-conspirator 3 sent a wire transfer of approximately $510,000 to an account controlled by co-conspirator 1 for the benefit of the defendant and his family. Co-conspirator 1 caused a false invoice to be created as support for this payment. The defendant and co-conspirator 1 used these funds to upgrade a luxury residence and to purchase an office building. These properties were held by companies in the names of co-conspirator 1's associates, but were, in fact, beneficially owned by co-conspirator 1 for the benefit of the defendant and his family.

III.   **THE CHARGES**

Based on the conduct described above, the defendant was charged with one count of conspiring to launder money, in violation of 18 U.S.C. § 1956(h), three substantive counts of money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2, and two substantive counts of engaging in transactions in criminally derived property, in violation of 18 U.S.C. §§ 1957 and 2.

*Conspiracy to Commit Money Laundering*

To prove the defendant is guilty of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), the government must prove: (1) two or more people agreed to try to accomplish a common and unlawful plan to violate Sections 1956 and 1957; and (2) the defendant knew about the plan's unlawful purpose and voluntarily joined in it.  Eleventh Cir. Pattern Jury Instruction O74.5. The Indictment alleges the defendant conspired to commit the following offenses: 18 U.S.C. § 1956(a)(1)(B); 18 U.S.C. § 1956(a)(2)(A); and 18 U.S.C. § 1957.  The specified unlawful activity for the money laundering charges is an offense against a foreign nation, specifically Ecuador, involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, as provided by Title 18, United States Code, Section 1956(c)(7)(B)(iv).

The specific Ecuadorian laws at issue are violations of the crime of bribery under the 1971 Penal Code and the 2014 Penal Code.  The 1971 Penal Code bribery law made it a violation to offer or promise a gift or present to a public official or a person charged with performing a public service.  The public official must have accepted or received the gift or present and the purpose of the gift or present must be to induce the public official to perform or refuse to perform an act within the scope of his or her position for which he or she is not entitled to renumeration.  Finally, the person offering or accepting the bribe must act with a corrupt or malicious intent. The 2014 Penal

6

Code bribery law makes it a violation for a public servant or a person acting on behalf of a governmental institution to accept or agree to accept an undue payment from another for the purpose of influencing the way in which the public servant performs his or her job or function. The person accepting or offering the bribe must act with a corrupt or malicious intent.

*Money Laundering*

Counts two through four of the Indictment charge the defendant with money laundering, concealing proceeds of specified unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(B).  The elements of this crime are as follows: (1) the defendant knowingly conducted or tried to conduct financial transactions; (2) the defendant knew that the money or property involved in the transaction were the proceeds of some kind of unlawful activity; (3) money or property did come from an unlawful activity; and (4) the defendant knew that the transaction was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or the control of the proceeds.  Eleventh Cir. Pattern Jury Instruction O74.2.  Again, the specified unlawful activity for the money laundering charges is an offense against a foreign nation, specifically Ecuador, involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, as provided by Title 18, United States Code, Section 1956(c)(7)(B)(iv).

*Engaging in Transactions in Criminally Derived Property*

The Indictment also charges the defendant with two counts of Engaging in Transactions in Criminally Derived Property in violation of 18 U.S.C. § 1957. The defendant can be found guilty of this offense only if all the following are proved beyond a reasonable doubt; (1) the defendant knowingly engaged or attempted to engage in a monetary transaction; (2) the defendant knew the transaction involved property or funds that were the proceeds of some criminal activity; (3) the

property had a value of more than $10,000; (4) the property was in fact proceeds of the specified

unlawful activity alleged in the indictment; and (5) the transaction took place in the United States.

Eleventh Cir. Pattern Jury Instruction O74.6.  The specified unlawful activity is an offense against

a foreign nation, specifically Ecuador, involving bribery of a public official, and the

misappropriation, theft, and embezzlement of public funds by and for the benefit of a public

official, as provided by Title 18, United States Code, Section 1956(c)(7)(B)(iv).

## IV.   <u>EVIDENTIARY MATTERS</u>

The government respectfully seeks to admit certain emails, messages and statements into

evidence described in the following subsections:  (A) emails and text messages sent by the

defendant; (B) audio recordings of the defendant's statements; (C) emails and text messages sent

and statements made by co-conspirator 1 in furtherance of the conspiracy; (D) emails sent or

received by co-conspirator 1 and co-conspirator 1's employees that constitute business records and

(E) emails sent by Odebrecht employees that constitute business records.

The government also seeks to admit certain certified records and summary documents as

described herein under the following subsections: (F) certified domestic bank records and foreign

bank records; (G) certified Florida State Corporate records; (H) copies of foreign resolutions issued

by the Ecuadorian Comptroller General's Office and a foreign press release issued by the

Ecuadorian State Attorney General's Office; (I) summary exhibits; and (J) the defendant's

Ecuadorian public corruption conviction should he elect to testify or otherwise opens the door.

Finally, the government seeks to exclude certain non-relevant testimony, including (K)

testimony about the defendant's prior commission of good acts or prior non-commission of bad

acts; and (L) improper arguments that politicize the case. "The court must decide any preliminary

question about whether . . . evidence is admissible.  In so deciding, the court is not bound by

evidence rules, except those on privilege."  FRE 104(a); <u>see, e.g.</u>, <u>In re Intern. Management Associates, LLC</u>, 781 F.3d 1262, 1268 (11th Cir. 2015) ("When making preliminary factual inquiries about the admissibility of evidence under a hearsay exception, the district court must base its findings on the preponderance of the evidence.") (internal citation omitted).

### A.  The Court Should Admit the Emails and Text Messages Sent by the Defendant as Party Admissions under FRE 801(d)(2)(A)

The government intends to introduce at trial certain emails sent from the defendant's personal email account — carlospolitfaggioni@hotmail.com.  The government intends to identify the defendant as the author of those emails based on the name in the email address and the context of the communications (e.g., communications from defendant's co-conspirators and communications related to matters at issue in the trial).  <u>See, e.g.</u>, <u>United States v. Siddiqui</u>, 235 F.3d 1318, 1322-23 (11th Cir. 2000) (affirming authentication of defendant's emails based on context and email address); <u>United States v. Macaluso</u>, 460 Fed. App'x 862, 870 (11th Cir. Mar. 9, 2012) (affirming admission of the defendant's emails).  The government intends to authenticate the contents of the email based on a certification from the email service provider who produced the emails in response to a search warrant.  The government also intends to introduce a text message communication sent by the defendant to co-conspirator 2, an Odebrecht manager and trial witness, that the witness will authenticate.

The government seeks to admit the defendant's statements in the emails and messages under FRE 801(d)(2)(a) — statements of an opposing party defendant.  The Eleventh Circuit has routinely upheld the admissions of such emails and messages sent by a defendant as party admissions under this rule.  <u>See</u> <u>Siddiqui</u>, 235 F.3d at 1322-23 (upholding emails and messages sent by defendant as admissions of a party opponent); <u>Macaluso</u>, 460 Fed. App'x at 870 (same).

Based on the above, the government submits that the Court should admit the following emails sent by the defendant: GX 1-11, 4-3, 11-2, 11-3, 20-1, 20-2, and 20-3.[1]

### B. The Court Should Admit Recordings of the Defendant Made by Witnesses under FRE 801(d)(2)(A)

The government seeks to introduce audio recordings into evidence of the defendant made by two separate witnesses who will testify at trial.  One of the recordings was made on July 23, 2016, by a former Odebrecht manager capturing a meeting with the defendant at the defendant's home in Guayaquil, Ecuador.  The other recording was made on October 15, 2020, by an Ecuadorian insurance broker during a meeting with the defendant in Miami, Florida.  Both individuals will testify at trial and authenticate the respective recordings.

The party introducing a recording into evidence has the burden of showing the recording is an accurate reproduction of the conversation recorded.  See, e.g., United States v. Capers, 708 F.3d 1286, 1305 (11th Cir. 2013).  In this case, the government expects the witnesses will testify that: (a) they used a competent recording device; (b) the recordings accurately reflect the conversation with the defendant; and (c) there were no material alterations, deletions, or additions. See United States v. Sarro, 742 F.2d 1286, 1292 (11th Cir. 1984) (upholding admission of recorded statements of defendant upon similar showing).  Based on such testimony, the recordings should be admitted as properly authenticated.  Id.

Further, the statements of the defendant in the recordings are admissible as statements of a party opponent under FRE 801(d)(2)(A).  See United States v. Trent, 2007 WL 2916322, at *1 (M.D. Fla. Oct. 5, 2007) (upholding admission of recording and noting that statements of defendant

---

[1] In addition to the defendant's written statements, the government will also seek to offer relevant oral statements or facsimiles made by the defendant — as recalled by witnesses who will testify from their personal knowledge and be subject to cross-examination as to what the defendant said.  These oral statements should likewise be admitted as party-opponent admissions under FRE 801(d)(2)(A).

are "clearly not hearsay" under FRE 801(d)(2)(A)); see also United States v. Williams, 2013 WL 1748753, at *3 (S.D. Fla. Apr. 23, 2013) (same).  The government also seeks to introduce certified transcripts of these recordings in Spanish with side-by-side translations prepared by a qualified interpreter.  See United States v. Cruz, 765 F.2d 1020, 1022-23 (11th Cir. 1985) (upholding admission of certified English translations of Spanish recordings into evidence provided by government).

Based on the above, the government seeks to admit GX 1-10 (recording on July 23, 2016), 1-10A (transcript of recording on July 23, 2016), 10-4 (recording on October 15, 2010), and 10-4A (transcript of recording on October 15, 2010).

### C. The Court Should Admit Emails and Text Messages Sent by Co-Conspirator 1 and Statements Made by Co-Conspirator 1 as Co-Conspirator Statements under FRE 801(d)(2)(E)

The Government intends to introduce at trial certain emails sent from co-conspirator 1's email accounts: john.polit@gmail.com and reports.jcp@gmail.com.  The government intends to authenticate the emails as of those of co-conspirator 1 based on the name in the email address and witness testimony that co-conspirator 1 used the above accounts.  The government intends to authenticate the contents of the email based on certifications from the email service provider.  The government also intends to introduce certain text messages sent by co-conspirator 1 that witnesses will authenticate.

The government seeks to admit these out-of-court statements as co-conspirator statements admissible under FRE 801(d)(2)(E).  The standard for admission of co-conspirator statements is that the government must prove by a preponderance of the evidence that (1) a conspiracy existed involving the defendant and declarant and (2) the statement was made during and in furtherance of the conspiracy.  See United States v. Magluta, 418 F.3d 1166, 1177-78 (11th Cir. 2005); United States v. Kandhai, 629 Fed. App'x 850, 853 (11th Cir. Oct. 14, 2015).  In making the

determination, the district court may consider both the statement itself and "evidence independent of it." United States v. Hough, 803 F.3d 1181, 1193 (11th Cir. 2015). The court may admit the statements even if they came from an unindicted co-conspirator. See United States v. Wenxia Man, 891 F.3d 1253, 1272 (11th Cir. 2018).

As for the first prong, the government will present evidence that the defendant and co-conspirator 1 were engaged in a conspiracy where co-conspirator 1 laundered the proceeds of bribes received by the defendant. The government intends to introduce the following evidence at trial to support that such a conspiracy existed between 2010 and 2017, including among other evidence:

- Witness testimony from a senior Odebrecht representative who paid bribes to the defendant that the defendant stated that co-conspirator 1 made his bribe proceeds "disappear";

- Evidence (bank records and witness testimony) that co-conspirator 1 caused Odebrecht bribe funds to be sent as "loans" to various businesses and subsequently transferred to accounts in Miami controlled by co-conspirator 1;

- Witness testimony from employees of co-conspirator 1 that co-conspirator 1 kept folders in an office in Miami — including folders relating to the loans from Odebrecht funds — and described these as "investments" of the defendant; and

- Witness testimony from an Ecuadorian insurance broker that the defendant directed him to coordinate with co-conspirator 1 payment of a $500,000 bribe, which the broker subsequently did.

As explained further below, the emails and messages themselves further corroborate the existence of this criminal conspiracy.

As to the second prong, the government intends to introduce certain categories of emails and statements, including transactions involving bribery proceeds, ledgers, and fake invoices, made in furtherance of the conspiracy.   The Eleventh Circuit "applies a liberal standard in determining whether a statement was in furtherance of a conspiracy." United States v. Siegelman, 640 F.3d 1159, 1181 (11th Cir. 2011) (citing United States v. Santiago, 837 F.2d 1545, 1549 (11th Cir. 1988)).   "The statement need not be necessary to the conspiracy, but must only further the interests of the conspiracy in some way." Id.   The statement from the co-conspirator need not be made to another conspirator to be admissible. See United States v. McKinnies, 165 Fed. App'x 851, 852-83 (11th Cir. Feb. 8, 2006).

*Transactions in Bribery Proceeds*

The government seeks to introduce emails and messages relating to financial transactions in bribery proceeds.  The government intends to introduce evidence that the Odebrecht paid bribes to the defendant in cash and in wire transfer and that the defendant coordinated with co-conspirator 1 to receive those bribe proceeds.

The government intends to introduce evidence that co-conspirator 1 coordinated where defendant's bribe proceeds would be sent.   For example, to receive the Odebrecht bribes via wire transfer, co-conspirator 1 arranged for certain companies (Inmobiliaria Cosani S.A., Plastiquim S.A., and Italcom S.A.) to receive loans purporting to be from co-conspirator 1's U.S. company (Venture Overseas).  Co-conspirator 1 then provided the name of these companies and account wiring information to the defendant.  The defendant then provided this information to Odebrecht as instructions for the transfer of his bribe payments.   After Odebrecht sent these funds, the companies transferred the bribery proceeds to co-conspirator 1's account in South Florida, as repayment of the loans.  The bribery proceeds were then used by co-conspirator 1 to purchase real

estate and other assets in the Southern District of Florida and elsewhere for the benefit of the defendant and his family.

For example, on May 11, 2014, co-conspirator 1 sent an email on his personal account to the defendant's personal email account with wire transfer instructions for an account of Plastiquim. Shortly thereafter, Odebrecht transferred approximately $700,000 in bribery funds to the same Plastiquim account provided by co-conspirator 1. This email furthered the conspiracy as co-conspirator 1's email provided the account instructions for receipt of bribery proceeds.

Similarly, in November 2014, co-conspirator 1 exchanged emails with the CFO of Italcom — a Panamanian company that arranged to receive a multi-million-dollar loan from co-conspirator 1. Co-conspirator 1 and defendant caused these loans to be funded by the Odebrecht bribe payments benefitting the defendant.   In the exchanges between co-conspirator 1 and the CFO of Italcom, co-conspirator 1 explained that two transfers (totaling approximately $700,000) would be coming from an entity that the government will establish is an Odebrecht-controlled entity. This statement furthered the interests of the conspiracy as it ensured the identification of the defendant's bribery proceeds as the "loan" payment as well as the repayment of those funds for the benefit of co-conspirator 1 and the defendant.

Similarly, in July 2015, co-conspirator 1 exchanged text messages with an employee relating to a report about "loans" from Cosani.   Cosani's accounts received bribery proceeds directly from Odebrecht and repaid these funds to accounts of co-conspirator 1. This statement furthered the interest of the conspiracy as it tracked the repayment of defendant's bribery funds from Cosani to accounts of co-conspirator 1.

Based on the above, the government seeks to admit 4-2, 4-5, 6-1, 7-2, 7-2A, 8-1, and 11-1.

14

*Ledgers*

The government seeks to introduce certain ledgers sent by co-conspirator 1 that tracked the receipt of bribery proceeds and the use of those funds.  For example, in an email co-conspirator 1 sent on October 14, 2014, he attached an email to himself with a spreadsheet that contained line items tracking the "loans" made from the Odebrecht bribes proceeds as well as payments from the insurance broker.  The government seeks to admit these ledgers as statements in furtherance of the conspiracy, consistent with Eleventh Circuit case law.  See United States v. Young, 39 F.3d 1561, 1571 (11th Cir. 1994) (admitting ledgers of transactions made by one co-conspirator in trial of another co-conspirator as statements in furtherance of the conspiracy); United States v. Smith, 918 F.2d 1501, 1511-12 (11th Cir. 1990) (same).  Based on the above, the government seeks to admit GX 7-3, 7-3A, 8-5, 8-5A, 8-5B, 8-6,[2] 8-7, 8-7, 8-7A, 8-8, 8-8A, 8-9, and 8-9A.

*Fake Invoice*

The government intends to introduce evidence of a fake invoice that co-conspirator 1 directed an employee to make relating to a bribe payment for the defendant.  Specifically, the government intends to introduce evidence that the insurance broker made a bribe payment for the benefit of the defendant of $510,000 to an account controlled by co-conspirator 1 in South Florida in December 2015.  The government intends to introduce testimony from an employee of co-conspirator 1 that co-conspirator 1 directed her to create a fake invoice relating to this payment. The government intends to introduce an email from March 2016 where co-conspirator 1 sent the employee a template for the creation of this fake invoice as well as additional contemporaneous

---

[2]      Most of the emails are sent by emails from Co-Conspirator 1's email address at john.polit@gmail.com or reports.jcp@gmail.com.  This particular exhibit (8-6 and 8-6A) was actually sent by another relative of the defendant using the email account reports.cgp@gmail.com.  This Witness testimony will establish that this relative was also involved in the conspiracy to launder proceeds from the defendant's bribery scheme.

emails on the subject.  The invoice was to be prepared and provided to the insurance broker as justification for the transaction.  This email furthered the interest of the conspiracy as it helped prevent the detection of the conspiracy.   Based on the above, the government seeks to admit GX 13-1, 13-1A, and 13-3.

*Ownership of Funds*

The government intends to introduce evidence of a statement made by co-conspirator 1 to an employee of co-conspirator 1 in or around 2015.  At that time, this employee noticed a series of folders in a drawer in co-conspirator 1's office in Miami.  The folders contained documents on "loans" to Italcom, among others, that the government will show included Odebrecht bribery funds.  Co-conspirator 1 explained that these folders were the defendant's "investments."  This employee had a close relationship with co-conspirator 1 and had responsibility for obtaining repayment on the "loans" and tracking the receipt of those funds.  The statement is in furtherance of the conspiracy as it was intended to affect future dealings between the parties by maintaining trust and cohesiveness and ensuring the employee continued assisting in collecting repayment of the proceeds.  United States v. Holt, 777 F.3d 1234, 1267 (11th Cir. 2015) (upholding admission of co-conspirator statement describing defendant's involvement in narcotics trafficking as furthering the conspiracy because it provided reassurance, served to maintain trust and cohesiveness, and inform each other of current status of conspiracy); Siegelman, 640 F.3d at 1181 (upholding admission of co-conspirator's statement describing defendant's successful bribe as in furtherance of the conspiracy); Santiago, 837 F.2d at 1549 (upholding admission of co-conspirator's statement described  "bragging" or "boast" statement about defendant's willingness to pay to move cocaine as in furtherance of the conspiracy).  As in those cases, so too here.

### D. The Court Should Admit Emails Relating to Co-Conspirator 1's Financial Transactions as Business Records Admissible under FRE 803(6)[3]

The government intends to introduce evidence that co-conspirator 1 caused the defendant's bribery proceeds from Odebrecht to be sent as "loans" to companies and repaid to accounts controlled by co-conspirator 1.  Once in the account of co-conspirator 1, the government further intends to introduce evidence that co-conspirator 1 used the bribery funds to operate various businesses in South Florida, including among others, a real estate business, restaurants, and a tile business.   Co-conspirator 1 employed various individuals to collect on the loans and to operate the real estate business and other businesses.  Witnesses will testify that co-conspirator 1 used his email for regularly conducted activity relating to the loans and for the real estate and other businesses as business records.

FRE 803(6) provides that business records are admissible if they are:

"made at or near the time by, or from information transmitted by, someone with knowledge, . . . kept in the course of a regularly conducted activity, . . . and . . . making the record was a regular practice of that activity, all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) . . . and neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness."

Id.  "The touchstone of admissibility under the business records exception to the hearsay rule is reliability, and a trial judge has broad discretion to determine the admissibility of such evidence." United States v. Bueno-Sierra, 99 F.3d 375, 378 (11th Cir. 1996) (citing United States v. Veytia-Bravo, 603 F.2d 1187, 1189 (5th Cir. 1979)).

---

[3] The government notes some of these communications are also admissible as co-conspirator statements under FRE 801(d)(2)(E).  The government's Omnibus Motions in Limine includes a chart listing many of the government's exhibits and the legal bases for their admissibility.  The government incorporates by reference that chart into this filing.

Courts have routinely admitted emails where they reflect regularly conducted activity of a business. See, e.g., United States v. Parnell, No. 1:13–CR–12 (WLS), 2015 WL 3447250, *8-9 (M.D. Ga. May 28, 2015) (upholding admission of emails as business records where emails contained communications of regularly conducted business); United States v. Lischewski, 860 Fed. App'x 512, 516 (9th Cir. July 7, 2021) (same); United States v. Figueroa, 2023 WL 8373566, at *3 (S.D.N.Y. Dec. 4, 2023) (same).

*Emails Related to Receipt of Bribery Proceeds as Loans*

The government seeks to introduce a series of emails sent or received by co-conspirator 1 relating to the use of bribery proceeds to fund loans and to receive repayment on the loans. For example, on or about March 26, 2014, co-conspirator 1 received an email with wire transfer instructions for an account of Cosani in Panama. Shortly thereafter, Odebrecht bribery funds were sent to this account and later wired to accounts controlled by co-conspirator 1.

As another example, on or about March 14, 2014, co-conspirator 1 received an email from an individual who expected to receive a $400,000 loan in cash from co-conspirator 1 during the time of the money laundering conspiracy. A witness will testify that co-conspirator 1 provided funds to the witness in cash in Ecuador as a "loan" to be repaid to accounts in South Florida. This witness will testify that he counted the funds and noted a discrepancy. In the email, the individual writes that there were multiple counts of the currency (denominations of $20, $50, and $100) and that the total amount was $395,000. This email should be admitted both as a business record and under the "present sense" impression exception. See Figueroa, 2023 WL 8373566, at *4 (upholding admission of emails sent by assistant describing contemporaneous or summarized phone calls).

18

These emails should be admitted because they reflect records of regularly conducted activity of the business and making the record was a regular practice of co-conspirator 1's business. Based on the above, the government seeks to admit GX 4-1, 4-4, 4-6, 5-3, 6-2, 6-2A, 7-1, and 8-4.

*Emails Related to Use of Bribery Funds for Real Estate*

The government also seeks to introduce a series of emails sent by co-conspirator 1 or co-conspirator 1's employees relating to these businesses.  For example, some of the defendant's bribery proceeds were used to upgrade a luxury residence in Coral Gables at 7233 Los Pinos Boulevard.  The government seeks to introduce an email sent by one of co-conspirator 1's employee responsible for the renovation of this property with a spreadsheet tracking the costs of the upgrade.  This witness will testify that he had a regular practice of making this kind of document.  The government will authenticate the email and spreadsheet based on these witness' testimony.  Based on the above, the government seeks to admit GX 9-1, 9-1A, 9-1B, and 9-1C.

**E.  The Court Should Admit Emails Sent by Odebrecht Representatives Relating to Various Financial Transactions as Business Records under FRE 803(6)[4]**

The government plans to introduce certain emails and documents sent by Odebrecht employees to facilitate wire transfers to pay bribes to government officials.  Specifically, the government seeks to introduce a series of emails from Odebrecht Employee A to Odebrecht Employee B with different spreadsheets listing: (a) dates, (b) payment amounts, (c) wire transfer recipient, and (d) wire transfer instructions.  These spreadsheets were used to transmit payment instructions for bribes to be paid from various Odebrecht-controlled shell companies to public

---

[4] The government notes some of these communications are also admissible as co-conspirator statements under FRE 801(d)(2)(E).  The government's Omnibus Motions in Limine includes a chart listing many of the government's exhibits and the legal bases for their admissibility.  The government incorporates by reference that chart into this filing.

officials, including bribes for the benefit of the defendant.  The email sender and recipients used code names to disguise their identities, but Odebrecht Employee A and B will identify themselves as the sender and recipient, respectively.   The government will authenticate the emails and spreadsheets based on these witness' testimony.  See FRE 901(b)(1) (permitting witness with knowledge to authenticate evidence); Siddiqui, 235 F.3dat 1322-23 (upholding authentication of email by witness with knowledge).

The government seeks to introduce the contents of the emails as business records under FRE 803(6).  The government will introduce evidence that Odebrecht had a specific department — the Division of Structured Operations — responsible for making billions of dollars in bribe payments to various government officials.  Both Odebrecht Employee A and B worked for the Division of Structured Operations.  Both will testify that this division had a regular practice as part of its regularly conducted activity of sending these emails with wiring instructions to further the payment of the bribes.

Odebrecht Employee A will testify that she received instructions from different Odebrecht country managers with instructions on payment to various code-named individuals, including for the defendant – code named "Miami."  Odebrecht Employee A will testify that she had a regular practice of preparing and sending emails with a spreadsheet of authorized payments (including date, amounts, and wire transfer instructions) to Odebrecht Employee B.  Odebrecht Employee B will testify that he received these instructions and arranged for the wire transfers from various Odebrecht shell company bank accounts to the bank accounts identified in the spreadsheet.  These emails should be admitted because they reflect records of regularly conducted activity of Odebrecht's business and making the record was a regular practice of the business.  Based on the

above, the government seeks to admit GX 2-1,[5] 2-2, 2-4, 2-5, 3-1, 3-1A, 3-2, 3-2A, 3-3, 3-3A, 3-3B, 3-4, 3-4A, 3-5, 3-5A, 3-6, 3-6A.

### F. The Court Should Admit Domestic and Foreign Bank Account Records as Business Records under FRE 803(6)

The government's case will rely, in part, on bank records provided by domestic and foreign financial institutions.  The custodians who produced these records to the government also provided written certifications attesting to their authenticity. The Federal Rules of Evidence allow a party offering business records to authenticate them through a written declaration instead of calling a custodian witness to testify.  Here, the proposed exhibits at issue consist of records from domestic and foreign financial institutions.

As to the domestic records, the custodian certificates establish that they are records of regularly conducted activity within FRE 803(6).  The Rule specifies that a live witness need not testify to establish the foundational requirements of Rule 803(6); instead, a business record may be authenticated through a certification that complies with Rule 902(11).  *See* Fed. R. Evid. 803(6)(D).  Under Rule 902(11), certified domestic records of a regularly conducted activity are self-authenticating if "they meet the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or other qualified person that complies with federal statute or a rule prescribed by the Supreme Court."

As to the foreign records, 18 U.S.C. § 3505 allows a party offering foreign business records to establish authenticity through a "foreign certification" defined by the statute as "a written

---

[5]      GX 2-1, 2-2, 2-4, and 2-5 are spreadsheets kept by a former Odebrecht employee tracking bribe payments on various Odebrecht projects in Ecuador to the defendant and others.  This employee will testify that he maintained these spreadsheets, or bribe ledgers, as part of his regular activity for Odebrecht and regularly updated the spreadsheet to reflect ongoing payments.  These ledgers should be admitted under the business record exception to the hearsay rule.  <u>See United States v. Durrett</u>, 524 Fed. App'x 492, 495-96 (11th Cir. July 25, 2013) (upholding district court's admission of ledgers tracking bribe payments under business records exception to hearsay rule).

declaration made and signed in a foreign country by the custodian of a foreign record of regularly conduct activity….”[6]  “A foreign certification is a written declaration made and signed in a foreign country by the custodian of a foreign record of regularly conducted activity … [that] if falsely made, would subject the maker to criminal penalty under the laws of that country.”  <u>United States v. Aguirre-Rodriguez</u>, 762 Fed. App’x 956, 957 (11th Cir. Mar. 14, 2019) (internal citations omitted).  “Because Congress designed [§ 3505] to track the business records exception to hearsay in Federal Rule of Evidence 803(6), we interpret § 3505 ‘in the same manner as the comparable language in Rule 803(6) is interpreted.’”  <u>Id</u>. (quoting <u>United States v. Ross</u>, 33 F.3d 1507, 1515 (11th Cir. 1994)).

The Sixth Amendment’s Confrontation Clause does not prohibit the proponent of a record from establishing its authenticity through a custodian certification, as opposed to a live witness.  The Supreme Court’s decision in <u>Crawford v. Washington</u>, 541 U.S. 36 (2004) held that “testimonial” hearsay may not be admitted in a criminal trial unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination.  The Court, however, noted that business records admitted pursuant to an evidentiary hearsay exception are not testimonial.  <u>Id</u>. at 56.  Citing <u>Crawford</u>, the Eleventh Circuit has held that the introduction of bank records does not require a live custodian because “[b]usiness records are not testimonial.”  <u>United States v. Naranjo</u>, 634 F.3d 1198, 1213-14 (11th Cir. 2011); <u>see also</u> <u>United States v. Lezcano</u>, 296 Fed. App’x 800, 808 (11th Cir. Oct. 17, 2008) (rejecting defendant’s contention that the admission of business records through a Fed. R. Evid. 902(11) certification — and not a live witness — violated

---

[6]      18 U.S.C. § 3505(b) requires the defendant to affirmatively move to exclude foreign business records offered pursuant to a custodian certification and makes clear that a defendant waives his objection by failing to do so.

Crawford); United States v. Weiland, 420 F.3d 1062, 1077 (9th Cir. 2005) (affirming the admission of Fed. R. Evid. 803(6) evidence through a Fed. R. Evid. 902(11) certificate).

Accordingly, if a stipulation is not reached, the government asks the Court to rule that the following exhibits, described in the table below, are authentic business records, as the custodians in the corresponding certificates attest.

| Exhibit Numbers | Custodian | Certificate Exhibit |
|---|---|---|
| GX 12-1, 12-2, and sub-exhibits | Suntrust Bank | CRP-DOJ-0000404033 |
| GX 12-3, 12-4, 12-5, 12-6, 12-7, and sub-exhibits | Suntrust Bank | CRP-DOJ-0000395447 |
| GX 12-13, 12-14, 12-15, and sub-exhibits | Suntrust Bank | CRP-DOJ-0003142970 |
| GX 9-5, 9-6, 12-8, 12-10 and sub-exhibits | City National Bank | CRP-DOJ-0000172428 |
| GX 10-1, and sub-exhibits | Merrill Lynch | CRP-DOJ-0000308190 |
| GX 10-2, 12-9, and sub-exhibits | Merrill Lynch | CRP-DOJ-0000305585 |
| GX 12-11, 12-12, and sub-exhibits | Bank of America | CRP-DOJ-0000151454 |
| GX 4-7, and sub-exhibits | Banco Bolivariano (Panama) | CRP-DOJ-0000477934 |
| GX 6-3, and sub-exhibits | Tower Bank (Panama) | CRP-DOJ-0002070909 |
| GX 6-4, and sub-exhibits | Tower Bank (Panama) | CRP-DOJ-0003142730 |
| GX 7-4, and sub-exhibits | Tower Bank (Panama) | CRP-DOJ-0000481079 |

### G. The Court Should Admit State of Florida Corporate Records as Certified Public Records under FRE 902

The government will also seek to admit the State of Florida Corporate Records for certain companies beneficially owned by the defendant and/or co-conspirator 1. These exhibits are self-authenticating under Rule 902(4) — certified copies of public records — because they are accompanied by a certification by the custodian of the records, the Bureau Chief for Commercial

Information Services, certifying that the records are correct under Federal Rule of Evidence 902(4).  They are admissible under Federal Rule of Evidence 803(8)(A) as public records.

The government asks the Court to rule that the following exhibits, described in the table below, are self-authenticated Certified Public Records, as the custodian in the corresponding certificates attest.

| Exhibit Numbers | Custodian of Record | Certificate Exhibit |
|---|---|---|
| GX 8-2 (Am Land) | Bureau Chief for Commercial Information Srvs. | CRP-DOJ-0002403269 |
| GX 8-3 (Kuadra) | Bureau Chief for Commercial Information Srvs. | CRP-DOJ-0002403395 |
| GX 9-2 (Invecon) | Bureau Chief for Commercial Information Srvs. | CRP-DOJ-0002403345 |
| GX 9-3 (JC Funds) | Bureau Chief for Commercial Information Srvs. | CRP-DOJ-0002403374 |
| GX 9-4 (Los Pinos) | Bureau Chief for Commercial Information Srvs. | CRP-DOJ-0002403401 |
| GX 13-5 (1900 Office Building) | Bureau Chief for Commercial Information Srvs. | CRP-DOJ-0002403229 |

### H. The Court Should Admit Foreign Resolutions and Press Releases as Public Records under FRE 803(8)

The government will seek to admit official Resolutions issued by the Ecuadorian Comptroller General's Office (GX 1-1 through GX 1-9) as well as an official press release issued by the Ecuadorian State Attorney General's Office (GX 11-5).

The official Resolutions and official press release will be authenticated by knowledgeable witnesses pursuant to Federal Rule of Evidence 901(b)(1) and are admissible under Federal Rule of Evidence 803(8)(A) as public records.  Federal Rule of Evidence 803(8)(A) "allows admission of public-agency statements, in any form, setting forth the activities of the office or agency." United States v. Mena, 863 F.2d 1522, 1531 (11th Cir. 1989) (affirming admissibility of Honduran

vessel registry under Fed. R. Evid. 803(8)(A) because registration of the vessel was a "regular activity of the Honduran government").

The official Resolutions, issued by the Ecuadorian Comptroller General's Office, announced the dismissal of certain fines and penalties that had been previously imposed by the Ecuadorian Comptroller General's Office. That Office was responsible for auditing government contracts and protecting the public fisc of Ecuador. The Resolutions were issued by the Ecuadorian Comptroller General's Office as part of the a "regular activity" of that Office. Similarly, the official press release was issued by the Ecuadorian State Attorney General on that office's official website. The press release, which announced a favorable arbitration award obtained by the Ecuadorian State Attorney General's office, is a record of that office's "regular activity." As such, these documents are admissible Fed. R. Evid. 803(8)(A).[7]

**I.   The Court Should Admit the Government's Summary Exhibits**

The government will seek to admit summary exhibits analyzing and tracing the flow of bribery proceeds during the course of the defendant's scheme (GX 12-16 through GX 12-28) pursuant to FRE 1006.[8] These summaries will be offered through the testimony of a witness who prepared and reviewed them. FRE 1006, which governs the admission of summaries, provides in pertinent part that:

> The proponent may use a summary, chart, or calculation to prove
> the content of voluminous writings . . . that cannot be conveniently

---

[7]     The government has sought *via* Mutual Legal Assistance certified copies of the Resolutions and the press release. Once obtained, these records will also be admissible under 18 U.S.C. § 3505. They will be authenticated as records accompanied by "foreign certification[s]" — "declaration[s] made and signed in a foreign country by the custodian of a foreign record of regularly conduct activity...." 18 U.S.C. § 3505. And, as analyzed *supra* in Subsection F, they will be admissible under Federal Rule of Evidence 803(6). Because 18 U.S.C. § 3505 "track[s] the business records exception to hearsay in Federal Rule of Evidence 803(6)," the Eleventh Circuit "interpret[s] § 3505 in the same manner as the comparable language in Rule 803(6) is interpreted." Aguirre-Rodriguez, 762 Fed. App'x at 957.

[8]     The government produced these as draft exhibits on March 4, 2024.

> examined in court. The proponent must make the originals or
> duplicates available for examination or copying, or both, by other
> parties at reasonable time and place. And the court may order the
> proponent to produce them in court.

Id.  The rule's plain language provides that summaries of voluminous evidence, whether or not the underlying evidence is introduced, are admissible, particularly when the summaries are a practical way to place information in an intelligible form. See, e.g., United States v. Cuya, 724 Fed. App'x 720, 725 (11th Cir. Feb. 2, 2018) (no abuse of discretion in admitting summary of voluminous bank records), cert. denied sub nom. Rodriguez Cuya v. United States, 138 S. Ct. 2591 (2018); United States v. Scotton, 647 Fed. App'x 947, 949-50 (11th Cir. Apr. 12, 2016) (no abuse of discretion or plain error in admitting summaries based on business records government had provided to defendant in discovery), cert. denied, 137 S. Ct. 604 (2016); United States v. Clements, 588 F.2d 1030, 1039 (5th Cir. 1979) (The underlying evidence "need not have been introduced into evidence but only made available.").[9]  "Although the documents underlying a summary exhibit must be made available to the defendant for examination, Rule 1006 leaves it to the district court's discretion whether the proponent of the summary must produce the underlying documents in the courtroom." Lezcano, 296 Fed. App'x at 808.

The Eleventh Circuit has repeatedly affirmed the admission of summaries — even those incorporating certain assumptions or argument — as long as the supporting evidence has previously been presented to the jury.  The court makes clear that the jury should make the ultimate decision as to what weight to give the evidence, and the defense has the opportunity to cross-

---

[9]     Courts have held there is no requirement that the court find it to be "literally impossible to examine the underlying records before a summary chart may be utilized."  United States v. Scales, 594 F.2d 558, 562 (6th Cir. 1979).  All that is required for the rule to apply is that underlying material be voluminous and that in-court examination would "not be convenient."  Id. (citing United States v. Evans, 572 F.2d 455 (5th Cir. 1978)); accord United States v. Cray, 450 F. App'x 923, 937 (11th Cir. Jan. 12, 2012) (affirming use of chart summarizing "approximately 160 pages of voluminous and technical computer data").

examine a witness regarding any disputed issues in the summary.  See United States v. Richardson, 233 F.3d 1285, 1293 (11th Cir. 2000) (affirming admission of charts of transactions whose column headings were originally labeled "unauthorized transaction" and changed to "questioned transaction" later in the trial, where the witness testified that the label "unauthorized" represented his opinion, the witness was subject to cross-examination, and the jury was given numerous limiting instructions);[10] see also United States v. Suarez, 162 Fed. App'x 897, 903 (11th Cir. Jan. 17, 2006) (no abuse of discretion to admit summary chart without any limiting instruction where chart contained no assumptions, the underlying evidence was admitted, and the chart was accompanied by the testimony of a witness subject to cross-examination); United States v. Francis, 131 F.3d 1452, 1457-58 (11th Cir. 1997) (affirming admission of summaries that were neither argumentative nor unfair, contained assumptions that were supported by evidence that was before the jury, accompanied by cautionary instructions, and offered through a witness subject to cross-examination); United States v. Massey, 89 F.3d 1433, 1441 (11th Cir. 1996) (affirming admission of summaries of underlying evidence presented at trial, where defense conducted voir dire on each chart and cross-examined the witnesses, and the jury was cautioned to disregard any charts or summaries which "do not correctly reflect facts or figures shown by the evidence in the case").  In this regard, "[t]he essential requirement is not that the charts be free from reliance on any assumptions, but rather that these assumptions be supported by evidence in the record."  United States v. Norton, 867 F.2d 1354, 1363 (11th Cir. 1989).

---

[10]    The Court of Appeals has since noted that "Richardson created no . . . rigid requirement" to use the exact same prophylactic measures as were present in that case.  United States v. Benavides, 470 Fed. App'x 782, 788 (11th Cir. Apr. 24, 2012).  "To the contrary, [the Richardson Court] stressed that district courts have wide discretion to admit summary charts 'so long as supporting evidence has been presented previously to the jury' and 'the court has made clear that the ultimate decision should be made by the jury as to what weight should be given to the evidence.'" Id. (quoting Richardson, 233 F.3d at 1294 (internal quotations omitted)).

In this case, the government will seek to offer summary charts that satisfy the Eleventh

Circuit's criteria for admissibility as follows:

- First, the documents underlying the summaries are admissible. The government is admitting into evidence: (a) domestic bank account records of Venture Overseas (GX 12-1, 12-2, 12-13, 12-14, 12-15, and sub-exhibits), American Land Investment & Development (GX 12-3 and sub-exhibits), Invecon (GX 12-4 and sub-exhibits), Kuadra (12-5 and 12-6), Los Pinos (GX 9-5, and 9-6, 12-10, and sub-exhibits), JC Funds (GX 12-7 and GX 12-8), Thomas Kucera (GX 12-11, 12-12, and sub-exhibits), Global Reinsurance Brokers (GX 10-1 and sub-exhibit), and Hendricks Trading (GX 10-2, 12-9, and sub-exhibit); (b) foreign bank records of Plastiquim (GX 4-7, 4-8, and sub-exhibits), Italcom (GX 5-1, 6-3, 6-4, and sub-exhibits), Inmobiliaria Cosani (GX 5-2 and GX 7-4 and sub-exhibits), and Select Engineering (GX 14-2 and sub-exhibits); and (c) documents relating to the purchase and sale of certain properties (GX 8-10, 8-11, 9-5, 9-7, 9-8, 13-4). The government produced these records to the defendant.[11]

- Second, the government has converted these bank account records into Excel spreadsheets showing the flow of monies into and out of the account. The account records consist of hundreds of pages of records and courts have considered such summaries of financial records as admissible. See United States v. Harmas, 974 F.2d 1262, 1268 (11th Cir. 1992) (upholding admissions of summaries of financial data); United States v. Jennings, 724 F.2d 436, 441-42 (5th Cir. 1984) (upholding summary charts for records of almost two hundred pages); United States v. Jones, 664 F.3d 966, 975-76 (5th Cir. 2011) (upholding admission of summaries of defendants' bank records).

- Finally, the government has made summary charts showing the transfer of funds from Odebrecht controlled companies to certain non-U.S. companies (Inmobiliaria Cosani S.A., Plastiquim S.A., and Italcom S.A.) that coincide with promissory notes between these non-U.S. companies and co-conspirator 1's U.S. company (Venture Overseas). These summary charts show the repayment of the loans as transfers from the non-U.S. companies to co-conspirator 1's U.S. company. The summaries further show that the funds received as loan repayments were later used to purchase real estate and make improvements to properties in the Southern District of Florida for the benefit of the defendant and his family. The summaries also show transfers from co-conspirator 3 to an account controlled by co-conspirator 1 and how that money was similarly used to make improvements to a property in the Southern District of Florida. Finally, the summaries show the

---

[11] The promissory notes for Cosani and Italcom (GX 5-2 and 5-1, respectively) will be authenticated by a foreign certification that meets the requirements under 18 U.S.C. § 3505.

inflows and outflows of accounts controlled by co-conspirator 1, for the benefit of the defendant.

Consistent with FRE 1006 and established authority in this Circuit, this Court should admit the government's summaries.

### J.   If the Defendant Testifies, the Court Should Allow the Government to Admit the Defendant's Ecuadorian Fraud Conviction under FRE 609

If the defendant testifies, the Court should permit the Government on cross-examination to impeach his credibility by admitting a certified copy of the judgment of conviction issued by the Supreme National Court of Justice in Ecuador on or about July 20, 2018, finding the defendant guilty of *concusión* — demand-side bribery and extortion by a public official — in violation of Article 264 of the Ecuadorian Comprehensive Organic Penal Code.  The government should also be permitted to admit the September 2020 decision by the Tribunal Penal de la Corte Nacional affirming that conviction.

Pursuant to FRE 609(a)(2), foreign convictions "<u>shall</u> be admitted" to impeach a witness's character for truthfulness if they are for a crime that required proving a dishonest fact or false statement (emphasis added).   Admissibility of a conviction that satisfies 609(a)(2) is not discretionary.  See <u>Benavides</u>, 470 Fed. App'x at 789 ("A district court has no power, however, to keep a defendant from impeaching a witness's credibility with prior convictions for crimes involving dishonesty.").  "[A] cross-examiner has an absolute right to introduce a *crimen falsi* conviction for impeachment purposes." <u>United States v. Toney</u>, 615 F.2d 277, 278 (5th Cir.1980). When it comes to admissibility for impeachment purposes, "foreign convictions stand on the same footing as domestic proceedings provided that the procedural protections necessary for fundamental fairness are observed by the foreign jurisdiction." <u>United States v. Rodarte</u>, 596 F.2d

141, 146 (5th Cir. 1979) (per curiam) (affirming admission of the defendant's prior Mexican conviction for similar offense which was introduced in rebuttal).[12]

Here, the defendant was convicted of demand-side bribery and extortion by a public official (*concusión*), in violation of Article 264 of the Ecuadorian Penal Code.  Violations of Article 264 are punishable by 2 months to 4 years in prison, unless the crime is committed with violence or threats, in which case the punishment increases to 2 to 6 years.  Here, the defendant was found guilty of *concusión* for soliciting and receiving bribes received from Odebrecht in exchange for granting Odebrecht certain advantages.  The defendant was sentenced to 6 years' imprisonment and ordered to pay US$40,000,000 in restitution.  On appeal, the Tribunal Penal de la Corte Nacional, in an order dated September 23, 2020, affirmed the defendant's conviction of demand-side bribery and extortion by a public official.

The defendant's Ecuadorian conviction satisfies the conditions for admissibility under Rule 609(a)(2) because it was for a crime of dishonesty.[13]  Although no U.S. court appears to have

---

[12]     "It is the defendant's burden to establish a lack of fundamental fairness by raising "'specific allegations of procedural deficiencies' in the foreign proceedings."  United States v. Shkambi, 620 Fed. App'x 260, 268 (5th Cir. Aug. 6, 2015) (citing Rodarte, 596 F.2d at 146).  "Absent specific allegations of procedural deficiencies, a trial court is under no duty to conduct, *sua sponte*, an inquiry into the presumptions and procedures of foreign jurisdictions."  Rodarte, 596 F.2d at 146.

[13]     While FRE 609(a)(2) alone suffices to admit the defendant's Ecuadorian conviction, his conviction is also admissible under FRE 609(a)(1).  As provided in Article 264 of the Ecuadorian Penal Code, the offense for which the defendant was convicted is punishable by up to six years' imprisonment.  The defendant was, in fact, sentenced to six years' imprisonment in this case.  Admission through 609(a)(1) — unlike 609(a)(2) — requires the trial judge to make an on-the-record finding that the probative value of admitting the prior non-609(a)(2) conviction outweighs its prejudicial effect.  United States v. Preston, 608 F.2d 626, 639 (5th Cir. 1979); see also FRE 609(a)(1)(B).  "[T]he implicit assumption of Rule 609 is that prior convictions have probative value."  United States v. Burston, 159 F.3d 1328, 1336 (11th Cir. 1998).  Here, the nature of the Ecuadorian public corruption offense indicates that the "defendant might be the type of person who would not take the judicial oath seriously" and would further render his denials of the current alleged misconduct less trustworthy.  See United States v. Cohen, 544 F.2d 781, 785 (5th Cir. 1977).  The government submits that the highly probative value of this conviction outweighs the risk of unfair prejudice, especially because "the impeachment refers to the conviction, not to the underlying acts supporting the conviction." Jones, 2005 WL 8165345 at *2.

examined Article 264 of the Ecuadorian Penal Code for the required proof of a dishonest act, analogous U.S. crimes, such as bribery, public corruption, and extortion are recognized as crimes involving dishonesty.  See, e.g., United States v. Jefferson, 623 F.3d 227, 234 (5th Cir. 2010) (vacating district court order excluding prior convictions for bribery because bribery is a *crimen falsi* and is "automatically admissible" under 609(a)(2)); United States v. Jones, 2005 WL 8165345, *2 (N.D. Oh. Aug. 5, 2005) (admitting defendant's prior conviction under FRE 609(a)(2) because his "conviction on public corruption charges, including extortion, constitutes a crime involving dishonesty"); see also Elcock v. Kmart Corp., 233 F.3d 734, 752 (3d Cir. 2000) (Prior conviction of embezzlement under 18 U.S.C. § 641 is admissible under 609(a)(2) because it "is a crime of dishonesty.").

Because it satisfies FRE 609(a)(2) and the defense has made no showing of any fundamental unfairness in the foreign proceedings, the defendant's prior Ecuadorian conviction is admissible for purposes of impeachment.[14]

### K.  The Court Should Preclude Testimony About the Defendant's Prior Commission of Good Acts or Prior Non-Commission of Bad Acts

The defendant should be precluded from presenting evidence of his prior good (e.g., legitimate, legal, etc.) conduct as the Comptroller General of Ecuador or evidence of his prior non-commission of bad acts.

The defendant may seek to offer proof that he engaged in good conduct as the Comptroller General of Ecuador, including protecting the public fisc and auditing government contracts within Ecuador.  The purpose of this proof would be to give the jury the impression that the defendant is

---

[14]     In the event the defendant, through cross-examination of government witnesses or direct testimony of defense witnesses, elicits testimony regarding the defendant's reputation for truthfulness and/or honesty, the government reserves the right to seek to introduce the evidence of the defendant's conviction, even if he does not testify.

an upstanding member of the community and a legitimate public official who lacked criminal intent in the bribery and money laundering schemes at issue here.  However, that impression is both irrelevant and misleading.

Evidence of prior acts of good conduct "is not admissible to negate criminal intent." United States v. Camejo, 929 F.2d 610, 613 (11th Cir. 1991) (holding that defendant charged with cocaine importation was properly precluded from introducing character evidence that he refused an opportunity to become involved in a different narcotics business); see also United States v. Ifediba, 46 F.4th 1225, 1238 (11th Cir. 2022) (affirming district court's exclusion of good-care evidence in health care fraud case because it was "no defense that [the defendant] lawfully treated some patients").  In other words, "[p]roof that a defendant acted lawfully on other occasions is not necessarily proof that he acted lawfully on the occasion[s] alleged in the indictment." United States v. Heidecke, 900 F.2d 1155, 1162 (7th Cir. 1990); see also United States v. Russell, 703 F.2d 1243, 1249 (11th Cir. 1983) ("Evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant.").

"[I]f prior good acts were admissible to negate intent, which is an element of the charge of fraud here, then the exception of Rule 405(b) would swallow the general rule of 405(a) that proof of specific acts is not allowed." United States v. Ellisor, 2005 WL 8165626, at *2 (S.D. Fla. Jan. 31, 2005) (internal citation omitted).

## L. The Defendant Should be Precluded from Making Improper Arguments that Politicize the Case

The defendant has a history of making public statements claiming political persecution, including as it relates to the facts underlying the instant action.  For example, on February 22, 2018, the defendant — in an interview on CNN — claimed that he was a victim of "total persecution" because he had "produced the most forceful reports against the Correa

32

government."[15]  The court should preclude the defendant from making improper arguments that politicize the case, that attempt to encourage jury nullification, and/or that he is a victim of selective prosecution.

"[T]he trial judge has the responsibility to maintain decorum in keeping with the nature of the proceeding; 'the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct.'" United States v. Young, 470 U.S. 1, 10 (1985) (quoting Quercia v. United States, 289 U.S. 466, 469 (1933)). Accordingly, the Court has broad discretion and authority to prevent a circus atmosphere at trial and must exclude irrelevant and improper evidence and argument that would create it.  See United States v. McGregor, 960 F.3d 1319, 1323-24 (11th Cir. 2020) ("The starting place for evidentiary admissibility is relevance . . . irrelevant evidence is not admissible.") (citing Fed. R. Evid. 402). Moreover, the Court must guard against arguments that seek only to encourage jury nullification. See United States v. Moss, 297 Fed. App'x 839, 841 (11th Cir. Oct. 20, 2008) ("A court may prohibit the presentation of evidence insufficient to support a defense, where the defendant's true intent is to improperly inspire a jury to exercise nullification."); United States v. Hall, 188 Fed App'x 922, 925 (11th Cir. July 11, 2006) (affirming trial court's exclusion of evidence relevant only to jury nullification); United States v. Funches, 135 F.3d 1405, 1409 (11th Cir. 1998) ("[T]he jury enjoys no right to nullify criminal laws.").

Based on the defendant's prior public statements, there is some indication he may seek to confuse the jury by inappropriately injecting political arguments and may seek a verdict based on improper nullification considerations instead of the relevant law and facts. His efforts should be rejected and his attempts to raise improper arguments during trial precluded.

---

[15]    Carlos Pólit: "Me siento un perseguido total" | Video | CNN; Excontralor de Ecuador Carlos Pólit enfrenta primera audiencia en EE.UU. (cnn.com).

It should be uncontroversial that partisan politics has no place in a criminal trial. See United States v. Rosado, 728 F.2d 89, 93 (2d Cir. 1984) (identifying claims by defendants that they were victims of political persecution as "matters far beyond the scope of legitimate issues in a criminal trial"). In his public statements, however, the defendant has attempted to make his prosecutions — here and abroad — about politics, not about the law and the facts.

To the extent that the defendant seeks to cross-examine government witnesses about their personal political affiliations, about the political dynamics of Ecuador, to suggest he was charged because of improper political motivations, or to otherwise use the opportunity to inject politics into the trial, the Court should not permit him to do so.  The Court retains broad discretion to properly cabin the Defendant's cross-examinations. See Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (holding that the Confrontation Clause "guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish") (emphasis in original); United States v. Barrington, 648 F.3d 1178, 1188 (11th Cir. 2011) ("A district court retains wide latitude to impose reasonable limits on cross-examination."). To the extent that the defendant seeks to cross-examine government witnesses about their personal political affiliations, about the political dynamics of Ecuador, to suggest the defendant was charged because of improper political motivations, or to otherwise use the opportunity to inject politics into the trial, none of these issues are relevant to whether the defendant solicited and received bribes in Ecuador and laundered those bribery proceeds in the Southern District of Florida, and should be excluded under Fed. R. Evid. 401.

In addition to its irrelevance to the defendant's guilt, the political affiliation of a government witness is not an indication of bias against the defendant that would constitute proper grounds for cross-examination in this case. Bias is a relevant basis for cross-examination to the

extent it goes to the witness's credibility, that is, "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." United States v. Abel, 469 U.S. 45, 52 (1984). However, nothing about the mere political affiliations of a witness goes to his or her truthfulness about the facts to which they will testify. See United States v. Arias-Izquierdo, 449 F.3d 1168, 1180 (11th Cir. 2006) ("Membership in a political party, by itself, does not necessarily signify anything about a person's truthfulness.").

Finally, "selective prosecution is a defect in the institution of the prosecution that has no bearing on the determination of factual guilt [therefore] … selective prosecution [] is an issue for the court to decide, not an issue for the jury." United States v. Jones, 52 F.3d 924, 927 (11th Cir. 1995) (internal citations omitted); see also United States v. Maxwell, 2006 WL 8439795, at *1 (S.D. Fla. Oct. 4, 2006) (holding that selective prosecution "is to be decided by the Court as a matter of law, not sent to the jury"); United States v. Grenon, 2023 WL 3947712, at *6 (S.D. Fla. June 12, 2023) (same). Any claims by the defendant that he is the victim of selective prosecution based on his political affiliation in Ecuador is not proper argument for the jury, therefore, and should also be excluded.

V.    **CONCLUSION**

For the foregoing reasons, the Court should admit the categories of evidence set forth

above in subsections A through J, and preclude non-relevant testimony as outlined above in

subsections K through L.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:   _s/     Michael N. Berger_____

Michael N. Berger
Assistant United States Attorney
Court No. A5501557
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9445
Fax: (305) 536-4699

GLENN S. LEON
CHIEF, FRAUD SECTION

By:   _s/     Jil Simon_____
Jil Simon
Trial Attorney
Court No. A5502756
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20005
Tel: (202) 514-3257

Dated:  March 4, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2024, a copy of the foregoing brief was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ *Michael N. Berger*
Michael N. Berger
Assistant United States Attorney
Court No. A5501557
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9445
Fax: (305) 536-4699