*ciento siento jsimes*

2446

2 6 AGO. 2010



**RESOLUCION No.**

**EL CONTRALOR GENERAL DEL ESTADO**

**CONSIDERANDO:**

I.  Que como resultado del estudio del informe del examen especial de ingeniería practicado a los daños provocados al sistema de enfriamiento y en los filtros de agua y la evaluación de los daños que ocasionaron la paralización de la Central Hidroeléctrica San Francisco, a cargo de la compañía Hidropastaza S.A., por el período comprendido entre el 26 de septiembre de 2007 y el 30 de septiembre de 2008, se estableció en contra del *Consorcio Norberto Odebrecht–Alstom–Va Tech,* en la persona de su representante legal, contratista de la ingeniería de detalle, suministros y construcción de la Central Hidroeléctrica San Francisco, la glosa por *USD 7 000 000,* que corresponde al monto de la afectación y del perjuicio económico causado por la instalación de dos rodetes nuevos, que serán colocados en las turbinas de la Central Hidroeléctrica San Francisco, en vista de que en menos de un año de funcionamiento los anteriores, presentaron desgaste y deterioro; de acuerdo a la siguiente explicación:

La empresa contratista, durante la etapa de optimización del diseño, implantó el cambio de la velocidad sincrónica de la turbina, de 244 a 327,27 revoluciones por minuto, sin presentar el estudio que evidencie la evaluación de los parámetros asociados al proyecto y establezca la conveniencia del cambio de velocidad; así como del riesgo geológico volcánico de la zona y el eventual aumento del arrastre de sedimentos, contraviniendo lo señalado en el numeral 3.2 de la cláusula tercera del contrato de ingeniería de detalle, suministros y construcción (EPC), así como los numerales 2.2.1 y 2.5.1 de las especificaciones mecánicas del segundo contrato modificatorio del contrato de concesión, lo cual ha provocado el prematuro desgaste y deterioro de los álabes del rodete de la turbina de la Unidad 2; sin embargo, no se exigió al consorcio constructor la presentación de los estudios y diseños que justifiquen adecuadamente el aumento de velocidad de las turbinas, los riesgos geológico-volcánicos de la zona y el eventual aumento del arrastre de sedimentos, contraviniendo lo señalado en los apartados d), e) y g) del numeral 5.1, "Deberes del concesionario durante la construcción", de las especificaciones generales del segundo contrato modificatorio al contrato de concesión.

El Consejo Nacional de Electricidad, CONELEC, en calidad de concedente de la construcción, operación y mantenimiento de la Central Hidroeléctrica San Francisco, al emitir su "no objeción" a la optimización del proyecto, sin haber realizado un análisis de los cambios relacionados con el aumento de la velocidad sincrónica de las turbinas, que respeten o mejoren el concepto básico de la Central, contraviene lo señalado en el numeral 6.7 "Optimización del diseño Básico" del contrato de concesión.

El consorcio constructor, en la paralización de las operaciones de la Central, entre el 6 de junio y el 15 de octubre de 2008, efectuó a su costo, trabajos de soldadura para



A088-C
**GOVERNMENT EXHIBIT**
CASE NO. 22-cr-20114-KMW
EXHIBIT NO. 1-1B



DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143567

reconstruir los perfiles originales de los álabes, los rodetes de las dos unidades generadoras y emitió la orden de fabricación de un rodete que reemplace al de la Unidad 2.

El Presidente Ejecutivo de Hidropastaza S.A. con oficio HP-0957-2008 de 28 de octubre de 2008, establece que el monto de la afectación por la instalación de dos rodetes nuevos, asciende a USD 7 000 000.

Por lo expuesto, la falta de cumplimiento de las disposiciones legales antes señaladas y la no presentación de los estudios y diseños que justifique adecuadamente el aumento de velocidad de las turbinas, produjo daños en los álabes de los rodetes de las dos unidades generadoras de la Central Hidroeléctrica, ocasionando perjuicio económico a la entidad en el valor de la glosa.

I.  Responden solidariamente en *USD 7 000 000*, los señores ingenieros: *Germán Bolívar Anda Naranjo*, presidente ejecutivo de Hidropastaza S.A., por no exigir al consorcio constructor la presentación de los estudios y diseños que justifiquen adecuadamente el aumento de velocidad de las turbinas, con el fin de evitar los riesgos geológico-volcánicos de la zona y el eventual aumento del arrastre de sedimentos; *Sadinoel Freitas Junior*, vicepresidente ejecutivo de Hidropastaza S.A., por solicitar la aprobación de los cambios en el proyecto, sin el debido sustento técnico; *Bolívar Javier Astudillo Farah,* director ejecutivo del Consejo Nacional de Electricidad, CONELEC, por emitir la no objeción para la fabricación de los equipos electromecánicos; *Pablo Aníbal Viteri Estévez*, director de Concesiones de CONELEC; *Pablo Mauricio Cisneros Gárate*, director de Supervisión y Control de CONELEC; *Néstor Valdospinos Cisneros*; *Descartes Higinio León Pérez*; y, *Edgar Rodrigo Castro Hitchcock,* funcionarios de CONELEC; por cuanto, luego de revisar la documentación técnica, no realizaron un adecuado control y análisis de los cambios efectuados en los equipos de generación.

II.  Que por este motivo, el 29 de mayo de 2009 se expidieron las glosas solidarias 5882, 5886 a 5893 en contra del Consorcio Norberto Odebrecht-Alstom-Va Tech funcionarios y ex funcionarios de la Compañía Hidropastaza S.A., habiéndoseles notificado legalmente en la forma y fechas que constan a continuación, dándoles a conocer el fundamento de la observación y concediéndoles el plazo de sesenta días de conformidad con el artículo 53, numeral 1, de la Ley Orgánica de la Contraloría General del Estado, a fin de que contesten y presenten las pruebas de descargo pertinentes:

| No. de Glosa y Nombres | Notificación | Fechas |
|---|---|---|
| 5882 *Consorcio Norberto Odebrecht – Alstom – Va Tech* | Publicado Diario"HOY" | 2009-07-16 |
| 5886 *Edgar Rodrigo Castro Hitchcock* | Personal | 2009-06-09 |
| 5887 *Descartes Higinio León Pérez* | Personal | 2009-06-04 |

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143527

— 127 —
ciento veinte y
siete

III.

| | 5888 | | |
|---|---|---|---|
| | *Néstor Valdospinos Cisneros* | Personal | 2009-06-04 |
| | 5889 | | |
| | *Pablo Mauricio Cisneros Gárate* | Personal | 2009-06-04 |
| a) | 5890 | | |
| | *Pablo Aníbal Viteri Estévez* | Personal | 2009-06-05 |
| | 5891 | | |
| | *Sadinoel de Freitas Junior* | Publicado Diario "HOY" | 2009-07-16 |
| | 5892 | | |
| | *Bolívar Javier Astudillo Farah* | Personal | 2009-06-09 |
| | 5893 | | |
| | *Germán Bolívar Anda Naranjo* | Personal | 2009-06-15 |

III.   Que dentro del plazo legal, las personas que se indican, dan contestación a las glosas mediante comunicaciones ingresadas a la Contraloría General del Estado, según detalle que consta a continuación:

a) **Consorcio Norberto**

| 5882 | Fecha | Comunicación |
|---|---|---|
| **Odebrecht – Alstom – Va Tech** | 2009/09/21 | 058091 |
| | 2009/07/21 | 026260 |
| | 2009/09/18 | 058091 |
| | 2009/09/18 | S/N |
| | 2010/08/05 | 69453 |

En conocimiento de la responsabilidad civil, el representante legal del Consorcio Norberto Odebrecht– Alstom – Va Tech**,** en su comunicación que consta a fojas 11281 a 11299 realiza un análisis pormenorizado tendiente a demostrar que fueron CONELEC e Hidropastaza S.A., quienes aprobaron el aumento de velocidad de las turbinas. En forma adicional a este argumento principal, exponen otros subsidiarios eximentes de responsabilidad tales como:

*"Eventos Geológicos geotécnicos.*

*"Son conocidas las condiciones geológicas-volcánicas del área de implantación del Proyecto Hidroeléctrico San Francisco, las mismas que fueron descritas en forma pormenorizada en los estudios e informes preparados por INECEL en la etapa de la elaboración de la pre-factibilidad, factibilidad, diseño y etapa precontractual de la concesión y sobre los cuales se desarrollaron las especificaciones técnicas del proyecto…*

*Entre noviembre de 2003 y junio de 2008, se produjeron algunas erupciones de tipo explosivo, unas más graves que otras (mayo-julio de 2004, mayo-agosto de 2006 y febrero de 2008).*

3

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143529

*Si como señala la CGE no se consideró adecuadamente el riesgo geológico-volcánico de la zona y el eventual aumento del arrastre de sedimentos, tales consideraciones debieron realizarse por parte de INECEL en el diseño básico o en las condiciones de la licitación, lo cual no fue así; pues la magnitud de esos fenómenos es siempre impredecible y las medidas de mitigación que pueden ser adoptadas en un diseño para adaptarlo a los efectos tales eventos pueden tener un amplísimo rango de opciones, siendo que cualquiera de ellos repercutirá en el presupuesto de construcción de la obra y en su estructura financiera tanto en la etapa de construcción cuanto en la etapa de operación. En ningún documento contractual se requirió al Consorcio Constructor, ni éste se comprometió, a re analizar la situación sedimentológica, geológica, o volcánica del área de implantación del proyecto. Asimismo, esta es una conducta razonable del Consorcio Constructor, ya que INECEL realizó estudios por un número importante de años, no siendo esperado de un constructor experimentado bajo las circunstancias (incluyendo pero sin limitarse a la experiencia y conocimiento de INECEL) volviera a evaluar esta situación luego de la adjudicación de su contrato y en forma paralela con el inicio de los trabajos a su cargo, por ende, no correspondiendo, al Consorcio Constructor realizar dichos estudios.*

*Afirmar que el riesgo geológico-volcánico no fue considerado adecuadamente no puede ser de ninguna manera imputado al Consorcio Constructor, pues tal responsabilidad le corresponde al INECEL, quien suministró los estudios y diseños en base a los cuales se llevó a cabo la construcción de la obra y al CONELEC, en su calidad de Concedente.  De manera análoga, el estudio de optimización desarrollado por el Consorcio Constructor no tuvo en su alcance, como presupone incorrectamente la CGE, alterar las especificaciones sobre las condiciones del sitio de las obras, o anticipar una condición imprevisible de fuerza mayor muy por encima de las condiciones geológico-volcánicas contempladas por INECEL en sus estudios y diseños".*

<u>Mediciones durante la ejecución</u>

El Consorcio constructor remite pruebas de la gravedad e impactos de la actividad volcánica y sísmica del volcán Tungurahua, según los Decretos de emergencia emitidos en los años 2006, 2007 y 2008, por lo que manifiesta *"…representan un claro ejemplo de un evento de fuerza mayor para el cual ni diseño básico suministrado por el concedente ni la optimización al mismo podían haber previsto una solución técnica o económicamente viable.".*

*"Sedimentos en el río Pastaza*
*De acuerdo con la información contenida en las Bases de Licitación, en el Volumen 3, Parte 6, Especificaciones Técnicas Generales 2-1, Sección 2 – Condiciones Generales para el diseño, Numeral 2.2.1 – Condiciones del Agua, las características del agua a ser turbinada por el Proyecto Hidroeléctrico San Francisco eran las siguientes:*

*"a) Río Pastaza a la salida de Agoyán*
*Análisis de fechas 6 y 8/IV/89*
*PH 7.8*
*Dureza total como Ca CO3 130 ppm.*
*Alcalinidad total como Ca CO3 160 ppm.*
*Bicarbonatos 195 ppm.*



DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143569

Cloruros 20 ppm.
Sulfatos 22 ppm.
Conductividad 400 µS/cm
Sólidos totales disueltos 256 ppm.
**Sólidos en suspensión 150 ppm.**
Índice de Langelier - 0.5
Índice de estabilidad 8.80

El material sólido en suspensión en el Río Pastaza, antes del embalse es de aproximadamente 6 300 000 t/año, de los cuales el 70% queda retenido en el embalse y se evacuan durante las maniobras de lavado.

**En las aguas turbinadas de Agoyán se han medido concentraciones de sólidos de 1.7 Kg/m3 = 1 700 ppm, aunque generalmente no superan 0.4 Kg/m3.**

El análisis granulométrico indica un 30% de arena fina con partículas de 40 a 150 µm, 20% de arcilla fina con partículas mayores de 140 µm y el 50% restante es limo arcilla con partículas menores a 40 µm.

El análisis mineralógico ha determinado que la arena fina de más de 150 µm está compuesta principalmente de grumos arcillosos y plantas, la de menos de 150 µm por cuarzo de dureza 7 de Mohs con forma subhedral, siendo el limo y arcilla no identificables".

Esta misma información se incluye textualmente en el Anexo I del Tomo 2 del Segundo Contrato Modificatorio al Contrato de Concesión, página 22, Numeral 2.2, Condiciones Ambientales, las cuales son repetidas en el Anexo 4 - Tomo 2 del Contrato EPC, aprobado mediante el Addendun Nº 4 (Pág. 22, artículo2.2.1.).

Las informaciones técnicas arriba citadas pueden resumirse, en lo que a sólidos en suspensión se refiere, en la siguiente tabla:

| | Sólidos en suspensión (mg / l) | Sólidos en suspensión (kg / m3) | Sólidos en suspensión (ppm) | Sólidos sedimentables (ml / l) | Sólidos sedimentables (ppm) |
|---|---|---|---|---|---|
| Valor medido | 150 | 0,150 | 150 | | |
| Valor máx. medido | 1700 | 1,7 | 1700 | 0,256 | 256 |
| Valor promedio | 400 | 0,4 | 400 | | |

Asimismo, de las informaciones consignadas en las bases del concurso se establece que los sólidos totales en suspensión en el agua a ser turbinada alcanzarían el orden de 1'890.000 Ton/año, siendo que el embalse retendría 4'410.000 Ton/año, que serían desalojados del mismo durante las operaciones de lavado por parte de Hidroagoyán.

Entre los estudios desarrollados por INECEL, se incluyeron aforos sólidos de distintas estaciones de la cuenca, estimaciones de los valores estadísticos de la cantidad de sedimentos aportados al embalse por arrastre y en suspensión; evaluaciones batimetrías del embalse entre lavados, estimaciones del aporte medio

CONTRALORÍA GENERAL DEL ESTADO

DIRECCIÓN NACIONA DE RESPONSABILIDA

*diario en distintos períodos, y análisis de calidad de las aguas turbinadas, todos los cuales dieron origen a las especificaciones de licitación, mereciendo destacarse que tales estudios son todos de largo plazo y alcance.*

*Es evidente que INECEL, CONELEC e Hidropastaza contaban con cuantiosa información relacionada con el régimen hidrosedimentológico del río Pastaza, sin que de ninguna manera las especificaciones técnicas, el contrato de concesión o el contrato de construcción contemplasen cualquier tipo de obligación por parte del Contratista Designado para actualizar tales informaciones, monitorear la calidad del agua del río Pastaza o adecuar su diseño a otras condiciones que no fueran aquellas establecidas en los documentos de la licitación y del contrato de construcción, puesto que además, estos monitoreos no deberían obedecer a cortos períodos, sino que dependen de un análisis histórico estadístico del comportamiento del río a lo largo del tiempo, tal como lo plantearon en la etapa de licitación los entes mencionados.*

*A más de que no existe ningún tipo de obligación contractual expresa en ese sentido, es evidente que el alcance de los servicios del Consorcio Constructor no contemplaba realizar un nuevo estudio sedimentológico, ya que los tiempos necesarios para el detallamiento del diseño básico y construcción del proyecto no resultan compatibles con los tiempos para la ejecución de un estudio sedimentológico detallado que permita validar el realizado en la etapa de proyecto básico, especialmente si se deseaba incorporar una campaña de muestreo representativa de la variabilidad de las condiciones de la calidad del agua que transporta el río, que por su propia naturaleza, para arrojar valores confiables, implicaría varios años hidrológicos."*

*"Propuesta de un desarenador por parte del Consorcio*
*Aunque el Consorcio no tenía la obligación contractual de verificar lo realizado en el Diseño Básico de INECEL, en la etapa de optimización del proyecto, el Consorcio Constructor puso a consideración de Hidropastaza una serie de alternativas para mejorar la capacidad del desarenador del embalse de Agoyán, según consta en la Carta OEC/ADC/031/2003 del 20/05/03 que anexaba al informe de optimización, de forma a mejorar su funcionamiento y reducir la cantidad de sólidos en suspensión que llegan hasta las unidades de generación de Agoyán y San Francisco, afectando su funcionamiento y desempeño. Ninguna de esas alternativas fue adoptada por el Concesionario debido al costo de tales obras de infraestructura. Las alternativas planteadas incluyeron:*

*Un nuevo decantador en túnel, sobre la margen izquierda, funcionando en paralelo al embalse existente, el mismo que requeriría de 5 túneles en dicha margen y que fue descartada por la imposibilidad física que suponía implementar esta alternativa.*

*Prolongación del desarenador existente con un predesarenador aguas arriba, que fue descartado ya que el tramo de embalse disponible aguas arriba de la estructura existente no tiene la extensión y el ancho necesarios para la decantación de la partícula objeto a retener.*

*Modificaciones al desarenador existente que no podían implementarse debido al plazo durante el cual el embalse se encontraría fuera de servicio.*

*Pre-decantador con compuertas flap.*

*La propuesta del Consorcio no tuvo ningún pronunciamiento de parte del Concedente y el Concesionario, por lo que el 28 de Enero del 2004 el CONELEC solicitó a Hidropastaza el diseño de detalle del proyecto en la que se incluya las modificaciones derivadas de la eliminación de la captación del Río Verde, según se detalla más adelante en este documento. Se debe aclarar sin embargo que la implementación de cualquiera de estas alternativas hubiera significado una mejoría en el manejo de los sedimentos normalmente transportados por el Río Pastaza según constaba en las Bases de Licitación y el Diseño Básico de INECEL, beneficiando a las centrales de Agoyán y San Francisco, pero de ninguna manera hubiera podido evitar los efectos de los eventos imprevisibles y de fuerza mayor como fue la actividad volcánica y lluvias durante el primer año de operación de la Central y reflejados en el estado de emergencia extraordinaria experimentado en forma reiterada en la zona del Proyecto durante los años 2006, 2007 y 2008.".*

El Consorcio Constructor incluye, en su escrito de descargo y sus anexos, evidencias de la variación significativa en las concentraciones de sólidos en suspensión en el río Pastaza a partir de la conclusión de la construcción del proyecto, así como informes del Instituto Geofísico de la Escuela Superior Politécnica Nacional, indicando que:

*"Es evidente que la fase eruptiva de mayor intensidad del volcán Tungurahua, iniciada desde el año 2006, es un evento que influyó directamente para el severo deterioro de la calidad del agua, todo lo cual puede ser comprobado por los informes del Instituto Geofísico de la Escuela Superior Politécnica Nacional, institución que mes a mes ha realizado un seguimiento del comportamiento del volcán. En los informes del Instituto Geofísico de julio de 2006 hasta diciembre de 2007, que se adjuntan, se destaca la actividad eruptiva, actividad sísmica, lluvias y lahares que alteraron las condiciones de la calidad del agua e incluso dieron paso a los decretos de emergencia emitidos para la zona afectada."*

### Análisis de los administrados

### *"Alcance de los Estudios de Optimización y Proceso de Aprobación*

*El Diseño Básico de las Obras en base al cual se construyó el Proyecto Hidroeléctrico San Francisco corresponde al diseño básico constante en los documentos precontractuales entregados por el ex – INECEL durante el proceso de licitación para la concesión y construcción del Proyecto. Estos son los diseños que posteriormente pasaron a formar parte del Contrato de Concesión suscrito entre Hidropastaza S.A. y el Estado ecuatoriano representado por el CONELEC.*

*Este diseño básico que hace parte integrante del Contrato de Concesión fue también incorporado al contrato de construcción suscrito entre Hidropastaza S.A. y el Consorcio Constructor sin ningún cambio o adición.*

*De igual forma, el Contrato de Construcción celebrado entre Hidropastaza S.A. y el Consorcio Constructor tiene por objeto esencial el detallamiento, suministros y construcción del diseño básico suministrado por el Concedente para la ejecución del Proyecto San Francisco.*

7

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143535

*El numeral 3.1 del Contrato de Construcción establece que:*

*"El alcance de los trabajos (en adelante el "Trabajo" o los "Trabajos") para las OBRAS incluirá la Ingeniería de Detallamiento del Proyecto Básico, el suministro, el montaje, la construcción y las pruebas, comisionamiento y puesta en marcha de las OBRAS. Los Trabajos deberán ser desarrollados de acuerdo con: (i) el Proyecto Básico, (ii) la Optimización al Proyecto definida en el numeral 3.2, (iii) los cambios o mejoras acordadas entre las Partes al tenor del Numeral 8 de este Contrato, si las hubiere, (iv) las Especificaciones incluidas en el Contrato de Concesión y (v) las normas y estándares ecuatorianos u otros aplicables acordados entre el Consorcio y la Concesionaria."*

*"Es importante destacar que ningún cambio, modificación y/u optimización bajo el Contrato de Construcción podía ser implementada si no contaba con la aprobación y autorización del CONELEC e Hidropastaza S.A. en su calidad de ente Concedente del Proyecto y representante del Estado Ecuatoriano en el caso del primero, y como ente Concesionario del Proyecto y Contratante en el caso del segundo. Tampoco se incluyen dentro de las obligaciones a cargo del Consorcio Constructor la ejecución de estudios de campo, verificación de datos básicos, o cualquier otro estudio que se pueda haber requerido para reconsiderar el diseño básico, en especial con relación a la información geológica, vulcanológica, hidrológica, sedimentológica, etc."*

*"Al respecto, tenemos que mencionar que las modificaciones a realizar fueron solicitadas directamente por el CONELEC a Hidropastaza S.A. mediante Oficio DE-04-0112 que textualmente dice lo siguiente:"*

*"En la cláusula 10.2.3 del contrato suscrito por su representada con el CONELEC se establece que, según lo acordado con los representantes de las comunidades de Baños de Agua Santa y Río Verde, el Estudio de Impacto Ambiental contemplará, entre otros, la eliminación de la Captación de Río Verde del Alcance del Proyecto, preservando así la cascada denominada "Pailón del Diablo".*

*Por lo indicado anteriormente agradeceremos remitir el diseño en detalle del proyecto, en la que incluya las modificaciones derivadas de la eliminación de la captación del Río Verde."*

*"Así mismo nos permitimos citar textualmente el contenido del Oficio No. HP-405-2004 del 10 de junio de 2004 a través del cual el Director Ejecutivo de Hidropastaza S.A. comunica al representante del Consorcio Constructor lo siguiente:*

*"Mediante oficio número HP-339-2004 del 26 de mayo de 2004, Hidropastaza S.A. remitió al CONELEC el informe "Modificaciones Derivadas de la Eliminación de la Captación de Río Verde", que nos fue entregado por el Consorcio Constructor Odebrecht-Alstom-VaTech. En el antes citado oficio la Concesionaria solicitó al Concedente la inmediata aprobación de las modificaciones concernientes a los equipos hidro-electromecánicos considerados en dicho informe, como forma de que Hidropastaza S.A. pudiese emitir la orden de fabricación respectiva de los mismos.*

*Al respecto de lo anterior y en concordancia con lo indicado en el oficio No. DE-04-0903 que nos remitió el CONELEC el 9 de junio de 2004, cuya copia adjuntamos, mediante la presente comunicación, Hidropastaza S.A. formaliza al Consorcio*

DIRECCIÓN NACIONAL
E RESPONSABILIDADE

*ciento treinta
y tres*

Constructor la Orden de Fabricación de todos los equipos hidro-electromecánicos necesarios para la Central San Francisco."

"Respecto de la Optimización del Proyecto, el Numeral 6.7 del Contrato de Concesión establece lo siguiente:"

"6.7 Optimización del Diseño Básico: El Concesionario está autorizado a efectuar Optimizaciones del Diseño Básico realizado por INECEL, para lo cual podrá incrementar, modificar o eliminar las diferentes partes de obra que conforman el Proyecto Básico, previa la aprobación del CONELEC, manteniendo siempre el concepto básico de la Central. De la misma manera, el Concesionario podrá introducir mejoras o cambios a las especificaciones técnicas de los materiales y equipos previstos inicialmente."

"El significado e implicaciones contractuales de lo anteriormente expuesto son claras y merecen ser destacadas: el diseño básico y las especificaciones son entregados por el Concedente, la optimización del proyecto era una opción del concesionario pero que en este caso fue solicitada por el Concedente debido a los problemas con las comunidades del sector, tiene finalidades específicas y está sujeto a la aprobación previa del Concedente."

"Considerando que la ejecución del Proyecto San Francisco fue aprobada por el Directorio de INECEL mediante Resolución 030/94, del 24 de febrero de 1994, y que la construcción solamente pudo iniciarse una década más tarde, no es de extrañarse que la optimización del proyecto haya tenido como objetivo fundamental, que el Concedente ajuste el mismo a las condiciones ambientales más próximas a su construcción. Por esta misma razón, la optimización no tuvo por objeto analizar nuevamente los parámetros geológicos, hidrológicos o sedimentológicos previstos en las bases del concurso, pues estos corresponden a estudios pormenorizados y de largo plazo realizados por el INECEL.

No cabría ni sería posible proponer optimizaciones basadas en informaciones puntuales, descartando la información estadística de largo plazo disponible. Además, siendo que el Concesionario financiaría las obras básicas y las resultantes de la optimización, la inversión resultante tendría limitaciones financieras. Por ello, tampoco se puede pretender que la optimización haya representado una carta blanca para rediseñar la totalidad del proyecto ante cualquier eventualidad claramente imprevisible, pues toda mejora tiene un costo y dicho costo correspondía al Concesionario y éste a su vez debía trasladar al precio del kw/h, afectando los precios marginales del Sistema Nacional Interconectado (SNI) dentro del mecanismo vigente en el País.

La optimización no tuvo por propósito realizar un rediseño total de las obras para así enfrentar cualquier tipo de evento de fuerza mayor como lo fue la actividad volcánica registrada durante el primer año de operación de la central y sí realizar ajustes y adecuaciones de tipo constructivo por la salida forzada de la captación del Río Verde y que al mismo tiempo permitieran recuperar el retraso de diez años en la construcción de la obra y lograr la entrada de operación anticipada de la central San Francisco dada la situación de emergencia decretada por el Gobierno en forma reiterada en su momento.

9

DIRECCIÓN NACIONAL
DE RESPONSABILIDAD

9

*De conformidad con lo establecido en las Cláusulas 3, 4 y 5 del Addendum No. 4 al contrato de detallamiento del diseño básico, suministros y construcción, la optimización tuvo como alcance las modificaciones surgidas por la salida de la captación del Río Verde y adicionalmente algunas mejoras en la metodología de construcción con nuevas tecnologías disponibles a la fecha como se indica a continuación:*

1. *Excavación del túnel de conducción con Topo Mecánico (TBM – Tunnel Boring Machine);*

2. *Adopción de revestimientos/sostenimiento con dovelas prefabricadas en el Túnel de Conducción;*

3. *Cambio de ubicación y sección de la Ventana 4;*

4. *Cambio de pendiente de la tubería de presión;*

5. *Aumento de la sección del Túnel de Acceso al Bifurcador para permitir el transporte de los anillos de la Tubería de Presión;*

6. *Cambio de pendiente de la Chimenea de Equilibrio Superior aumentando el tramo vertical de 30 para 40 metros;*

7. *Cambio en la estructura de las columnas y vigas del Camino de Rodamiento del Puente Grúa de hormigón armado por estructura metálica;*

8. *Cambio parcial del revestimiento de hormigón convencional por hormigón lanzado en el Túnel de Restitución;*

9. *Reubicación del Pórtico de Salida de Línea, aumento del Túnel de Cables y Pozo y eliminación del Túnel de la Carretera Baños-Puyo;*

10. *Incremento en la longitud de cables aislados de 230 KV.*

11. *Incremento en la longitud del Ascensor del Pozo de Cables.*

12. *Sustitución de tres puentes grúa por uno solo de mayor capacidad.*

13. *Eliminación de los tapones en las Ventanas 1 y 3.*

14. *Aumento del espesor del blindaje en la Tubería de Presión.*

15. *Cambio de diseño en el tubo de succión.*

16. *Cambio de diseño del Puente Grúa.*

  *Es evidente que estas modificaciones en nada cambian el concepto básico del Proyecto".*

## "Aprobación por parte del CONELEC e Hidropastaza.

En agosto del año 2004 el CONELEC e Hidropastaza suscribieron el contrato modificatorio N° 2 a través del cual se estableció entre otras cosas el cambio de la velocidad sincrónica de las turbinas, las cuales aumentaron de 240 rpm a 327,27 rpm, como consecuencia de la limitación del caudal de Agoyán, del nivel de la Cámara de Interconexión por la restricción en la sumergencia de las unidades de generación de Agoyán, de la disminución de caudal debida a la eliminación de la Captación de Río Verde acordada entre el CONELEC y la comunidad y, la consecuente disminución de potencia, entre otros aspectos. Este cambio en la principal estructura mecánica del proyecto, que nace de un ajuste adoptado entre el Concedente y el Concesionario, fue a su vez transferido a las obligaciones del Consorcio Constructor a través del Addendum No. 4 al contrato de construcción. Por lo tanto, la modificación de las revoluciones de la turbina no fue una decisión arbitraria o unilateral del Consorcio Constructor sino que fue primeramente acordado entre el Concedente y el Concesionario y posterior y consecuentemente adoptado por el Consorcio Constructor, previa la presentación de las características técnicas del equipo a ser suministrado, el mismo que fue revisado y aprobado por el Concedente y el Concesionario.

Con relación a la presentación "del estudio que evidencie la evaluación de los parámetros asociados al proyecto y establezca la conveniencia del cambio de velocidad" constante en la glosa impugnada, la obligación de presentar un estudio específico al respecto no existe, pues el cambio de velocidad de la turbina se produjo como parte de la Optimización del Proyecto prevista contractualmente en el Numeral 6.7 del Contrato de Concesión y 3.1 del Contrato de Construcción.

No se entiende por tanto que, habiendo el Consorcio Constructor incluido tal aspecto en el estudio de optimización (este sí requerido contractualmente), habiendo sometido el mismo a la aprobación del Concesionario y del Concedente y habiendo obtenido dicha aprobación en función de los sustentos técnicos presentados, se pretenda ahora imputarle una falta que no cometió sobre un requerimiento específico que no existía.

Por medio de Oficio No. OEC-SF-ADM-046-2004 del 14 de junio de 2004, el Consorcio Constructor remitió a la aprobación de Hidropastaza el conjunto de diseños que conformaban adecuaciones al Diseño Básico resultantes de la optimización del Proyecto y entre los cuales se incluía el cambio de velocidad de las turbinas. Posteriormente, Hidropastaza sometió la propuesta del Consorcio Constructor a una evaluación por parte de consultores externos quienes emitieron el "Informe de Evaluación del Proyecto Electromecánico del Diseño Consolidado para Aceleración".

Andritz, atendiendo una solicitud de aclaraciones de Hidropastaza, a través del estudio técnico de fecha 19 de julio de 2004 realizó un pormenorizado análisis de las velocidades de rotación de la turbina, y considerando los niveles de sedimentos informados en los documentos de Licitación y verificados hasta el momento, confirmó la adecuada selección de la velocidad de rotación de 327,27 rpm. Hidropastaza analizó la presentación, y posteriormente, en el Acta de Reunión del 22 de noviembre de 2004 se dejó constancia de que el Consorcio hizo una nueva presentación a las autoridades técnicas de Hidropastaza, por medio de la cual fue consignado y firmado que;

CONTRALORÍA GENERAL DEL ESTADO

DIRECCIÓN NACIONAL DE RESPONSABILIDADES

CRP-DOJ-0003143543

"Hidropastaza acepta estos criterios expuestos en la presentación, quedando de esta manera superadas todas las inquietudes que se tenían hasta la fecha por parte del área mecánica. Por lo expuesto se considera aprobada la velocidad de rotación de 327,27 rpm".

"Debe mencionarse asimismo, que conforme quedó consignado en el Punto 5 Apartado D) - Créditos a Favor de Hidropastaza, del Anexo 3 del Anexo 1 del Addendum 4, se estableció un crédito por variaciones de los equipos hidroelectromecánicos que resultaron de las menores dimensiones y pesos de los mismos, que fueron establecidos en US$ 3.181.674.

El 21 de septiembre de 2004, Hidropastaza efectúa la entrega formal al Consorcio Constructor de una copia certificada del Addendum No. 4 y los respectivos Anexos al Contrato EPC.

Por su parte, en lo que al conocimiento y aprobación por parte del Concedente CONELEC al respecto de las modificaciones al Diseño Básico se refiere, el "Segundo Contrato Modificatorio del Contrato de Concesión para la Construcción, Operación y Mantenimiento de la Central Hidroeléctrica denominada Proyecto Hidroeléctrico San Francisco celebrado entre el Consejo Nacional de Electricidad (CONELEC) y la Compañía Hidropastaza" contiene una pormenorizada relación de las aprobaciones internas que resultaron en la suscripción de dicho contrato,

A través del Memorando No. DE-04-0903 del 07 de julio del 2004, el Director Ejecutivo del CONELEC informa a Hidropastaza que luego del análisis realizado por el Concedente, se ha determinado que las modificaciones al Diseño Básico son efectivamente una consecuencia lógica por la eliminación de la captación de río Verde (acordada entre el CONELEC y las comunidades aledañas al Proyecto según numeral 10.2.3 del contrato de concesión) y de la ligera reducción de la caída por efecto de la sumergencia de las unidades de Agoyán. Por lo anterior, las modificaciones al diseño básico fueron aprobadas por el CONELEC e incorporadas al Segundo Contrato Modificatorio al Contrato de Concesión suscrito entre Hidropastaza S.A. y CONELEC el 19 de agosto de 2004.

Finalmente, la velocidad de las turbinas se encuadra en un conjunto de acciones de detallamiento de diseño básico entre las cuales la selección de la velocidad de rotación de la turbina no puede considerarse aisladamente. No existen límites estrictos para la selección de la velocidad de rotación de turbinas que operarán con aguas que contienen sólidos en suspensión, sino criterios sustentados esencialmente por resultados operativos. La velocidad de rotación propuesta por el Consorcio y aprobada por Hidropastaza está en línea con criterios actualizados avalados por su propia experiencia… Todo esto resultaba válido considerando la cantidad de sólidos en suspensión incluidas en la documentación licitatoria.

Como resultado de lo expuesto, es incorrecto afirmar que no se contó con la información necesaria que evidencie la evaluación de los parámetros asociados al proyecto y establezca la conveniencia del cambio de velocidad de las turbinas, pues los cambios al diseño y sus sustentos técnicos fueron puestos en conocimiento de la Concesionaria y del Concedente en innumerables ocasiones y aprobados por éstos, generando beneficios económicos para la Concesionaria.

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CONTRALORÍA
GENERAL
DEL ESTADO

### Diseño de las turbinas conforme a las especificaciones técnicas

Analicemos por un momento el contenido de las cláusulas contractuales invocadas por la CGE para configurar el supuesto incumplimiento del Consorcio Constructor e imputar la glosa correspondiente:

*Cláusula 3.2 del Contrato de Ingeniería de Detalle, Suministros y Construcción (EPC)*

"3.2 Inmediatamente luego de la firma de este Contrato, el Consorcio desarrollará un estudio técnico ("Estudio de Optimización") con el fin de estudiar la posibilidad de Optimizar el Proyecto Básico objeto de la Licitación llevada a cabo por INECEL. En base a las conclusiones de este Estudio de Optimización, al precio del Contrato establecido en el Numeral 5 y al Anexo 2 a este Contrato, el Consorcio revisará los precios y plazos de las partes de las OBRAS afectadas por la Optimización a implementarse."

Como se dejó demostrado en el Numeral IV.A.1 de este documento, el Consorcio Constructor desarrolló los estudios técnicos que condujeron a la optimización del proyecto y en base a los cuales se revisaron los precios y plazos de las obras afectadas por la optimización a implementarse, por lo que el Consorcio Constructor cumplió a cabalidad lo requerido por el citado Numeral 3.2 del Contrato de Ingeniería de Detalle, Suministros y Construcción (EPC).

*Numeral 2.2.1 de las especificaciones mecánicas del segundo contrato modificatorio del contrato de concesión*

"Las máquinas deben ser de construcción robusta y cada una de sus partes se debe diseñar teniendo en cuenta las limitaciones impuestas por los sedimentos en el agua a turbinar, la seguridad en la operación y la facilidad para el montaje y mantenimiento. Las turbinas deben funcionar bajo cualquier condición de operación dentro de los valores especificados así también como vibraciones, temperatura, cavitación y desgaste".

Como se deja demostrado hasta la saciedad en la Sección III de este documento, las condiciones de operación durante el primer año de funcionamiento de la Central se vieron sujetas a eventos imprevisibles de fuerza mayor y superaron los valores especificados y cualquier posible previsión del Consorcio Constructor cuando desarrolló los estudios técnicos que condujeron a la optimización del proyecto y en base a los cuales se revisaron los precios y plazos de las obras afectadas por la optimización a implementarse.

Es así que el detallamiento del Diseño Básico suministrado por el Concedente se fundamenta en el rango de condiciones mínima y máxima de contenido de sólidos en el agua, los mismos que fueron tomados en consideración por el Consorcio Constructor, quien, consciente de sus obligaciones y de las solicitaciones a las que se verían sometidos los equipos a ser suministrados, no solamente diseñó las turbinas de conformidad con las especificaciones, sino que además tuvo en cuenta los efectos de los sólidos en suspensión en el agua en el funcionamiento y mantenimiento de la turbina, diseñando especialmente el rodete minimizando las

CONTRALORÍA
GENERAL
DEL ESTADO   DOR 13

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

*velocidades relativas con respecto al perfil hidráulico de los álabes, obteniendo un alto rendimiento y condiciones de cavitación cero, y diseñando el conjunto de la turbina de forma tal que los tiempos de remoción del rotor cuando fuese necesario fuesen mínimos...*

Numeral 2.5.1, "Garantía de Cavitación":

*"El rodete, placas y anillos de desgaste y entrada al tubo de succión estarán garantizados contra excesiva picadura debida a cavitación. Se efectuará medición después de 8 000 horas de operación efectiva o durante un período no mayor de dos años calendario.*

*Si llegara a ocurrir una cavitación excesiva, se adoptará las medidas efectivas de corrección.*

*Los límites superiores de desgaste por cavitación son los siguientes:*

*- Picadura de profundidad de 4 mm en cualquier zona*

*- Área dañada de 6 000 cm2 con más de 1 mm de profundidad promedio".*

El Informe de Examen Especial de Ingeniería a la Construcción del Proyecto DIAPA-0039-2008 del 27 de Noviembre de 2008 en sus páginas 61 a 63, hace referencia al "Informe de la inspección realizada a la Unidad Francis No. 2 de la Planta San Francisco en Ecuador" realizado por la empresa Turbo Dynamics Corporation, el 9 de mayo de 2008, en el que señala:

*"4. He señalado que no hay evidencia de cavitación. El daño es debido a la erosión..."*

Desgaste y deterioro del Rodete de la Unidad 2 a causa de sedimentos

*"...los ensayos de sólidos en suspensión de las aguas del río Pastaza efectuados durante la construcción del proyecto vinieron a corroborar los datos de diseño establecidos en las Especificaciones Técnicas y consiguientemente, las turbinas fueron fabricadas de acuerdo a dichos requerimientos. Sin embargo, es evidente que al entrar en operación la Central San Francisco, los valores reales de sedimentos producto de la mayor actividad volcánica ocurrida en el año 2006 y el arrastre de los mismos producidos luego de estas erupciones durante la temporada invernal del año 2007, ocasionaron que los sólidos en suspensión fuesen significativamente mayores a los valores previstos en base a los cuales se realizó el detallamiento del diseño básico, suministros y construcción de la central, situación que corresponde a un evento imprevisible de fuerza mayor.*

*Las operaciones de lavado del embalse de Agoyán requieren de la paralización de las unidades de la Central San Francisco. Mientras se ejecuta el lavado, los sólidos en suspensión presentes en la tubería de presión, que superaron cualquier previsión de diseño o construcción, se depositan al fondo de dicha tubería, con lo cual, al concluir el lavado y reiniciar la operación de las unidades de generación, el agua con la cual éstas arrancan presenta una altísima concentración de sólidos. Repetir esta operación después de cada una de las numerosas paradas que se realizaron*

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143549

durante el primer año de operación de la Central indudablemente ha incidido en el desgaste y abrasión de los álabes de la Unidad 2, los cuales se han visto afectados a causa de un evento imprevisible y de fuerza mayor como lo fue la actividad volcánica durante el primer año de operación de la Central y reflejados en el estado de emergencia extraordinaria experimentado en forma reiterada en la zona del Proyecto durante los años 2006, 2007 y 2008.

El desprendimiento del revestimiento duro de protección de los álabes tiene su origen en la abrasión provocada por sólidos en suspensión de magnitud excepcional e impredecible para el Consorcio Constructor en el momento del estudio de modelo y de diseño.

De la misma manera, el Informe de Examen Especial de Ingeniería a la Construcción del Proyecto DIAPA-0039-2008 del 27 de Noviembre de 2008 en sus páginas 39 y 40, hace referencia al informe FURNAS.001.2008-R0 por medio del cual el representante legal de la asociación FURNAS - INTEGRAL contratista de la fiscalización de la construcción del proyecto hidroeléctrico San Francisco informó sobre la inspección realizada al estado del túnel de conducción, al 9 de julio del 2008. Al respecto, la CGE cita lo siguiente:

"Como conclusiones señala que la paralización de la Central San Francisco se debe a la sensible modificación de la calidad del agua del río Pastaza, pues la alta cantidad de sedimentos puede poner en riesgo el funcionamiento de las trampas de rocas; que es urgente pensar en la construcción de un nuevo desarenador en Agoyán o mejorar el existente; que los desplazamientos de rocas ocurridos en el túnel de conducción son normales y no tienen que ver con la paralización de la Central; y, que es urgente que Va Tech cambie los sistemas de vaciado y drenaje, como lo había recomendado la fiscalización en la etapa de comisionamiento del proyecto."

Los comentarios vertidos por la Fiscalización en su Informe de Inspección al túnel de conducción coinciden con nuestra apreciación de que la paralización de la Central San Francisco se debe a eventos imprevisibles y de fuerza mayor concomitantes con la emergencia extraordinaria experimentada en forma reiterada en la zona del Proyecto durante los años 2006, 2007 y 2008, que ocasionaron la sensible modificación de la calidad del agua del río Pastaza.

### "Erupción volcánica, sedimentos y condiciones de operación

Respecto al supuesto incumplimiento de las condiciones de diseño de las turbinas, dichas condiciones fueron primeramente provistas por el Concedente y se relacionaron con informaciones estadísticas de calidad de agua que a su vez hicieron parte de los documentos del contrato de concesión y por tanto, del contrato de construcción.

Una vez finalizadas las pruebas de las Unidades de San Francisco, se dio comienzo a la operación comercial por parte de Hidropastaza. Sin embargo, en contra de todas las reglas del arte y la práctica usual en la industria y las normas de operación, las turbinas fueron utilizadas durante los primeros meses aún con la presencia de niveles de sedimentos muy por encima de lo admisible,

15

DIRECCIÓN NACIONAL DE RESPONSABILIDADES

*La operación de la Central San Francisco por parte de Hidropastaza en las épocas de grandes lluvias luego del depósito de millones de toneladas de material volcánico en la cuenca alta del río Chambo afluente principal del Río Pastaza, no puede ser calificada de otra cosa que imprudente, pues la práctica normal en la industria es monitorear el contenido de sedimentos en el agua turbinada para disponer la parada de las unidades cuando existen grandes concentraciones de sedimentos que pueden ocasionar daños en los equipos, tal como se advertía en el propio Contrato de Concesión.*

*Debe destacarse asimismo que la decisión de Hidropastaza de operar la Central San Francisco bajo tales condiciones extremas fue tomada a pesar de conocer la ineficiente capacidad del Desarenador de Agoyán para retener partículas y sedimentos, pues, como ya se dejó señalado, en la fase de optimización se propusieron varias alternativas, seleccionando la que se consideró más conveniente y desarrollando su diseño a nivel de anteproyecto. Las recomendaciones efectuadas por el Consorcio no fueron puestas en práctica por Hidropastaza y, consecuentemente, ninguna obra adicional fue ejecutada, con lo cual se mantuvo la operación ineficiente del desarenador. Hidropastaza conocía plenamente las limitaciones del desarenador de Agoyán y, sin embargo, continuó operando las turbinas fuera de los rangos operativos recomendados por el Fabricante, en prueba de lo cual se adjunta los registros de operación, donde se demuestra que el 62,23 por ciento del período entre Junio 2007 a mayo 2008 la Central operó fuera de los rangos cubiertos por la garantía de operación del Fabricante, por lo que cualquier reclamo al respecto del funcionamiento o estado de las unidades carece del menor sustento.*

*Abundando en lo expuesto, debe considerarse que el punto 3.2.3 del Anexo 4 - Parámetros de Operación y Mantenimiento del Contrato de Concesión celebrado entre el CONELEC e Hidropastaza donde se señala expresamente que:*

*"Debido a que durante las crecidas del río Pastaza, el embalse Agoyán pierde su capacidad desarenadora, para evitar el deterioro de las turbinas, se podrá suspender controladamente la operación de las centrales Agoyán y San Francisco, para lo cual se tendrá en las estipulaciones de este Contrato al respecto."*

*A pesar de que la suspensión de la operación de San Francisco estaba prevista contractualmente, Hidropastaza continuó generando durante las crecidas del Río Pastaza ocurridas en los extraordinarios inviernos del año 2007, a lo que se sumó el arrastre de sedimentos de elevada dureza provenientes del volcán Tungurahua.*

*Esto incluso va en contra del Manual de Operación y Mantenimiento de la Turbina de Andritz (Doc SFR-OM5VAT-CMTU-006 del 18-7-07), que expresa claramente las medidas a adoptar cuando las condiciones de operación son diferentes a las previstas en las Especificaciones:*

*"3 Los equipos suministrados por Va Tech Hydro Brasil Ltda. fueron diseñados y ajustados con relación a los criterios y condiciones de operación específicas para el Proyecto Hidroeléctrico San Francisco.*

*Va Tech Hydro Brasil Ltda. no podrá ser responsabilizada por una operación de la Turbina que no esté de acuerdo a las condiciones contractuales."*

16

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

*"6.1 General. Las condiciones de operación de los equipos deberán respetar los límites contractuales establecidos entre el cliente y Va Tech Hydro Brasil Ltda."*

*"6.3.1   La no observancia de los límites contractuales de operación implicará un riesgo de desgaste prematuro de las superficies hidráulicas de la turbina, como bridas, álabes fijos del predistribuidor, álabes directrices, rodete y tubo de succión. La garantía de desgaste por cavitación del rodete está limitada a la observancia de los límites de operación de la turbina."*

*"6.3.3   Deberán ser respetadas las potencias máxima de 117,081 MW con una unidad en operación y potencia mínima de 50 MW para una o dos unidades en operación conforme lo indicado en la tabla adjunta al ítem 1. La falta de observancia del límite de observación implicará un riesgo de desgaste prematuro de las superficies hidráulicas de la turbina y desgaste por cavitación en el rodete no garantizado por Va Tech Hydro Brasil Ltda."*

*"6.3.5   El desgaste de las superficies hidráulicas por abrasión debido a partículas sólidas en suspensión en el agua o corrosión causada por algún compuesto químico o electrogalvánica no están incluidos en las garantías de Va Tech Hydro Brasil Ltda. En caso de fallas, será necesario reparar inmediatamente antes que ocurran mayores daños."*

*"7 La lista mínima de inspecciones y mantenimientos que el cliente deberá ejecutar está presentada en los ítems 7.3, 7.4 y 7.5 de este manual. La ejecución con periodicidad menor puede ser adoptada por el cliente, una periodicidad más grande no puede ser aceptada.*

*Deberá mantenerse un registro de todas las operaciones de mantenimiento disponible en la central para consulta del histórico de los equipos. Va Tech Hydro Brasil Ltda. deberá estar siempre informada en cuanto a la necesidad de evaluación de problemas en el período de garantía y en caso necesario enviará un representante para asistencia técnica en campo."*

Los administrados señalan:

*"...Es evidente a todas luces que el Consorcio Constructor no es responsable de los daños cuando no se cumplen las condiciones establecidas en el Manual de Operación y especificaciones técnicas, sobre todo la referida a la necesidad de no operar las unidades en condiciones de sedimentación extraordinarias o por encima de los límites establecidos por el fabricante.*

*El análisis efectuado y lo arriba indicado dispensa de cualquier comentario adicional que pueda efectuarse al respecto de los eventos de naturaleza impredecible y de fuerza mayor que ocasionaron daños en la Central, del hecho que tales condiciones superaron ampliamente los requerimientos establecidos en licitación en base a los cuales se contrató y realizó el suministro, y del cumplimiento de las obligaciones del Consorcio.*

*El Consorcio Constructor no solamente cumplió a cabalidad su obligación de suministrar los equipos requeridos bajo las condiciones de operación establecidas*

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143555

*por el Estado Ecuatoriano en los documentos de licitación y Especificaciones Técnicas del Contrato, sino que, confirmó hasta donde y hasta cuando fue posible, que estas condiciones (esto es, la calidad del agua) se mantuvieron dentro de los rangos requeridos y previstos en los documentos suministrados por el Concedente.*

b)

*Es inaceptable que las glosas establecidas por la CGE tengan como fundamento el hecho que el Consorcio Constructor no pudo establecer a priori el rango de concentración de sólidos que tendría lugar una vez que la Central entró en operación y ante la ocurrencia de un evento de fuerza mayor, más aún considerando que las evaluaciones de la calidad del agua efectuadas por el Consorcio Constructor durante la construcción de las obras fueron consistentes con aquellas previstas en los estudios y documentos suministrados por el Concedente.*

*Por otra parte, la CGE no ha considerado en absoluto la forma en la cual Hidropastaza ha operado los equipos suministrados por el Consorcio Constructor ni ha evaluado si tales operaciones se han sujetado a los requerimientos establecidos en las garantías técnicas de los equipos y si, fruto de tales operaciones, los reclamos efectuados se encuentran cubiertos por la garantía técnica y si, por tanto, tienen o no fundamento contractual. Como queda demostrado, la garantía técnica ha sido viciada por la operación indebida de las turbinas por parte de Hidropastaza".*

| | | Fecha | Comunicación |
|---|---|---|---|
| b) | 5886 **Edgar Rodrigo Castro Hitchcock** | 2009/07/24 | 027311 |
| | 5887 **Descartes Higinio León Pérez** | 2009/07/24 | 027311 |
| | 5888 **Néstor Valdospinos Cisneros** | 2009/07/24 | 027311 |
| | 5889 **Pablo Mauricio Cisneros Gárate** | 2009/07/24 | 027311 |
| | 5890 **Pablo Aníbal Viteri Estévez** | 2009/07/28 | 028321 |
| | 5891 **Sadinoel de Freitas Junior** | 2009/09/22 | 24547 |
| | 5892 **Bolívar Javier Astudillo Farah** | 2009/08/11 | 035471 |
| | 5893 **Germán Bolívar Anda Naranjo** | 2009/07/28 | 027077 |

Al respecto, el representante legal de Hidropastaza, con oficio 0436-HEPT-2010 de 9 de julio de 2010, textualmente señala que la: "Reparación de desperfectos de forma que la obra alcance su estado y desempeño requeridos en el Contrato y en las Especificaciones Técnicas, así:



DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

**"Rodetes.**

El problema de desgaste prematuro del rodete de la turbina de la Unidad 2 fue inicialmente identificado en el curso del programa general de mantenimiento preventivo para el año 2007. Durante la parada programada para mantenimiento semestral efectuada el 11 de noviembre del 2007 se detectó la presencia de una fisura aparentemente superficial en el álabe N° 10 del rodete de la turbina de la Unidad 2, determinándose que dicho elemento no requería de una reparación urgente, por lo que las unidades volvieron a operación.

En marzo de 2008, el Consorcio procedió a su cuenta y cargo a la recuperación por soldadura controlada de la fisura del álabe N° 10 del rodete de la turbina de la Unidad 2, que volvió a operación ese mismo mes, tras lo cual se realizó una inspección visual tres días más tarde sin que se detecten defectos.

A la luz de los acontecimientos y tras diversos análisis, puede concluirse que los rodetes de las turbinas han sufrido un desgaste prematuro que puede atribuirse en gran medida al hecho que las concentraciones de sólidos en suspensión en el agua turbinada se han encontrado muy por encima de los valores previstos en las especificaciones técnicas. Por otra parte, atendiendo la recomendación de la Contraloría General del Estado, el Convenio Transaccional contempla:

El suministro de 2 (dos) rodetes nuevos para las turbinas de la Central, los cuales serán entregados en un plazo de 2 (dos) años, a partir de la fecha de inicio de los Trabajos Complementarios.

La supervisión de la instalación de dichos rodetes. La cesión integral de las garantías de los fabricantes de los rodetes. Dicha garantía tendrá una vigencia de 24 (veinticuatro) meses desde la recepción de los equipos por parte de Hidropastaza.".

IV.   Que analizados tanto el informe del examen especial de ingeniería como el memorando de antecedentes registrados en archivo con el número 0029-2009, al igual que las comunicaciones y pruebas remitidas, se concluye que:

El diseño básico de las obras en base al cual se construyó el Proyecto Hidroeléctrico San Francisco corresponde al diseño que consta en los documentos precontractuales entregados por el ex – INECEL, primero, durante el proceso de licitación para la concesión del proyecto entre el CONELEC e HIDROPASTAZA y luego, para la construcción del proyecto entre HIDROPASTAZA y el Consorcio Constructor Norberto Odebrecht–Alstom–Va Tech.

El referido diseño básico que es parte integrante del contrato de concesión, suscrito por el CONELEC en representación del Estado ecuatoriano, fue también incorporado al contrato de construcción suscrito entre HIDROPASTAZA S.A. y el Consorcio Constructor Norberto Odebrecht–Alstom–Va Tech, sin ningún cambio o adición, pues no podía modificarse sin el expreso conocimiento y autorización del Concedente, como lo dispone la Ley de Régimen del Sector Eléctrico.

El contrato de construcción tiene por objeto el detallamiento, suministro y construcción del diseño básico entregado por el Concedente para la ejecución del Proyecto San Francisco.

CRP-DOJ-0003143559

El numeral 3.1 del Contrato de Construcción, establece:

*"El alcance de los trabajos para las obras incluirá la Ingeniería de Detallamiento del Proyecto Básico, el suministro, el montaje, la construcción y las pruebas, comisionamiento y puesta en marcha de las obras. Los Trabajos deberán ser desarrollados de acuerdo con: (i) el Proyecto Básico, (ii) la Optimización al Proyecto definida en el numeral 3.2, (iii) los cambios o mejoras acordadas entre las Partes al tenor del Numeral 8 de este Contrato, si las hubiere, (iv) las Especificaciones incluidas en el Contrato de Concesión y (v) las normas y estándares ecuatorianos u otros aplicables acordados entre el Consorcio y la Concesionaria."*

De la cláusula citada se evidencia que el Consorcio Constructor tenía la obligación, entre otras, de realizar la ingeniería del detallamiento del diseño básico, y la optimización del proyecto definida en el numeral 3.2; lo cual no comprende la realización de estudios de hidrología, sedimentología, vulcanología o geotécnicos, que a su debido tiempo fueron ejecutados por el INECEL, confirmados por el CONELEC y que sirvieron de base para la concepción del Proyecto San Francisco. Estos estudios básicos tienen un período considerable de tiempo, e incluyen el monitoreo del comportamiento de la cuenca del río Pastaza, por el contenido de sedimentos de los ríos de las respectivas subcuencas y microcuencas que depositan, contaminan y arrastran las aguas, hacia el río Pastaza, las cuales son fuente para el funcionamiento de las centrales hidroeléctricas Agoyán y San Francisco; así como, de la conducta del volcán activo Tungurahua, ligado con eventos volcánicos y sismos; información estadística que fue la base de los diseños del proyecto San Francisco.

El CONELEC decidió la eliminación de la captación de las aguas del Río Verde del Alcance del Proyecto, preservando así la cascada denominada "Pailón del Diablo", lo que obedeció a un pedido de las comunidades de Baños de Agua Santa y Río Verde y a aspectos ambientales, por lo que solicitaron al Consorcio Constructor el diseño en detalle del proyecto, que incluya las modificaciones derivadas de la eliminación de la captación del Río Verde y la postergación de la construcción del by pass Agoyán - San Francisco para el año 2012.

El Concedente (CONELEC) mediante oficio No. DE-04-0112, solicitó directamente al Concesionario (HIDROPASTAZA) la presentación para la aprobación de las modificaciones a realizar, concernientes a los equipos hidro-electromecánicos considerados en el informe presentado por el Consorcio Constructor Odebrecht-Alstom-VaTech, a fin de que HIDROPASTAZA S.A. emita la orden de fabricación respectiva de los mismos.

HIDROPASTAZA formalizó al Consorcio Constructor la orden de fabricación de todos los equipos hidro-electromecánicos necesarios para la Central San Francisco, una vez que se contó con la aprobación del CONELEC, a través del oficio HP-405-2004 de 10 de junio de 2004 (anexo 28), y suscribió el 19 de agosto de 2004 (anexo 32) el Segundo Contrato Modificatorio al Contrato de Concesión, incluyendo cambios.

El alcance de la optimización del proyecto constituyen las modificaciones surgidas por la salida de la captación del Río Verde y algunos cambios en la metodología de construcción, como por ejemplo: la utilización del topo mecánico (TBM – Tunnel

Boring Machine) para la excavación del túnel de conducción; adopción de revestimientos/sostenimiento con dovelas prefabricadas en el túnel de conducción; cambio de ubicación y sección de la ventana 4; cambio de pendiente de la tubería de presión; aumento de la sección del túnel de acceso al bifurcador para permitir el transporte de los anillos de la tubería de presión; cambio de pendiente de la chimenea de equilibrio superior aumentando el tramo vertical de 30 a 40 metros; aumento del espesor del blindaje en la Tubería de Presión. Estas modificaciones no han cambiado el concepto básico del Proyecto.

De acuerdo con los descargos presentados por el Consorcio Constructor, los problemas en las obras civiles del circuito hidráulico de la central y en los elementos hidromecánicos del proyecto San Francisco se han generado por el incremento desmedido de los sedimentos que receptó y acarreó el río Pastaza, como consecuencia de las erupciones del volcán Tungurahua y los períodos invernales de gran magnitud, considerados como eventos de fuerza mayor o caso fortuito, evidenciados en los respectivos decretos ejecutivos de emergencia, los mismos que constan de fojas 21452 a 21457, con ciclos de cedimentación extremadamente superiores a los constantes en la información estadística de períodos de largo plazo realizados por INECEL, que fueron el fundamento de los diseños básicos.

Asimismo, según las evidencias que constan en los descargos suministrados y analizados posteriormente en relación a los procesos de aprobación de las obras, equipos y sistemas, el problema en el Sistema de Agua de Enfriamiento y en los álabes de los rodetes de las turbinas, se debió a condiciones de funcionamiento extremas, relacionadas con las emergencias extraordinarias experimentadas en forma reiterada en la zona del Proyecto durante los años 2006, 2007 y 2008.

De igual manera, cabe indicar que los rodetes afectados fueron reparados por el Consorcio Constructor Norberto Odebrecht–Alstom–Va Tech y se encuentran actualmente en funcionamiento, sin perjuicio del compromiso asumido por el Consorcio Constructor en el convenio que ha suscrito con Hidropastaza, el 8 de julio de 2010, en el cual, entre otros aspectos, se ha previsto que el Consorcio suministrará 2 rodetes nuevos para las turbinas de la central; así como a otorgar una garantía por las obras civiles y la provisión y ejecución de las obras del Sistema de Agua de Enfriamiento, dando solución a los hechos que dieron lugar al establecimiento de la glosa.

A base del indicado Convenio, Hidropastaza remite adjunto al oficio 526-HPEP-2010, la copia certificada de la orden de compra para el suministro de los dos rodetes nuevos especificados en la cláusula 1.2.2. (i) del Convenio, y la certificación del primer pago por EUR 350.000 a la empresa ANDRITZ HYDRO, como abono por la compra de los dos rodetes cuyo costo asciende a USD 7 000 000; valor materia de la glosa.

La Contraloría General del Estado, en su oportunidad, verificará el cumplimiento de las obligaciones asumidas por las partes, en el convenio celebrado el 8 de julio de 2010 con una nueva acción de control.

Por lo expuesto; y,

En ejercicio de las facultades que le confiere la ley,

DIRECCIÓN NACIONAL
DE RESPONSABILIDAD

CRP-DOJ-0003143563

– 146 –
*ciento cuarenta*
*y seis*

Noti

**RESUELVE:**

**DESVANECER** la responsabilidad civil solidaria establecida mediante glosas 5882, 5886 a 5893 de 29 de mayo de 2009, por **USD 7 000 000,** determinadas en contra de los señores: **Consorcio Norberto Odebrecht– Alstom–Va Tech**, en la persona de su representante legal, señor **Germán Bolívar Anda Naranjo**, presidente ejecutivo de Hidropastaza S.A., señores: **Sadinoel Freitas Junior**, vicepresidente ejecutivo de Hidropastaza S.A., **Bolívar Javier Astudillo Farah,** director ejecutivo del Consejo Nacional de Electricidad, CONELEC, **Pablo Aníbal Viteri Estévez**, director de Concesiones de CONELEC; **Pablo Mauricio Cisneros Gárate**, director de Supervisión y Control de CONELEC; **Néstor Valdospinos Cisneros**; **Descartes Higinio León Pérez**; y, **Edgar Rodrigo Castro Hitchcock,** funcionarios de CONELEC.

Notifíquese.-

Por el Contralor General del Estado,

Dr. César Mejía Freire
Subcontralor General del Estado, Encargado

PCF/ØVN/DGC
G. 5882, 5886 a 5893
Inf. 29/2009
Nis. 7539/2009
18-08-2010



**DIRECCIÓN NACIONAL
DE RESPONSABILIDADES**

22

CRP-DOJ-0003143565