- 157 -
ciento cincuenta
y siete

2449

- 1 SET 2010



**RESOLUCION No.**

**EL CONTRALOR GENERAL DEL ESTADO**

**CONSIDERANDO:**



GOVERNMENT EXHIBIT
CASE NO. 22-cr-20114-KMW
EXHIBIT NO. 1-3B

I. Que como resultado del estudio del informe del examen especial de ingeniería practicado a los daños provocados al sistema de enfriamiento y en los filtros de agua y la evaluación de los daños que ocasionaron la paralización de la Central Hidroeléctrica San Francisco, a cargo de la compañía Hidropastaza S.A., por el período comprendido entre el 26 de septiembre de 2007 y el 30 de septiembre de 2008, se estableció en contra del **Consorcio Norberto Odebrecht– Alstom–Va Tech**, en la persona de su representante legal, contratista de la ingeniería de detalle, suministros y construcción de la Central Hidroeléctrica San Francisco, la glosa por **USD 521 587**, valor establecido en la Adenda 4 que corresponde al item 3.05 del "Desglose de la Facturación", por daños ocurridos en el sistema de agua de enfriamiento y sello, debido al incumplimiento de las especificaciones técnico - mecánicas del contrato suscrito entre Hidropastaza S.A. y el consorcio Odebrecht – Alston – Va Tech, en el que se estipula que el alcance de los trabajos incluye la ingeniería de detallamiento del proyecto básico, suministro, montaje, construcción, pruebas, comisionamiento y puesta en marcha de las obras, por un monto de USD 286 851 129; pactándose como anticipo el 30% del monto del contrato a ser entregado a la fecha de su suscripción y pagos mensuales por avance de las obras, "*en conformidad con el avance físico del Trabajo según el Desglose de la Facturación (WBS) contenido en el Anexo 2 a este Documento*".

Los pagos por avance de obra se efectuaron de la siguiente manera:

**Ingeniería de Detalle**.- De acuerdo al porcentaje de avance de los trabajos.

**Trabajos de Construcción**.- En función del porcentaje de la suma global correspondiente a cada parte de la obra efectivamente realizada.

**Montaje, Pruebas, Comisionamiento y Puesta en Marcha**.- De acuerdo a los porcentajes de servicios realizados.

**Suministros.**- De acuerdo a los porcentajes indicados en el Anexo 2 del contrato EPC.

Los pagos se realizaron por disposición de Hidropastaza S.A., emitiendo autorizaciones de desembolso contra el préstamo obtenido con el Banco Nacional de Desarrollo Económico y Social, BNDES de Brasil y con el aporte de capital de los socios de Hidropastaza S.A., por lo que al realizarse la liquidación del proyecto se pagó el 100% de su costo, como se evidencia en la "Memoria Explicativa de la Liquidación del Programa de Aceleración".

Dirección de Responsabilidades. Teléfono: 398-7360
Oficina matriz: Av. Juan Montalvo e4-37 y Av. 6 de Diciembre. Quito-Ecuador



DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143469

En el "Desglose de Facturación" se detalla el costo de cada uno de los componentes del proyecto, estableciendo que el ítem 3.05 "Sistema de Agua de Enfriamiento y Sello" tiene un costo de USD 529 282.

Hidropastaza S.A. y el consorcio constructor del proyecto San Francisco, celebran la Adenda 4, el 25 de agosto de 2004, con la finalidad de excluir del objeto del contrato la construcción del By Pass en la Central Agoyán, modificar el diseño básico y efectuar un programa de aceleración de los trabajos; producto del cual cambia el costo de ciertos componentes del proyecto.

La Adenda 4, presenta el "Desglose de la Facturación", estableciéndose que el ítem 3.05 "Sistema de Agua de Enfriamiento y Sello" tiene un costo de USD 521 587, existiendo una diferencia de USD 7 695, respecto al contrato original.

Hidropastaza S.A. y el consorcio constructor, el 16 de enero de 2006, suscriben la Adenda 6 al contrato EPC, con la finalidad de realizar una serie de obras tendientes a liberar el Topo (Taladro TBM) y recuperar el atraso ocasionado por esta eventualidad, producto de lo cual los costos de varios componentes del proyecto se modifican; respecto al costo del sistema de agua de enfriamiento, que se mantiene con lo establecido en la Adenda 4.

Hidropastaza S.A., incumplió lo señalado en los apartados d), e) y g) del numeral 5.1 "Deberes del concesionario durante la construcción", de las especificaciones generales del segundo contrato modificatorio al contrato de concesión, por no revisar los estudios y diseños de detalle del sistema de agua de enfriamiento, ni adoptar las medidas correctivas que garanticen el funcionamiento y durabilidad de los equipos protegidos por este sistema.

De acuerdo a las inspecciones realizadas por el equipo de Contraloría al proyecto, se establece que existen fallas técnicas en la construcción de la Central por parte del consorcio por los siguientes motivos:

- No realizó la optimización del sistema de agua de enfriamiento, considerando los riesgos geológico-volcánicos y su influencia en el incremento de sedimentos en el río Pastaza, incumpliendo lo señalado en el numeral 3.2 "Estudio de Optimización" del contrato EPC.

- No colocó la malla de filtración que retenga las partículas en suspensión identificadas en el numeral 2.2.1 "Condiciones del agua", (arena fina con partículas de 40 a 150 micras), contraviniendo lo señalado en el numeral 6.4.5 de las especificaciones mecánicas que establece que los filtros de agua, en concordancia con la especificación 6.4.2, contarán con un filtrado de 150 micras; mientras que el filtro seleccionado utiliza una malla de filtrado de 760 micras que permite el paso de todas las partículas en suspensión, que acarrea el agua del río Pastaza.

- Colocó la toma de agua en la entrada de los caracoles de manera lateral a una altura de 1,60 m., incumpliendo lo señalado en el numeral 6.4.3. "Toma de agua de la entrada de los caracoles", que establece que la toma de agua será ubicada en la parte superior de la tubería, aguas abajo del obturador de la válvula mariposa.

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143471

- Instaló equipos que generan una presión de 0,7 MPa (7 bares) para destapar las rejillas de las tomas de agua, incumpliendo lo señalado en el numeral 6.4.5 "Filtros de agua de los caracoles", que establece que la presión de limpieza de las rejillas será de 2,2 MPa., equivalentes a 22 bares.

- En el plano de diseño del Sistema de Agua de Enfriamiento SFR-DS8PCE-CMSA-003, del Anexo I, Tomo 6, "Planos" del Segundo Contrato Modificatorio al contrato de concesión, se establece que antes de los filtros se instalarán válvulas motorizadas; al no considerar las condiciones de arrastre de sedimentos del río Pastaza, realizó una inadecuada elección de las válvulas de paso.

Estos incumplimientos de las especificaciones técnicas del proyecto no fue observado por la Asociación Furnas – Integral, fiscalizadora de la construcción en representación de Hidropastaza S.A., quien durante la construcción del proyecto no advirtió de los cambios antes descritos realizados por la constructora, sin contar con la autorización previa de Hidropastaza, incumpliendo de esta manera con la función de la fiscalización n), del numeral 2, "Funciones de la Fiscalización", y lo establecido en la primera viñeta del numeral 3, "Fiscalización de las Obras", de los términos de referencia de las Bases de la Invitación para la Contratación de la Fiscalización.

Mediante documento SFR-HD5ALS-GESA-001 de noviembre 14 de 2005, el consorcio constructor como parte de la ingeniería de detalle y construcción del proyecto, presenta los datos técnicos de los filtros automáticos FL-001/FL-002:

| CONDICIÓN DE OPERACIÓN | | |
|---|---|---|
| Fluido | Agua bruta de río | |
| Caudal | 500 – 1000 | m³/h |
| Presión de | 23 – 30 | kgf/cm² |
| Temp. operación | Ambiente | °C |
| Densidad | 1,0 | kg/l |
| Viscosidad | 1,0 | Cp |
| Grado de filtración | 760 | Micrones |
| ΔP (limpio/sucio) | 0,06 - 0,22 / 0,35 | kgf/cm² |

El costo del sistema de agua de enfriamiento y sello, de acuerdo con el contrato EPC y la adenda 1, asciende a USD 529 282, el cual es modificado a USD 521 587 en las adendas 4 y 6 al contrato EPC.

Por lo expuesto, la falta de cumplimiento de las especificaciones técnicas contractuales, por parte del consorcio constructor, dio lugar a que se presenten daños en el sistema de agua de enfriamiento y sello de la Central Hidroeléctrica; ocasionando perjuicio económico a la entidad en el valor de la glosa, cuya demostración consta en el *anexo 1* que se adjuntó a la misma.

Responden solidariamente en **USD 521 587**, los señores ingenieros: **Germán Bolívar Anda Naranjo**, presidente ejecutivo de Hidropastaza S. A., por autorizar el pago del sistema de agua de enfriamiento; **Asociación Furnas – Integral**, en la persona de su representante legal, contratista del servicio de consultoría para la fiscalización del proyecto, y **Marco Antonio Narváez Pinto**, supervisor de Obras

3

DIRECCIÓN NACIONAL
RESPONSABILIDADES

CRP-DOJ-0003143473

Mecánicas de Hidropastaza, por no exigir al consorcio constructor la ejecución de los trabajos, con estricto cumplimiento de las especificaciones técnicas contractuales.

II. Que por este motivo, el 29 de mayo de 2009 se expidieron las glosas solidarias 5882 a 5884 y 5893 en contra del Consorcio *Norberto Odebrecht – Alstom – Va Tech*, representante legal, contratista del servicio de consultoría para la fiscalización del proyecto, funcionarios y ex funcionarios de la Compañía Hidropastaza S.A., habiéndoseles notificado legalmente en la forma y fechas que constan a continuación, dándoles a conocer el fundamento de la observación y concediéndoles el plazo de sesenta días de conformidad con el artículo 53, numeral 1, de la Ley Orgánica de la Contraloría General del Estado, a fin de que contesten y presenten las pruebas de descargo pertinentes:

| No. de Glosa y Nombres | Notificación | Fechas |
|---|---|---|
| 5882 **Consorcio Norberto Odebrecht – Alstom – Va Tech.** | Publicado Diario "HOY" | 2009-07-16 |
| 5883 **Asociación Furnas – Integral** | Personal | 2009/06/09 |
| 5884 **Marco Antonio Narváez Pinto** | Personal | 2009/06/09 |
| 5893 **Germán Bolívar Anda Naranjo** | Personal | 2009-06-15 |

III. Que dentro del plazo legal, las personas que se indican, dan contestación a las glosas mediante comunicaciones ingresadas a la Contraloría General del Estado, según detalle que consta a continuación:

a) 5882
**Consorcio Norberto Odebrecht – Alstom – Va Tech**

| Fecha | Comunicación |
|---|---|
| 2009/09/21 | 058091 |
| 2009/07/21 | 026260 |
| 2009/09/18 | 058091 |
| 2009/09/18 | S/N |

El Consorcio Constructor, con oficio No. CNO-041-2009 de 18 de septiembre de 2009, en base a la responsabilidad civil imputada en su contra, realiza una descripción de la misma, que para efectos de este análisis se describe de la siguiente manera:

- *"No realizó la optimización del sistema de agua de enfriamiento, considerando los riesgos geológico-volcánicos y su influencia en el incremento de sedimentos en el río Pastaza, incumpliendo lo señalado en el numeral 3.2 "Estudio de Optimización" del contrato EPC.*

4

DIRECCIÓN NACIONAL DE RESPONSABILIDADES

No colocó la malla de filtración que retenga las partículas en suspensión identificadas en el numeral 2.2.1 "Condiciones del agua", (arena fina con partículas de 40 a 150 micras), contraviniendo lo señalado en el numeral 6.4.5 de las especificaciones mecánicas que establece que los filtros de agua, en concordancia con la especificación 6.4.2, contarán con un filtrado de 150 micras; mientras que el filtro seleccionado utiliza una malla de filtrado de 760 micras que permite el paso de todas las partículas en suspensión, que acarrea el agua del río Pastaza.

Colocó la toma de agua en la entrada de los caracoles de manera lateral a una altura de 1,60 m., incumpliendo lo señalado en el numeral 6.4.3. "Toma de agua de la entrada de los caracoles", que establece que la toma de agua será ubicada en la parte superior de la tubería, aguas abajo del obturador de la válvula mariposa.

Instaló equipos que generan una presión de 0,7 MPa (7 bares) para destapar las rejillas de las tomas de agua, incumpliendo lo señalado en el numeral 6.4.5 "Filtros de agua de los caracoles", que establece que la presión de limpieza de las rejillas será de 2,2 MPa., equivalentes a 22 bares.

En el plano de diseño del Sistema de Agua de Enfriamiento SFR-DS8PCECMSA-003, del Anexo 1, Tomo 6, "Planos" del Segundo Contrato Modificatorio al contrato de concesión, se establece que antes de los filtros se instalarán válvulas motorizadas; al no considerar las condiciones de arrastre de sedimentos del río Pastaza, realizó una inadecuada elección de las válvulas de paso."

Indica además la CGE que:

"Por lo expuesto, la falta de cumplimiento de las especificaciones técnicas contractuales, por parte del consorcio constructor, dio lugar a que se presenten daños en el sistema de agua de enfriamiento y sello de la Central Hidroeléctrica; ocasionando perjuicio económico a la entidad en el valor de la glosa, cuya demostración consta en anexo 1 adjunto."

**Especificaciones contractuales**

Al respecto de estas observaciones, cabe en primer lugar analizar el contenido de los documentos contractuales y las Especificaciones Técnicas en base a las cuales se realizó el detallamiento del diseño básico y se suministraron los equipos.

El diseño básico de INECEL contempla un sistema de agua de enfriamiento compuesto por dos circuitos, el primero alimentado por agua de las quebradas aledañas ubicadas a aproximadamente 300 m de la entrada del pozo de cables, del cual se aprovecharía un caudal de 50 l/s para sumarlo al caudal proveniente de las filtraciones (5 a 10 l/s). Este circuito se destinaría a enfriar los equipos más delicados e importantes para el funcionamiento de la Central, como los cojinetes del generador, de la turbina y el sello del eje. Vale recalcar que estas aguas son limpias, con un mínimo contenido de sedimentos y significativamente menos contaminada que las aguas del Río Pastaza. El segundo circuito toma el agua de la tubería de presión después de la válvula mariposa de entrada para pasar por un

filtro automático y abastecer a los intercambiadores de calor del generador y transformadores. Ambos circuitos se encuentran interconectados entre sí para que los cojinetes puedan ser enfriados por el agua del Río Pastaza en un caso emergente en el falte agua de las quebradas e infiltraciones.

Es así que, las páginas M6-1 a M6-7 del volumen III de las especificaciones técnicas establecen que:

"Para el suministro de agua de enfriamiento de transformadores, cojinetes, reguladores y compresores, agua de sellos, agua potable, contra incendio y de servicio se dispone de tres fuentes distintas: una captación de las quebradas aledañas, filtraciones de la caverna y tomas en la tubería de entrada a los caracoles de las turbinas. Para el suministro de agua de enfriamiento de los generadores solo se dispone de las tomas del caracol.

El agua a turbinar proviene de la descarga de la Central Agoyán más el aporte del río Verde. Agoyán turbina el agua desarenada del río Pastaza, un análisis físico químico de una muestra de agua figura en las Especificaciones Técnicas Generales, pudiéndose apreciar alta concentración de sólidos en suspensión.

Se utilizará el agua de las quebradas para todos los servicios, excepto para enfriamiento de los generadores para lo cual es insuficiente. El agua de filtraciones por su buena calidad..."

Está por demás señalar las diferencias que existen entre las características previstas del agua del río Pastaza y las realmente experimentadas durante el primer año de operación de la Central, según se ha detallado en la sección III de este documento.

La Sección M6 - 6.3 - Características Técnicas Generales señala que:

"...Las tomas de los caracoles se ubicarán en cada grupo después de la válvula mariposa. Se prevé la limpieza de las rejillas de dichas tomas, en caso de obstrucción, por medio de aire comprimido. El agua captada pasa por filtros rotativos en paralelo y válvulas reductoras de presión con sus respectivas válvulas de seguridad con descarga al pozo de drenaje de la central, si la presión es menor a la requerida para una evacuación directa a la galería de drenaje. El agua filtrada, de un caudal que varía aproximadamente de 100 l/s a 400 l/s, dependiendo del número de unidades en funcionamiento y con presión reducida a 0.6 MPa, es conducida a los enfriadores de los generadores y supletoriamente al enfriamiento de los equipos comunes, cojinetes, reguladores y sellos.

Los enfriadores deben ser dimensionados para la presión de 0,6 MPa o instalará válvulas reductoras apropiadas."

Por su parte, la Sección M6 - 6.4.2 - Filtro rotativo para el agua de las quebradas indica:

"... retrolavado automático con válvula de acero inoxidable operable eléctricamente por el temporizador e interruptor por taponamiento. El conjunto se completará con válvulas compuertas manuales de entrada, salida y en paralelo

6

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143479

para mantenimiento del filtro y un gabinete de control (...). El filtro será para la capacidad a ser definida durante el proyecto ejecutivo, con un filtrado de 150 micrómetros."

Vale recalcar que el agua que alimenta este circuito y los requerimientos de filtrado en este caso son distintos a aquellos correspondientes al circuito de enfriamiento de los intercambiadores de calor del generador y transformadores, pues éste último se alimenta del agua proveniente de la tubería de presión.

A su vez, la Sección M6 - 6.4.3 - Toma de agua de la entrada de los caracoles establece que:

"Las tomas de agua se efectuará en ambas unidades en forma similar aguas abajo del obturador de la válvula mariposa y en la parte superior para disminuir la entrada de sedimentos. Se proveerá una válvula en cada toma. Los elementos necesarios para inyectar aire a presión para destapar las rejillas si se detectara una disminución del flujo y/o presión. Se utilizará el aire comprimido de un motocompresor de 2.2 MPa.

En operación normal las dos tomas están abiertas disminuyendo el riesgo de obstrucción."

Finalmente, la Sección M6 - 6.4.5 - Filtros de agua de los caracoles dispone que: "El conjunto consta de dos filtros rotativos automáticos de características similares a las descritas en 6.4.2, pero de mayor capacidad dado que cada uno será diseñado para el flujo total necesario para el enfriamiento de todos los elementos y equipos de las dos unidades."

Según los administrados: "Como ha quedado demostrado en la sección III del presente documento, la gran cantidad de sedimentos ocurrida durante el primer año de operación de la Central afectó, entre otros aspectos, el funcionamiento del filtro principal, el cual no estaba proyectado para esta sobrecarga, pues Hidropastaza operó el filtro a la par que se mantenía su retrolavado en funcionamiento permanente (las escobas de limpieza operaban sin paradas). Este hecho también afectó los demás componentes del equipo y del sistema en los puntos donde hay control de caudal o reducción de presión.

Durante inspecciones realizadas para mantenimiento, aprovechando las frecuentes paradas de Agoyán para el lavado del embalse, fue posible constatar los desgastes causados por la mala calidad del agua también en las válvulas FV001 y FV002, cuyo reductor de velocidad resultó averiado luego de operar bajo estas condiciones extremas y en la válvula PCV003, cuyo obturador se desgastó impidiendo el control de la reducción de presión.

CRP-DOJ-0003143481

El sistema de agua de enfriamiento de los caracoles instalado cumple cabalmente tanto con los requisitos básicos contractuales del Contrato EPC suscrito con Hidropastaza como con las Bases de la Licitación como con los establecidos en el Addendum Nº 4 del Contrato EPC.

En esta parte del presente documento, analizaremos cada uno de los cuestionamientos efectuados por la CGE en el mismo orden en que han sido planteados, esto es:

- Optimización del Proyecto y aprobación por parte de Hidropastaza.
- Diseño del Consorcio adecuado a las especificaciones contractuales:
  - Malla filtrante
  - Ubicación de la toma de agua
  - Presión del Sistema para destapar las rejillas
  - Válvulas de paso.
- Reconocimiento por Hidropastaza de que los daños fueron causados por sedimentos.
- Aspectos jurídicos.

**Optimización del Proyecto y aprobación por parte de Hidropastaza**

Como ya se deja señalado en este documento, la optimización del Proyecto se fundamenta en el Diseño Básico constante en los documentos precontractuales entregados por el ex – INECEL durante el proceso de licitación para la concesión y construcción del Proyecto y ratificados por el CONELEC, de tal manera que estos son los diseños que posteriormente pasaron a hacer parte del contrato de concesión suscrito entre Hidropastaza S.A. y el Estado ecuatoriano representado por el CONELEC.

Este diseño básico que hace parte integrante del contrato de concesión fue también incorporado al contrato de construcción suscrito entre Hidropastaza S.A. y el Consorcio Constructor.

De igual forma, el contrato de construcción celebrado entre Hidropastaza S.A. y el Consorcio Constructor tiene por objeto esencial el detallamiento, suministros y construcción del diseño básico suministrado por el Concedente para la ejecución del Proyecto San Francisco.

El numeral 3.1 del contrato de construcción establece que:

"El alcance de los trabajos (en adelante el "Trabajo" o los "Trabajos") para las OBRAS incluirá la Ingeniería de Detallamiento del Proyecto Básico, el suministro, el montaje, la construcción y las pruebas, comisionamiento y puesta en marcha de las OBRAS. Los Trabajos deberán ser desarrollados de acuerdo con: (i) el Proyecto Básico, (ii) la Optimización al Proyecto definida en el numeral 3.2, (iii) los cambios o mejoras acordadas entre las Partes al tenor del Numeral 8 de este Contrato, si las hubiere, (iv) las Especificaciones incluidas en el Contrato de Concesión y (v) las normas y estándares ecuatorianos u otros aplicables acordados entre el Consorcio y la Concesionaria."

— 165 —
ciento sesenta y
cinco

"Es importante destacar nuevamente que ningún cambio, modificación y/u optimización bajo el Contrato de Construcción podía ser implementada si no contaba con la aprobación y autorización del CONELEC e Hidropastaza S.A. en su calidad de ente Concedente del Proyecto y representante del Estado Ecuatoriano en el caso del primero, y como ente Concesionario del Proyecto en el caso del segundo. Todos los ajustes, diseños y detalles de los equipos suministrados fueron puestos en conocimiento y aprobados por el Concedente Hidropastaza, tal y como lo señalan, tanto la página 24 de la Comunicación de Resultados Provisionales (Oficio No. 24107-DIAPA del 23 de septiembre de 2008) como la página 77 del Informe DIAPA-0039-2008 que comentan textualmente lo siguiente:

"El consorcio constructor a través del Departamento de Ingeniería de Odebrecht envía treinta comunicaciones en las cuales presenta esquemas, detalles de construcción, especificaciones técnicas de equipos y realiza correcciones, aclaraciones y presenta los documentos definitivos del sistema de agua de enfriamiento, (documento inicial N° OEC/PHSF/GING/0139/2006 de febrero 2 de 2006 hasta el documento final N° OEC/PHSF/GING/1304/2006 de diciembre 11 de 2006); documentos que son observados y aprobados por Hidropastaza S.A., mediante oficios N° HP-0423-2006 a N° HP-2139-2006, suscritos por su Presidente Ejecutivo."

"Adicionalmente a estas comunicaciones que corresponden todas al año 2006, en el año 2005 se cursaron otras correspondencias en las cuales el Consorcio Constructor e Hidropastaza definieron y acordaron las características del Sistema de Agua de Enfriamiento suministrado, de conformidad con las especificaciones y planos y con el conocimiento y aprobación del Concesionario y del Concedente."

"Al respecto de la Optimización del Proyecto, el Numeral 6.7 del Contrato de Concesión establece lo siguiente:

"6.7 Optimización del Diseño Básico: El Concesionario está autorizado a efectuar Optimizaciones del Diseño Básico realizado por INECEL, para lo cual podrá incrementar, modificar o eliminar las diferentes partes de obra que conforman el Proyecto Básico, previa la aprobación del CONELEC, manteniendo siempre el concepto básico de la Central. De la misma manera, el Concesionario podrá introducir mejoras o cambios a las especificaciones técnicas de los materiales y equipos previstos inicialmente."

"Como ya hemos indicado, el diseño básico y las especificaciones son provistos por el Concedente, la optimización del proyecto es una opción del Concesionario, tiene finalidades específicas y está sujeto a la aprobación previa del Concedente.

"La optimización no tuvo por objeto analizar nuevamente los parámetros hidrológicos y sedimentológicos provistos en las bases del concurso, pues siendo éstos estudios pormenorizados y de largo plazo realizados por el INECEL, su actualización hubiera requerido de nuevos estudios cuyo plazo de ejecución no estaba contemplado en el cronograma contractual ni en el alcance de los trabajos a ser desarrollados por el Consorcio Constructor. La optimización del proyecto tampoco tuvo por propósito realizar un rediseño total de las obras para enfrentar cualquier tipo de evento posterior e imprevisible de fuerza mayor como lo fue la actividad volcánica registrada durante el primer año de operación de la Central.

[Seal: CONTRALORÍA GENERAL DEL ESTADO — ECUADOR] 9

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143485

"En este documento hemos descrito el alcance específico de los estudios de optimización del Proyecto, estudios que no incluyeron el rediseño de las obras en función de las condiciones sedimentológicas o volcánicas pre-existentes de la zona, pues estas condiciones ya fueron definidas en los documentos precontractuales en base a estudios detallados desarrollados a lo largo de muchos años, y menos aún de las condiciones futuras, pues estas eran absolutamente imprevisibles.

"En agosto del año 2004 el CONELEC e Hidropastaza suscribieron el contrato modificatorio N° 2 a través del cual se mantuvo el diseño del sistema de agua de enfriamiento previsto en el Diseño Básico de la Licitación y, de igual manera, al suscribir el Addendum N° 4 al Contrato de Construcción, no se modifican las especificaciones respecto del sistema de agua de enfriamiento, ni tampoco sobre la calidad de agua del río Pastaza, sino que se ratifican las especificadas en la Licitación de INECEL aún cuando la Central Agoyán ya se encontraba en operación, por lo que, de haber tenido información más actualizada, Hidropastaza debió aportarla o alertar sobre las nuevas condiciones.

"Al respecto de las características del agua, en este documento se ha expuesto ampliamente sobre el tema, por lo que todas las consideraciones ahí planteadas son aplicables al Sistema de Agua de Enfriamiento y a los desperfectos sufridos por éste a causa de las condiciones imprevisibles y de fuerza mayor a las que fue sometida la Central durante su primer año de operación y concomitantes con la emergencia extraordinaria experimentada en forma reiterada en la zona del Proyecto durante los años 2006, 2007 y 2008.

"La glosa imputada solamente podría haberse generado en caso de que el Concedente hubiese requerido que como parte de la optimización, el Consorcio Constructor rediseñe el sistema de agua de enfriamiento, lo cual no fue así, pues su adopción fue implementada luego de contar con las aprobaciones correspondientes de cada una de dichas entidades".

"No se entiende por tanto que, habiendo el Consorcio Constructor desarrollado el Sistema de Agua de Enfriamiento de acuerdo al Diseño Básico de INECEL, habiéndolo sometido a la aprobación del Concesionario y del Concedente y habiendo obtenido dicha aprobación, se pretenda ahora imputarle los desperfectos sufridos a causa de eventos imprevisibles de fuerza mayor concomitantes con la emergencia extraordinaria experimentada en forma reiterada en la zona del Proyecto durante los años 2006, 2007 y 2008".

"Sobre los desperfectos experimentados en este sistema con posterioridad al comisionamiento, los mismos se deben al incremento imprevisible de sólidos en suspensión en el río Pastaza como resultado de la actividad del volcán Tungurahua que fueron posteriormente arrastrados al cauce del río Pastaza por las importantes lluvias acaecidas. Los datos presentados en la Sección III del presente documento son fehacientes y no dejan margen de duda sobre los cambios experimentados en la calidad del agua, ni sobre la situación de emergencia extraordinaria experimentada en forma reiterada en la zona del Proyecto durante los años 2006, 2007 y 2008".



CONTRALORÍA GENERAL DEL ESTADO — ECUADOR

DIRECCIÓN NACIONAL DE RESPONSABILIDADES

"Tal es así que... la asociación Furnas-Integral en su informe de montaje electromecánico N° ASFLSF.006M.2007-R0 de junio del 2007 señala en su numeral 8.6.6.1 que:

"En el período del 26 de abril al 25 de mayo del 2007, debido a la mala calidad del agua del Río Pastaza, se presentaron dificultades en la operación de las Válvulas FV 001, FV 002 y en las Válvulas de drenaje de los Filtros de Agua de Enfriamiento".

"La optimización del proyecto tuvo un alcance definido y acordado entre las Partes que no incluyó la introducción de cambios o mejoras en el sistema de agua de enfriamiento, toda vez que la información suministrada en las Bases del Concurso por el ex - INECEL se consideraba completa y consistente con la realidad".

"Por otra parte, el detallamiento del diseño básico y construcción de las obras estuvo basado en las condiciones previstas por INECEL y plasmadas en las especificaciones técnicas del proyecto, siendo que tales condiciones sufrieron una extraordinaria variación durante el primer año de funcionamiento de la Central, variación que no pudo haber sido razonablemente prevista o cuantificada de antemano por el Consorcio Constructor, pues corresponden a un evento imprevisible de fuerza mayor..."

".... las características del agua y las condiciones de operación de los filtros de agua de las quebradas son absolutamente distintas a las de los filtros de agua de los caracoles".

"Como ya se ha dejado señalado, la sección 6.4.2 de las especificaciones técnicas se refiere a los filtros rotativos a ser empleados para las tomas de agua ubicadas en las quebradas, en tanto que la Sección 6.4.5 se relaciona con los filtros para el agua proveniente de los caracoles los mismos que deberán ser **similares**, pero que obviamente nunca pueden ser iguales, dado que los primeros son filtros para el agua mucho más limpia proveniente de las quebradas y que alimentan las partes más delicadas del sistema de enfriamiento y sellos".

"En cambio, el filtro utilizado para el agua de los caracoles indicado en 6.4.5, está diseñado para filtrar las aguas con todo tipo de impurezas proveniente de la tubería de presión para el enfriamiento de equipos menos delicados".

"Por lo tanto, el empleo de un equipo "similar" como se menciona en el numeral 6.4.5 de las especificaciones se refiere al diseño conceptual del filtro, pero no implica idénticas características de todos sus elementos, ya que son diferentes las condiciones del agua a filtrar y los requerimientos de los equipos a los que alimenta, según fue aclarado en la reunión técnica celebrada con Hidropastaza del 19 de mayo de 2005 y posteriormente a través de un sinnúmero de comunicaciones, envíos y aprobaciones de planos, diseños e informaciones técnicas cursadas entre las Partes".

"Los filtros autolimpiantes utilizados para los circuitos de enfriamiento de los generadores y transformadores son los habitualmente utilizados para esta función en todo tipo de centrales hidroeléctricas, dentro de los parámetros de diseño establecidos en las especificaciones indicadas en la Licitación de INECEL y en el

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143489

– 168 –
ciento noventa y
ocho p

a. addendum 4 del contrato EPC anexo 4 - Tomo 4 sección M6 que reproducen las especificaciones originales del proyecto de INECEL dentro de los siguientes parámetros de diseño:

Utilización normal
Caudal constante a ser filtrado:      500   m³/hora
Sólidos en suspensión:
- normal                              150   ppm
- elevado                             400   ppm
- excepcional                         1700  ppm
Utilización de emergencia (para alimentar las 2 unidades)
Caudal constante a ser filtrado:      1000  m³/hora
Sólidos en suspensión:                150   ppm

**Diseño del Consorcio adecuado a las especificaciones contractuales**

a. **Malla filtrante**

"La malla filtrante de 760 micrones es adecuada para el agua de los enfriadores de los generadores y transformadores, cuyos conductos de pasaje varían entre 8" y 3" de diámetro. De hecho, filtros como éstos son normalmente utilizados en sistemas de agua de enfriamiento de centrales.

Siendo que la función de estos filtros es impedir el paso de macroimpurezas, minerales u orgánicas, como grumos arcillosos, plantas, etc., eventualmente, durante el proceso normal de filtración, el propio material retenido genera una capa filtrante mucho más fina (pasta) que la propia malla. Cuando se forma la pasta, ésta es el medio filtrante y la malla oficia solo de soporte. Cuando la caída de presión a través del filtro llega al valor ajustado, se inicia el ciclo de retrolavado, removiendo la capa de material filtrado.

Algunos elementos arrastrados por el agua, tales como plásticos, frascos de vidrio, botellas, trozos de madera, etc., que hubiesen atravesado la reja de la toma, pueden alcanzar el interior del filtro y atascarán el mecanismo, pues no fue diseñado para separar estos objetos.

Si se utiliza una malla de 150 micrones en el agua relativamente sucia de los caracoles, como ha sido sugerido, se agravarían las condiciones de atoramiento del sistema por el rápido crecimiento de la pasta.

La malla suministrada por el Consorcio Constructor se ajusta a lo previsto en las especificaciones técnicas, pues las características del agua de enfriamiento proveniente de las quebradas (empleada en el sistema de enfriamiento de los cojinetes y sellos) no son iguales a las características del agua de enfriamiento proveniente de los caracoles (empleada en el sistema de enfriamiento de los intercambiadores de calor del generador y transformadores). No se ha demostrado que el empleo de una malla más fina hubiera evitado la aparición de los problemas ocurridos, visto el significativo incremento de sólidos en suspensión en el agua a turbinarse ocurridos durante el primer año de operación de la central.

12

b. *Ubicación de la toma de agua*

Al igual que otros aspectos del Proyecto Hidroeléctrico San Francisco que han sido incorrectamente cuestionados en los informes elaborados por la CGE, la posición del Consorcio Constructor al respecto de este tema es que las adecuaciones y detalles relacionados con la ubicación de las tomas de agua fueron debida y oportunamente puestos a consideración del Concesionario y aprobados por éste a lo largo del proceso constructivo.

Al margen que el cambio de posición de la toma fuera oportunamente aprobado por Hidropastaza según Oficios Nos. HP-0490-2005 del 30 de abril de 2005 y HP-0850-2005 del 30 de mayo de 2005, para analizar el fenómeno propiamente dicho, es necesario considerar los principios básicos de ingeniería y diseño que tienen relación con el flujo del agua en estas tomas.

El Manual Perry para Ingenieros Químicos (Perry's Chemical Engineers Handbook), refiriéndose al problema de sedimentación en tuberías señala:

"Indudablemente, la sedimentación de las partículas en suspensión es uno de los problemas de la circulación horizontal por conductos de fluidos con sólidos en suspensión.

- Los casos de sedimentación rápida suelen producirse generalmente en partículas mayores a 0,01 pulgada (0,25 mm).

- Las partículas de 0,002 pulgadas o menos (51 micrones), permanecen fácilmente en suspensión.

- Los sólidos pueden permanecer en suspensión cuando la velocidad del fluido sea lo suficientemente alta como para estar en régimen turbulento, en tamaños de partículas menores que 1/8 de pulgada (3 mm)."

Como puede verse, los primeros dos puntos se refieren a líquido detenido o a muy baja velocidad (régimen laminar), en tanto que el tercer caso es aplicable al agua de las tomas del caracol, que por la velocidad del agua, experimenta un flujo de régimen turbulento (N° Reynolds = $22 \times 10^6$) asegurando una enérgica uniformización de la masa líquida debido a la formación de vórtices generalizados, multiplicadores de la velocidad.

Por ello, a esa velocidad de flujo, simplemente no se producirá ningún tipo de gradiente vertical en la concentración de sólidos en suspensión, y por ende, la concentración de éstos no se verá mejorada en lo más mínimo al cambiar la toma a la parte superior del conducto.

El punto de instalación de las tomas de agua para el sistema de enfriamiento de los generadores y transformador es técnicamente adecuado, pues en la parte superior se puede encontrar aire atrapado y objetos sobrenadantes. La aseveración de que cualquiera de los desperfectos sufridos por el Sistema de Agua de Enfriamiento pueda haber sido ocasionado por la ubicación de las respectivas tomas carece de cualquier tipo de fundamento técnico.

13

DIRECCIÓN NACIONAL DE RESPONSABILIDADES

CRP-DOJ-0003143493

c. *Presión del sistema para destapar las rejillas*

El sistema originalmente previsto contemplaba la instalación de un sistema de limpieza que operaría a una presión de 2,2 MPa o 22 bares, en forma paralela y simultánea a la operación de las unidades de generación. Tal sistema fue descartado debido a que la inyección de aire a esa presión, con las unidades en funcionamiento, podía alcanzar las turbinas y producir cavitación.

Es por ello que durante el proceso de detallamiento del diseño básico, suministro y construcción, el Consorcio Constructor propuso fundamentadamente el suministro del sistema de limpieza de las rejillas con una presión de 0,7 MPa, 7 bares, suficiente para realizar tal operación con mayores condiciones de seguridad, esto es, con las unidades paradas y las válvulas mariposa cerradas a fin de evitar los citados riesgos de cavitación en las máquinas.

d. De acuerdo con el sistema planteado y aprobado por Hidropastaza, la toma dispone de un sistema de inyección de aire de limpieza con una presión de 7 bares para destapar las rejillas que es el suficiente para destapar las rejillas en condiciones de parada, válvula mariposa cerrada, válvulas FV001 o FV002 cerrada y válvula esférica ¾" para aire abierta, no siendo necesario el vaciado de la tubería de presión, que es un sistema que en todo caso presenta condiciones más seguras de operación. Esta concepción está presente en el Diagrama de Flujo Básico SFR-DS4PCE-CMSA-003 y en el diagrama SFRR-PCEFJ5-GESA-002, aprobados por Hidropastaza a través de Oficio No. HP-1762-2006.

El sistema de limpieza a presión de las rejillas se ajusta al diseño de detalle presentado por el Consorcio Constructor y aprobado por Hidropastaza, siendo que la concepción de dicho sistema es más segura pues evita el riesgo de que se inyecte aire a las unidades en funcionamiento y se ocasionen problemas de cavitación en las mismas.

d. *Válvulas de paso*

Las válvulas esféricas de 14" suministradas por el Consorcio Constructor de acuerdo a los diseños y detalles aprobados por Hidropastaza son habitualmente usadas en estas instalaciones de agua, inclusive en tamaños bastante mayores funcionando eficientemente en cometidos de alta responsabilidad como válvulas de guardia en tuberías a presión.

Este tipo de válvulas permiten un cierre balanceado y exento de vibraciones y se las puede considerar como una correcta elección plasmada en las especificaciones contractuales, para las condiciones de agua especificadas. En las circunstancias dadas en el período 2007-2008, la exposición a grandes cantidades de lodo que se introducen en espacios confinados del sistema de sellos y en el canal de la esfera obturadora, hacen que esta válvula funcione completamente fuera de su cometido y no trabaje correctamente. En este contexto y conforme lo solicitado en las reuniones de agosto de 2007, Alstom reemplazó estas válvulas por válvulas de cuchilla con sellos especiales recubiertos con metal duro electro depositado (Stellite), habituales para trabajos a altas presiones y lodos abrasivos en extracción de petróleo.

14

CONTRALORÍA GENERAL DEL ESTADO
ECUADOR

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143495

*Si bien las válvulas suministradas son las adecuadas para el tipo de servicio y condiciones del agua previstas en las especificaciones técnicas, la presencia de sólidos en suspensión en cantidades extraordinarias hizo necesario su reemplazo, el mismo que fue realizado por el Consorcio Constructor a pedido de Hidropastaza S.A. en una reunión mantenida en los días 14 y 15 de Agosto del 2007 acta adjunta, en la misma que todos los presentes llegaron a la conclusión de que el motivo para el mal funcionamiento de las válvulas eran los excesivos sedimentos acarreados por el Río Pastaza, es así que el Presidente Ejecutivo de Hidropastaza S.A con Oficio No. HP-1268-2007 solicita autorización al Presidente del directorio de Hidropastaza S.A. para la compra de dichas válvulas, en la misma que se manifiesta lo siguiente:*

*"2) Sistema de Enfriamiento.-Considerando el incremento sustancial de la cantidad de sedimentos en las aguas turbinadas en la Central San Francisco, sedimento producto del lavado de las laderas donde se depositó el material que el Volcán Tungurahua expulsó en su última erupción ocurrida el 16 de agosto del 2006, la operación de la válvula de entrada al filtro del sistema de agua de enfriamiento se han visto comprometidas en su funcionamiento automático, lo cual está causando un manejo manual del sistema de enfriamiento, lo cual no es recomendado, por lo que, mantuvimos una reunión técnica con los suministradores de los equipos electromecánicos de la Central San Francisco los días 14 y 15 de agosto de 2007,..."*

*Por lo que Hidropastaza S.A. adquirió e instaló las válvulas, quedando de esta manera la observación solventada, a pesar de que, como ya se señala, su mal funcionamiento se debió a condiciones de funcionamiento extremas ocasionadas por eventos imprevisibles de fuerza mayor concomitantes con la emergencia extraordinaria experimentada en forma reiterada en la zona del Proyecto durante los años 2006, 2007 y 2008.*

4. **Reconocimiento por Hidropastaza de que los daños fueron causados por sedimentos**

*"El detallamiento, suministro y construcción del SAE se llevó a cabo de conformidad con las especificaciones del diseño básico de INECEL, y cada uno de sus detalles estuvo siempre sujeto a la revisión y aprobación de la Concesionaria Hidropastaza".*

Los administrados exponen:

*"Por otra parte, es pertinente analizar algunos de los temas tratados en el informe y presentación realizados por Ingeconsult Cía. Ltda. a mediados del año 2008, en el cual se concluye, entre otros aspectos, que:*

<u>*Las basuras y sedimentos han afectado a los equipos y causando paradas. De esta manera, Ingeconsult coincide con lo que el Consorcio ha venido demostrando, es decir, que los sedimentos, y las basuras traídas por el agua del río fueron la causa de los daños en cuestión. Además, es*</u> *un equívoco asociar paralizaciones en la Central con el Sistema de Agua de Enfriamiento, pues el Sistema fue diseñado para que las dos unidades puedan operar solo con uno de los circuitos de agua, atendiendo las dos Unidades Generadoras.*

15

- *Causas del problema: alto contenido de sedimentos en suspensión, granulometría muy fina, basuras grandes flotantes turbinadas en Agoyán pasan por rejillas, el sistema de filtros previstos en el diseño básico por INECEL no resuelven el problema.*

- *Alto contenido de sedimentos: análisis de 2008 muestran valores mayores, sedimentos provienen desde cuenca alta, lavas del volcán pueden haber incrementado sedimentos…*

*Hidropastaza ha reconocido el cumplimiento de las especificaciones técnicas y ha aceptado que los desperfectos sufridos por el Sistema de Agua de Enfriamiento han sido ocasionados por la mayor concentración de sedimentos en el agua, sin embargo de lo cual, la CGE persiste en pretender inculpar al Consorcio Constructor por desperfectos ocasionados por eventos imprevisibles de fuerza mayor concomitantes con la emergencia extraordinaria experimentada en forma reiterada en la zona del Proyecto durante los años 2006, 2007 y 2008 sin siquiera analizar si la operación de la Central por parte de Hidropastaza se encontraba dentro de los parámetros técnicos exigidos por las especificaciones o establecidos por los fabricantes de los equipos involucrados."*

b) | 5883 | | |
| **Asociación Furnas – Integral** | 2009/06/15 | 020484 |
| 5884 | | |
| **Marco Antonio Narváez Pinto** | 2009/07/29 | 029049 |
| 5893 | | |
| **Germán Bolívar Anda Naranjo** | 2009/07/28 | 027877 |

Por su parte HIDROPASTAZA, con oficio No. 0436-HPEP-2010 de julio 9 de 2010, señala que el *Sistema de Agua de Enfriamiento (SAE)*, "En el año 2007, *con posterioridad a la ejecución de la ingeniería de detalle, Hidropastaza y el Consorcio intercambiaron una serie de correspondencias y mantuvieron varias reuniones relacionadas con el diseño del sistema de agua de enfriamiento, su desempeño y las condiciones de calidad del agua. Producto de estas comunicaciones y reuniones fue el desarrollo de un estudio de viabilidad técnica para un nuevo Sistema de Agua de Enfriamiento empleando otras fuentes de agua, dado el incremento imprevisible de sólidos en suspensión en el río Pastaza. Por otra parte, ante el desgaste sufrido por los componentes del sistema, el Consorcio suministró e instaló nuevas válvulas de captación del agua de los caracoles y bloqueo del circuito de agua de enfriamiento para el mantenimiento del Sistema y válvulas del sistema de retrolavado del Filtro principal, con objetivo de optimizar la disponibilidad operacional del Sistema de Agua de Enfriamiento, mientras se prosiguiera con los estudios y decisiones para la implantación de una solución definitiva, teniendo en cuenta el incremento en la concentración de sólidos en suspensión en el agua del Río Pastaza.*



16

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143499

*Al cabo de tres años de operación, Hidropastaza considera que el sistema de enfriamiento suministrado de conformidad con el Diseño Básico de INECEL y las especificaciones técnicas del Proyecto que hacen parte del Contrato de Concesión, debe ser reemplazado por un nuevo sistema que se ajuste a las condiciones que actualmente presenta el agua del río Pastaza o que contenga los dispositivos necesarios para mitigar las concentraciones de sólidos en suspensión que superan los valores contractuales previstos o que obtenga el agua de enfriamiento de otra fuente. Es así que atendiendo la recomendación de la Contraloría General del Estado, el Convenio Transaccional contempla:*

*La ejecución por parte del Consorcio, a su costo, de un estudio técnico, económico y financiero de la viabilidad de ejecución de la instalación de equipos de mejoría para el actual Sistema de Agua de Enfriamiento (SAE) de la Central San Francisco.*

*Una vez efectuados los estudios arriba citados y aprobada la ejecución de dicha Obra Adicional por HPEP, ésta será ejecutada por el Consorcio, a su costo dentro del plazo de 2 (dos) años, a partir de la fecha de inicio de los Trabajos Complementarios.*

*Al igual que en el caso de los rodetes, el Consorcio cederá a HPEP las garantías de los fabricantes de los equipos electromecánicos que integrarán dicho SAE y otorgará una garantía por las obras civiles y equipos comprendidos en el nuevo SAE por 24 (veinte y cuatro) meses a partir de la entrega de dicha obra adicional.".*

IV. Que analizados tanto el informe de examen especial como el memorando de antecedentes registrados en archivo con el número 029-2009, al igual que las comunicaciones y pruebas remitidas, se concluye que:

El diseño básico de las obras, con base en el cual se construyó el Proyecto Hidroeléctrico San Francisco, corresponde al diseño constante en los documentos precontractuales entregados por el ex – INECEL, primero durante el proceso de licitación para la concesión del proyecto entre el CONELEC e HIDROPASTAZA y, luego, para la construcción del proyecto entre HIDROPASTAZA y el Consorcio Constructor.

El referido diseño básico, que es parte integrante del contrato de concesión, suscrito por el CONELEC en representación del Estado ecuatoriano, fue también incorporado al contrato de construcción suscrito entre HIDROPASTAZA S.A. y el Consorcio Constructor, sin ningún cambio o adición, pues no podía modificarse sin el expreso conocimiento y autorización del Concedente, como lo dispone la Ley de Régimen del Sector Eléctrico.

El contrato de construcción tiene por objeto el detalle, suministros y construcción del diseño básico suministrado por el Concedente para la ejecución del Proyecto San Francisco.

El numeral 3.1 del Contrato de Construcción, establece:



17

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143501

"El alcance de los trabajos para las obras incluirá la Ingeniería de Detallamiento del Proyecto Básico, el suministro, el montaje, la construcción y las pruebas, comisionamiento y puesta en marcha de las obras. Los Trabajos deberán ser desarrollados de acuerdo con: (i) el Proyecto Básico, (ii) la Optimización al Proyecto definida en el numeral 3.2, (iii) los cambios o mejoras acordadas entre las Partes al tenor del Numeral 8 de este Contrato, si las hubiere, (iv) las Especificaciones incluidas en el Contrato de Concesión y (v) las normas y estándares ecuatorianos u otros aplicables acordados entre el Consorcio y la Concesionaria."

De la cláusula citada, se evidencia que el Consorcio Constructor tenía la obligación, entre otras, de realizar la "ingeniería de detallamiento del proyecto básico", y "la optimización al proyecto definida en el numeral 3.2"; lo cual no comprende la realización de estudios de hidrología, sedimentología, vulcanología o geotécnicos, que a su debido tiempo fueron ejecutados por el INECEL, confirmados por el CONELEC y que sirvieron de base para la concepción del Proyecto San Francisco. Estos estudios básicos tienen un período considerable de tiempo y comprenden el monitoreo del comportamiento de la cuenca del río Pastaza, respecto al contenido de sedimentos de los ríos de las respectivas subcuencas y microcuencas que depositan, contaminan y arrastran las aguas hacia el río Pastaza, las cuales son fuente para el funcionamiento de las centrales hidroeléctricas Agoyán y San Francisco; así como de la conducta del volcán activo Tungurahua, ligado con eventos volcánicos y sismos; información estadística que fue la base de los diseños del proyecto San Francisco.

El CONELEC decidió la eliminación de la Captación del Río Verde del Alcance del Proyecto, preservando así la cascada denominada "Pailón del Diablo", lo que obedeció a un pedido de las comunidades de Baños de Agua Santa y Río Verde y a aspectos ambientales, por lo que se solicitó al Consorcio Constructor el diseño en detalle del proyecto, que incluya las modificaciones derivadas de la eliminación de la captación del Río Verde y la postergación de la construcción del by pass Agoyán - San Francisco para el año 2012.

El Concedente (CONELEC), mediante oficio No. DE-04-0112, solicitó directamente al Concesionario (HIDROPASTAZA) la presentación para la aprobación de las modificaciones a realizar, concernientes a los equipos hidro-electromecánicos considerados en el informe presentado por el Consorcio Constructor Odebrecht-Alstom-VaTech, a fin de que HIDROPASTAZA S.A. emita la orden de fabricación respectiva.

HIDROPASTAZA formalizó al Consorcio Constructor la orden de fabricación de todos los equipos hidro-electromecánicos necesarios para la Central San Francisco, una vez que se contó con la aprobación del CONELEC, y suscribió el Segundo Contrato Modificatorio al Contrato de Concesión, incluyendo ya estos cambios.

El alcance de la optimización del proyecto constituyen las modificaciones surgidas por la salida de la captación del Río Verde y algunos cambios en la metodología de construcción, como por ejemplo: la utilización del topo mecánico (TBM – Tunnel Boring Machine) para la excavación del túnel de conducción; adopción de revestimientos/sostenimiento con dovelas prefabricadas en el túnel de conducción; cambio de ubicación y sección de la ventana 4; cambio de pendiente de la tubería de presión; aumento de la sección del túnel de acceso al bifurcador para permitir el

18

transporte de los anillos de la tubería de presión; cambio de pendiente de la chimenea de equilibrio superior aumentando el tramo vertical de 30 a 40 metros; aumento del espesor del blindaje en la Tubería de Presión. Estas modificaciones no han cambiado el concepto básico del Proyecto.

Hidropastaza y el Consorcio Constructor, el 8 de julio de 2010 han suscrito un Convenio en el que, entre otros asuntos, el Consorcio se ha comprometido a otorgar una garantía por las obras civiles y la provisión y ejecución de las obras del Sistema de Agua de Enfriamiento, dando solución a los hechos que dieron lugar al establecimiento de la glosa.

La Contraloría General del Estado verificará, a través de una nueva acción de control, el cumplimiento de las obligaciones asumidas por las partes en el convenio celebrado el 8 de julio de 2010.

Por lo expuesto; y

En ejercicio de las facultades que le confiere la ley,

**RESUELVE:**

**DESVANECER** la responsabilidad civil solidaria establecida mediante glosas 5882 a 5884 y 5893 de 29 de mayo de 2009, por **USD 521 587**, determinada en contra de los señores: **Consorcio Norberto Odebrecht– Alstom–Va Tech**, en la persona de su representante legal, **Germán Bolívar Anda Naranjo**, presidente ejecutivo de Hidropastaza S. A., **Asociación Furnas – Integral**, en la persona de su representante legal, contratista del servicio de consultoría para la fiscalización del proyecto, y, **Marco Antonio Narváez Pinto**, supervisor de Obras Mecánicas de Hidropastaza.

Notifíquese,

Por el Contralor General del Estado,

Dr. Eduardo Muñoz Vega
Subcontralor General del Estado, Encargado

PCF/GVN/DGG
G. 5882, 5886 a 5893
Inf. 29/2009
Nis. 7539/2009
31-08-2010

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

19

CRP-DOJ-0003143505