2450

- 1 SET 2010



**RESOLUCION No.**

**EL CONTRALOR GENERAL DEL ESTADO**

**CONSIDERANDO:**



A0386-C
**GOVERNMENT EXHIBIT**

CASE NO. 22-cr-20114-KMW

EXHIBIT NO. 1-4B

I. Que como resultado del estudio del informe del examen especial de ingeniería practicado a los daños provocados al sistema de enfriamiento y en los filtros de agua y la evaluación de los daños que ocasionaron la paralización de la Central Hidroeléctrica San Francisco, a cargo de la compañía Hidropastaza S.A., por el período comprendido entre el 26 de septiembre de 2007 y el 30 de septiembre de 2008, se estableció en contra del *Consorcio Norberto Odebrecht– Alstom–Va Tech*, en la persona de su representante legal, contratista de la ingeniería de detalle, suministros y construcción de la Central Hidroeléctrica San Francisco, la glosa por *USD 18 589 852,44*, de los cuales se benefició en *USD 13 639 235,54*, que corresponde a los 9,1726 meses de entrega anticipada de las obras, de acuerdo a la progresión lineal establecida en el numeral 5, "Precio del Programa de Aceleración" de la adenda 4 del contrato EPC; sin considerar que el proyecto no estuvo debidamente terminado, por lo que existió interrupciones en el funcionamiento de la planta; y, *USD 4 950 616,90* que corresponde a la parte proporcional de los intereses que Hidropastaza S.A. debe pagar al Banco Nacional de Desarrollo Económico y Social, BNDES por concepto de capitalización durante el período de gracia.

El numeral 5, "Precio del programa de aceleración" de la adenda 4 del contrato EPC, establece que debido *"...a los costos adicionales para la implementación de un esfuerzo de aceleración en el ritmo de los trabajos para concluirlos con una meta de anticipación de 7 meses, las partes convienen que el ajuste del Precio Global del Contrato será la suma fija de USD 12 784 29, pagadera en su totalidad a la Recepción Provisional de las Obras";* realiza proyecciones del costo del programa de aceleración para 5, 6, 8 y 9 meses; y establece: *"En el caso de que la anticipación en la Terminación Substancial de las obras dentro de un período menor a 5 meses su remuneración estará regulada por la cláusula 11 del Contrato EPC y este acuerdo perderá validez,..."*.

La cláusula 11.- Bonificación por terminación anticipada, del contrato EPC, establece: *"Si la Terminación de cada Unidad de la Central se produce antes de las fechas previstas en el Cronograma Ajustado del Proyecto, o en su defecto, antes de las fechas en que contractualmente tienen el Consorcio derecho a terminarlas, éste tendrá derecho a una bonificación equivalente a la mitad de los ingresos netos..."*.

El Jefe Financiero de Hidropastaza S.A., en la Memoria Explicativa de la Liquidación del Programa de Aceleración, de 8 de agosto de 2008, respecto al pago por *"Bonificación por Terminación Anticipada"*, establece que: *"...la base de cálculo para la Bonificación es negativa, al ser los ingresos netos menores al doble del monto pagadero bajo el Programa de Aceleración, por lo que el Consorcio Constructor no tiene derecho a la Bonificación por terminación anticipada"*.

Dirección de Responsabilidades. Teléfono: 398-7360
Oficina matriz: Av. Juan Montalvo e4-37 y Av. 6 de Diciembre. Quito-Ecuador

**DIRECCIÓN NACIONAL DE RESPONSABILIDADES**

CRP-DOJ-0003143423

El Acta de Liquidación Provisional de la Adenda 4 del contrato EPC, de 14 de septiembre de 2007, establece que la contratista ha terminado los trabajos con 273 días de anticipación, a los cuales se suman 6 días por paralizaciones ocurridas por fuerza mayor, con lo que suman 279 días, equivalentes a 9,1726 meses, con lo que el contratista se hace acreedor a un pago de USD 13 639 235,54.

En el numeral 5 del Acta de Liquidación Provisional, respecto a los pagos efectuados por el Programa de Aceleración, señala:

"i) El Precio del Contrato EPC no varió con la suscripción de la Adenda 4 al contrato EPC y se mantuvo en USD 286 851 129, en el que se incluye la aceleración del ritmo de los trabajos con una aceleración de siete meses con respecto al Plazo contractual, acordándose que el precio del programa de aceleración es de USD 12 784 219.

ii) La Concesionaria ha emitido las Autorizaciones de Desembolso al Banco Nacional de Desarrollo Económico y Social, BNDES por el 84.17%... de la Totalidad del Precio del Contrato EPC por USD 286 851 129, en el que se incluye el precio del programa de aceleración a 7 meses.

iii) La Concesionaria conforme al numeral 6 de la Adenda 4 entregó en carácter de anticipo mediante Aporte Local la cantidad de USD 7 525 680,30 que se contabilizaron como pagos anticipados en Hidropastaza S.A. y,

iv) El Consorcio Constructor reconoce que existe un crédito por USD 7 525 680,30 entre las partes a favor de Hidropastaza S.A.

Por otro lado, conforme lo establece el numeral 4.1 el precio pactado por el esfuerzo y recursos utilizados en el Programa de Aceleración para la anticipación realmente conseguida de 9,1726 meses es de USD 13 639 235,54, es decir un monto adicional de USD 855 016,54, respecto al Precio del Programa de Aceleración con meta de 7 meses, por lo que, las Partes acuerdan que dicho monto adicional sea debitado del crédito a favor de Hidropastaza S.A. enunciado en el párrafo anterior.

El Departamento Financiero de Hidropastaza S.A., elaboró un cuadro denominado "Crédito externo al sector privado" que contiene un resumen de las planillas de avance de obra con el correspondiente número de factura, que fueron canceladas mediante autorizaciones de desembolso del crédito del Banco Nacional de Desarrollo Económico y Social, BNDES.

De acuerdo con el numeral 5.3 de la cláusula quinta del contrato de financiamiento y con el numeral 3.3 de la cláusula tercera de la adenda operativa, los intereses generados durante la etapa de construcción del proyecto deben ser capitalizados; en el anexo a la carta AEX 0200/2008, emitida por el Banco Nacional de Desarrollo Económico y Social, BNDES, determina que el monto de los intereses por el préstamo de USD 242 965 100, generados durante la etapa de construcción, asciende a USD 88 188 749,86; es decir que la tasa de interés es de (36,2968796%). Aplicando la misma tasa al pago del programa de aceleración USD 13 639 235,54, alcanza la suma de USD 4 950 616,90.



DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143425

— 178 —
ciento setenta
y ocho

En la hoja de vida de las turbinas de generación eléctrica se detallan las horas en las cuales la Central ha estado en funcionamiento y las horas en las que se han producido eventos que han provocado su paralización. Analizando el funcionamiento de la Unidad 2, en la que se presentó inconvenientes en el sistema de agua de enfriamiento, desde el inicio de sus operaciones hasta el 6 de junio de 2008, fecha en la que sale de funcionamiento la Central, se determinó que se han efectuado trabajos de mantenimiento electromecánico por 247,45 horas, equivalentes a 10,3 días.

Entre el 6 de junio y el 15 de octubre de 2008, fechas en las que la Central San Francisco salió y nuevamente entró en operación, respectivamente, transcurrieron 131 días.

Por lo expuesto, los trabajos en el túnel de conducción no fueron adecuadamente terminados, ya que no se efectuó el sostenimiento apropiado para cada tipo de roca, ni se realizó la limpieza del hormigón de rebote, pernos, elementos metálicos de sujeción y cables; en la trampa de rocas existen defectos en la excavación (paredes inclinadas, piso irregular), la rampa de acceso para limpieza de sedimentos se construyó en un sitio equivocado; en la chimenea de equilibrio, a pesar de haberse detectado una zona de debilidad geológica, no se revistió su solera; en el sistema de agua de enfriamiento, durante la optimización del proyecto no se realizó una adecuada evaluación, en la ingeniería de detalle se especificaron válvulas y filtros no aptos para trabajar con el tipo de agua que transporta el río Pastaza y la existencia de pendientes de construcción, por lo que no se justifica el pago establecido en el numeral 5, "Precio del Programa de aceleración" de la adenda 4 del contrato EPC; esto es USD 13 639 235,54 por los 9,1726 meses de entrega anticipada de las obras, según lo señala el numeral 4.1 del "Acta de Liquidación Provisional" y USD 4 950 616,90, que corresponde a la parte proporcional de los intereses que Hidropastaza S.A. debe pagar al Banco Nacional de Desarrollo Económico y Social, BNDES, por concepto de capitalización durante el período de gracia; ocasionando perjuicio económico a la entidad en el valor de la glosa, cuya demostración consta en el **anexo 2** que se adjuntó a la misma.

Responden solidariamente en **USD 18 589 852,44**, la **Asociación Furnas – Integral**, en la persona de su representante legal, contratista del servicio de consultoría para la fiscalización del proyecto; e, ingeniero **Carlos Manuel Paz Durini,** supervisor de Obras Civiles, por no exigir al consorcio constructor la ejecución de los trabajos cumpliendo las especificaciones técnicas contractuales; ingenieros: **Germán Bolívar Anda Naranjo,** presidente ejecutivo de Hidropastaza S. A., por disponer el pago del programa de aceleración de los trabajos; **Bolívar Javier Astudillo Farah**, director ejecutivo del Consejo Nacional de Electricidad de CONELEC; **Pablo Aníbal Viteri Estévez,** director de concesiones de CONELEC; y, **Pablo Mauricio Cisneros Gárate**, director de Supervisión y Control de CONELEC; por cuanto no ejercieron un adecuado control y supervisión del proceso de aceleración de los trabajos.

II.   Que por este motivo, el 29 de mayo de 2009 se expidieron las glosas solidarias 5882, 5883, 5885, 5889, 5890, 5892 y 5893, en contra del Consorcio Norberto Odebrecht – Alstom – Va Tech, funcionarios y ex funcionarios de la Compañía Hidropastaza S.A., habiéndoseles notificado legalmente en la forma y fechas que constan a continuación, dándoles a conocer el fundamento de la observación y

3

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CGR-DOJ-0003143427

concediéndoles el plazo de sesenta días de conformidad con el artículo 53, numeral 1, de la Ley Orgánica de la Contraloría General del Estado, a fin de que contesten y presenten las pruebas de descargo pertinentes:

| No. de Glosa y Nombres | Notificación | Fechas |
|---|---|---|
| 5882<br>**Consorcio Norberto**<br>**Odebrecht – Alstom – Va Tech.** | Publicación Diario "HOY" | 2009/07/16 |
| 5883<br>**Asociación Furnas – Integral** | Personal | 2009/06/09 |
| 5885<br>**Carlos Manuel Paz Durini** | Personal | 2009/06/08 |
| 5889<br>**Pablo Mauricio Cisneros Gárate** | Personal | 2009/06/04 |
| 5890<br>**Pablo Aníbal Viteri Estévez** | Personal | 2009/06/05 |
| 5892<br>**Bolívar Javier Astudillo Farah** | Personal | 2009/06/09 |
| 5893<br>**Germán Bolívar Anda Naranjo** | Boleta | 2009/06/15 |

III. Que dentro del plazo legal, las personas que se indican, dan contestación a las glosas mediante comunicaciones ingresadas a la Contraloría General del Estado, según detalle que consta a continuación:

| a) 5882<br>**Consorcio Norberto**<br>**Odebrecht – Alstom – Va Tech** | Fecha | Comunicación |
|---|---|---|
| | 2009/09/21 | 058091 |
| | 2009/07/21 | 026260 |
| | 2009/09/18 | 058091 |
| | 2009/09/18 | S/N |

La responsabilidad fue determinada mediante responsabilidad civil por **USD 18 589 852,44** correspondientes a **USD 13 639 235,54** por los 9,1726 meses de entrega anticipada de las obras y a **USD 4 950 616,90** por la parte proporcional de los intereses pagaderos al BNDES por concepto de capitalización durante el período de gracia.

Sobre el particular, el representante legal del Consorcio Constructor mediante oficio N° CON-041-2009 de septiembre de 2009, textualmente manifiesta que:

*"El fundamento de la glosa 5882 es que:*

*"...los trabajos del túnel de conducción no fueron adecuadamente terminados, ya que no se efectuó el sostenimiento adecuado para cada tipo de roca, ni se realizó la limpieza del hormigón de rebote, pernos, elementos metálicos de sujeción y cables; en la trampa de rocas existen defectos en la excavación (paredes*

4

CRP-DOJ-0003143429

*inclinadas, piso irregular), la rampa de acceso para limpieza de sedimentos se construyó en un sitio equivocado; en la chimenea de equilibrio, a pesar de haberse detectado una zona de debilidad geológica, no se revistió su solera; en el sistema de agua de enfriamiento, durante la optimización del proyecto no se realizó una adecuada evaluación, en la ingeniería de detalle se especificaron válvulas y filtros no aptos para trabajar con el tipo de agua que transporta el río Pastaza y la existencia de pendientes de construcción, por lo que no se justifica el pago establecido en el numeral 5, 'Precio del Programa de aceleración' de la adenda 4 del contrato EPC; esto es USD 13 639 235,54 por los 9,1726 meses de entrega anticipada de las obras, según lo señala el numeral 4.1 del 'Acta de Liquidación Provisional' y USD 4 950 616,90 que corresponde a la parte proporcional de los intereses que Hidropastaza S.A. debe pagar al Banco Nacional de Desarrollo Económico y Social, BNDES, por concepto de capitalización durante el período de gracia; ocasionando perjuicio económico a la entidad en el valor de la glosa, cuya demostración consta en anexo 2 adjunto."*

*"Al igual que en las demás secciones del presente documento, analizaremos cada uno de los cuestionamientos efectuados por la CGE en el mismo orden en que han sido planteados, esto es:*

− *Los trabajos del túnel de conducción fueron adecuadamente terminados, y se instalaron sostenimientos adecuados.*

− *Se realizaron las limpiezas necesarias.*

− *La rampa de acceso de la trampa de rocas No. 1 no afecta su funcionamiento.*

− *La chimenea de equilibrio fue adecuadamente construida y no se requería revestir su solera.*

− *El sistema de agua de enfriamiento fue adecuadamente diseñado.*

− *Los pendientes de construcción fueron levantados.*

− *Análisis jurídico*

**Los trabajos del túnel de conducción fueron adecuadamente terminados y se instalaron sostenimientos adecuados**

*En primer lugar, vale tener presente que los criterios de diseño y el diseño básico elaborados por INECEL, expresados en el Memorando I.IV-7 Diseño Geotécnico del Túnel de Conducción, Casa de Máquinas y Obras Anexas tuvieron como premisa fundamental la construcción de un túnel sin revestimiento de hormigón, debido entre otros aspectos, a que la mayoría de las inestabilidades singulares potenciales serán estructuralmente controladas, las características de dureza y calidad del macizo rocoso excepto en pequeños tramos aislados aseguraba la ausencia de inestabilidades que justifiquen medidas de excavación y soporte especial o anormal, los tramos del túnel donde se podrían encontrar rocas comprimidas debido a una relación esfuerzo/deformación desfavorable serían escasos y la estabilidad del túnel durante la excavación y en la fase de operación estaba garantizada, sin requerir mayor revestimiento.*

5

CRP-DOJ-0003143431



*Por otra parte, el mismo diseño geotécnico de INECEL previó que la colocación de pernos de anclaje y hormigón lanzado sería suficiente para asegurar la estabilidad del túnel de conducción siendo que la aplicación de hormigón proyectado y cerchas metálicas estaría limitada a un porcentaje mínimo de su extensión, ante la presencia de roca triturada o fracturada.*

*Tales criterios de diseño se vieron reflejados en los planos de diseño básico 0213-C-4002-0 Túnel de Conducción Excavación y Sostenimiento Secciones Típicas y Detalles de INECEL y consecuentemente en los planos de detallamiento del diseño básico SFR-DS4PCE-TC43-002 y en la sección 4.4.3 del Tomo 3 del Addendum No. 4 al Contrato de Construcción, que señala:*

*"4.4.3. Instalación*

*La instalación de los pernos de anclaje se realizará de acuerdo a los planos y/o requerimientos particulares identificados en los frentes de trabajo.*

*La indicación de pernos sistemáticos presentada en los planos es referencial y debe ser ajustada técnicamente en los frentes de trabajo por personal especializado."*

*Es así que a partir de los criterios del diseño básico y de su detallamiento, la instalación de los sostenimientos se definió en cada frente de trabajo, tal como estaba previsto en las Especificaciones Técnicas y siguiendo estrictos criterios constructivos, como es normal en este tipo de obra con la permanente participación de la Fiscalización e Hidropastaza.*

*Ello se evidencia en los 429 DTO's (Documentos Técnicos de Obra) emitidos por PCE y aprobados por la Fiscalización donde se establecen los sostenimientos necesarios para cada tramo del túnel de conducción y de las demás excavaciones subterráneas del Proyecto y en las Actas de Entrega-Recepción No. 1 y No. 2 de mayo y junio de 2007, respectivamente. No cabe duda que cada una de las excavaciones que conforman el Proyecto como un todo fueron liberadas progresiva y secuencialmente en función de las verificaciones e inspecciones de la Fiscalización e Hidropastaza, según lo registrado en los 449 folios que componen el dossier de Control de Calidad Final de la Obra, a tal punto que ésta fue recibida con total conformidad de Hidropastaza sin que existan objeciones u observaciones de ningún tipo.*

*Para mayor abundamiento, la siguiente tabla ilustra la cantidad de sostenimientos instalados:*

| Anclajes Totales | 16.786 |
|---|---|
| Hormigón lanzado | 51.767 |
| Hormigón lanzado | 2.735 |
| Dovelas Prefabricadas | 877 |



6

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143433

*Si la afirmación de que "los trabajos del túnel de conducción no fueron adecuadamente terminados, ya que no se efectuó el sostenimiento adecuado para cada tipo de roca" fuese cierta, se supone que la CGE habría determinado fehacientemente que los sostenimientos instalados no fueron suficientes o adecuados y que por ende, ocasionarían una cantidad significativa de desprendimientos de roca; sin embargo, tal afirmación se basa única y exclusivamente en los criterios subjetivos de diversos consultores contratados unilateralmente por Hidropastaza y no en determinaciones objetivas en campo.*

*Para muestra basta citar un ejemplo, como el comentario contenido en el informe de Lombardi S.A. citado por la CGE en su Oficio No. 24107-DIAPA y en el Informe DIAPA-0039-2008, quien expresa "Un rápido control de algunos planos as built, indicó que no hay correspondencia a lo constatado en el sitio durante la Inspección... Parece justificado afirmar que la obra no fue completamente terminada siguiendo los planos de diseño.", ante lo cual solo cabe preguntarse, ¿Cuántos y cuáles planos? ¿De qué forma no se cumplieron los planos de diseño? ¿Cómo fue efectuado el "rápido control"?*

*Adoptando, sin que ello implique de manera alguna nuestra aceptación, las informaciones suministradas por los consultores contratados unilateralmente por Hidropastaza, se demuestra claramente que no existe ningún tipo de sustento cuantitativo que permita afirmar que los sostenimientos instalados no fueron los adecuados.*

*Si por otra parte se adopta el valor de 85 m³ de material desprendido estimado sin el menor sustento en el Informe Pericial Geológico – Geotécnico ordenado por el Juez Noveno de lo Civil de Baños, y que, dicho sea de paso, carece de cualquier valor procesal, se obtiene una razón de 0,0077 m³ por cada metro lineal de túnel.*

*Dichos valores son absolutamente insignificantes en relación a la cantidad de partículas y sedimentos provenientes del Embalse de Agoyán, puesto que aún con las condiciones de sedimentos previstas en la Licitación, -que fueron largamente superadas en el primer año de operación de la Central- el total de los sedimentos previstos que impactarían sobre las turbinas fue estimado en 1 890 000 toneladas por año.*

*La información objetiva disponible no permite afirmar que los elementos de sostenimiento y protección sean insuficientes; por el contrario, las protecciones y sostenimientos fueron colocados según lo encontrado en la excavación del túnel, manteniendo los criterios del diseño básico elaborado por INECEL. Los comentarios de la CGE se basan en afirmaciones subjetivas de los consultores externos contratados unilateralmente por Hidroagoyán y no en levantamientos objetivos de cantidades. Finalmente, aún empleando las informaciones de los consultores de Hidroagoyán, los desprendimientos de rocas en el túnel son insignificantes frente a la cantidad de sedimentos transportados por el río Pastaza hasta las unidades de generación, los mismos que corresponden a eventos imprevisibles de fuerza mayor concomitantes con la emergencia extraordinaria experimentada en forma reiterada en la zona del Proyecto durante los años 2006, 2007 y 2008.*



7

CRP-DOJ-0003143435

*Se realizaron las limpiezas necesarias*

Al igual que en el numeral 3.1 precedente, la afirmación de que "No se realizó la limpieza del hormigón de rebote, pernos, elementos metálicos de sujeción y cables" se basa única y exclusivamente en los criterios subjetivos de diversos consultores contratados unilateralmente por Hidropastaza y no en determinaciones objetivas en campo ya que el túnel fue liberado por la Fiscalización con la aprobación de Hidropastaza antes de su primer llenado.

En este caso y en todas las demás instancias en las cuales se citan y emplean como sustento los informes de los consultores contratados unilateralmente por Hidropastaza, no cabe al Consorcio Constructor sino remitirse a los informes tanto de las entidades previstas contractualmente, como es la Fiscalización como a las Actas de Entrega-Recepción de las Obras, en las cuales no existen observaciones al respecto..."

*"La rampa de acceso de la trampa de rocas No. 1 no afecta su funcionamiento*

La inclinación de las paredes y el piso irregular de la trampa de rocas no tiene ninguna relevancia ni demuestra en absoluto que la obra no haya sido terminada completamente, como sostiene la CGE. Al respecto de la ubicación de la rampa de acceso de la Trampa de Rocas N° 1, su ubicación tuvo el objetivo de facilitar el acceso de mantenimiento evitando el agua de filtraciones aguas arriba de la trampa. No obstante, independientemente de este hecho, la ubicación de la rampa fue colocada en su posición original durante la paralización de junio a octubre de 2008.

La disposición de la rampa de acceso construida en un inicio no tuvo la menor influencia en la operación de la Central, puesto que cualquier material no retenido por la primera trampa de rocas sería retenido por la segunda, ubicada 600 metros aguas abajo.

Conforme se señala en la página 50 del Informe DIAPA-0039-2008, "...la rampa para efectuar la limpieza a la trampa de rocas N° 1, fue construida en una posición contraria a la establecida en los planos de diseño, lo cual fue solucionado durante la etapa de reparación de junio a octubre de 2008."

*"La chimenea de equilibrio fue adecuadamente construida y no se requería revestir su solera*

Si bien el comentario contenido en su Oficio No. Comunicado Glosa 5882 al respecto de la Chimenea de Equilibrio Superior (CES) es más bien breve, el mismo se basa en las observaciones y contenido del Oficio No. 24107-DIAPA y en el Informe DIAPA-0039-2008 que a su vez se fundamentan sobre comentarios contenidos en los informes emitidos por los consultores contratados unilateralmente por Hidropastaza.

De manera general, las observaciones formuladas por los distintos consultores contratados unilateralmente por Hidropastaza, adolecen de las siguientes deficiencias:

CONTRALORÍA
GENERAL
DEL ESTADO

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES
CRP-DOJ-0003143437

Los comentarios y opiniones vertidas en muchos casos son sólo parciales y no abarcan a la totalidad de las obras.

Quienes inspeccionaron las obras no conocieron importantes antecedentes del proyecto, tal como el marco geológico-geotécnico y sedimentológico establecido por INECEL y los protocolos de ejecución y aceptación de las obras, así como tampoco tomaron en consideración las condiciones bajo las cuales operó la Central durante su primer año de funcionamiento, entre otros, todo lo cual debe ser considerado al momento de evaluar la situación en su conjunto.

Muchas de las conclusiones son exclusivamente conceptuales o parciales, sin fundamentos analíticos o cuantitativos.

Por consiguiente, cabe realizar las siguientes puntualizaciones:

La configuración de la Chimenea de Equilibrio Superior mantiene los conceptos de diseño básicos establecidos por INECEL tales como: galería de oscilación inclinada, orificio de embocadura restringido para generación de pérdidas y amortiguación de las oscilaciones y aireación superior en conducto de diámetro reducido. Este diseño de la galería de oscilación es utilizado en muchos proyectos cuando las condiciones geológico-geotécnicas, o aspectos constructivos no permiten una excavación vertical sencilla.

Es así que el Consorcio Constructor respetó el Diseño Básico de INECEL el cual preveía para la Chimenea de Equilibrio Superior un túnel inclinado sin revestimiento y sólo introdujo ligeros ajustes de diseño en su geometría dado que el Diseño Básico de INECEL es adecuado.  Las modificaciones en el diseño incluyeron el descenso de la cota inicial de la Chimenea de Equilibrio Superior y la incorporación de la galería final horizontal como expansión del área, reduciendo la cota final de oscilación. Sin embargo, no se modificó el concepto de funcionamiento de la Chimenea de Equilibrio Superior.

A lo largo de la construcción, el Consorcio Constructor cumplió con todas las prescripciones y criterios de diseño previstos. La construcción de la Chimenea de Equilibrio Superior se completó sin registrarse objeciones al proceso cumpliendo con los estándares técnicos de diseño y de construcción, y en particular, los sostenimientos requeridos, como se detalla más adelante.

En términos geotécnicos, la Chimenea de Equilibrio Superior corresponde al macizo rocoso denominado Zona VII, compuesto por **granito orientado,** en el que se presentan delgadas intercalaciones de esquistos verdes y metavolcanitas. El macizo rocoso presenta foliación de rumbo norte-sur y buzamientos subverticales. La permeabilidad es aleatoria y asociada a la presencia de fracturas y/o fallas combinadas, con cuya frecuencia aumenta.

Según el "Informe Final Apendice X Diseño del Esquema Definitivo" de INECEL, el túnel inclinado se localizaría íntegramente en la roca base, donde no se esperaba mayor fracturamiento, por lo que la Chimenea de Equilibrio Superior no sería revestida. Algunos tramos de falla y cizalladura podrían requerir un sostenimiento más intenso dependiendo de la calidad de la roca encontrada.

9

CRP-DOJ-0003143439

A su vez, en el detallamiento del Diseño Básico se establecieron las secciones de excavación y elementos de refuerzo y revestimiento en el túnel inclinado, las mismas que fueron iguales a las previstas por INECEL, manteniéndose el criterio de que el sistema de refuerzo consistiría en el empleo puntual de hormigón lanzado con fibra de acero, con espesor variable, y de pernos de anclaje en los sitios donde fuese requerido.

Igualmente, se consideró la chimenea sin revestir excepto en la conexión de la chimenea con el túnel de conducción y en un tramo del pozo vertical de la chimenea de equilibrio en función de la buena calidad de roca esperada, en concordancia con el Diseño Básico de INECEL.

Cabe aclarar que el no revestimiento de la Chimenea de Equilibrio, tal como estuvo previsto en el Diseño Básico de INECEL no tuvo incidencia en el evento que se analiza, considerando que se detectó depósito de sedimentos en la Chimenea, producto de la importante cantidad de sólidos en suspensión en el Río Pastaza y no desprendimientos de la propia Chimenea, sin revestir.

Al igual que para el túnel de conducción, previo a la liberación de la estructura fueron ejecutados importantes relevamientos de detalle con señalamiento de los principales aspectos pendientes que fueron corregidos hasta su total aprobación.

Es así que por medio de la Nota OEC/PHSF/GING/01267/2006 entregando documentación de liberación de estructuras acompañada de los documentos SFR-EO8CNO-CS81-002, SFR-EO8CNO-CS85-002, SFR-EO8CNO-CS80-002, SFR-EO8CNO-CS81-001, SFR-EO8CNO-CS85-001, y SFR-EO8CNO-CS80-001 se muestra que las observaciones realizadas al término de la construcción fueron superadas con la intervención y aceptación de Furnas e Hidropastaza.

Es decir, que al momento de proceder a la puesta en servicio de las instalaciones, existía total coincidencia en que los tratamientos necesarios habían sido realizados.

En lo que a la instalación de sostenimientos y protecciones se refiere, según lo establecido por el Diseño Básico de INECEL [Numeral 6.9 - Estudios de Factibilidad y Diseños de Licitación. Informe Final. Septiembre de 1990; plano 0-214-C-4010 y 4011], la Chimenea de Equilibrio no estuvo revestida salvo situaciones puntuales de sostenimiento. Durante la construcción de la CES se encontró que el macizo rocoso estaba altamente fracturado en un tramo importante que en el diseño básico había sido considerado de buena calidad. Cabe destacar que el Consorcio Constructor aplicó adecuadamente los sostenimientos necesarios en función de la mala calidad de la roca, utilizando en la zona de hastiales y bóveda medidas especiales y una mayor cantidad de pernos y hormigón lanzado de lo que se tenía contemplado en el detallamiento del diseño básico [Ref. SFR-IT5PCE-GE41 Octubre 2004 a Enero 2006 y Es decir, que al momento de proceder a la puesta en servicio de las instalaciones, existía total coincidencia en que los tratamientos necesarios habían sido realizados y Plano As-built SFR-DS5PCE-CS41-002-5].

Con base en estas premisas la siguiente tabla presenta una comparación de los soportes colocados respecto a los previstos. Los soportes previstos han sido estimados asumiendo que su cuantía y características serían análogos a los

10

CONTRALORÍA GENERAL DEL EST.00

DIRECCIÓN NACIONAL DE RESPONSABILIDADES

establecidos en el diseño básico de INECEL para la Zona VII del Túnel de Conducción.

| | Anclajes totales | Hormigón lanzado | Cerchas 8WF c/ 1.2 m |
|---|---|---|---|
| Previstos | 1030 un | 875 m² | 10 un |
| Colocados | 1381 un | 7809 m² | - |

En conclusión, puede decirse que durante la construcción se aplicaron los sostenimientos y revestimientos en hormigón lanzado con fibras de acero requeridos de acuerdo a las características del macizo rocoso, superando significativamente las cantidades de sostenimientos previstos en el diseño básico de INECEL. Cabe destacar que no había un requisito en las Bases de Licitación, o en el Contrato EPC, de instalar un cierto volumen de sostenimientos, sino que, como se ha mencionado, los sostenimientos debían instalarse según las necesidades del frente de obras.

En lo que a la solera de la CES se refiere, esta fue sobre-excavada antes del inicio de operación precisamente para remover antes de la liberación definitiva todo el material fracturado que pudiera ser potencialmente transportado hacia las turbinas y por la propia metodología constructiva de barrenado horizontal al trabajar en forma ascendente, por lo que no resulta factible ni existen evidencias de desprendimientos de trozos de este sector hayan sido transportados por el flujo hacia la turbina durante la etapa operativa.

Lo anterior es consistente con lo que indica Furnas, en el informe de inspección posterior al vaciado de Abril de 2007 en su Informe de Inspección Geológica del Sistema de Conducción Posterior al Vaciado ASFI.SF.005E3.2007-R0 del 26 de Abril de 2007, donde se señala que:

"Entre los Pk 0+285 – 0+295, se encuentra una gran sobre excavación del piso (Foto 21), esta zona proyectada hacia la carretera coincide con la primera zona de cizalla que presentó agua en la vía Baños - Puyo (150 m abajo del Pórtico de Salida). **El resto del piso de la chimenea de Equilibrio Superior, se presenta irregular con tramos con grandes desniveles de sobre excavación, esto se dio durante la limpieza del piso para la liberación,** ya que bloques grandes de roca no se observan al inicio de la chimenea en el emboquillado (Foto 20), en el mapeo de las estructuras geológicas, se evidencian zonas de cizallas intercaladas cada 5 a 10 metros y de espesores de 1.0 a 2.5 m a partir del Pk 0+250 de la chimenea. (Foto 22 y 23)."

El informe de la Fiscalización arriba citado muestra la secuencia de avance de las excavaciones y presenta una serie de imágenes de la solera de la chimenea antes y después del primer año de operación (Abril 2007 y Junio 2008). Se observa claramente que la solera de la Chimenea de Equilibrio Superior fue fuertemente sobre excavada antes del inicio de la operación de la Central San Francisco y que no sufrió erosión durante el primer año de operación de la misma.



11

CRP-DOJ-0003143443

Luego de un año de operación, tras la inspección y limpieza se realizaron tareas de regularización solamente para facilidad de mantenimiento, construyendo paños de rellenos y losas de hormigón que mejoraron la uniformidad de la solera de la chimenea y facilitan las tareas futuras de inspección y mantenimiento. Así, la solera fue regularizada en varios puntos de acuerdo a los trabajo exigidos por Furnas antes de la liberación de la estructura, cuyo detalle y control de ejecución figuran en el documento respectivo SFR-EO8CNO-CS81-002. La aprobación de los trabajos correspondientes figura en el documento SFR-EO8CNO-CS85-002.

Las inspecciones realizadas a partir de julio de 2008 mostraron que la roca de la solera había permanecido inalterada luego del primer año de operación, verificándose el depósito de sedimentos finos sobre la misma, sobre lo cual se comenta más adelante. Si bien la CES tiene capacidad para sedimentar material fino en su interior, no existe evidencia de erosión o transporte de materiales hacia las turbinas.

Según los administrados:

"Es un error por tanto considerar que la ausencia de un revestimiento en la solera de la CES produce o favorece la erosión y el desprendimiento de rocas o la sedimentación del material fino en suspensión. No existen evidencias de lo primero y el fenómeno de sedimentación se produce debido a las bajas velocidades que normalmente se presentan en la chimenea y, durante el primer año de operación, fue ocasionado principalmente por la enorme cantidad de sólidos en suspensión transportados por las aguas.

Respecto a las filtraciones, el fenómeno de alta permeabilidad del macizo rocoso en una zona de la CES no tiene incidencia en la estabilidad interna de la chimenea puesto que el sostenimiento aplicado en esta zona es adecuado y consecuente con la clasificación del macizo rocoso.

Por otra parte, al verificar los espesores de cobertura vertical y lateral y su relación con la presión de operación de la CES, se encuentran factores de seguridad por fractura hidráulica por lo general superiores a 3.0, lo que indica que el alineamiento vertical y horizontal de la chimenea de equilibrio superior es adecuado, por lo que en el macizo no se van a presentar fracturas inducidas por la presión del túnel que pudieran generar problemas de inestabilidad de la ladera.

Las zonas de fallas naturales existentes en la zona de la CES, han generado que exista un escurrimiento menor de agua hacia el exterior de las mismas, que alimentó una pequeña cascada, la cual resulta visible desde la carretera que conduce a la localidad de Baños. Esta cascada existía antes de la excavación del túnel y moradores de la zona la utilizaban para tomar agua para sus parcelas.

Durante la construcción del túnel de acceso principal, la cascada se secó y esas aguas fueron captadas por el túnel antes indicado. Después del llenado del túnel, esta cascada se reactivó con caudales similares a los que presentaba antes de la construcción.

En el Adjunto de Revestimientos de la Chimenea de Equilibrio se muestran las verificaciones realizadas.

12

CONTRALORÍA
GENERAL
DEL ESTADO

E
C
U
A
D
O
R

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143445

Con respecto a la posibilidad de acumulación de sedimentos y sus efectos deben señalarse dos hipótesis: el retorno de una amplia proporción de los sedimentos alojados en la CES al túnel y por ende a las turbinas y la eficacia del muro de entrada como barrera para los sedimentos.

La primera hipótesis no está respaldada por ninguna evidencia que confirme su ocurrencia y contradicen lo constatado durante la inspección de la obra. Es claro que la acumulación de sedimentos es algo totalmente distinto a aportar una cantidad considerable de sedimentos hacia la Casa de Máquinas y no hay evidencias de que lo último haya ocurrido.

Es indiscutible que la CES funciona como sedimentador en una amplia parte del tiempo, reteniendo sedimentos que, de circular en suspensión en el agua del túnel, pasarían por los rodetes de las turbinas, pero ello se debe a sus concentraciones en el agua y al estado de reposo en la galería inclinada de la CES, lo cual es inevitable. Por el contrario, sólo en una mínima proporción del tiempo, durante los cambios del régimen operativo de la central, la CES tendría la capacidad hidráulica de aportar sedimentos previamente depositados hacia el túnel de conducción por las velocidades de salida.

Respecto a la eficacia del muro de entrada, desde el punto de vista del diseño, el orificio o estrangulamiento de la sección creado por el muro vertical en la unión entre el túnel y la chimenea de equilibrio cumple una función hidráulica específica que es la de generar pérdidas de carga durante los fenómenos transitorios.

Considerando los reducidos tiempos en que se alcanzan velocidades de egreso capaces de arrastrar sedimentos desde la CES al Túnel de Conducción, y la ausencia de materiales erosionados de la CES, se descarta entonces la hipótesis de que haya existido material desprendido de techo, paredes y solera de la CES que haya alcanzado a la turbinas, predominando en cambio, el comportamiento de retención de sedimentos, aportado por las aguas del río Pastaza, como fue demostrado por el estado en que se encontró la galería inclinada.

El otro tema que debe quedar perfectamente claro es la tendencia de la CES a funcionar como un sedimentador. Esto no depende para nada de la presencia o no la losa en la solera de la chimenea de manera que es un error considerar que con la losa de fondo se evitará la acumulación de sedimentos en el interior de la misma pues el único efecto que tendrá la losa de fondo será regularizar el piso para facilitar los desplazamientos del personal y equipo durante los períodos de inspección y mantenimiento.

En resumen, considerando los efectos producidos por la acumulación de sedimentos, consideramos que dentro de amplios límites, no se pierde la función primaria de la chimenea en cuanto a su capacidad para amortiguar las oscilaciones y proteger al túnel de aducción.

Por ende, el funcionamiento de la CES y la sedimentación ocurrida en la misma no son causa de los daños encontrados en las turbinas de la Central San Francisco. Por el contrario, los mismos se relacionan principalmente con la elevadísima cantidad de sedimentos transportados por el río Pastaza durante el primer año de operación.

13

CRP-DOJ-0003143447

El revestimiento de la solera, así como todas las observaciones efectuadas por la CGE respecto a la CES en su Oficio No. 24107-DIAPA y en el Informe DIAPA-0039-2008 carecen de fundamento, pues el Consorcio Constructor ejecutó la obra de acuerdo con los diseños, planos y especificaciones técnicas acordadas en el contrato, el mismo que establece, entre otros aspectos, las condiciones normales de operación de la Central, las mismas que fueron superadas ampliamente durante el primer año de funcionamiento del Proyecto Hidroeléctrico San Francisco a causa de los eventos imprevisibles de fuerza mayor concomitantes con la emergencia extraordinaria experimentada en forma reiterada en la zona del Proyecto durante los años 2006, 2007 y 2008 y que generaron el arrastre de una enorme cantidad de sólidos en suspensión transportados por el río Pastaza hasta las unidades de generación…."

"Los pendientes de construcción fueron levantados

Al respecto de este punto, procedemos a analizar los trámites cumplidos durante la ejecución de las obras, previas al comisionamiento y recepción de las mismas.

Las condiciones para la recepción de las obras, fueron establecidas en la Cláusula 24 del Contrato EPC suscrito entre Hidropastaza y el Consorcio Constructor, en base a la cual se realizó la recepción de las obras.

Previamente y durante la construcción, se realizaron las sucesivas liberaciones de cada uno de los componentes del proyecto, siguiendo un proceso de revisión detallada por parte de la Fiscalización e Hidropastaza, señalándose en cada caso específicamente los aspectos pendientes y su posterior ejecución y aprobación, como consta en las Notas OEC/PHSF/GING/01267/06 y Anexos del 24 de noviembre de 2006, OEC/PHSF/GING/01268/06 y Anexos del 30 de noviembre de 2006 y las fichas de liberación que hacen parte de los documentos del contrato.

Una vez concluida la totalidad de la obra, ésta fue recibida de conformidad con el contrato y con el acuerdo de las partes evidenciado en el Acta de Entrega Recepción No. 1 – Unidad Generadora No. 2 y Obras Esenciales de Mayo 2007 y en el Acta de Entrega Recepción No. 2 – Unidad Generadora No. 1 y Central como un todo de Junio 2007.

De acuerdo a la cláusula 24.4, si existiesen pendientes que impidieran la operación de las unidades, éstas serían detalladas y resueltas por el Consorcio Constructor. En oportunidad de la recepción no fue detallada alguna deficiencia de importancia, limitándose los pendientes señalados a aspectos de escasa importancia, normales en este tipo de proyectos y que no comprometían la seguridad del personal o de las instalaciones.

De hecho, cada Acta de Entrega incluye un detalle exhaustivo de las partes de las obras liberadas, con los documentos donde se formalizó dicha liberación.

A través de los documentos mencionados queda absolutamente claro que al momento de ambas Actas de Entrega las obras se encontraban totalmente finalizadas, de acuerdo al alcance previsto en el contrato oportunamente celebrado, a satisfacción de las partes. Ninguno de los funcionarios de la Fiscalización, de Hidropastaza u otras instituciones formalizó algún tipo de observación con relación a

14

*los aspectos que actualmente se observan, existiendo coincidencia total en dichos aspectos, por lo que la afirmación de la CGE carece de todo sustento."*

**"Aspectos jurídicos**

*Una vez que todos los aspectos técnicos implícitos en el numeral 3 de la Glosa que impugno han sido aclarados, conviene analizar el tema de fondo de la glosa parcial por el valor de USD 18 589 852,44 de los cuales se dice que el glosado se benefició en USD 13 639 235,54 que corresponde a los 9,1726 meses de entrega anticipada de las obras, de acuerdo a la progresión lineal establecida en el numeral 5, "Precio del Programa de aceleración" del Addendum No. 4 del contrato EPC sin considerar que el proyecto no estuvo debidamente terminado, por lo que existió interrupciones en el funcionamiento de la planta; y, ii) USD 4 950 616,90 que corresponde a la parte proporcional de los intereses que Hidropastaza S.A. debe pagar al Banco Nacional de Desarrollo Económico y Social, BNDES por concepto de capitalización durante el período de gracia.*

*El valor de USD 13 639 235,54 que según la Glosa constituyó un beneficio, no es tal, pues el Addendum No. 4 que se halla vigente reconoce a este valor como el resultado de los costos incurridos por el Constructor en el plan de aceleramiento. No puede confundirse entre beneficio y costo, pues contablemente constituyen dos ingresos distintos y diferentes en su esencia.*

*El numeral 5) del Addendum No. 4 al Contrato de Construcción, las Partes establecen los costos adicionales a ser reconocidos al Consorcio Constructor por alcanzar diversas metas de anticipación, en un rango de 5 a 9 meses, explicando de manera clara el concepto del costo del plan de aceleración de obras, conforme sigue a continuación:*

*"5. PRECIO DEL PROGRAMA DE ACELERACIÓN*

*En consideración a los costos adicionales para la implementación de un esfuerzo de aceleración en el ritmo de los trabajos para concluirlos con una meta de anticipación de 7 meses, las Partes convienen que el ajuste del Precio Global del Contrato será la suma fija de USD 12 784 219 pagadera en su totalidad a la Recepción Provisional de las Obras.*

*El valor de este reajuste está discriminado así:*

| | |
|---|---|
| Obras Civiles | USD 9 887 197 |
| Obras Electromecánicas | USD 2 897 022 |

*Por otra parte, el precio neto de la aceleración será modificado automáticamente si la anticipación obtenida en la Terminación Substancial de las obras con respecto al plazo contractualmente establecido en el Contrato EPC Original se ve modificada por razones bajo control o responsabilidad del Consorcio Constructor…"*

*En el numeral 3) del anexo número 1) al addendum No. 4, se describen las principales actividades que comportan este costo, se la siguiente manera:*



15

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143451

*"3.- ACTIVIDADES PERTINENTES AL PROGRAMA DE ACELERACIÓN*

*El Programa de Aceleración aquí propuesto tiene como base fundamental lo siguiente:*

*a) La utilización de turnos adicionales de personal y equipos, especialmente en todas las actividades que hacen parte de la Ruta Crítica y de las que puedan tornarse críticas.*

*b) Sobre tiempo de personal y equipos en todos los turnos de trabajo.*

*c) Mayor cantidad de personal, equipos y herramientas que lo originalmente previsto.*

*d) Mayor Supervisión, Ingeniería de Campo e Ingeniería del Diseño del Proyecto.*

*e) Mayor infraestructura logística (talleres, bodegas, depósitos al aire libre, instalaciones industriales, administrativas y similares).*

*f) Cambio en la secuencia de algunos trabajos.*

*g) Cambios metodológicos en la ejecución de los trabajos incluyendo la incorporación de tecnología de punta mecanizada en las excavaciones subterráneas*

*h) Cambios de diseño requeridos para la aceleración de los trabajos."*

*En el Anexo No. 3 del Addendum No. 4 se describen cada uno de los costos. Cabe preguntarse ¿en dónde se halla el beneficio, premio o algo similar…? Lo lógico y legal era establecer si verdaderamente o no, estos costos fueron incurridos en las obras descritas en el Addendum materia del análisis, pero lamentablemente la Contraloría no analiza nada de esto, tornando a la Glosa nula, por falta de análisis de pruebas.*

*El hecho que la obra fue terminada anticipadamente se demuestra fehacientemente en el hecho que previo a la suscripción de las Actas de Recepción No. 1 correspondiente a la Unidad Generadora No. 2 y sus Obras Esenciales (en la cual consta el Túnel de Conducción y Chimenea de Equilibrio Superior) y de Recepción No. 2 correspondiente a la Unidad Generadora No. 1 y al Central Como un Todo, suscritas el 10 de mayo y 25 de junio de 2007 respectivamente, el Consorcio Constructor acordó con Hidropastaza S.A. un procedimiento de liberación de estructuras, cuyos soportes constan como anexos a dichas actas.*

*Después de realizar el primer vaciado del Túnel de Conducción en abril de 2007, se realizaron inspecciones tanto con la Fiscalización del Proyecto, así como con representantes del CONELEC, los mismos que emitieron informes sin mayores novedades.*

16

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143453

*Luego de casi dos meses, las Partes suscriben el Acta de Liquidación Provisional del Programa de Aceleración, en donde declaran que se ha cumplido con todas las premisas acordadas en el Addendum No. 4 al Contrato de Construcción. Es por tanto evidente que las obras fueron concluidas anticipadamente según lo establecido en el programa de aceleración del Addendum No. 4 al Contrato de Construcción.*

*Sin embargo resulta notoria la parcialidad con la que se analiza los valores glosados y se dejan de analizar otros, tales como los ingresos extraordinarios que percibió Hidropastaza en el período de aceleración por concepto de venta de energía y cuyas cifras fueron señaladas en nuestras contestaciones dentro del examen citando los siguientes ingresos por mes.*

| AÑO | MÊS | FACTURACION |
|---|---|---|
| **2007** | MARZO | 14.249,25 |
| | ABRIL | 7.561,72 |
| | MAYO | 2.535.099,51 |
| | JUNIO | 2.816.062,45 |
| | JULIO | 5.685.371,84 |
| | AGOSTO | 5.263.964,23 |
| | SEPTIEMBRE | 5.957.758,42 |
| | OCTUBRE | 5.125.416,19 |
| | NOVIEMBRE | 4.782.572,47 |
| | DICIEMBRE | 5.481.967,86 |
| **2008** | ENERO | 5.811.508,19 |
| | FEBRERO | 4.523.687,77 |
| | **TOTALES** | **48.005.219,91** |

*Estos ingresos de Hidropastaza durante el período durante el cual supuestamente la Central no estaba terminada, demuestran que la Central sí fue completada, y sí fue operada durante más de nueve meses antes de la fecha prevista originalmente, dando así derecho al Consorcio a los costos de la aceleración, y a la bonificación por aceleración (concepto este último que no fue pagado por Hidropastaza, en violación de las prescripciones contractuales).*

*En todo caso, es ilógico reclamar al Consorcio la devolución de los costos de la aceleración, y retener al mismo tiempo las ganancias realizadas como resultado de la entrega acelerada. Es un doble beneficio que estaría pretendiendo el Estado.*

*Adicionalmente, el Sistema Eléctrico nacional está formado por la interconexión entre todas las centrales de generación de tal manera que la entrada o salida de una de aquellas afecta la entrega de energía a la demanda. No puede ignorarse que adicionalmente, la entrada anticipada de la Central San Francisco se debió fundamentalmente a necesidades del país para atender su demanda de energía eléctrica y que ello generó los siguientes ahorros estimados para el Estado:*



DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

17

CRP-DOJ-0003143455

**Reducción de importaciones de diesel por el Proyecto San Francisco**

| | 2005 | 2006 | |
|---|---|---|---|
| Costo de importación de diesel total nacional (US$) (1) | 648.293.257,17 | 949.953.341,96 | a |
| Consumo de diesel del sector eléctrico (miles de barriles) (2) | 1.987,80 | 2.873,47 | b |
| Volumen total de importaciones de diesel (miles de barriles) (2) | 8.122,34 | 11.325,19 | c |
| Costo de importación de diesel del sector eléctrico (US$) | 158.658.046,92 | 241.026.100,30 | d=(b/c)*a |
| Producción de energía eléctrica con diesel (MWh) (2) | 1.012.058,83 | 1.418.989,61 | e |
| Costo unitario de importación de diesel del sector eléctrico (US$ / MWh) | 156,77 | 169,86 | f=d/e |
| Producción de energía eléctrica de SF (MWh) | 1.412.000,00 | 1.412.000,00 | g |
| Reducción de importaciones de diesel por el SF (US$ miles) | 221.355.869,80 | 239.838.861,51 | h=g*e |

| | | |
|---|---|---|
| **Reducción proporcional para 9 meses** | 166.016.902,35 | 179.879.146,13 |

| | |
|---|---|
| **Promedio** | **172.948.024,24** |

Fuentes: (1) BCE 2005 - 2006, (2) CENACE

*Esta categórica prueba respecto de las ventajas de la entrada en operación anticipada de la Central tanto en lo relacionado con los beneficios recibidos por HPSA, reportados en sus estados financieros de los años 2007 y 2008 como en lo relacionado a los beneficios percibidos por el Estado, no ha sido analizada, desvirtuada o controvertida en el análisis de prueba, simplemente porque no se hace un análisis de todos los elementos presentados de manera contundente evidenciando una total falta de consideración al debido proceso que ampara a mi representada…."*

*"…Los USD 4 950 616,90 que según la glosa corresponden a la parte proporcional de los intereses que Hidropastaza S.A. debe pagar al Banco Nacional de Desarrollo Económico y Social-BNDES, por concepto de capitalización durante el período de gracia es ajena a la obligación contractual y seguramente contiene los riesgos asumidos por el prestatario dentro de un contrato de préstamo del cual el Consorcio Constructor no es parte. No hay duda que la glosa por el valor de los intereses que debe pagar Hidropastaza al BNDES, constituye una figura de pago de lucro cesante que utiliza la Contraloría violando los derechos de limitación al pago de lucro cesante contenidos en el Contrato de Construcción en la cláusula 30, que establece expresamente lo siguiente:*

*"…En ningún evento tendrá cualquiera de las Partes responsabilidades hacia la otra o hacia sus respectivas matrices, subcontratistas, filiales, empleados y/o agentes, por daños consecuenciales, incluyendo daños emergentes, pérdida o disminución de ingresos, lucro cesante y similares...".*

*Finalmente, la bonificación anticipada por terminación de la obras antes del plazo, sí constituía un beneficio a favor del Consorcio Constructor pero este beneficio nunca fue pagado y así se reconoce en la Glosa con el siguiente texto:*

18

CONTRALORIA
GENERAL
DEL ESTADO

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143457

*"El Jefe Financiero de Hidropastaza S.A., en la Memoria Explicativa de la Liquidación del Programa de Aceleración, de 8 de agosto de 2008, respecto al pago por 'Bonificación por Terminación Anticipada', establece que: '...La base de cálculo para la Bonificación es negativa, al ser los ingresos netos menores al doble del monto pagadero bajo el Programa de Aceleración, por lo que el Consorcio Constructor no tiene derecho a la Bonificación por terminación anticipada'".*

*Existe por tanto un error de concepto en el argumento que el pago por la terminación anticipada de los trabajos es indebido a causa de que la entrega de la obra no se produjo debido a que posteriormente a la entrada en operación de la central ésta ha sido paralizada para efectuar reparaciones, pues no cabe la menor duda que la entrada de operación anticipada de la central tuvo efectivamente lugar inclusive antes de junio de 2007, que la obra fue recibida y aceptada y que producto de esta aceptación y entrada en operación anticipada debidamente autorizada por el CENACE y el CONELEC, la Concesionaria Hidropastaza S.A. obtuvo importantes ingresos no previstos y el Estado ecuatoriano percibió grandes ahorros por concepto de reemplazo de combustibles fósiles. La paralización de la obra fue el resultado de los eventos imprevisibles de fuerza mayor concomitantes con la emergencia extraordinaria experimentada en forma reiterada en la zona del Proyecto durante los años 2006, 2007 y 2008 y que generaron el arrastre de una enorme cantidad de sólidos en suspensión transportados por el río Pastaza hasta las unidades de generación, Esta causa no tiene nada que ver y es absolutamente independiente de la aceleración de la obra establecida en el Addendum No. 4 al Contrato de Construcción, por lo cual impugno la glosa establecida por la CGE.".*

| | Fecha | Comunicación |
|---|---|---|
| 5883 **Asociación Furnas – Integral** | 2009/06/15 | 020484 |
| 5885 **Carlos Manuel Paz Durini** | 2009/08/07 | 034805 |
| 5889 **Pablo Mauricio Cisneros Gárate** | 2009/07/02 | 022673 |
| 5890 **Pablo Aníbal Viteri Estévez** | 2009/07/28 | 028321 |
| 5892 **Bolívar Javier Astudillo Farah** | 2009/08/11 | 035471 |
| 5893 **Germán Bolívar Anda Naranjo** | 2009/07/28 | 027877 |

Al respecto el representante legal de HIDROPASTAZA, con oficio No. 0436-HPEP-2010 de julio 9 de 2010, textualmente señalan que la:

*"Aceleración*
*Como indica la Contraloría General del Estado en su Informe DIAPA-0039-2008, el Addendum N° 4 al Contrato de Construcción fue suscrito el 20 de septiembre de 2006 para acelerar el ritmo de los trabajos, y adaptar el diseño básico al programa de aceleración.*

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143459

*El 10 de mayo del 2007, y posteriormente, el 25 de junio del 2007 Hidropastaza, la Fiscalización y el Consorcio Constructor suscribieron el Acta de Entrega Recepción No. 1 para la Unidad Generadora N° 2 y demás obras esenciales y el Acta de Entrega Recepción N° 2 para la Unidad Generadora N° 1 y la Central Como un Todo, respectivamente.*

*El 14 de septiembre del 2007, se suscribió el Acta de Liquidación Provisional del Addéndum 4 en la que se establece que entre el 27 de febrero del 2008, fecha prevista para la terminación del proyecto, y el 30 de mayo del 2007, fecha de terminación de los trabajos, se ha logrado una anticipación de 273 días, a los cuales se agregan 3 días de paralización por manifestaciones y 3 días por actividades volcánicas, por lo que la anticipación es de 279 días o 9,1726 meses que resulta en un monto a pagar de USD 13 639 235,54.*

*Por otra parte, en el trámite de la instrucción fiscal y dentro del Juicio No. 18251-2009-0741, el Señor Fiscal del Distrito de Tungurahua dispuso se realice un peritaje pormenorizado y se presente el correspondiente informe pericial de la contabilidad de Hidropastaza cuyo objeto fue la inspección a los estados financieros de Hidropastaza para determinar los ingresos que tuvo por venta de potencias y energía entre Mayo del 2007 hasta la fecha del peritaje, para lo cual era necesario verificar los estados financieros de los años 2007, 2008 y 2009, y expresamente determinar cuáles fueron dichos ingresos y cuál fue el presupuesto estimado de la empresa.*

*Como resultado de dicha investigación, el escrito presentado por el perito designado permite establecer ciertas comparaciones entre la facturación de Hidropastaza durante el período de aceleración (Mayo 2007 a Febrero 2008) y el costo de la aceleración. En su escrito, el perito presenta los siguientes datos de facturación de Hidropastaza:*

| | 2007 | 2008 | 2009 |
|---|---|---|---|
| | Facturado | Facturado | Facturado |
| Enero | | 5.518.142,82 | 5.877.076,28 |
| Febrero | | 5.845.724,17 | 5.347.402,75 |
| Marzo | | 4.570.020,16 | 6.064.182,29 |
| Abril | | 5.999.787,68 | 5.579.607,85 |
| Mayo | | 5.971.445,68 | 1.224.915,59 |
| Junio | 2.606.549,27 | 6.150.973,29 | 5.772.876,70 |
| Julio | 2.858.017,25 | 1.457.889,37 | 6.127.753,30 |
| Agosto | 5.746.956,25 | | 11.344.648,99 |
| Septiembre | 5.287.841,35 | | 5.811.967,76 |
| Octubre | 5.986.511,82 | | 5.838.395,14 |
| Noviembre | 5.155.827,39 | 3.670.374,64 | 5.849.715,89 |
| Diciembre | 4.833.604,32 | 6.449.306,13 | 5.790.123,74 |
| **Total** | **32.475.307,65** | **45.633.663,94** | **70.628.666,28** |

*Los valores sombreados en gris corresponden a la facturación y recaudación durante los meses de aceleración (mayo 2007 a febrero 2008). La venta y recaudación de un mes se refleja en el mes siguiente. Esto se evidencia por el hecho que los ingresos del mes de junio de 2008 aparecen en el mes de julio siguiente, que no tuvo de hecho ingresos a causa de la interrupción de las operaciones de la central.*

DIRECCIÓN NACIONAL
DE RESPONSABILIDADES

CRP-DOJ-0003143461

IV.

*Por tanto, la facturación en los meses de anticipación ascendió a USD 48 409 194,80. En contraparte y como ya se ha indicado, el costo de la aceleración fue de apenas USD 13 639 235,54 por lo que el beneficio neto percibido por Hidropastaza como resultado de la aceleración asciende a USD 34 769 959,26. Las ventas de los años 2007, 2008 y 2009 alcanzan un valor de USD 148 737 637,87, es decir, casi la mitad del costo del proyecto sin considerar los valores de ahorro de combustibles como valores asociados al reemplazo de generación térmica.*

*Aún más, si las pérdidas de ingresos ocasionados por la paralización establecidos por la Contraloría General del Estado (que según la Contraloría ascienden a USD 26 556 179,17 y que superan el valor estimado del lucro cesante, tema sobre el cual se comenta más adelante) se imputan a los ingresos adicionales obtenidos por Hidropastaza como resultado de la aceleración del Proyecto, el saldo resultante todavía resulta favorable a Hidropastaza, pues ésta obtendría ganancias de USD 8 213 780,09 con respecto a la facturación, con lo cual no existen pérdidas contables que puedan ser imputadas al Consorcio ni perjuicio económico alguno a causa de la aceleración del plazo de terminación de las obras.*

*Estas consideraciones se resumen en la siguiente tabla:*

| Concepto | Facturación |
|---|---|
| Ingresos adicionales durante la aceleración | 48'409.194,80 |
| Costo de la aceleración | 13'639.235,54 |
| Saldo a favor de Hidropastaza | 34'769.959,26 |
| Pérdidas por lucro cesante según CGE | 26'556.179,17 |
| Saldo a favor de Hidropastaza | 8'213.780,09 |

*Por ende, en consideración a los hechos subsecuentes explicados anteriormente, se desvirtúa el hecho que la Central no haya sido entregada en forma anticipada, justificándose así, el costo de la aceleración incurrido por Hidropastaza.".*

IV. Que analizados tanto el informe de examen especial como el memorando de antecedentes registrados en archivo con el número 029-2009, al igual que las comunicaciones y pruebas remitidas, se concluye que:

Los administrados han remitido las Actas de Entrega-Recepción No. 1 y No. 2 de mayo y junio de 2007, las que se basan en documentos técnicos aprobados por la Fiscalización, con los cuales fueron liberadas las obras en forma progresiva y secuencial en función de las verificaciones e inspecciones de la Fiscalización e Hidropastaza. Habiéndose recibido en forma integral el túnel de conducción y de las demás excavaciones subterráneas del proyecto, como las mencionadas en el fundamento de la glosa, sin que existan objeciones u observaciones de ningún tipo.

De los documentos SFR-EO8CNO-CS81-002, SFR-EO8CNO-CS85-002, SFR-EO8CNO-CS80-002, SFR-EO8CNO-CS81-001, SFR-EO8CNO-CS85-001, y SFR-EO8CNO-CS80-001 se demuestra que las observaciones realizadas al término de la construcción fueron superadas con la aceptación de la fiscalización e HIDROPASTAZA.

21

CRP-DOJ-0003143463

Como se señaló en párrafos precedentes, las obras fueron recibidas por la fiscalización e HIDROPASTAZA, por lo que, la central inició su operación de acuerdo a lo previsto. Los problemas en el túnel, chimenea de equilibrio y revestimiento de solera, se presentaron por la excesiva carga de sedimentos de la fuente de uso para el funcionamiento de las centrales Agoyán y San Francisco, presentados en forma reiterada en la zona del Proyecto y a otras afectaciones de orden constructivo inherentes a un proyecto de esa magnitud. Los citados problemas fueron solucionados por el Consorcio Constructor luego del primer año de funcionamiento del Proyecto Hidroeléctrico San Francisco, dentro del período de garantía técnica y durante una parada programada de mantenimiento, como estuvo previsto en el contrato.

Señalan los administrados que, los consultores que inspeccionaron las obras no conocieron importantes antecedentes del proyecto, tal como el marco geológico-geotécnico y sedimentológico establecido por INECEL y los protocolos de ejecución y aceptación de las obras, así como tampoco tomaron en consideración las condiciones bajo las cuales operó la Central durante su primer año de funcionamiento, las obligaciones contractuales del Consorcio Constructor, documentos que constan en los descargos suministrados en relación a los procesos de aprobación de las obras.

El adendum No. 4 al contrato de construcción, tiene que ver con los costos incurridos por el Consorcio Constructor para que las obras fueran concluidas anticipadamente, según lo establecido en el programa de aceleración del citado adendum. La glosa determina que el contratista se benefició en USD 13 639 235,54, que corresponde a los 9,1726 meses de entrega anticipada de las obras; sin embargo, este monto se refiere a los valores cancelados por gastos incurridos por el Consorcio Constructor para cumplir con el objeto del adendum 4, es decir, la aceleración de la obra, que contractualmente fueron establecidas por HIDROPASTAZA.

En el numeral 5) del Adendum No. 4 al Contrato de Construcción, las Partes establecen los costos adicionales a ser reconocidos al Consorcio Constructor por alcanzar diversas metas de anticipación, en un rango de 5 a 9 meses.

El Programa de Aceleración comprende, entre otros aspectos, la utilización de turnos adicionales de personal y equipos, especialmente en todas las actividades que hacen parte de la Ruta Crítica y de las que puedan tornarse críticas, cambio en la secuencia de algunos trabajos, cambios metodológicos en la ejecución de los trabajos, cambios de diseño.

En el Anexo No. 3 del Adendum No. 4 se describen cada uno de los costos. De la documentación analizada no se evidencia que el beneficio o premio ha sido pagado al Consorcio Constructor, ya que exclusivamente se le reconoció el valor de los gastos antes citados.

La Central fue operada durante más de nueve meses antes de la fecha prevista originalmente, por lo que HIDROPASTAZA reconoció al Consorcio Constructor los costos de la aceleración.



DIRECCIÓN NACIONAL
DE RESPONSABILIDADES
CRP-DOJ-0003143465

Por lo expuesto, los gastos ocasionados para adelantar la entrada en funcionamiento del proyecto San Francisco, se dieron y cancelaron, en cumplimiento del adendum No. 4; y por otro lado, el Consorcio Constructor subsanó los problemas suscitados en varias obras civiles del circuito hidráulico e hidromecánicas del proyecto, por arrastre, impacto y acumulación de sedimentos, en cantidades superiores a las de los estudios e información estadística de INECEL, toda vez que la central hidroeléctrica entró en pleno funcionamiento en la fecha prevista.

Por lo expuesto; y,

En ejercicio de las facultades que le confiere la ley,

**RESUELVE:**

**DESVANECER** la responsabilidad civil solidaria establecida mediante glosas 5882, 5883, 5885, 5889, 5890, 5892 y 5893 de 29 de mayo de 2009, por el valor de **USD 18 589 852,44,** determinada en contra de los señores: **Consorcio Norberto Odebrecht– Alstom–Va Tech,** en la persona de su representante legal, **Asociación Furnas – Integral,** en la persona de su representante legal, contratista del servicio de consultoría para la fiscalización del proyecto; ingeniero **Carlos Manuel Paz Durini,** supervisor de Obras Civiles, **Germán Bolívar Anda Naranjo,** presidente ejecutivo de Hidropastaza S. A., **Bolívar Javier Astudillo Farah,** director ejecutivo del Consejo Nacional de Electricidad de CONELEC; **Pablo Aníbal Viteri Estévez**, director de concesiones de CONELEC; y, **Pablo Mauricio Cisneros Gárate,** director de Supervisión y Control de CONELEC.

Notifíquese,

Por el Contralor General del Estado,

Dr. Eduardo Muñoz Vega
Subcontralor General del Estado, encargado

PCF/GVN/DGO
G. 5882, 5883, 5889, 5890, 5892 y 5893
Inf. 29/2009
Nis. 7539/2009
31-08-2010



**DIRECCIÓN NACIONAL
DE RESPONSABILIDADES**

23

CRP-DOJ-0003143467