DIRES-SR
Resolución No. 2451
01/09/2010
5882

Señor (a) (ita)
CONSORCIO NORBERTO ODEBRECHT
CONTRATISTA
COMPAÑIA HIDROPASTAZA S.A.
EDF. WORLD TRADE CENTER, TORRE A OF.808
QUITO    PICHINCHA    22227068

Oficina Matriz: Av. Juan Montalvo E4-37 y Av. 6 de Diciembre. Teléfono: (593-2) 3987100. Quito-Ecuador





AO386-C
**GOVERNMENT EXHIBIT**
CASE NO. 22-cr-20114-KMW
EXHIBIT NO. 1-5

CRP-DOJ-0002392619



**REPUBLICA DEL ECUADOR**
**CONTRALORIA GENERAL DEL ESTADO**
DIRECCION DE RESPONSABILIDADES
NOTIFICACION DE RESOLUCIONES

Quito, 01/09/2010

Señor (a) (ita)
**CONSORCIO NORBERTO ODEBRECHT**
**CONTRATISTA**
**COMPAÑIA HIDROPASTAZA S.A.**
EDF. WORLD TRADE CENTER, TORRE A OF.808
QUITO          PICHINCHA

De conformidad con lo dispuesto en el artículo 55 de la Ley Orgánica de la Contraloría General del Estado, adjunto al presente le remito en 8 hojas un ejemplar de la Resolución No. 2451 de 01/09/2010 referente a la GLOSA No. 5882 de 01/09/2010 con la que se notificó oprtunamente

Atentamente,
DIOS PATRIA Y LIBERTAD
Por el Contralor General del Estado

María Patricia Alcoser C.
SECRETARIO DE RESPONSABILIDADES

JZ/

2451

-1 SET 2010



**RESOLUCION No.**

**EL CONTRALOR GENERAL DEL ESTADO**

**CONSIDERANDO:**

I. Que como resultado del estudio del informe del examen especial de ingeniería practicado a los daños provocados al sistema de enfriamiento y en los filtros de agua y la evaluación de los daños que ocasionaron la paralización de la Central Hidroeléctrica San Francisco, a cargo de la compañía Hidropastaza S.A., por el periodo comprendido entre el 26 de septiembre de 2007 y el 30 de septiembre de 2008, se estableció en contra del *Consorcio Norberto Odebrecht– Alstom–Va Tech*, en la persona de su representante legal, contratista de la ingeniería de detalle, suministros y construcción de la Central Hidroeléctrica San Francisco, la glosa por *USD 26 556 179,17*, valor que Hidropastaza S.A., dejó de percibir por paralización de la Central Hidroeléctrica San Francisco.

En vista de que en mayo de 2007 se puso en operación la Unidad de Generación 2, en junio de 2007, la Unidad de Generación 1 y en junio de 2008, se paralizó la Central, no existen datos estadísticos que reflejen la producción mensual de la Central San Francisco.

El agua captada en la represa Agoyán, es conducida a las turbinas de dicha Central para producir energía, luego mediante el túnel de conducción es transportada hasta la Central San Francisco, donde nuevamente es aprovechada en la generación eléctrica, por lo que las dos centrales están interconectadas; es decir, al momento que Agoyán se encuentra en operación, San Francisco está en capacidad de producir energía.

Para establecer la cantidad de energía que debió producir la Central San Francisco en la etapa de paralización para la inspección y arreglos preliminares, se realizan las siguientes consideraciones:

Se toma la producción mensual real de energía de las Centrales Agoyán y San Francisco de los meses de agosto de 2007 a enero de 2008 y la de mayo de 2008, eliminando las restantes por cuanto en esos meses la Central San Francisco estuvo paralizada, parcial o totalmente, por fallas en los sistemas construidos.

| Central | Producción Real en MW/h | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| | Ago-07 | Sep-07 | Oct-07 | Nov-07 | Dic-07 | Ene-08 | May-08 | |
| Agoyán | 83 441,14 | 92 889,02 | 77 514,53 | 75 328,59 | 81 769,68 | 101 660,47 | 101 660,47 | 614 263,90 |
| San Francisco | 94 704,50 | 126 189,28 | 106 260,45 | 98 436,42 | 115 012,27 | 122 934,31 | 130 408,29 | 793 945,52 |

Dirección de Responsabilidades. Teléfono: 398-7360
Oficina matriz: Av. Juan Montalvo e4-37 y Av. 6 de Diciembre. Quito-Ecuador



La sumatoria de la producción de estos meses se relacionan (Producción total de San Francisco/Producción total de Agoyán) y se obtiene un "Índice de Producción".

Índice de Producción = Producción total de San Francisco/Producción total de Agoyán
Índice de Producción = (793.945,52/614.263,90) = 1,2925

El agua que se utiliza en la Central Agoyán pasa a las turbinas de la Central San Francisco, en consecuencia hay una relación directa en la producción de las dos centrales, por lo que es factible establecer el índice de producción señalado.

El índice de producción calculado se utiliza para proyectar la producción de la Central San Francisco para el período de paralización, esto es, del 6 de junio al 15 de octubre de 2008; cálculo que consta en el siguiente cuadro:

| Producción MW/h | Producción Proyectada – Período 07-Jun-08 a 15-Oct-08 | | | | |
|---|---|---|---|---|---|
| | 7 a 30-Jun-08 * | Jul-08 * | Ago-08 * | Sep-08 ** | 15-Oct-08 ** |
| Real: Agoyán | 65 076,08 | 109 389,17 | 109 946,32 | 89 180,00 | 26 605,00 |
| Proyectada: San Francisco | 84 110,83 | 141 385,50 | 142 105,62 | 115 265,15 | 34 386,96 |

(*) Producción real
(**) Producción proyectada

Según el equipo de Contraloría, los costos mensuales de la producción proyectada para el período de paralización de la Central San Francisco, calculados al precio de USD 0,0412 el Kw/h, son los siguientes:

| Central | Costo de la Producción Proyectada – Período 07-Jun-08 a 15-Oct-08 | | | | | |
|---|---|---|---|---|---|---|
| | Jun-08 | Jul-08 | Ago-08 | Sep-08 | 15-Oct-08 | Total USD |
| San Francisco | 3 465 366,20 | 5 825 082,60 | 5 854 751,54 | 4 748 924,18 | 1 416 742,75 | 21 310 867,27 |

Al total establecido en el cuadro anterior hay que sumarle el valor mensual de la "Potencia Remunerable Puesta a Disposición (PRPD)" de 135,027 MW/mes, a un valor de USD 5 700 MW/mes, como se muestra a continuación:

| PERIODO | | Potencia Remunerable MW |
|---|---|---|
| 2008-06-07 | 2008-06-30 | 108,022 |
| 2008-07-01 | 2008-07-31 | 135,027 |
| 2008-08-01 | 2008-08-31 | 135,027 |
| 2008-09-01 | 2008-09-30 | 135,027 |
| 2008-10-01 | 2008-10-15 | 67,514 |

| Costo Total de la Producción Proyectada – Período 07-Jun-08 a 04-Oct-08 | | | | | | |
|---|---|---|---|---|---|---|
| | Jun-08 | Jul-08 | Ago-08 | Sep-08 | 15-Oct-08 | Total USD |
| Energía producida | 3 465 366,20 | 5 825 082,60 | 5 854 751,54 | 4 748 924,18 | 1 416 742,75 | 21 310 867,27 |
| Potencia remunerable | 615 725,40 | 769 653,90 | 769 653,90 | 769 653,90 | 384 824,67 | 3 309 511,77 |
| | | | | | SUMAN | 24 620 379,04 |



2

El valor diario de la energía que deja de producir la Central San Francisco en los 131 días comprendidos entre el 6 de junio y el 15 de octubre del 2008 es:

Valor diario = Costo Total de la Producción / N° de Días

Valor diario = USD 24 620 379,04/131 = USD 187 941,82/día

Durante la operación de la Central Hidroeléctrica San Francisco se han producido paralizaciones por 10,3 días, por inconvenientes originados en daños en los álabes del rodete de la Unidad 2 y 131 días, entre el 6 de junio y el 15 de octubre de 2008, para ejecutar las reparaciones de los daños detectados en el túnel de conducción y chimenea de equilibrio.

Por lo expuesto, las paralizaciones producidas en la Central Hidroeléctrica San Francisco, suman 141,3 días, que multiplicados por el costo diario de la energía que deja de producir, USD 187 941,82, se obtiene una afectación económica a la entidad por el valor motivo de glosa.

II. Que por este motivo, el 29 de mayo de 2009 se expidió la glosa 5882 en contra del Consorcio Norberto Odebrecht– Alstom–Va Tech, en la persona de su representante legal, habiéndosele notificado legalmente mediante prensa Diario "Hoy" el 16 de julio de 2009, dándole a conocer el fundamento de la observación y concediéndole el plazo de sesenta días de conformidad con el artículo 53, numeral 1, de la Ley Orgánica de la Contraloría General del Estado, a fin de que conteste y presente las pruebas de descargo pertinentes

III. Que dentro del plazo legal, el **Consorcio Norberto Odebrecht – Alstom – Va Tech**, da contestación a la glosas mediante comunicaciones 058091, 026260, 058091, S/N y 69453, ingresadas a la Contraloría General del Estado el 21 de julio, 21 noviembre; 18 de noviembre de 2009; y, 5 de agosto de 2010, (fojas 21391 a 21394; y, 21508 a 21518) y mediante las cuales manifiesta que: *"En el número 4 de la glosa que se impugna, se impone una glosa parcial por el valor de USD 26 556 179,17, que según la misma corresponde al valor que Hidropastaza S.A., dejó de percibir por paralización de la Central Hidroeléctrica San Francisco. Esto es lo que constituye, según el análisis que se hace, el lucro cesante el mismo que impugno seguidamente.*

*Límite contractual al pago de lucro cesante*

*El contrato de detallamiento del diseño básico, suministros y construcción fue firmado en Ambato, el 29 de Marzo de año 2000 entre Hidropastaza S.A., sociedad concesionaria del Proyecto Hidroeléctrico San Francisco y el Consorcio ODEBRECHT/Alstom/VaTech. En el caso de las dos empresas comparecientes, se trata de empresas de carácter privado sujetas por tanto a las normas privadas, pues para el año 2000, ya se hallaba en plena vigencia la Ley de Régimen del Sector Eléctrico (1996) cuyo Artículo 26 señala:*

*"Artículo 26.- Régimen de las empresas de generación; transmisión y distribución.- La generación, transmisión o distribución de energía eléctrica será realizada por compañías autorizadas, y establecidas en el país, de conformidad con esta Ley y la de Compañías. Las compañías a las que se refiere esta disposición,*



3

*independientemente de su estructura accionaria, se someterán para todos los efectos, incluyendo el tributario y el laboral, al régimen legal aplicable para las personas jurídicas de derecho privado."*

*El objeto del Contrato fue la Ingeniería de Detalle del Proyecto Básico, Suministro y Montaje de equipos eléctricos, mecánicos e hidromecánicos y Construcción del Proyecto Hidroeléctrico San Francisco. El Proyecto Básico es de propiedad del Estado ecuatoriano, pues se debe recordar que este Proyecto fue concursado por el Instituto Ecuatoriano de Electrificación INECEL y el proceso lo concluyó el CONELEC, vale decir, que la concepción del Proyecto Básico, no le corresponde al Consorcio Constructor y tampoco a Hidropastaza S.A.*

*Siendo que el contrato de detallamiento del diseño básico, suministros y construcción se celebró entre dos empresas privadas, las normas que lo regulan están dentro de la esfera del derecho privado, pues la norma del derecho público no constituye la base de configuración de las relaciones contractuales, aunque, en la hipótesis, no hay duda que la Ley de Régimen del Sector Eléctrico debe ser cumplida por todos los actores en la parte que corresponda a la esencia de la personalidad jurídica de cada uno de los intervinientes.*

*Las partes Contratantes, precisamente atendiendo las normas del Código Civil Ecuatoriano, han descrito expresamente al lucro cesante como un evento no sujeto a indemnizaciones y en la parte pertinente de la cláusula treinta (30) acordaron:*

*"En ningún evento tendrá cualquiera de las Partes responsabilidades hacia la otra o hacia sus respectivas matrices, subcontratistas, filiales, empleados y/o agentes, por daños consecuenciales, incluyendo daños emergentes, pérdida o disminución de ingresos, lucro cesante y similares.*

*En adición al límite de responsabilidad del Consorcio, fijado en el Numeral 6.2.b de este Documento, toda otra responsabilidad del Consorcio relacionada o resultante del Contrato estará limitada como sigue; i) Daños por Incumplimiento del Consorcio al tenor del Numeral 33 de este Documento, limitados a Cinco millones de Dólares de los Estados Unidos de América (US$ 5'000.000); ii) demás responsabilidades contractuales o extra-contractuales ante la Concesionaria y/o el Concedente, no resarcidas por seguro, limitadas a Diez millones de Dólares de los Estados Unidos de América (US$ 10'000.000)."*

*Este límite de responsabilidad pactado legítimamente como una modificación a la regla general del artículo 1574 del Código Civil, deja legalmente claro, que la indemnización de perjuicios contractual, quedó limitada al daño emergente o a lo que puede conocerse al momento de firmar el contrato.".*

### Inexistencia de dolo



*El artículo 1574, regula la condición para que el lucro cesante sea de responsabilidad de una parte contractual y lo describe expresamente así:*

*"Artículo 1574.- Si no se puede imputar dolo al deudor, sólo es responsable de los perjuicios que se previeron o pudieron preverse al tiempo del contrato. Pero si hay dolo, es responsable de todos los perjuicios que fueron una consecuencia inmediata*

4



o directa de no haberse cumplido la obligación, o de haberse demorado su cumplimiento".

La mora causada por fuerza mayor o caso fortuito no da lugar a indemnización de perjuicios.

<u>Las estipulaciones de los contratantes podrán modificar estas reglas."</u>

<u>Como puede verse, la CGE aparentemente pretendería invocar un supuesto dolo por parte del Consorcio para superar las reglas pactadas en el Contrato con respecto a las limitaciones de daños.</u>

<u>Sin embargo, aún cuando se considerase que el dolo puede permitir que se dejen de lado dichas limitaciones, el dolo debe ser probado, y no se presume, conforme consta en el Artículo 1475 del Código Civil.</u>

El dolo consiste en la intención positiva de irrogar daño a la persona o propiedad de otro, en consecuencia, cuando se extienden y aplican garantías para una obligación, esta intención positiva de daño solamente puede verificarse mediante procesos legales probatorios hecho que no es materia de análisis por no existir esta hipótesis, pues no existe pronunciamiento de un Arbitro o Juez que haya determinado la existencia de dolo en el cumplimiento de la obligación. <u>Cabe destacar que en ninguna parte de su glosa o de sus informes la CGE ha indicado ni ha probado que el Consorcio haya actuado dolosamente. Al contrario, en su respuesta a los comentarios del Consorcio, incluida en el Informe Definitivo de Resultados al Examen Especial de Ingeniería, expedido bajo el número DIAAPA -039-2008, al final de la página 116, la CGE ha dicho:</u>

<u>"El análisis jurídico de la aplicación del daño emergente y lucro cesante, deberá ser efectuado en las instancias competentes".</u>

<u>De este modo, la CGE ha reconocido su propia incompetencia legal para resolver estas cuestiones. Como se ha dicho al inicio de este escrito, la instancia competente es el arbitraje conforme lo pactado en el Contrato EPC.</u>
En concordancia con lo expuesto, se puede concluir lo siguiente:

a) De conformidad con el Contrato, cláusula (30), la indemnización de perjuicios está limitada a los valores citados en la misma, siempre en relación al daño emergente.

b) La limitación de indemnizaciones al daño emergente, excluyendo expresamente al lucro cesante, es una obligación válidamente pactada, por así permitirlo el artículo 1574 del Código Civil.

c) A pesar de estar claro de que no existen obligaciones por lucro cesante, tampoco existen pruebas de dolo.



<u>En cualquier caso, cabe destacar la falta de lógica de una pretensión de lucro cesante. El lucro cesante alegado por la CGE supuestamente iría para compensar las paradas de la Central. Pero la CGE deja de lado el hecho de que la Central entró en operación más de nueve meses antes del plazo original, e Hidropastaza</u>

5

recibió ingresos por venta de energía durante ese período. Según los estados financieros de Hidropastaza S.A. de los años 2007 y 2008, estos ingresos superan los US$ 48'000.000,00. También olvida la CGE que Hidropastaza no pagó al Consorcio la bonificación por la entrega anticipada de la Central.

Además, la CGE no ha realizado conforme corresponde, un análisis de la energía producida en el período de anticipación de la Central para hacer un análisis de producción energética de los dos períodos, anticipación y parada y el cálculo de la energía no vendida es antitécnico y se aparta de toda la lógica del despacho.

Tampoco se ha hecho un descuento de los costos de operación y mantenimiento. Con esto, la CGE va en contra de las reglas del debido proceso, provocando la nulidad de lo actuado, pues se violentan derechos y garantías constitucionales establecidas en el Artículo 76 de la Ley Fundamental, en particular el literal a) que se refiere al derecho de defensa.".

A pesar de que HIDROPASTAZA, no ha sido notificado con esta responsabilidad mediante oficio No. 0436-HPEP-2010 de julio 9 de 2010, textualmente sobre la Restitución de pérdidas y gastos, señala que:

"Como ya se ha señalado, de acuerdo al peritaje efectuado por solicitud de la Fiscalía, los registros contables de Hidropastaza muestran que las ventas de la empresa durante los años 2007, 2008 y 2009 fueron las siguientes:

|  | 2007 Facturado | 2008 Facturado | 2009 Facturado |
|---|---|---|---|
| Enero |  | 5.518.142,82 | 5.877.076,28 |
| Febrero |  | 5.845.724,17 | 5.347.402,75 |
| Marzo |  | 4.570.020,16 | 6.064.182,29 |
| Abril |  | 5.999.787,68 | 5.579.607,85 |
| Mayo |  | 5.971.445,68 | 1.224.915,59 |
| Junio | 2.606.549,27 | 6.150.973,29 | 5.772.876,70 |
| Julio | 2.858.017,25 | 1.457.889,37 | 6.127.753,30 |
| Agosto | 5.746.956,25 |  | 11.344.648,99 |
| Septiembre | 5.287.841,35 |  | 5.811.967,76 |
| Octubre | 5.986.511,82 |  | 5.838.395,14 |
| Noviembre | 5.155.827,39 | 3.670.374,64 | 5.849.715,89 |
| Diciembre | 4.833.604,32 | 6.449.306,13 | 5.790.123,74 |
| Total | 32.475.307,65 | 45.633.663,94 | 70.628.666,28 |

Si se admite como válido el valor de ventas de USD 26 556 179,17 establecido por la Contraloría General del Estado para el período de interrupción de las actividades de operación comprendido entre el 6 de junio y el 15 de octubre del año 2008, la facturación total de Hidropastaza debería haber alcanzado un valor de USD 72 189 843,11. Este valor es bastante consistente con las ventas de Hidropastaza del año siguiente, que alcanzaron los USD 70 628 666,28.



6



*Sin embargo, es evidente que a esas ventas habría que deducir los costos y gastos fijos de operación que habrían sido incurridos independientemente de que la Central se encuentre en operación o no. Con esta consideración, según consta en el Cuadro "Estado de Pérdidas y Ganancias Condensado de Hidropastaza", la utilidad operacional no percibida durante el período comprendido entre el 6 de junio y el 15 de octubre de 2008 alcanza un valor de US$ 19'944.183,30, que es un valor aún menor al contemplado en el Convenio Transaccional.*

*En consecuencia, como ya ha sido señalado, el Convenio Transaccional contempla la entrega de una garantía bancaria de US$ 20 millones de dólares a la suscripción del Convenio. Esta garantía será honrada por un pago transaccional de USD 20 millones en efectivo al producirse el desvanecimiento de las glosas 5882 y 6825".*

IV. Que analizados tanto el informe de examen especial de ingeniería como el memorando de antecedentes registrados en archivo con el número 0029-2009, al igual que las comunicaciones citadas, se concluye que el valor de la glosa por **USD 26 556 179,17**, no procede; toda vez que, según consta en el Cuadro "Estado de Pérdidas y Ganancias Condensado de HIDROPASTAZA", la utilidad operacional no percibida durante el período comprendido entre el 6 de junio y el 15 de octubre de 2008 alcanza un valor de USD 19 944 183,30.

Cabe precisar que mediante el Convenio Transaccional suscrito el 8 de julio de 2010 entre HIDROPASTAZA y el Consorcio Constructor, éste entre otros aspectos, se ha comprometido a pagar a HIDROPASTAZA el valor de USD 20 000 000 por todos los días de paralización de la Central Hidroeléctrica San Francisco; que es un valor mayor al determinado por el concesionario de acuerdo al cálculo del estado de pérdidas y ganancias condensado y menor a la glosa establecida, dando solución a los hechos que dieron lugar al establecimiento de la determinación.

En los términos del Convenio, se ha establecido una garantía excepcional de sesenta meses para las obras ya construidas, a contarse a partir de octubre de 2008, con lo cual, si existirían obras en el circuito hidráulico que deban ser reparadas, su intervención estaría cubierta, y que consta de fojas 21508 a 21515.

La Contraloría General del Estado verificará, a través de una nueva acción de control, el cumplimiento de las obligaciones asumidas por las partes en el convenio celebrado el 8 de julio de 2010.

Por lo expuesto; y,

En ejercicio de las facultades que le confiere la ley,



**RESUELVE:**

**DESVANECER** la responsabilidad civil establecida mediante glosa 5882 de 29 de

7

mayo de 2009, por **USD 26 556 179,17**, determinada en contra del **Consorcio Norberto Odebrecht- Alstom-Va Tech**, en la persona de su representante legal.

Notifíquese,

Por el Contralor General del Estado,

Dr. Eduardo Muñoz Vega
Subcontralor General del Estado, encargado

CONTRALORIA GENERAL DEL ESTADO. ES FIEL COPIA. LO CERTIFICO.

SECRETARIA DE RESPONSABILIDADES



8

CRP-DOJ-0002392628