*DIRES-SR*
*Resolution No. 2451*
*09/01/2010*
*5882*

Mr./Ms.
**CONSORCIO NORBERTO ODEBRECHT**
CONTRACTOR
**COMPAÑIA HIDROPASTAZA S.A.**
EDF. [Building] WORLD TRADE CENTER, TORRE [TOWER] A, OF. [SUITE] 808
QUITO     PICHINCHA     22227068

[Office of the State Comptroller General]



Main Office: Av. Juan Montalvo E4-37 y Av. 6 de Diciembre. Telephone: (593-2) 3987100. Quito - Ecuador

AO386-C
GOVERNMENT EXHIBIT
CASE NO. 22-cr-20114-KMW
EXHIBIT NO. 1-5A

CRP-DOJ-0002392619_TR

**REPUBLIC OF ECUADOR**
**OFFICE OF THE STATE COMPTROLLER GENERAL**
**ACCOUNTABILITY DIRECTORATE**
**NOTICE OF RESOLUTIONS**

[OFFICE OF THE STATE COMPTROLLER GENERAL]

**Quito, 09/01/2010**
**Mr./Ms.**
**CONSORCIO NORBERTO ODEBRECHT**
**CONTRACTOR**
**COMPAÑIA HIDROPASTAZA S.A.**
**EDF. WORLD TRADE CENTER, TORRE A OF. 808**
**QUITO                        PICHINCHA**

In accordance with the terms of Article 55 of the Organic Law of the Office of the State Comptroller General, I am forwarding as an attachment hereto, on 8 pages, a copy of Resolution No. 2451 of 09/01/2010, regarding PENALTY ASSESSMENT No. 5882 of 09/01/2010, whereby timely notice was given

**Sincerely,**
**GOD, COUNTRY AND LIBERTY**
**For the State Comptroller General**

[*Signature*]
**Maria Patricia Alcoser C.**
**ACCOUNTABILITY SECRETARY**

JZ/



[OFFICE OF THE STATE COMPTROLLER GENERAL] ACCOUNTABILITY DIRECTORATET



2451

1 Sep 2010



**RESOLUTION No.**

**THE STATE COMPTROLLER GENERAL**

**WHEREAS:**

[OFFICE OF THE STATE COMPTROLLER GENERAL]

**I.** As a result of the study of the special engineering inspection report undertaken on the damages caused to the cooling system and water filters and the assessment of the damages that caused the shutdown of the San Francisco Hydroelectric Power Plant, under the responsibility of the company Hidropastaza S.A., for the period between September 26, 2007 and September 30, 2008, a penalty of ***USD 26,556,179.17*** was assessed against ***Consorcio Norberto Odebrecht-Alstom-Va Tech***, through its legal representative, a detail engineering, supplies and construction contractor of the San Francisco Hydroelectric Power Plant, an amount that Hidropastaza S.A. failed to receive due to the shutdown of the San Francisco Hydroelectric Power Plant.

Given that in May 2007, Generation Unit 2 and Generation Unit 1 were placed online and in June 2008, the Plant was shut down, there are no statistical data that reflect the monthly production of the San Francisco Plant.

The water captured at the Agoyán dam is conducted to the turbines of this Plant to produce energy, then by means of the headrace tunnel it is transported to the San Francisco Plant, where it is again used in power generation, consequently the two plants are interconnected, i.e., at the time that Agoyán is in operation, San Francisco is in a position to produce energy.

To establish the amount of energy that the San Francisco Plant ought to have produced in the shutdown stage for inspection and preliminary arrangements, the following considerations were made:

The actual monthly energy production of the Agoyán and San Francisco Plants is taken for the months of August 2007 to January 2008 and that of May 2008, eliminating what is remaining since in those months the San Francisco Plant was partially or totally shut down, due to failures in the systems constructed.



| | Actual Production in MW/h | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Plant** | **Aug-07** | **Sep-07** | **Oct-07** | **Nov-07** | **Dec-07** | **Jan-08** | **May-08** | **Total** |
| **Agoyán** | 83,441.14 | 92,889.02 | 77,514.53 | 75,328.59 | 81,769.68 | 101,660.47 | 101,660.47 | 614,263.90 |
| **San Francisco** | 94,704.50 | 126,189.28 | 106,260.45 | 98,436.42 | 115,012.27 | 122,934.31 | 130,408.29 | 793,945.52 |

**[OFFICE OF THE STATE COMPTROLLER GENERAL]**
**ACCOUNTABILITY DIRECTORATE**

Accountability Directorate. Telephone: 398-7360

Main Office: Av. Juan Montalvo e4-37 y Av. 6 de Diciembre. Quito – Ecuador

CRP-DOJ-0002392621_TR

The summation of the production for these months is listed (Total Agoyán Production) and a "Production Index" is obtained.

Production Index = Total San Francisco Production/Total Agoyán Production
Production Index = (793,945.52/614,263.90) = 1.2925

The water used in the Agoyán Plant passes through the San Francisco Plant turbines; as a result, there is a direct relationship in the production of the two plants, therefore it is feasible to establish the indicated production index.

The production index calculated is used to project the production of the San Francisco Plant for the shutdown period, i.e., from June 6 to October 15, 2008, a calculation that appears in the following table:

| MW/h Production | Projected Production – Jun-07-08 to Oct-15-08 | | | | |
|---|---|---|---|---|---|
| | June 7 to 30-08* | Jul-08* | Aug-08* | Sep-08** | Oct-15-08** |
| **Actual:** Agoyán | 65,076.08 | 109,389.17 | 109,946.32 | 89,180.00 | 26,605.00 |
| **Projected:** San Francisco | 84,110.83 | 141,385.50 | 142,105.62 | 115,265.15 | 34,386.96 |

(*)   Actual production
(**) Projected production

According to the Comptroller's team, the monthly production costs projected for the shutdown period of the San Francisco Plant, calculated at a price of USD 0.0412 per Kw/h, are as follows:

| Plant | Cost of Projected Production – Jun-07-08 to Oct-15-08 | | | | | |
|---|---|---|---|---|---|---|
| | Jun-08* | Jul-08 | Aug-08 | Sep-08 | Oct-15-08 | Total USD |
| San Francisco | 3,465,366.20 | 5,825,082.60 | 5,854,751.54 | 4,748,924.18 | 1,416,742.75 | **21,310,867.27** |

The monthly amount of the "Remunerable Power Made Available (PRPD, per its Spanish acronym)" of 135.027 MW/month, at a cost of USD 5,700 MW/month, is added to the total above, as shown below:

| PERIOD | | Remunerable Power MW |
|---|---|---|
| 06-07-2008 | 06-30-2008 | 108,022 |
| 07-01-2008 | 07-31-2008 | 135,027 |
| 08-01-2008 | 08-31-2008 | 135,027 |
| 09-01-2008 | 09-30-2008 | 135,027 |
| 10-01-2008 | 10-15-2008 | 67,514 |

| | Total Cost of Projected Production – June-07-08 to Oct-04-08 Period | | | | | |
|---|---|---|---|---|---|---|
| | June-08 | Jul-08 | Aug-08 | Sep-08 | Oct-15-08 | Total USD |
| Energy produced | 3,465,366.20 | 5,825,082.60 | 5,854,751.54 | 4,748,924.18 | 1,416,742.75 | 21,310,867.27 |
| Remunerable power | 615,725.40 | 769,653.90 | 769,653.90 | 769,653.90 | 384,824.67 | 3,309,511.77 |
| | | | | | **TOTAL** | 24,620,379.04 |



**[OFFICE OF THE STATE COMPTROLLER GENERAL]
ACOUNTABILITY DIRECTORATE**



The daily amount of energy that the San Francisco Plant failed to produce in the 131 days included between June 6 and October 15, 2008, is:

Daily amount = Total Cost of Production / No. of Days

Daily amount = USD 24,620,379.04/131 = USD 187,941.82/day

During the operation of the San Francisco Power Plant, shutdowns occurred for 10.3 days due to problems originating in damage in the Unit 2 runner vanes, and 131 days between June 6 and October 15, 2008, to make repairs on damage detected in the headrace tunnel and surge shaft.

In view of the foregoing, the shutdowns that occurred at the San Francisco Hydroelectric Power Plant total 141.3 days which, multiplied by the daily cost of the energy that it failed to produce, USD 187,941.82, result in an economic impact to the entity for the amount that is the reason for the penalty assessment.

II. For that reason, on May 29, 2009, penalty 5882 was assessed against Consorcio Norberto Odebrecht–Alstom–Va Tech, through its legal representative, who was legally notified through the daily newspaper "Hoy," on July 16, 2009, informing it of the grounds for the observation and granting the sixty-day period in accordance with Article 53, number 1, of the Organic Law on the Office of the State Comptroller General, in order to respond and present the relevant rebuttal evidence.

III. Within the legal period, **Consorcio Norberto Odebrecht–Alstom–Va Tech,** responded to the penalty assessments through correspondence 058091, 026260, 058091, Unnumbered, and 69453, entered at the Office of the State Comptroller General on July 21, November 21, November 18, 2009, and August 5, 2010 (pages 21391 through 21394, and 21508 through 21518), stating that: "*In number 4 of the penalty being challenged, a partial penalty is assessed in the amount of USD 26,556,179.17 which, according to same, corresponds to the amount that Hidropastaza S.A. failed to receive for the shutdown of the San Francisco Hydroelectric Power Plant. This, according to the analysis performed, constitutes the same lost profits disputed below.*

**Contractual Limit on the Lost Profits Payment**

*The contract detailing the basic design, supplies and construction was signed in Ambato, on March 29 of the year 2000 between Hidropastaza S.A., a concessionaire company for the San Francisco Hydroelectric Power Plant Project and Consorcio ODEBRECHT/Alstom/VaTech. In the case of the two appearing companies, these are companies that are private in nature, thus subject to private rules, since for the year 2000, the Law on the Electrical Sector System (1996) was already in full effect, Article 26 of which indicates:*

*"Article 26. System governing generation, transmission and distribution companies. Generation, transmission or distribution of electric power will be done by companies authorized and established in this country, in accordance with this Law and the Companies Law. The companies referenced in this provision,*

\



**[OFFICE OF THE STATE COMPTROLLER GENERAL]
ACCOUNTABILITY DIRECTORATE**

*regardless of their shareholding structure, will be subject for all intents and purposes, including taxation and labor, to the applicable legal system for legal entities governed by private law."*

*The objective of the Contract was the Detail Engineering of the Basic Design, Supply and Assembly of electrical, mechanical and hydromechanical equipment, and Construction of the San Francisco Hydroelectric Power Plant. The Basic Design is owned by the Ecuadorian State, because it must be remembered that this Project was the subject of a bid by the Instituto Ecuadorian Electrification Institute (INECEL, per its Spanish acronym), and CONELEC [National Electricity Council] concluded the process; consequently, the conception of the Basic Design does not belong to the Construction Consortium or Hidropastaza S.A.*

*Given that the contract detailing the basic design, supplies and construction was entered into between two private companies, the rules that regulate it are within the realm of private law, since the rules for public law do not constitute the basis for configuring contractual relationships; however, in the assumption, there is no doubt that the Law on the Electrical Sector System must be complied with by all the players in the part applicable to the essence of the legal status of each one of the participants.*

*The Contracting parties, in strict adherence to the rules of the Ecuadorian Civil Code, have expressly described the lost profits as an event not subject to indemnification, and in the relevant part of clause 30 (thirty) they agreed:*

*"In no event will any of the Parties be liable to the other or to their respective home offices, subcontractors, branch offices, employees and/or agents, for consequential damages, including ensuing damages, loss or reduction of income, lost profits and the like.*

*In addition to the limit of liability for the Consortium, established in Number 6.2.b of this Document, any other liability of the Consortium related to or resulting from the Contract will be limited to the following: i) Damages for noncompliance by the Consortium pursuant to Number 33 of this Document, limited to Five million United States of America dollars (USD 5,000,000); ii) other contractual or extracontractual liabilities payable to the Concessionaire and/or the Licensor, not reimbursed by insurance, limited to Ten million United States of America dollars (USD 10,000,000)."*

*This limit of liability, legitimately agreed upon as a modification to the general rule of Article 1574 of the Civil Code, makes it legally clear that the indemnification of contractual damages was limited to consequential damages or to that which could be known at the time of signing the contract."*

**Absence of Willful Misconduct**

*Article 1574 regulates the conditions under which lost profits become a liability for one contractual party and expressly describes this figure as:*

*"Article 1574. If no willful misconduct can be imputed to the debtor, it is only liable for the losses that were foreseen or could have been foreseen at the time of the contract. But if there is willful misconduct, it is liable for all losses that were an immediate*

\                                                                                    4

**[OFFICE OF THE STATE COMPTROLLER GENERAL] ACCOUNTABILITY DIRECTORATE**

*or direct consequence of failing to comply with the obligation, or of having delayed in its fulfilment."*

*Delays caused by force majeure or an act of God do not give rise to indemnification of losses.*

***The contracting parties' stipulations may modify these rules."***

As can be seen, the CGE [Office of the State Comptroller General] seems to intend to invoke alleged willful misconduct on the part of the Consortium in order to overcome the rules agreed upon in the Contract with **regard to limitations of damages.**

However, even when it is found that willful misconduct may allow setting aside these limitations, the willful misconduct must be proven, and it is not assumed, as **appears in Article 1475 of the Civil Code.**

Willful misconduct consists of the positive intent to cause harm to the person or property of another; consequently, when guarantees are issued and apply to an obligation, this positive intent to cause harm may only verified through legal evidentiary processes, a fact that is not subject to analysis given the absence of this hypothesis, since there is no ruling by an Arbiter or Judge that has determined the existence of willful misconduct in the compliance of an obligation. It should be noted that in no part of its penalty assessment or reports has the CGE indicated, nor has it proven, that the Consortium has acted with malice. On the contrary, in its response to the Consortium's comments, included in the Definitive Report on the Results of the Special Engineering Inspection, issued under number DIAAPA-039-2008 at the end **of page 116, the CGE said:**

*"The legal analysis of applying consequential damages and lost profits must be **conducted by competent venues."***

In this way, the CGE has acknowledged its own lack of legal competence to resolve these questions. As was said at the beginning of this document, **the competent instance is arbitration, as agreed upon in the EPC Contract.**
In accordance with the foregoing, the following may be concluded:

a) In accordance with the Contract, Clause (30), indemnification for losses, is limited to the amounts cited in this clause, always in relation to the consequential damages.

b) The limitation to indemnification for the consequential damages, expressly excluding lost profits, is a validly agreed-upon obligation, permitted as such in article 1574 of the Civil Code.

c) Although it is clear that there are no obligations for lost profits, there is also no evidence of willful misconduct.

In any case, the absence of logic of a claim of lost profits should be emphasized. The lost profits alleged by the CGE would supposedly go to compensate for the Plant's shutdowns. But the CGE ignores the fact that the Plant went online more than nine months before the original deadline, and Hidropastaza



**[OFFICE OF THE STATE COMPTROLLER GENERAL] ACCOUNTABILITY DIRECTORATE**

5

*received income from the sale of energy during that period. According to the financial statements of Hidropastaza S.A. for the years 2007 and 2008, this income exceeded USD 48,000,000.00. The CGE also forgets that Hidropastaza did not pay the Consortium the bonus for early delivery of the Plant.*

*Also, the CGE has not performed, as it should have, an analysis of the energy produced in the Plant's early period to conduct an analysis of energy production for the two periods, early and shutdown, and the calculation of the unsold energy is not technical and deviates from all the logic of that office.*

*Nor has a discount been applied to operating costs and maintenance. With this, the CGE contravenes the rules of due process, nullifying* **the actions taken***, since they* **violate constitutional rights and guarantees** *established in Article 76 of* **the Constitution,** *in particular, subparagraph a) referring to the right to a defense."*

Despite the fact that HIDROPASTAZA has not been notified of this responsibility by means of Official Letter No. 0436-HPEP-2010 of July 9, 2010, literally regarding the Restitution of losses and expenses, it indicates that:

*"As has already been indicated, in accordance with the expert analysis performed at the request of the Prosecutor's Office, Hidropastaza's accounting records show that the company's sales during the years 2007, 2008 and 2009 were as follows:*

|  | *2007* | *2008* | *2009* |
|---|---|---|---|
|  | ***Invoiced*** | ***Invoiced*** | ***Invoiced*** |
| *January* |  | 5,518,142.82 | 5,877,076.28 |
| *February* |  | 5,845,724.17 | 5,347,402.75 |
| *March* |  | 4,570,020.16 | 6,064,182.29 |
| *April* |  | 5,999,787.68 | 5,579,607.85 |
| *May* |  | 5,971,445.68 | 1,224,915.59 |
| *June* | 2,606,549.27 | 6,150,973.29 | 5,772,876.70 |
| *July* | 2,858,017.25 | 1,457,889.37 | 6,127,753.30 |
| *August* | 5,746,956.25 |  | 11,344,648.99 |
| *September* | 5,287,841.35 |  | 5,811,967.76 |
| *October* | 5,986,511.82 |  | 5,838,395.14 |
| *November* | 5,155,827.39 | 3,670,374.64 | 5,849,715.89 |
| *December* | 4,833,604.32 | 6,449,306.13 | 5,790,123.74 |
| ***Total*** | **32,475,307.65** | **45,633,663.94** | **70,628,666.28** |



*\If the amount of sales of USD 26,556,179.17 established by the Office of the State Comptroller General is admitted as valid for the period of interruption of the operating activities included between June 6 and October 15 of the year 2008, the total invoicing of Hidropastaza should have totaled USD 72,189,843.11. This amount is quite consistent with Hidropastaza's sales for the next year, which totaled USD 70,628,666.28.*

6

**[OFFICE OF THE STATE COMPTROLLER GENERAL] ACCOUNTABILITY DIRECTORATE**

*However, it is evident that the fixed operating costs and expenses would have to be deducted from those sales, which would have been incurred regardless of whether the Plant was online or offline. With this consideration, as shown in the Table "Hidropastaza Condensed Profit and Loss Statement," the operating profit not received during the period included between June 6 and October 15, 2008, totaled USD 19,944,183.30, which is an amount even less than the amount included in the Settlement Agreement.*

*Consequently, as has already been indicated, the Settlement Agreement takes into account the delivery of a bank guarantee of USD 20 million dollars at the signing of the Agreement. This guarantee will be honored by a transactional payment of USD 20 million in cash upon dismissal of penalty assessments 5882 and 6825."*

IV. When both the special engineering inspection report as well as the background memorandum recorded in the file under number 0029-2009 are analyzed, together with the cited communications, it is found that the amount of the penalty assessment of **USD 26,556,179.17** is inadmissible since, as shown in the table "HIDROPASTAZA Condensed Profit and Loss Statement," the operating profit not received during the period included between July 6 and October 15, 2008, totaled USD 19,944,183.30.

It should be pointed out that in the Settlement Agreement signed on July 8, 2010, between HIDROPASTAZA and the Construction Consortium, the Construction Consortium, among other aspects, has promised to pay HIDROPASTAZA the amount of USD 20,000,000.00 for all the days of the shutdown of the San Francisco Hydroelectric Power Plant, which is a higher amount than the one determined by the concessionaire according to the calculation of the condensed profit and loss statement and lower than the penalty assessed, which provides a solution to the events that gave rise to the decision.

Pursuant to the Agreement, an exceptional warranty of sixty months has been established for the works already constructed, to be counted from October 2008, with which, if there are works in the hydraulic circuit that must be repaired, this procedure would be covered, as shown on pages 21508 through 21515.

The Office of the State Comptroller General shall verify, by means of a new control action, fulfillment of the obligations assumed by the parties in the agreement signed on July 8, 2010.

In view of the foregoing, and

In exercise of the powers granted by law,

**RESOLVES:**



**[OFFICE OF THE STATE COMPTROLLER GENERAL] ACCOUNTABILITY DIRECTORATE**

**DISMISS** the civil liability established in penalty 5882 dated

May 29, 2009, assessed in the amount of **USD 26,556,179.17,** against **Consorcio Norberto Odebrecht–Alstom–Va Tech,** through its legal representative.

Notice is ordered given,

For the State Comptroller General,

[*Signature*]

Dr. Eduardo Muñoz Vega
Deputy State Comptroller General, Acting

OFFICE OF THE STATE COMPTROLLER GENERAL. A TRUE COPY. I ATTEST.

[*Signature*]

\ACCOUNTABILITY SECRETARY

**[OFFICE OF THE STATE COMPTROLLER GENERAL] ACCOUNTABILITY DIRECTORATE**