# CONVENIO DE TRANSACCIÓN

Conste por el presente Convenio de Transacción (el "**Convenio de Transacción**" o "**Convenio**"), que se celebra el 08 de julio de 2010, con la participación de las siguientes partes:

De un lado:

(1) **HIDROPASTAZA EP** (en adelante, "**HPEP**"), en este acto representada legalmente por su Gerente General, Ciro Camilo Morán Maridueña, de conformidad con el nombramiento y la autorización del Directorio que se acompaña al presente como documento habilitante;

Y, del otro lado,

(2) **CONSTRUTORA NORBERTO ODEBRECHT S.A.** ("**CNO**"), representado en este acto por su apoderado, Sr. José Conceição Santos Filho, de conformidad con el poder que se acompaña al presente como documento habilitante; **ALSTOM BRASIL ENERGIA E TRANSPORTE LTDA.** (sucesora por incorporación de la empresa Alstom Hydro Energia Brasil Ltda. "**Alstom**"), representado en este acto por su apoderado, Sr. Wagner Cortez Gomes, de conformidad con el poder que se acompaña al presente como documento habilitante y **ANDRITZ HYDRO BRASIL LTDA.** (nueva denominación social de Va-Tech Hidro Energia Brasil Ltda., "**Andritz**"), representado en este acto por su apoderado, Sr. Antonio Eugenio Vilas Boas, de conformidad con el poder que se acompaña al presente como documento habilitante, cada parte individualmente por sus proprios derechos y en sus calidades de miembros del **CONSORCIO ODEBRECHT-ALSTOM-VA-TECH** (en adelante, el "**Consorcio**");

En adelante HPEP y el Consorcio serán denominados cada uno individualmente como una "**Parte**" o, conjuntamente, como "**Partes**".

A. **ANTECEDENTES Y OBJETIVOS**

1. HPEP y el Consorcio son partes del Contrato de Detallamiento de Ingeniería, Suministro y Construcción celebrado el 29 de marzo de 2000 y sus addenda (el "**Contrato de Construcción**") con relación a la Central Hidroeléctrica San Francisco (en adelante la "**Central**" o el "**Proyecto**").

2. En consecuencia de la expedición de la Ley Orgánica de Empresas Publicas, publicada en el Suplemento del Registro Oficial No. 48 del 16 de Octubre del 2009 y del Decreto Ejecutivo No. 219 de 14 de enero del 2010, se constituyó la Empresa Estratégica Hidropastaza EP, la misma que de conformidad con el Artículo 4 del

DEFENSE TRIAL EXHIBIT
3
22-CR-20114-KMW

DOJ_ODB_3705745
CRP-DOJ-0000107364

referido Decreto Ejecutivo se subrogó en todos los derechos y obligaciones de Hidropastaza S.A.

3. Mediante Oficio No. CCO-001-2010 del 4 de Febrero de 2010, dirigido por el Consorcio al Señor Ministro Coordinador de los Sectores Estratégicos, el Consorcio manifestó su voluntad de buscar una solución definitiva a los desacuerdos derivados de la ejecución del Proyecto. Esta comunicación fue contestada, en sentido favorable por los Señores Ministros Coordinador de los Sectores Estratégicos y de Electricidad y Energía Renovable, el día 9 de marzo de 2010 mediante Ofic. No. MICSE-10-241.

4. De conformidad con el Oficio de Jefatura de Producción de HPEP No.- 186-HPEP-JP-2010 de fecha 12 de mayo de 2010, se tiene programado y debidamente informado al Centro Nacional de Control de la Energía – CENACE, la realización de una paralización de la Central en agosto del 2010, a fin de efectuar trabajos de mantenimiento mayor que incluyen el metalizado de los rodetes de las turbinas de la Central, y es su intención aprovechar dicha parada programada para hacer los trabajos necesarios para garantizar el buen funcionamiento de la Central.

5. En reunión que tuvo lugar en la Ciudad de Quito el día 28 de Mayo de 2010, de conformidad con el numeral 9, Articulo 11 de la Ley Orgánica de Empresas Publicas, el Directorio de HPEP conoció los términos y condiciones de este Convenio de Transacción, aprobó los mismos y autorizó expresamente al Señor Gerente General, Ciro Camilo Morán Maridueña, mediante Resolución No. 003/2010, la suscripción de este Convenio de Transacción.

6. Mediante Oficio No. 15.178, de fecha 08 de julio de 2010, el Procurador General del Estado, de conformidad con el artículo 237 de la Constitución de la Republica, en concordancia con la letra e) del artículo 3 de la Ley Orgánica de la Procuraduría General del Estado, manifestó su opinión en el sentido que la celebración del presente Convenio no contraviene normas de derecho y que el representante legal de Hidropastaza EP tiene la facultad legal para suscribir este instrumento (ver **Anexo No. 1**).

7. Sin renunciar a los derechos que las Partes creen tener, estas iniciaron un proceso de negociación para resolver las disputas derivadas del Contrato de Construcción y del Proyecto. En este proceso participaron representantes del Ministerio Coordinador de los Sectores Estratégicos y del Ministerio de Electricidad y Energía Renovable.

8. Este Convenio de Transacción contiene el acuerdo alcanzado por las Partes mediante el cual se establecen los términos y condiciones para poner fin a todas sus controversias derivadas de la ejecución del Contrato de Construcción y del Proyecto.

B.  **Alcance del Convenio de Transacción**

El presente Convenio tiene por objeto establecer los términos y condiciones para terminar las controversias existentes entre las Partes derivadas del Contrato de Construcción y del Proyecto y contiene 8 (ocho) asuntos principales: (1) Trabajos Preliminares y Complementarios; (2) Garantías por los Trabajos Complementarios; (3) Condiciones

2

Precedentes para la Transacción; (4) Resolución de Controversias; (5) Condiciones Generales; (6) Documentación e Implementación; (7) Notificaciones; y (8) Otras Disposiciones.

En conformidad con lo expuesto, las Partes convienen en suscribir este Convenio de Transacción al tenor de los siguientes términos y condiciones:

1. **Trabajos Preliminares y Complementarios**

   1.1 <u>Trabajos Preliminares y Complementarios</u>. Contando con la aprobación de HPEP, el Consorcio Constructor, en adelante el Consorcio, ejecutará por su cuenta y bajo su responsabilidad (i) los trabajos preliminares necesarios para la ejecución de los Trabajos Complementarios ("**Trabajos Preliminares**") y (ii) las obras y servicios necesarios para restablecer los parámetros operacionales de la Central previstos en el diseño básico y especificaciones técnicas de construcción estipuladas en el Contrato de Construcción ("**Trabajos Complementarios**").

      1.1.1 Los Trabajos Preliminares que deberán ser ejecutados por el Consorcio inmediatamente después de la firma del Convenio serán: (i) la movilización del personal técnico necesario para ejecución de los Trabajos Complementarios. Dicha movilización deberá ser concluida en un plazo de 90 (noventa) días; y (ii) ejecución de los estudios técnicos para las Obras Adicionales de acuerdo con lo previsto en el numeral 5.2 de este Convenio, que deberán ser concluidos en el plazo de 180 (ciento ochenta) días.

      1.1.2 El inicio de la ejecución de los Trabajos Complementarios por parte del Consorcio estará sujeta al cumplimiento de las obligaciones de HPEP previstas en los numerales 4.2.2, 4.2.3 y 4.3.2 y dentro de los plazos y términos previstos en el numeral 1.2.1.

   1.2 <u>Alcance de los Trabajos Complementarios</u>.

      1.2.1 <u>Obras Civiles</u>. Se conviene que se aproveche la próxima parada programada para mantenimiento mayor de la Central prevista para el mes de de agosto de 2010 para que, representantes autorizados del Consorcio y de HPEP inspeccionen detalladamente y de forma conjunta el túnel de conducción y la chimenea de equilibrio superior con el fin de que el Consorcio defina el alcance de los Trabajos Complementarios y un cronograma para ejecución inmediata de las distintas etapas de los trabajos que deberán realizarse, de conformidad con las especificaciones técnicas del Contrato de Construcción con las modificaciones en este Convenio, como es el caso, por ejemplo, de la chimenea de equilibrio.

         1.2.1.1 Las Partes deberán iniciar la inspección conjunta de la Central en el plazo de 2 (dos) días después de que haya terminado el vaciado y la limpieza del túnel, que deberán ser realizados de conformidad con los numerales 1.2.1.3 y

3

DOJ_ODB_3705747
CRP-DOJ-0000107366

    1.2.1.4. La inspección, que no podrá extenderse por más de 30 días plazo, será realizada en el próximo paro programado de la Central prevista en conformidad con el Antecedente No. 4 en agosto de 2010.

  1.2.1.2 Concluida la inspección, el Consorcio deberá entregar a HPEP, en 15 (quince) días plazo, el cronograma para ejecución de los Trabajos Complementarios, el que podrá ser reajustado, de ser necesario, por acuerdo de las Partes.

  1.2.1.3 Para tal efecto, HPEP notificará por escrito al Consorcio, con la debida anticipación (mínimo de 3 meses), la fecha en que el túnel estará vaciado y limpio de sedimentos. El vaciado y la limpieza de los sedimentos serán de cargo de HPEP y deberán ser ejecutados en el plazo máximo de 30 (treinta) días a contarse desde la paralización programada de la Central.

  1.2.1.4 El vaciado del túnel de conducción de la Central deberá hacerse bajo la supervisión del Consorcio.

  1.2.1.5 HPEP deberá, a su cuenta y a su costo, contratar una empresa independiente de reconocido prestigio y experiencia en este tipo de trabajo, que no haya participado en el conflicto originado entre las Partes por concepto de la ejecución del Proyecto y que realice y garantice el control de calidad de las obras civiles previstas en los Trabajos Complementarios, de acuerdo con las especificaciones técnicas del Contrato de Construcción. Las observaciones que haga esta empresa serán acogidas por el Consorcio.

 1.2.2 <u>Servicios Electromecánicos</u>. El Consorcio se compromete, en los términos de este Convenio de Transacción, a (i) suministrar 2 (dos) rodetes nuevos para las turbinas de la Central, similares a los existentes. La entrega de los rodetes se hará en el plazo definido por el fabricante, que no será superior a 2 (dos) años, a contarse desde la fecha en que HPEP cumpla con lo previsto en el numeral 1.1.2. La obligación del Consorcio incluirá la supervisión de la instalación de los rodetes hasta por 10 días, esto dentro del período de garantía de dichos equipos electromecánicos según el numeral 2.1.2; y, (ii) resolver los puntos electromecánicos pendientes de la Central, según la información ya compartida entre HPEP y el Consorcio a la presente fecha, que consta en el **Anexo No. 2**.

1.3 <u>Soporte para Operación & Mantenimiento de la Central.</u>

 1.3.1 El Consorcio ofrece a su costo y cargo, como parte integrante de los Trabajos Complementarios, soporte técnico para la operación de la Central por un período máximo de hasta 30 (treinta) meses contados

4

DOJ_ODB_3705748
CRP-DOJ-0000107367

     a partir de la firma de este Convenio de Transacción, para el acompañamiento de la operación y el mantenimiento de la Central.

  1.3.2 Este soporte técnico consiste en la presencia diaria de dos técnicos por 6 (seis meses) y a partir del séptimo mes hasta completar los 30 (treinta) meses, mediante visitas a cada 2 (dos) meses a la Central, por parte de técnicos del Consorcio. Durante su presencia en la Central los técnicos capacitarán a los técnicos de HPEP.

  1.3.3 Este soporte no significa que el Consorcio asume responsabilidad por la operación y/o mantenimiento de la Central y tampoco implica una extensión o ampliación de la Garantía Técnica del Consorcio, señalada en el numeral 2.1.

1.4 Planos "As Built" y Manuales de Operación y Mantenimiento. En hasta 60 (sesenta) días de la finalización de la ejecución de los Trabajos Complementarios el Consorcio deberá entregar a HPEP los planos "as built" y los manuales de operación y mantenimiento referente a los equipos y servicios indicados en el numeral 1.2.2, debidamente revisados.

**2. Garantías por los Trabajos Complementarios**

2.1 Garantía Técnica por los Trabajos Complementarios. El Consorcio acepta otorgar una garantía técnica que ampare y respalde la calidad de los Trabajos Complementarios ("**Garantía Técnica**") que cubrirá (i) las obras civiles del circuito hidráulico (túnel de conducción y chimenea de equilibrio) (en adelante, la "**Garantía Técnica del Circuito Hidráulico**") y (ii) los servicios electromecánicos (en adelante, la "**Garantía Técnica Electromecánica**"), que sean ejecutados por el Consorcio en la próxima parada programada para mantenimiento mayor de la Central.

  2.1.1 Garantía Técnica del Circuito Hidráulico. La Garantía Técnica del Circuito Hidráulico cubrirá los defectos de construcción con respecto a las obras civiles del circuito hidráulico (túnel de conducción y chimenea de equilibrio) ejecutadas por el Consorcio, por un plazo de 60 (sesenta) meses contados a partir de la recepción de dichos Trabajos Complementarios por parte de HPEP.

  2.1.2 Garantía Técnica Electromecánica. El Consorcio se compromete y obliga a ceder integralmente las garantías de los fabricantes de los equipos electromecánicos que sean instalados y/o reemplazados por el Consorcio como parte de los Trabajos Complementarios. Dicha Garantía Técnica Electromecánica tendrá vigencia por el plazo máximo de 24 (veinticuatro) meses contados de la recepción, por parte de HPEP, de los Servicios Electromecánicos previstos en conformidad con el numeral 1.2.2.

  2.1.3 Exclusión de Responsabilidad.

5

        2.1.3.1 <u>Exclusiones de la Garantía Técnica</u>. La Garantía Técnica del Consorcio, en los términos del numeral 2.1, no aplicará en caso de: desgaste natural en las obras civiles y en el sistema electromecánico; caso fortuito; fuerza mayor; condiciones de operación y/o mantenimiento no establecidas por el Consorcio o por los fabricantes en los Manuales de Operación y Mantenimiento, como por ejemplo, sedimentos arriba de las especificaciones establecidas en el Contrato de Construcción; presencia de cuerpos extraños y/o basura urbana, provenientes de aguas arriba del circuito hidráulico de San Francisco.

        2.1.3.2 <u>Calidad del Agua Turbinada</u>. La Garantía Técnica mencionada en el numeral 2.1, está condicionada a la instalación y operación, por cuenta y a costo de HPEP, previo a la recepción de los Trabajos Complementarios, de un sistema de monitoreo electrónico para análisis dinámico de la calidad del agua y otros parámetros en puntos estratégicos del embalse y en la Central Agoyán, según las especificaciones técnicas definidas y entregadas por el Consorcio en el plazo de 30 (treinta) días después de finalizada la inspección de la Central. Adicionalmente, para que aplique la Garantía, HPEP deberá operar la Central de conformidad con los parámetros establecidos en dicho sistema de monitoreo, los cuales serán incorporados al Manual de Operación de los equipos de la Central.

        2.1.3.3 <u>Acceso a la Central</u>. La vigencia de la Garantía Técnica del Consorcio en los términos del numeral 2.1 requiere además que HPEP permita libre y permanente acceso a los representantes del Consorcio al sistema de monitoreo y a las informaciones por éste generadas, de conformidad con el numeral 5.3.

2.2 <u>Garantía por Ruina</u>. El Consorcio ratifica su responsabilidad civil hasta por 10 años por el evento de ruina de la Central, conforme al Art. 1.937 del Código Civil Ecuatoriano. Dicho período se contará a partir de la recepción de las obras de la Central San Francisco por parte de HPEP, ocurrida en Mayo de 2007 y sobre esta no se aplicará el límite de responsabilidad previsto en el numeral 5.1.

2.3 <u>Garantías Alstom/Andritz</u>. A la recepción por parte de HPEP de los Servicios Electromecánicos pendientes según el Anexo No. 2, HPEP deberá, en el plazo de 30 (treinta) días subsecuentes, restituir los valores de las garantías bancarias ejecutadas y cobradas contra Alstom y Andritz, y efectuar cuanta gestión fuere necesaria y le corresponda para subsanar totalmente los efectos de la ejecución de las garantías por Alstom y Andritz, excluido cualquier responsabilidad de HPEP por eventuales daños morales, lucro cesante o intereses por parte de los integrantes del Consorcio o terceros.

6

3. **Condiciones Precedentes para la Transacción**

3.1 En razón de este Convenio de Transacción y sin perjuicio del cumplimiento de las demás obligaciones asumidas por las Partes en virtud del mismo, con el objeto de llegar a una solución integral de sus controversias y sin reconocimiento del mérito de las pretensiones del Consorcio y de HPEP, el Consorcio pagará a HPEP US$ 20'000.000,00 (veinte millones de dólares de los Estados Unidos de América) por todos los días de paralización de la Central.

3.2 Este pago será imputable a las Glosas Nos. 5882 de 29 de mayo de 2009 y 6825 de 02 de febrero de 2010, con la excepción efectuada en el numeral 3.5 y una vez cumplida la condición precedente establecida en el numeral 3.3 ya que, en el evento de ratificarse tales glosas en la vía administrativa y/o judicial, el Consorcio estaría duplicando el pago, por cuanto asume y cubre diversos valores en virtud de la ejecución de este Convenio; y, la Contraloría General del Estado aún podría mantener su requerimiento al Consorcio por los mismos o similares conceptos relacionados con la ejecución del Proyecto San Francisco, materia de este Convenio.

3.3 Como consecuencia de lo anterior, a la firma de este Convenio, el Consorcio entrega a HPEP una garantía bancaria por la suma indicada en el numeral 3.1 pagadera al momento del desvanecimiento de las responsabilidades establecidas en las glosas, mencionadas en el numeral 3.2, con excepción de lo previsto en el numeral 3.5, de forma automática e inmediata, al sólo requerimiento de HPEP, en los términos de ley. Esta garantía tendrá vigencia de 3 (tres) meses contados a partir de la fecha de suscripción de este Convenio, renovable por una sola vez y en los mismos términos y condiciones, a discreción de HPEP, en el plazo de 10 (diez) días anteriores a la fecha de su vencimiento original. En el evento de haberse caducado la garantía y de cumplirse el supuesto previsto en los numerales 3.2 y 3.3, el Consorcio cumplirá con el pago señalado en el numeral 3.1, en el plazo máximo de 5 (cinco) días hábiles contados a partir de la fecha de notificación de la resolución desvaneciendo las glosas referidas.

3.4 Una vez que se cumpla la condición prevista en el numeral 3.3 y que el Procurador General del Estado haya dado su autorización, las Partes suscribirán un acta final de cumplimiento y efectividad de esta transacción substancialmente en los términos del **Anexo No. 03**, la misma que producirá los efectos previstos en el artículo 2.362 del Código Civil.

3.5 Se deja expresa constancia que las Partes exceptúan de la presente transacción las glosas relacionadas con la celebración del Addendum No. 10 al Contrato de Construcción, que no es materia de las controversias tratadas en este Convenio.

4. **Resolución de controversias**

7

DOJ_ODB_3705751
CRP-DOJ-0000107370

4.1 <u>Compromiso Arbitral para Resolución de Controversias relativas al Convenio de Transacción</u>. Cualquier eventual disputa, derivada de este Convenio de Transacción o del Contrato de Construcción se resolverá mediante proceso arbitral establecido en **Anexo No. 4** el cual forma parte integrante de ese Convenio.

4.2 <u>Transacción sobre Discrepancias entre las Partes</u>.

    4.2.1 A la suscripción de este Convenio HPEP se compromete a solicitar la suspensión del proceso arbitral planteado en contra del Consorcio y sus integrantes ante el Centro de Arbitraje y Mediación de las Cámaras de Comercio de Ambato, Cámara de Industrias de Tungurahua y la Pontificia Universidad Católica del Ecuador, Sede Ambato.

    4.2.2 Una vez cumplida la condición prevista en los numerales 3.3 y 3.4 y que HPEP haya obtenido de la Procuraduría General del Estado las autorizaciones de Ley, el Consorcio realizará el pago señalado en el numeral 3.1. Una vez efectuado dicho pago, las Partes darán por definitivamente terminadas todas sus controversias derivadas del Contrato de Construcción y las acciones administrativas, arbitrales y/o judiciales que se hubieren iniciado entre las Partes y se comprometen a desistir de las acciones iniciadas y a aceptar los desistimientos que sean necesarios en los 3 (tres) días hábiles siguientes a la fecha de cobro efectivo del monto señalado en el numeral 3.1.

    4.2.3 HPEP deberá, de manera inmediata, entregar al Consorcio la evidencia documental de los escritos de suspensión y desistimiento, respectivamente, de conformidad con los numerales 4.2.1 y 4.2.2.

    4.2.4 Las Partes declaran que en este Convenio se establecen los términos y condiciones para poner fin a todas sus diferencias existentes y que, en los términos del Artículo 2.362 del Código Civil del Ecuador, una vez cumplidas las condiciones establecidas en el numeral 4.2.2, nada tendrán que reclamarse en el futuro por ningún concepto, incluido a título de lucro cesante, distinto al cumplimiento de las obligaciones derivadas de este Convenio. La suscripción de este Convenio es un acto de de buena fe de las Partes que no implica el reconocimiento de ningún tipo de responsabilidad ni derecho a la otra en relación con el Contrato de Construcción y la ejecución del Proyecto San Francisco.

4.3 <u>Otras controversias relacionadas con el Proyecto San Francisco</u>. Una vez pagado el monto señalado en el numeral 3.1 de este Convenio, HPEP se compromete a realizar las acciones que le correspondan dentro de su ámbito y a notificar a las entidades públicas respectivas que todas sus controversias y reclamos al Consorcio y/o sus miembros o terceros en relación con el Proyecto San Francisco, han sido o serán resueltas mediante este Convenio.

DOJ_ODB_3705752
CRP-DOJ-0000107371

4.3.1 HPEP se compromete a realizar las actuaciones que correspondan dentro de su ámbito de acción para coadyuvar con Andritz para el éxito de su reclamo contra la Compañía Aseguradora SUL AMERICA DE SEGUROS C.A., actualmente Latina Seguros del Ecuador S.A.

4.3.2 HPEP suspende el reclamo administrativo presentado contra la empresa Aseguradora SUL AMERICA DE SEGUROS C. A., ahora Latina de Seguros del Ecuador S.A., ante la Superintendencia de Bancos y Seguros del Ecuador, comprometiéndose a notificarla en ese sentido en hasta 10 (diez) días hábiles subsecuentes a la suscripción de este Convenio. Una vez cumplido el pago señalado en el numeral 3.1, HPEP desistirá inmediatamente del reclamo administrativo referido en este numeral.

4.3.3 Las Partes se comprometen a realizar sus mejores esfuerzos para que HPEP y el *Banco Nacional de Desenvolvimento Econômico e Social - BNDES* busquen resolver en forma amigable y definitiva, la demanda arbitral presentada por HPEP contra el *BNDES*.

4.3.4 Las Partes presentarán en el plazo de 3 (tres) días hábiles contados a partir de la firma de este Convenio, un escrito en el trámite de la instrucción fiscal dentro del Juicio No. 18251-2009-0741, mediante el cual harán conocer, para todos los efectos legales correspondientes, los términos y condiciones acordados entre las Partes para poner fin a sus controversias, agregando al escrito una copia de este Convenio y sus anexos.

4.4 Costas y gastos: Cada Parte cubrirá las costas y gastos en que haya incurrido como consecuencia de la estructuración de este Convenio y en las controversias que por efecto de este Convenio se resuelven, y por lo tanto nada tendrán que reclamarse la una a la otra por este o ningún otro concepto.

5. **Condiciones Generales**

5.1 Límite Máximo de Responsabilidad. Sin perjuicio de las obligaciones asumidas por el Consorcio en los numerales 1.2, 3.1, 5.2 y 5.2.1, así como la garantía por ruina prevista en el numeral 2.2, el límite máximo de responsabilidad del Consorcio por los daños que sean cubiertos por la Garantía Técnica del Circuito Hidráulico (incluyendo la garantía técnica prevista en el numeral 5.4) y/o cualquier otro concepto, será de hasta US$ 9'500.000,00, (nueve millones y quinientos mil dólares de los Estados Unidos de la América).

5.2 Estudios técnicos para las Obras Adicionales. Las Partes acuerdan hacer un estudio técnico, económico y financiero de la viabilidad de ejecución de las siguientes obras adicionales ("**Obra(s) Adicional(es)**"): (i) la mejora del desarenador existente en el embalse de la Central Agoyán; (ii) la implementación de una barrera de contención a fin de evitar el ingreso de basura flotante a través de la toma de agua de la Central Agoyán; y, (iii) la

9

instalación de equipos de mejoría para el actual Sistema de Agua de Enfriamiento (SAE) de la Central San Francisco. El Consorcio asumirá el costo de estos estudios.

    5.2.1   Ejecución de las obras del Sistema de Agua de Enfriamiento (SAE). Una vez efectuados los estudios referidos en el punto (iii) del numeral 5.2 anterior, y aprobada la ejecución de dicha Obra Adicional por HPEP, ésta será ejecutada por el Consorcio, a su costo dentro del plazo de 2 (dos) años a contar desde la fecha en que HPEP cumpla con lo previsto en el numeral 1.1.2.

    5.2.2   Garantía del Nuevo SAE. El Consorcio otorgará una garantía por las obras civiles y equipos comprendidos en el nuevo SAE previsto en el numeral 5.2.1 por 24 (veinte y cuatro) meses a partir de la entrega de dicha obra adicional. Adicionalmente el Consorcio cederá a HPEP las garantías de los fabricantes de los equipos electromecánicos que integrarán dicho SAE.

5.3   Acceso a Información Técnica. Para el cumplimiento de sus compromisos, en coordinación con HPEP, el Consorcio tendrá inmediato y permanente acceso (durante el plazo de vigencia de la Garantía Técnica) a: (i) todas las instalaciones de las Centrales San Francisco y Agoyán; y (ii) toda la información y documentación de estas Centrales relacionadas con el cumplimiento de los compromisos establecidos en el Convenio de Transacción, incluyendo información sobre operación, mantenimiento y calidad del agua turbinada, incluyendo pero no limitado a, el acceso al monitoreo de las condiciones operaciones de las unidades generadoras a través del Sistema Digital de Comando de Control (*Digital Control System*) ubicado en la Sala de Control de las unidades generadoras de la Central.

5.4   Garantía Adicional por Defectos de Construcción. El Consorcio otorga una garantía técnica adicional por eventuales defectos de construcción que ampare y respalde la calidad de las obras civiles de las partes del circuito hidráulico (túnel de conducción y chimenea de equilibrio) ya construidas, que no sean objeto de los Trabajos Complementarios, por el plazo de 60 (sesenta) meses contados a partir del 4 de octubre de 2008, bajo las mismas condiciones de exclusión de responsabilidad previstas en el numeral 2.1.3.

6. **Documentación y Implementación**

    Las Partes acuerdan que firmarán los documentos complementarios necesarios para llevar a cabo todas las condiciones y obligaciones establecidas en este Convenio.

7. **Notificaciones**

  7.1   A HPEP:

    Ab. Ciro Camilo Morán Maridueña
    Dirección:

DOJ_ODB_3705754
CRP-DOJ-0000107373

       Calle Luis A. Martinez S/N y Pastaza
       Baños de Agua Santa, Provincia de Tungurahua, Ecuador
       Tel (593-3) 742-155
       Fax (593-3) 743-108

7.2   <u>Al Consorcio</u>:

       Ing. José Conceição dos Santos Filho
       Dirección:
       Edif. World Trade Center. Ofic. 808
       Quito, Ecuador
       Tel (593-2) 227068
       Fax. (593-2) 504627

7.3   Si hubiese cambio de la dirección de cualquiera de las Partes, se deberá notificar a la otra Parte inmediatamente por escrito. En caso de falta de notificación sobre dicho cambio de dirección, se entenderá como bien practicada la notificación realizada en la anterior dirección.

## 8. Otras Disposiciones

8.1   Las Partes reconocen que el presente Convenio refleja con precisión sus voluntades e intenciones respecto a la transacción realizada comprendiendo todas sus controversias existentes sobre el Contrato de Construcción y el Proyecto, y prevalecerá sobre cualquier acuerdo verbal o escrito anterior de las Partes. En caso de cualquier inconsistencia de interpretación o incompatibilidad entre una disposición específica concurrente del Contrato de Construcción y del Convenio, deberá prevalecer lo dispuesto en el Convenio y sus Anexos.

8.2   HPEP, de manera expresa, confirma, reconoce y conviene que en su calidad de empresa pública, en conformidad con la Ley Orgánica de Empresas Públicas, ha sucedido legalmente y ha asumido todos los derechos y obligaciones de Hidropastaza S.A., y, por tanto, que todas las obligaciones de Hidropastaza S.A. bajo el Contrato de Construcción, así como las del presente Convenio de Transacción, son legalmente válidas y vinculantes para HPEP.

8.3   Cada una de las Partes declara que la suscripción de este Convenio de Transacción es plenamente válida. Esta recíproca declaración de validez es la esencia para que se celebre este Convenio de Transacción. Ninguna de las Partes podrá cuestionar o impugnar la validez de este Convenio de Transacción. Las Partes se comprometen a cumplir con las obligaciones que asuman en virtud de este Convenio con total buena fe. En todo caso, la invalidez o ineficacia de cualquiera de las disposiciones del presente Convenio no afectará a las demás disposiciones del mismo.

8.4   En ningún caso una de las Partes podrá modificar unilateralmente el presente Convenio de Transacción. Cualquier modificación o enmienda al Convenio

11

DOJ_ODB_3705755
CRP-DOJ-0000107374

    se deberá efectuar por documento escrito mediante adendas al mismo que deberán ser suscritas por los representantes debidamente facultados de ambas Partes y contar con las autorizaciones de Ley.

8.5    El presente Convenio, conjuntamente con sus Anexos subsisten y dejan sin efecto todos los demás entendimientos, acuerdos y documentos celebrados o negociados anteriormente por las Partes respecto al mismo objeto.

Suscrito en Quito, Ecuador el 08 de julio de 2010

_____
**Por HIDROPASTAZA EP**
Nombre: Ciro Camilo Morán Maridueña
Cargo: Gerente General

_____
**Por CONSTRUTORA NORBERTO ODEBRECHT S.A.**
Nombre: José Conceição Santos Filho
Cargo: Diretor

_____
**Por ALSTOM BRASIL ENERGIA E TRANSPORTE LTDA.**
Nombre: Wagner Cortez Gomes
Cargo: Gerente

_____
**POR ANDRITZ HYDRO BRASIL LTDA**
Nombre: Antonio Eugenio Vilas Boas
Cargo: Diretor

DOJ_ODB_3705756
CRP-DOJ-0000107375