

Translation of Resolution No. 2450 of September 1, 2010, from Section II on Page 3 through Page 22

.

DEFENSE TRIAL
EXHIBIT

**21**

22-CR-20114-KMW

exhibitsticker.com

II. That for this reason, on May 29, 2009, joint and several Notices of Administrative Penalties 5882, 5883, 5885, 5889, 5890, 5892 and 5893 were issued against the Norberto Oderbrecht - Alstom - Va Tech Consortium, officers and former officers of Compañía Hidropastaza S.A., having been legally notified in the manner and dates shown below, informing them of the basis of the observation, and

granting them a period of sixty days in accordance with Article 53, paragraph 1, of the Organic Law of the Office of the Comptroller General of the State, in order for them to answer and present the pertinent evidence in their defense:

| Notice of Admin. Penalty No. and Names | Notification | Dates |
|---|---|---|
| 5882 Norberto Consortium Oderbrecht - Alstom - Va Tech. | Publication "HOY" Newspaper | 2009/07/16 |
| 5883 Furnas Association - Integral | Personal | 2009/06/09 |
| 5885 Carlos Manuel Paz Durini | Personal | 2009/06/08 |
| 5889 Pablo Mauricio Cisneros Garate | Personal | 2009/06/04 |
| 5890 Pablo Aníbal Viteri Estévez | Personal | 2009/06/05 |
| 5892 Bolivar Javier Astudillo Farah | Personal | 2009/06/09 |
| 5893 Germán Bolívar Anda Naranjo | Notice | 2009/06/15 |

III. That within the legal term, the referenced persons answered the Notices of Administrative Penalty by means of communications sent to the Comptroller General of the State, according to the following details:

| | Date | Communication |
|---|---|---|
| a) 5882 Norberto Consortium Odebrecht - Alston - Va Tech | 2009/09/21 | 058091 |
| | 2009/07/21 | 026260 |
| | 2009/09/18 | 058091 |
| | 2009/09/18 | No number |

Civil liability was found in the amount of USD 18,589,852.44, consisting of USD 13,639,235.54 for the 9.1726 months of early delivery of the works and USD 4,950,616.90 for the proportional part of the interest payable to BNDES for capitalization during the grace period.

In this regard, the legal representative of the Construction Consortium by means of official letter No. CON-041-2009 of September 2009, states that:

"The basis for Notice of Administrative Penalty 5882 is that:

...the headrace tunnel works were not properly completed, since the adequate support for each type of rock was not carried out, nor was the cleaning of the rebound concrete, bolts, metallic fastening elements and cables performed; in the rock trap there are defects in the excavation (sloping walls, uneven floor).

4

The access ramp for sediment cleaning was built in the wrong place; in the surge tank, despite having detected an area of geological weakness, its sill was not covered; in the cooling water system, during the optimization of the project an adequate evaluation was not performed; in the detailed engineering, valves and filters were specified that were not suitable for working with the type of water transported by the Pastaza River; and the existence of construction slopes. Therefore, the payment established in paragraph 5, "Price of the Acceleration Program" of Addendum 4 of the PPG contract is not justified: that is, USD 13,639,235.54 for the 9.1726 months of early delivery of the works, as indicated in paragraph 4.1 of the 'Provisional Liquidation Act' and USD 4,950,616,90 corresponding to the proportional part of the interest that Hidropastaza S. A. must pay to Banco Nacional de Pastaza S. A. for the 9.1726 months of early delivery of the works, as indicated in paragraph 4.1 of the 'Provisional Liquidation Act'.A. must pay to the National Bank of Economic and Social Development, BNDES, for capitalization during the grace period; causing economic damage to the entity in the amount set forth in the Notice of Administrative Penalty, as shown in Exhibit 2 attached."

"As in the other sections of this document, we will analyze each of the questions raised by CEM in the same order in which they have been raised, that is:

-The works of the headrace tunnel were properly completed, and adequate supports were installed.

-The necessary cleanings were performed.

-The access ramp of Rock Trap No. 1 does not affect its operation.

-The surge tank was adequately constructed and did not require a sill liner.

-The cooling water system was properly designed.

-The construction slopes were raised.

-Legal analysis

**The headrace tunnel works were adequately completed and adequate supports were installed**

First of all, it is worth bearing in mind that the design criteria and the basic design prepared by INECEL, expressed in Memorandum I.IV-7 Geotechnical Design of the HeadraceTunnel, Generator Room and Appurtenant Works had as a fundamental premise the construction of a tunnel without concrete lining, due, among other aspects, to the fact that most of the potential singular instabilities will be structurally controlled, the characteristics of hardness and quality of the rock mass, except in small isolated sections, ensured the absence of instabilities that would justify special or abnormal excavation and support measures, the tunnel sections where compressed rocks could be found due to an unfavorable stress/strain ratio would be scarce and the stability of the tunnel during excavation and in the operation phase was guaranteed, without requiring further lining.

5

On the other hand, the same geotechnical report prepared by INECEL foresaw that the placement of anchor bolts and shotcrete would be sufficient to ensure the stability of the headrace tunnel, being that the application of shotcrete and metallic trusses would be limited to a minimum percentage of its extension, due to the presence of crushed or fractured rock.

Such design criteria were reflected in INECEL's basic design drawings 0213- C-4002-0 Headrace Tunnel Excavation and Support Typical Sections and Details and consequently in the basic design detail drawings SFR-DS4PCE-TC43-002 and in section 4.4.3 of Volume 3 of Addendum No. 4 to the Construction Contract, which provides:

"4.4.3. Installation

The installation of the anchor bolts will be carried out according to the drawings and/or particular requirements identified at the job sites.

The systematic bolt indication presented in the drawings is referential and must be technically adjusted at the job sites by specialized personnel."

Thus, based on the basic design criteria and its detailing, the installation of the supports was defined in each job site, as foreseen in the Technical Specifications and following strict construction criteria, as is normal in this type of work with the permanent participation of the Control Department and Hidropastaza.

This is evidenced in the 429 Technical Project Documents (DTO's by its initials in Spanish) issued by PCE and approved by the Audit where the necessary supports are established for each section of the headrace tunnel and the other subterranean excavations of the Project and in the Delivery-Receipt Certificates No. 1 and No. 2 of May and June 2007, respectively. There is no doubt that each one of the excavations that make up the Project as a whole were progressively and sequentially released according to the verifications or inspections of the Auditors and Hidropastaza, as recorded in the 449 pages that make up the Final Quality Control dossier of the Work, to such an extent that it was received with total conformity from Hidropastaza without any objections or observations of any kind.

For further information, the following table illustrates the number of supports installed:

| Total Anchorages | 16.786 |
|---|---|
| Shotcrete | 51 |
| Shotcrete | 2.735 |
| Prefabricated Voussoirs | 877 |

If the statement that "the works of the headrace tunnel were not properly completed, since the adequate support was not provided for each type of rock" were true, it is assumed that CGE would have reliably determined that the supports installed were not sufficient or adequate and therefore caused a significant amount of rock falls; however, such statement is based solely and exclusively on the subjective criteria of various consultants hired unilaterally by Hidropastaza and not on objective determinations in the field.

For example, it is enough to cite an example, such as the comment contained in Lombardi S.A.'s report cited by the CGE in its Official Letter No. 24107-DIAPA and in Report DIAPA-0009-2008, which states: "A quick check of some as-built plans indicated that there is no correlation to what was found on site during the inspection.... It seems justified to state that the work was not completely finished according to the design plans", in view of which one can only ask: How many and which plans? How were the design plans not complied with? How was the "quick check" carried out?

By adopting, without implying in any way our acceptance, the information provided by the consultants unilaterally hired by Hidropastaza, it is clearly demonstrated that there is no quantitative support that would allow us to state that the installed supports were not adequate.

If, on the other hand, we adopt the value of 85 m³ of detached material estimated without the slightest support in the Geological-Geotechnical Expert Report ordered by the Ninth Civil Judge of Baños, which, by the way, lacks any procedural value, we obtain a ratio of 0.0077 m³ for each linear meter of tunnel.

These values are absolutely insignificant in relation to the quantity of particles and sediment coming from the Agoyán Reservoir, since even with the sediment conditions provided in the Bid, which were largely exceeded in the first year of operation of the Plant, the total sediment expected to impact the turbines was estimated at 1,890,000 tons per year.

The objective information available does not allow us to state that the support and protection elements are insufficient; on the contrary, the protections and supports were placed according to what was found in the excavation of the tunnel, maintaining the criteria of the basic design prepared by INECEL. CEM's comments are based on subjective statements of external consultants hired unilaterally by Hidroagoyán and not on objective quantity surveys. Finally, even using the information provided by Hidroagoyán's consultants, the rock falls in the tunnel are insignificant compared to the quantity of sediment transported by the Pastaza River to the generation units, which correspond to unforeseeable events of force majeure concomitant with the extraordinary emergency experienced repeatedly in the Project area during 2006, 2007 and 2008.

**The necessary cleanings were carried out**

As in paragraph 3.1 above, the statement that "The rebound concrete, bolts, metal fasteners and cables were not cleaned" is based solely and exclusively on the subjective criteria of various consultants hired unilaterally by Hidropastaza and not on objective determinations in the field, since the tunnel was released by the Auditors with Hidropastaza's approval prior to its first filling.

In this case and in all other instances in which the reports of the consultants hired unilaterally by Hidropastaza are cited and used as support, it is not up to the Construction Consortium to refer to the reports of the contractually stipulated entities, such as the Inspection and the Certificates of Delivery-Receipt of the Works, in which there are no observations in this regard.... "

**"The access ramp of Rock Trap No. 1 does not affect its operation".**

The inclination of the walls and the irregular floor of the rock trap has no relevance and in no way demonstrates that the work was not completely finished, as CGE claims. Regarding the location of the access ramp of Rock Trap Nº 1, its location had the objective of facilitating access for maintenance, avoiding the seeping of water upstream of the trap. However, regardless of this fact, the location of the ramp was placed in its original position during the shutdown from June to October 2008.

The layout of the access ramp built at the beginning did not have the slightest influence on the operation of the plant, since any material not retained by the first rock trap would be retained by the second one, located 600 meters downstream.

As stated on page 50 of Report DIAPA-0039-20U8, "...the ramp for cleaning Rock Trap Nº 1 was built in a position contrary to that established in the design plans, which was solved during the repair stage from June to October 2008".

**"The surge tank was adequately constructed and was not required to reline its sill.**

Although the commentary contained in its Communiqué Regarding Notice of Administrative Penalty No. 5882 regarding the Upper Surge Tank ("CES" by its initials in Spanish) is rather brief, it is based on the observations and content of Communiqué No. 24107-DIAPA and Report DIAPA-0039-2008, which in turn are based on the comments contained in the reports issued by the consultants hired unilaterally by Hidropastaza.

In general, the observations made by the different consultants hired unilaterally by Hidropastaza suffer from the following deficiencies:

8

-The comments and opinions expressed in many cases are only partial and do not cover all the works.

-Those who inspected the works were not aware of important background information on the project, such as the geological-geotechnical and sedimentological framework established by INECEL and the protocols for execution and acceptance of the works, nor did they take into consideration the conditions under which the plant operated during its first year of operation, among others, all of which should be considered when evaluating the situation as a whole.

-Many of the conclusions are exclusively conceptual or partial, without analytical or quantitative foundations.

Therefore, the following points should be made:

The configuration of the Upper Surge Tank maintains the basic design concepts established by INECEL, such as: inclined oscillation gallery, restricted mouth orifice for loss generation and damping of oscillations, and upper aeration in a reduced diameter duct. This design of the oscillation gallery is used in many projects when geological-geotechnical conditions or constructive aspects do not allow a simple vertical excavation.

Thus, the Construction Consortium respected INECEL's Basic Design which foresaw for the Upper Surge Tank an unlined inclined tunnel and only introduced slight design adjustments in its geometry since INECEL's Basic Design is adequate. The design modifications included lowering the initial elevation of the Upper Surge Tank and incorporating the final horizontal gallery as an area expansion, reducing the final oscillation elevation. However, the concept of operation of the Upper Surge Tank was not modified.

Throughout construction, the Construction Consortium complied with all the design requirements and criteria. The construction of the Upper Surge Tank was completed without any objections to the process, complying with the technical design and construction standards, and in particular, the required supports, as detailed below.

In geotechnical terms, the Upper Surge Tank corresponds to the rock massif called Zone VII, composed of oriented granite, with thin intercalations of green schist and metavolcanics. The rock massif presents north-south foliation and subvertical dips. Permeability is random and associated with the presence of fractures and/or combined faults, with increasing frequency.

According to INECEL's "Final Report Appendix X Definitive Schematic Design", the inclined tunnel would be located entirely in the bedrock, where no major fracturing was expected, so the Upper Surge Tank would not be lined. Some fault and shear sections may require more intense support depending on the quality of the rock encountered.

9

At the same time, the Basic Design detailing established the excavation sections and reinforcement and lining elements in the inclined tunnel, which were the same as those provided by INECEL, maintaining the criterion that the reinforcement system would consist of the timely use of shotcrete with steel fiber, with variable thickness, and anchor bolts in the places where it was required.

Likewise, the tank was considered unlined except in the connection of the tank with the headrace tunnel and in a section of the vertical shaft of the surge tank due to the good quality of the spoliated rock, in accordance with INECEL's Basic Design.

It should be clarified that the lack of lining of the Surge Tank, as foreseen in INECEL's Basic Design, had no impact on the event under analysis, considering that sediment deposits were detected in the Chimney, as a result of the significant quantity of solids in suspension in the Pastaza River and not detachments from the Tank itself, without lining.

As with the headrace tunnel, prior to the release of the structure, important detailed surveys were carried out, pointing out the main pending aspects, which were corrected until their total approval.

Thus, by means of Note OEC/PHSF/GING/01267/2006 delivering the documentation of release of structures accompanied by documents SFR-EO8CNO-CS 81-002, SFR-EO8CNO-CS-85-002, SFR-EO08CNO-CS-80-002, SFREO8CNO-CS85-001, and SFRE08CNO-CS 85-001, it is shown that the observations made at the end of construction were overcome with the intervention and acceptance of Furnas and Hidropastaza.

That is to say, at the time of commissioning the facilities, there was total agreement that the necessary treatments had been carried out.

Regarding the installation of supports and protections, according to INECEL's Basic Design [Paragraph 6.9 - Feasibility Studies and Tender Designs Final Report. September 1990: plan ()-214-C~^010 and 4011], the Surge Tank was not lined except for specific support situations. During the construction of the CES it was found that the rock massif was highly fractured in an important section that in the basic design had been considered of good quality. It is worth noting that the Construction Consortium adequately applied the necessary supports due to the poor quality of the rock, using special measures in the gables and vault area and a greater number of bolts and shotcrete than what was contemplated in the basic design detailing [Ref. SFR-IT5PCE-GE41 October 2004 to January 2006 and January 2006]. In other words, at the time of commissioning of the facilities, there was total agreement that the necessary treatments had been carried out and[sic] As-built Plan SFR-DS5PCE-CS41-002-5].

Based on these assumptions, the following table presents a comparison of the supports placed with respect to those provided. The supports provided have been estimated on the assumption that their amount and characteristics would be similar to those

10

set forth in INECEL's basic design for Zone VII of the Headrace Tunnel.

| | Total anchorages | Shotcrete | Trusses 8WF w/ 1.2 m |
|---|---|---|---|
| Expected | 1030 un | 875 m² | 10 un |
| Placed | 1381 a | 7809 m² | - |

In conclusion, it can be said that during construction the required steel fiber, shotcrete supports and linings were applied according to the characteristics of the rock massif, significantly exceeding the quantities of supports foreseen in INECEL's basic design. It should be noted that there was no requirement in the Bidding Terms and Conditions, or in the EPC Contract, to install a certain volume of supports; rather, as mentioned above, the supports were to be installed according to the needs of the construction site.

As far as the CES sill is concerned, it was over-excavated before the start of operation precisely to remove all the fractured material that could potentially be transported towards the turbines before the final release, and due to the construction methodology of horizontal drilling when working upwards, so it is not feasible and there is no evidence that detachments of pieces from this sector have been transported by the flow towards the turbine during the operational stage.

The above is consistent with what Fumas indicates in the April 2007 post-drainage inspection report in its Geological Inspection Report of the Post-Drainage Conduit System ASFI.SF.005E3.2007-R0 dated April 26, 2007, where it is stated that:

"Between Pk 0+285 - 0+295, there is a large over excavation of the floor (Photo 21), this area projected towards the road coincides with the first shear zone that presented water on the Baños - Puyo road (150 m below the Exit Portal). The rest of the floor of the Upper Surge Tank is irregular with sections with large slopes of over excavation, this occurred during the cleaning of the floor for the release, since large blocks of rock are not observed at the beginning of the Tank in the embayment (Photo 20), in the mapping of geological structures, shear zones are evident interspersed every 5 to 10 meters and thicknesses of 1.0 to 2.5 m from Pk 0+250 of the Tank. (Photo 22 and 23)."

The above Audit report shows the progress sequence of the excavations and presents a series of images of the Tank sill before and after the first year of operation (April 2007 and June 2008). It is clearly observed that the Upper Surge Tank sill was heavily over-excavated prior to the start of operation of the San Francisco Power Plant and that it did not suffer erosion during the first year of operation.

After one year of operation, following inspection and cleaning, regularization tasks were carried out for ease of maintenance only, constructing concrete backfills and slabs to improve the uniformity of the screed and facilitate future inspection and maintenance tasks. Thus, the floor was regularized at several points in accordance with the work required by Fumas prior to the release of the structure, the details and control of execution of which are contained in the respective document SFR-E08CNQ-CS81-002. The approval of the corresponding works is contained in document SFR-EO8CNO-CS85-002.

The inspections carried out since July 2008 showed that the sill rock had remained unaltered after the first year of operation, verifying the deposit of fine sediments on it, which is discussed further below. Although the CES has the capacity to deposit fine material in its interior, there is no evidence of erosion or transport of materials to the turbines.

According to the administrators:

"It is therefore a mistake to consider that the absence of a liner in the CES sill produces or favors the cleavage and detachment of rocks or the sedimentation of fine material in suspension. There is no evidence of the former and the phenomenon of sedimentation occurs due to the low velocities that normally occur in the Tank and, during the first year of operation, was caused mainly by the enormous quantity of suspended solids transported by the water.

Regarding seepage, the phenomenon of high permeability of the rock mass in an area of the ESC has no impact on the internal stability of the Tank since the support applied in this area is adequate and consistent with the classification of the rock mass.

On the other hand, when verifying the vertical and lateral cover thicknesses and their relationship with the operating pressure of the CES, the hydraulic fracture safety factors are generally higher than 3.0, which indicates that the vertical and horizontal alignment of the Upper Surge Tank is adequate, so that the massif will not present fractures induced by the tunnel pressure that could generate problems of slope instability.

The natural fault zones in the area of the CES have generated a minor runoff of water to the outside of them, which feeds a small waterfall, which is visible from the road leading to the town of Baños. This waterfall existed before the excavation of the tunnel and was used by local residents to provide water for their plots.

During the construction of the main access tunnel, the waterfall dried up and these waters were captured by the above-mentioned tunnel. After the tunnel was filled, this waterfall was reactivated with flows similar to those before construction.

The Surge Tank Linings Attachment shows the verifications performed.

12

With respect to the possibility of sediment accumulation and its effects, two hypotheses should be noted: the return of a large proportion of the sediment lodged in the ESC to the tunnel and thus to the turbines, and the effectiveness of the inlet wall as a sediment barrier.

The first hypothesis is not supported by any evidence confirming its occurrence and contradicts what was found during the site inspection. It is clear that sediment accumulation is something totally different from contributing a considerable amount of sediment to the Generator Room and there is no evidence that the latter has occurred.

It is undisputed that the CES functions as a settler over a large part of the time. retaining sediments that. if circulating in suspension in the tunnel water. would pass through the turbine stands. However, this is due to their concentrations in the water and the state of repose in the inclined gallery of the CES. which is unavoidable. On the other hand. only a very small proportion of the time, during changes in the operating regime of the power plant, the CES would have the hydraulic capacity to bring previously deposited sediments into the headrace tunnel due to the outlet velocities.

Regarding the effectiveness of the entrance wall, from the design point of view, the hole or choke in the section created by the vertical wall at the junction between the tunnel and the Surge Tank has a specific hydraulic function, which is to generate load losses during transient phenomena.

Considering the reduced times in which outflow velocities capable of dragging sediments from the CES to the Headrace tunnel are reached, and the absence of eroded materials from the CES, the hypothesis that there was material detached from the roof, walls and floor of the CES that reached the turbines is discarded, predominating instead, the behavior of sediment retention, contributed by the waters of the Pastaza River, as was demonstrated by the state in which the inclined gallery was found.

The other issue that must be perfectly clear is the tendency of the ESC to function as a sedimenter. This does not depend at all on the presence or not of the slab on the Tank floor, so it is a mistake to consider that the bottom slab will prevent the accumulation of sediments inside the Tank, since the only purpose of the bottom slab will be to regularize the floor to facilitate the movement of personnel and equipment during inspection and maintenance periods.

In summary, considering the effects produced by sediment accumulation, we consider that within broad limits, the primary function of the Tank in terms of its capacity to dampen oscillations and protect the adduction tunnel is not lost.

Therefore, the operation of the CES and the sedimentation that occurred in it are not the cause of the damage found in the turbines of the San Francisco power plant. On the contrary, they are mainly related to the very high quantity of sediment transported by the Pastaza River during the first year of operation.

13

The sill coating, as well as all the observations made by CGE regarding the CES in its Official Letter No. 24107-D1APA and in Report DIAPA- 0039-2008 are unfounded, since the Construction Consortium executed the work in accordance with the designs, plans and technical specifications agreed upon in the contract, which establishes, among other aspects, the normal operating conditions, which were largely exceeded during the first year of operation of the San Francisco Hydroelectric Project, due to unforeseeable events of force majeure concomitant with the extraordinary emergency repeatedly experienced in the Project area during 2006, 2007 and 2008, which generated the dragging of an enormous amount of suspended solids transported by the Pastaza River to the generation units.

**"The construction slopes were raised**

With respect to this point, we proceed to analyze the formalities carried out during the execution of the works, prior to the commissioning and receipt of the same.

The conditions for the acceptance of the works were established in Clause 24 of the EPC Contract signed between Hidropastaza and the Construction Consortium, on the basis of which the works were accepted.

Previously and during construction, successive releases of each of the project's components were made, following a detailed review process by the Audit Office and Hidropastaza, specifically pointing out in each case the pending aspects and their subsequent execution and approval, as stated in the Notes OEC/PHSF/GING/012G7/06 and Exhibits of November 24, 2006. OEC/PHSF/GING/O1268/06 and Exhibits of November 30, 2006 and the release forms that are part of the contract documents.

Once the work was completed, it was received in accordance with the contract and with the agreement of the parties, as evidenced in the Delivery Certificate No. 1 - Generating Unit No. 2 and Essential Works of May 2007 and in the Delivery Certificate No. 2 - Generating Unit No. 1 and Power Plant as a whole of June 2007.

According to Clause 24.4, if there were any pending issues that prevented the operation of the units, these would be detailed and resolved by the Construction Consortium. At the time of acceptance, no significant deficiencies were detailed, and the pending issues were limited to minor aspects, normal in this type of project, which did not compromise the safety of personnel or the facilities.

In fact, each Delivery Certificate includes an exhaustive detail of the parts of the works released, with the documents where such release was formalized.

It is absolutely clear from the aforementioned documents that at the time of both Delivery Certificates the works were fully completed, in accordance with the scope of the contract duly executed, to the satisfaction of the parties. None of the Audit officers, Hidropastaza or other institutions formalized any type of observation in relation to

14

the aspects that are currently observed, and there is total coincidence in these aspects, so that the statement of the CEM lacks any support".

## "Legal aspects

Once all the technical aspects implicit in paragraph 3 of the Notice of Administrative Penalty that I contest have been clarified, it is convenient to analyze the fundamental issue of the partial Notice of Administrative Penalty in the amount of USD 18,589,852.44, of which it is said that the sanctioned party benefited in the amount of USD $13,639,235.54, consisting of the 9.1726 months of early delivery of the works, according to the linear progression established in paragraph 5, "Price of the Acceleration Program" of Addendum No. 4 of the EPC contract, without considering that the project was not duly completed, so there were interruptions in the operation of the plant; and, ii) USD $4,950,616.90 corresponding to the proportional part of the interest that Hidropastaza S.A. must pay to Banco Nacional de Desarrollo Económico y Social, BNDES for capitalization during the grace period.

The value of USD 13,639,235.54, which according to the Notice of Administrative Penalty constituted a benefit, is not such since Addendum No. 4, which is in effect, recognizes this amount as the result of the costs incurred by the Builder in the acceleration plan. There can be no confusion between profit and cost, since in accounting terms, in their essence, they constitute two distinct and different revenues.

In paragraph 5) of Addendum No. 4 to the Construction Contract, the Parties establish the additional costs to be recognized to the Construction Consortium for reaching various accelerated goals, in a range of 5 to 9 months, clearly explaining the concept of the cost of the work acceleration plan, as follows:

## "5. PRICE OF THE ACCELERATION PROGRAM

In consideration of the additional costs for the implementation of an acceleration effort in the pace of the works to complete them with a target of 7 months in advance, the Parties agree that the adjustment to the Global Contract Price shall be the fixed sum of USD $12,784,219, payable in full upon Provisional Acceptance of the Works.

The value of this readjustment is itemized as follows:

| | | |
|---|---|---|
| Civil Works | USD | $9,887,197 |
| Electromechanical Works | USD | $2,897,022 |

On the other hand, the net acceleration price shall be automatically modified if the time advantage obtained in the Substantial Completion of the works in relation to the contractually established term in the Original EPC Contract is modified for reasons under the control or responsibility of the Construction Consortium..."

In paragraph 3) of Exhibit No. 1 to addendum No. 4, the main activities that involve this cost are described as follows:

15

"3 - ACTIVITIES RELEVANT TO THE ACCELERATION PROGRAM

The Acceleration Program proposed herein is based on the following:

a) The use of additional shifts of personnel and equipment, especially in all the activities that are part of the Critical Path and those that may become critical.

b) Overtime of personnel and equipment in all work shifts.

c) More personnel, equipment and tools than originally planned.

d) Major Supervision, Field Engineering and Project Design Engineering.

e) Increased logistical infrastructure (workshops, warehouses, open-air storage facilities, industrial, administrative and similar facilities).

f) Change in the sequence of some jobs.

g) Methodological changes in the execution of works including the incorporation of state-of-the-art mechanized technology in subway excavations.

h) Design changes required for the acceleration of the work."

Exhibit No. 3 of Addendum No. 4 describes each of the costs. One must ask, where is the profit, prize or something similar? The logical and legal thing to do is to establish whether or not these costs were actually incurred in the works described in the Addendum under analysis. Unfortunately, the Comptroller's Office does not analyze any of this, rendering the Notice of Administrative Penalty null and void, for lack of evidentiary analysis.

The fact that the work was completed in advance is evidenced by the fact that prior to the subscription of

Receipt Certificate No. 1 corresponding to Generating Unit No. 2 and its Essential Works (in which the Headrace tunnel and Upper Surge tank are included) and Receipt Certificate No. 2 corresponding to Generating Unit No. 1 and the Powerplant As a Whole, subscribed on May 10 and June 25, 2007, respectively, the Construction Consortium agreed with Hidropastaza S.A. on a procedure for the release of structures, whose supporting documents are attached as Exhibits to said minutes.

After the first emptying of the Headrace tunnel in April 2007, inspections were carried out with both the Project Control and CONELEC representatives, who issued reports with no major developments.

16

After almost two months, the Parties sign the Provisional Settlement of the Acceleration Program, in which they declare that all the premises agreed in Addendum No. 4 to the Construction Contract have been complied with. It is therefore evident that the works were completed in advance as established in the acceleration program of Addendum No. 4 to the Construction Contract.

However, it is obvious that there was bias in the analysis of the amounts mentioned and failure to analyze others, such as the extraordinary income that Hidropastaza received in the acceleration period from the sale of energy and whose figures were indicated in our responses in the examination, citing the following income per month.

| YEAR | MORE | BILLING |
|---|---|---|
| 2007 | MARCH | 14.249.25 |
| | APRIL | 7.56172 |
| | MAY | 2.535.099.51 |
| | JUNE | 2.816.062.45 |
| | JULY | 5.685.371.84 |
| | AUGUST | 5.263.964.23 |
| | SEPTEMBER | 5.957.758.42 |
| | OCTOBER | 5.125.416.19 |
| | NOVEMBER | 4.782.572.47 |
| | DECEMBER | 5.481.967.86 |
| 2008 | JANUARY | 5.811.508.19 |
| | FEBRUARY | 4.523.687,77 |
| | TOTALS | 48.005.219,91 |

These Hidropastaza revenues during the period in which the Plant was allegedly not completed demonstrate that the Plant was completed, and was indeed operated for more than nine months before the originally scheduled date, thus entitling the Consortium to the acceleration costs, and to the acceleration bonus (the latter amount was not paid by Hidropastaza, in violation of the contractual requirements).

In any case, it is illogical to claim from the Consortium the reimbursement of the acceleration costs, and at the same time retain the profits realized as a result of the accelerated delivery. It is a double benefit that the State would be seeking.

Additionally, the national Electric System is formed by the interconnection between all the generation plants in such a way that the entry or exit of one of them affects the delivery of energy in response to demand. Additionally, it cannot be ignored that the early entry of the San Francisco Power Plant was mainly due to the needs of the country to meet its demand for electricity and that this generated the following estimated savings for the State:

17

Reduction of diesel imports due to the San Francisco Project

| | 2005 | 2006 | |
|---|---|---|---|
| Total domestic diesel import cost (US$)(1) | 648.293.203.257,17 | 949.953.341,96 | a |
| Diesel consumption in the electricity sector (thousands of (2) | 1.987,80 | 2.873,47 | b |
| Total volume of diesel imports (thousands of barrels) (2) | 8.122,34 | 11.325,19 | c |
| Cost of diesel imports for the electricity sector | 158.658.046,92 | 241.026. 100,30 | d=(b/c)*a |
| Electricity production with diesel (MWh) (2) | 1.012.058,83 | 1.418.989.61 | e |
| Unit cost of diesel imports from the electricity sector (US$/MWh) | 156,77 | 169,86 | f=d/e |
| SF electric power production (MWh) | 1.412.000,00 | 1.412.000,00 | g |
| Reduction of diesel imports by the FS (US$ thousands) | 221.355.869,80 | 239.838.861,51 | h=g*e |
| | | | |
| Proportional reduction for 9 months | 166.016.902.35 | 179.879.146,13 | |
| Average | 172.948.024,24 | | |

Sources: (1) ECB 2005 - 2006 (2) CENACE

This categorical evidence regarding the advantages of the early start-up of the plant, both in relation to the benefits received by HPSA reported in its financial statements for the years 2007 and 2008 and in relation to the benefits received by the State, has not been analyzed, refuted or challenged in the analysis of the evidence, simply because there is no analysis of all the elements presented in a conclusive manner, evidencing a total lack of consideration of the due process that protects my client .....[u]

"...The USD $4,950,616.90 that according to the Notice of Administrative Penalty correspond to the proportional part of the interest that Hidropastaza S.A. must pay to the National Bank of Economic and Social Development-BNDES, for capitalization during the grace period is alien to the contractual obligation and surely contains the risks assumed by the borrower within a loan contract to which the Construction Consortium is not a party. There is no doubt that the Notice of Administrative Penalty in the amount of interest to be paid by Hidropastaza to BNDES, constitutes a figure of payment of lost profits used by the Comptroller's Office in violation of the rights of limitation to the payment of lost profits contained in the Construction Contract in clause 30, which expressly states the following:

"...In no event shall either Party have any liability to the other or to their respective parents, subcontractors, affiliates, employees and/or agents, for consequential damages, including consequential damages, including loss or diminution of income, loss of profits and the like..."

Finally, the anticipated bonus for completion of the works before the deadline did constitute a benefit in favor of the Construction Consortium, but this benefit was never paid and this is acknowledged in the Notice of Administrative Penalty with the following text:

18

"The Chief Financial Officer of Hidropastaza S.A., in the Report on the Liquidation of the Acceleration Program dated August 8, 2008, regarding the payment of the Early Termination Bonus, states that: "The calculation basis for the Bonus is negative, since the net income is less than twice the amount payable under the Acceleration Program, therefore the Construction Consortium is not entitled to the Early Termination Bonus".

There is therefore a misconception in the argument that the payment for the early termination of the works is undue because the delivery of the work did not take place due to the fact that after the entry into operation of the plant it has been paralyzed for repairs, since there is no doubt that the early entry into operation of the plant actually took place even before June 2007. The Concessionaire Hidropastaza S.A. obtained significant unforeseen revenues and the Ecuadorian State garnered great savings from the replacement of fossil fuels. The stoppage of the work was the result of unforeseeable events of force majeure concomitant with the extraordinary emergency repeatedly experienced in the Project area during 2006, 2007 and 2008, which generated the dragging of an enormous quantity of suspended solids transported by the Pastaza River to the generation units. This cause has nothing to do with and is absolutely independent of the acceleration of the work established in Addendum No. 4 to the Construction Contract, for which reason I contest the Notice of Administrative Penalty established by CGE."

|   |   | Date | Communication |
|---|---|---|---|
| b) | 5883 Furnas Association - Integral | 2009/06/15 | 020484 |
|   | 5885 Carlos Manuel Paz Durini | 2009/08/07 | 034805 |
|   | 5889 Pablo Mauricio Cisneros Garate | 2009/07/02 | 022673 |
|   | 5890 Pablo Aníbal Viteri Estévez | 2009/07/28 | 028321 |
|   | 5892 Bolivar Javier Astudillo Farah | 2009/08/11 | 035471 |
|   | 5893 Germán Bolívar Anda Naranjo | 2009/07/28 | 027877 |

In this regard, the legal representative of HÍDROPASTAZA, with official letter No. 0436-HPEP- 2010 of July 9, 2010, textually stated that the:

"Acceleration

As indicated by the Comptroller General's Office in its Report DIAPA-0030-2008, Addendum Nº 4 to the Construction Contract was signed on September 20, 2006 to accelerate the pace of the works and adapt the basic design to the acceleration program.

19

On May 10, 2007 and later on June 25, 2007 Hidropastaza, the Audit Office and the Construction Consortium subscribed Receipt Certificate No. 1 for Generating Unit No. 2 and other essential works and the Receipt Certificate No. 2 for Generating Unit No. 1 and the Powerplant as a Whole, respectively.

On September 14, 2007, the Provisional Settlement of Addendum 4 was signed, which establishes that between February 27, 2008, the date scheduled for completion of the project, and May 30, 2007, the date of completion of the work, there was an time savings of 273 days, plus 3 days of stoppage due to demonstrations and 3 days due to volcanic activities, resulting in an time savings of 273 days. The date of completion of the works has been recorded 273 days in advance, to which are added 3 days of stoppage due to demonstrations and 3 days due to volcanic activities, so that the time savings is 279 days or 9.1726 months, resulting in an amount to be paid of USD $13,639,235.54.

On the other hand, in the prosecutor's investigation and as part of Judgment No. 18251-2009-0741, the Prosecutor of the District of Tungurahua ordered the performance of detailed expert analysis and the presentation of the corresponding expert report of Hidropastaza's accounting, whose purpose was the inspection of Hidropastaza's financial statements to determine the income it had from the sale of power and energy between May 2007 until the date of the expert's analysis, for which it was necessary to verify the financial statements of the years 2007, 2008 and 2009, and expressly determine such income and the company's estimated budget.

As a result of such investigation, the brief submitted by the appointed expert allows establishing certain comparisons between Hidropastaza's invoicing during the acceleration period (May 2007 to February 2008) and the cost of the acceleration. In his brief, the expert presents the following Hidropastaza's invoicing data:

| | 2007 | 2006 | 2009 |
|---|---|---|---|
| | Invoiced | Invoiced | Invoiced |
| January | | 5.516.142,82 | 5.877.076,28 |
| February | | 5.845.724,17 | 5.347.402,75 |
| March | | 4.570.020,16 | 6.064.182,29 |
| April | | .999.787,68 | 5.579.607,85 |
| May | | 5.971.445,63 | 1.224.915,59 |
| June | 2.606.549,27 | 6.150.973,29 | 5.772.876,70 |
| July | 2.858.017,25 | 1.457.889,37 | 6.127.753,30 |
| August | 5.746.956,25 | | 11.344.548,99 |
| September | 5.287.841,35 | | 5.811.967.76 |
| October | 5.986.511,82 | | 5.838.395,14 |
| November | 5.155.827,39 | 3.670.374,64 | 5.848.715,89 |
| December | 4.833.604,32 | 6.449.306,13 | 5.790.123,74 |
| **Total** | **32.475.307,65** | **45.633.663,94** | **70.628.666,28** |

The values shaded in gray correspond to sales and collections during the months of acceleration (May 2007 to February 2008). The sales and revenues of one month are reflected in the following month. This is evidenced by the fact that the revenues for June 2008 appear in the following month of July, which in fact had no revenues due to the interruption of the powerplant's operations.

20

Therefore, the invoicing in the months of early completion amounted to USD $48,409,194.80. On the other hand, as mentioned above, the cost of the accelerated completion was only USD $13,639,235.54, so the net benefit received by Hidropastaza as a result of the acceleration amounts to USD $34,769,959.26. The sales for the years 2007, 2008 and 2009 reach an amount of USD $148,737,637.87, that is, almost half of the project cost without considering the amount of fuel savings as an amount associated with the replacement of thermal generation.

Furthermore, if the loss of income caused by the stoppage established by the Comptroller General of the State (which according to the Comptroller General of the State amounts to USD 26,556,179.17 and which exceeds the estimated loss of profits, which is discussed below) is imputed to the additional income obtained by Hidropastaza as a result of the acceleration of the Project, the resulting balance is still favorable to Hidropastaza, since the latter would obtain profits of USD $8,213,780.09 with respect to the invoicing, so there are no accounting losses that can be imputed to the Consortium or any economic loss due to the acceleration of the completion period of the works.

These considerations are summarized in the following table:

| Concept | Billing |
|---|---|
| Additional income during acceleration | 48.409.194.80 |
| Acceleration cost | 13.639.235,54 |
| Balance in favor of Hidropastaza | 34.769.959,26 |
| Loss of profits according to CGE | 26'556.179,17 |
| Balance in favor of Hidropastaza | 8'213.780.09 |

Therefore, in consideration of the subsequent facts explained above, the fact that the Power Plant has not been delivered in advance is disproved, thus justifying the cost of acceleration incurred by Hidropastaza".

IV. After analyzing both the special examination report and the background memorandum registered in the file under number 029-2009, as well as the communications and evidence submitted, it is concluded that:

The administrators have submitted the Delivery-Reception Certificates No. 1 and No. 2 of May and June 2007, which are based on technical documents approved by the Auditing Office, with which the works were released progressively and sequentially according to the verifications and inspections of the Auditing Office and Hidropastaza. Having received in integral form the headrace tunnel and the other subterranean excavations of the project, such as those mentioned in the basis of the Notice of Administrative Penalty, without objections or observations of any kind.

Documents SFR-EO8CNO-CS81-002, SFR-EO8CNO-CS85-002, SFR-EO8CNO-CS80-002, SFR-EO8CNO-CS81-001, SFR-EO8CNO-CS85-0D1, and SFR-EO8CNO-CS80-001 show that the observations made at the end of construction were overcome with the acceptance of the audit and HIDROPASTAZA.

21

As mentioned in previous paragraphs, the works were received by the Auditor and HIDROPASTAZA, so the plant began operating as planned. The problems in the tunnel, surge tank and sill lining were caused by the excessive sediment load from the source used for the operation of the Agoyán and San Francisco power plants, which occurred repeatedly in the Project area, and other construction-related problems inherent to a project of this magnitude. The aforementioned problems were solved by the Construction Consortium after the first year of operation of the San Francisco Hydroelectric Project, within the technical guarantee period and during a scheduled maintenance shutdown, as foreseen in the contract.

The parties claim that the consultants who inspected the works were not aware of important background information on the project, such as the geological-geotechnical and sedimentological framework established by INECEL and the protocols for execution and acceptance of the works, nor did they take into consideration the conditions under which the Power Plant operated during its first year of operation, the contractual obligations of the Construction Consortium, documents that are included in the documents provided in relation to the approval processes of the works.

Addendum No. 4 to the construction contract relates to the costs incurred by the Construction Consortium for the early completion of the works, as established in the acceleration program of said addendum. The Notice of Administrative Penalty determines that the contractor benefited by USD $13,639,235.54, which corresponds to the 9.1726 months of early delivery of the works; however, this amount refers to the amounts paid for expenses incurred by the Construction Consortium for a number of activities to comply with the purpose of Addendum 4, i.e., the acceleration of the work, which were contractually established by HIDROPASTAZA.

In paragraph 5) of Addendum No. 4 to the Construction Contract, the Parties establish the additional costs to be recognized to the Construction Consortium for reaching various anticipation goals, in a range of 5 to 9 months.

The Acceleration Program includes, among other aspects, the use of additional shifts of personnel and equipment, especially in all activities that are part of the Critical Path and those that may become critical, changes in the sequence of some works, methodological changes in the execution of the works, design changes.

Exhibit No. 3 of Addendum No. 4 describes each of the costs. From the documentation analyzed there is no evidence that the benefit or award has been paid to the Construction Consortium, since only the value of the aforementioned expenses was recognized.

The plant was operated for more than nine months before the originally planned date, for which HIDROPASTAZA recognized the costs of acceleration to the Construction Consortium.

22

**<u>AFFIDAVIT</u>**

I, **Juan F. Alban-Naranjo**, under penalties of perjury, declare:

1. My name is **Juan F. Alban-Naranjo**, I am over the age of eighteen (18) years, and I am competent to make this affidavit.  The statements contained herein are true and correct.

2. I am certified as a Spanish<>English interpreter by the state court systems in Florida and California.

3. I am an experienced bilingual translator who is fluent in both the English and Spanish languages.

4. Pursuant to Florida Statute § 90.606, I translated the item below from Spanish to English to the best of my knowledge, ability and belief and the translations are in fact true and accurate.

   See Exhibit "A" attached hereto

5. I have no affinity or consanguinity with the participants of the translated document.

   Pursuant to Florida Statute § 92.525(2), under penalties of perjury, I declare that I have read the foregoing Affidavit and that the facts stated in it are true.

_____          <u>April 1, 2024</u>
Juan F. Albán-Naranjo                                      DATE

STATE OF _____Texas_____

COUNTY OF _____Collin_____

Sworn to (or affirmed) and subscribed before me on April 1, 2024, by Juan F. Alban-Naranjo.

_____          _____
NOTARY PUBLIC, or other person authorized          Sue L Nix
to administer an oath                                      Printed, typed or stamped commissioned name
                                                          of Notary Public

o   Personally known
XX  Produced identification          Electronically signed and notarized online using the Proof platform.
    Type of identification produced: Florida Driver's License A-415-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

Sue L Nix
ID NUMBER
132369934
COMMISSION EXPIRES
February 21, 2028
NOTARY PUBLIC · STATE OF TEXAS

Exhibit "A"

1-1, Resolution No. 2446, August 26, 2010

1-2, Resolution No. 2448, August 27, 2010

1-3, Resolution No. 2449, September 1, 2010

1-4, Resolution No. 2450, September 1, 2010

1-6, Resolution No. 2452, September 1, 2010

1-7, Resolution No. 2453, September 1, 2010

1-8, Resolution No. 2454, September 1, 2010