## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 22-CR-20114-KMW

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

CARLOS RAMON POLIT FAGGIONI,

        Defendant.

_____/

## DEFENDANT'S OBJECTIONS TO THE
## PRESENTENCE INVESTIGATION REPORT

Defendant Carlos Polit ("Polit"), through undersigned counsel, respectfully submits the following objections to the Presentence Investigation Report (the "PSI") (ECF#224) and states:

Polit asserts four primary legal objections that affect the calculation of the total offense level that should be imposed.[1] The PSI proposes upward adjustments for sophisticated laundering, leadership role in the offense, and abuse of public trust, none of which are supported by the evidence presented at trial. Polit also objects to the methodology by which the PSI calculates the amount of laundered funds. In the

---

[1] Polit also has several clarifications to make in the PSI that do not affect the guideline calculation or proposed sentence. These objections will be submitted to the U.S. Probation Officer separately.

light most favorable to the government, the amount of laundered funds does not exceed $5,275,643. Thus, the total offense level should be no more than level 24.

### 1. The PSI Incorrectly Recites Facts Not Supported by the Evidence Presented at Trial.

Polit objects to the factual recitation under "Offense Conduct" in **paragraphs 5 through 30** (*id.* at pgs. 6-14), and as reflected in additional paragraphs of the PSI, to the extent that they are inconsistent with Polit's plea of not guilty or his defenses at trial.

More specifically, Polit objects to **paragraph 7** of the PSI (*id.* at pg. 6) because it is inconsistent with the evidence at trial. The government did not offer evidence that Polit allegedly received over $16 million in bribes while serving as Comptroller of Ecuador. Jose Conceicao Santos ("Santos"), the only Odebrecht representative to testify that he personally knew Polit, could not specifically recall the number of alleged bribes he paid Polit. Santos estimated it might have been about $6 million for the San Francisco project and perhaps an additional $6 million for the other Odebrecht projects (including Manduriacu, Duales Vinces, Refineria del Pacifico, Aqueduto, and Poliduto).

However, the defense established that Santos' testimony of paying Polit approximately $12 million was not credible because it was inconsistent with all his prior statements to the government. The defense established that Santos was cooperating with the Brazilian government as early as 2016, and soon after that

began cooperating with Ecuador and the United States. Santos told authorities that he paid Polit $6 million in cash for the San Francisco project, and an additional $4.1 million for the subsequent Odebrecht projects, of which $2.4 million was allegedly paid in cash, and the remaining $1.7 million paid by wires. Before trial, Santos had *never* asserted that he paid Polit an additional $4.1 million in wires alone. Thus, on the government's highest calculation, Polit could have received no more than $10.1 million in bribes from Santos, and $510,000 from Diego Sanchez, for a total of $10.6 million.

Polit further objects to **paragraph 7**, which states that "Polit promoted the bribery scheme and concealed the proceeds through financial transactions" in the U.S. PSI [ECF#224] at 7.

Polit objects to **paragraphs 17, 18, 31, and 33** of the PSI which allege that Polit received a total of $4.1 million in wire transfers for the Odebrecht scheme, in part, through the company Italcom. *Id.* at 9-10, 14-15. Before trial, Santos consistently maintained that he only paid Polit $1.7 million in wires and denied any knowledge of Italcom. At trial, the defense established that Santos told the government he had never heard of the company Italcom until the prosecutors in this case sent Santos documents relating to Italcom to question Santos about them. And even then, Santos continued to maintain that he was the only person at Odebrecht who paid bribes to Polit, and that Santos was not aware of the company Italcom or

any payments made to Polit via Italcom. This is supported by multiple government

interviews of Santos, as follows:

> FBI-302 of April 25, 2018, page 15: Santos paid "$1.7 million to accounts via wire transfers. The accounts were Cosani and Plastiquim."

> FBI-302 of April 25, 2018, page 18: "Besides the payments already discussed, Conceicao [Santos] did not know of any other payment to Polit."

> FBI-302 of February 22, 2022, page 1: "To the best of Conceicao [Santos]'s recollection, the first time that he saw the name of the corporation Italcom was when DOJ sent him these documents, in preparation for this interview."

> FBI-302 of February 22, 2022, page 1: "With respect to the payment dated 9/9/2014 in the amount of $648,000, Conceicao [Santos] did not have any recollection of Italcom or this payment."

> FBI-302 of February 22, 2022, page 2: "Conceicao [Santos] did not recall any other entities paid by BSO or Odebrecht as bribes to Carlos Polit in the amount of $648,000."

> FBI-302 of February 22, 2022, page 2: "Other than Conceicao [Santos], nobody else in Odebrecht was communicating with Polit in 2014."[2]

Thus, wire transfers made to Italcom should not be considered when

calculating the amount of funds laundered.

---

[2] Upon the Court's request, Polit will file the referenced 302's, which are currently subject to the Court's Protective Order Regulating Disclosure of Discovery. *See* ECF#53.

### 2. The Guideline Must be Determined Based on Polit's Alleged Conduct in the Money Laundering Offenses, not on the Alleged Bribery From Which the Funds Were Derived.

In *United States v. Salgado*, 745 F.3d 1135, 1138 (11th Cir. 2014), the Eleventh Circuit established that when determining an offense level under §2S1.1, "a court should make Chapter Three adjustments based on the defendant's conduct in the money laundering offense itself, not based on his conduct in the offense from which the money that was laundered was obtained[.]" *Id.* (distinguishing role in the substantive money laundering violations from role in specified unlawful activity and receipt of proceeds). The Court subsequently acknowledged *Salgado's* application to offense levels calculated under § 2S1.1(a)(2). *See United States v. Gross*, 661 F. App'x 1007, 1026 (11th Cir. 2016). The PSI fails to follow that instruction.

Instead, the PSI's primary focus centers around Polit's alleged conduct in the underlying bribery scheme. *See generally* ECF#224 at 6, ¶ 7 ("The Indictment arises from Polit's solicitation and receipt of over $16 million in bribe payments while serving as the Comptroller General of Ecuador[.]"). The PSI even goes so far as to say that the "loss amount could be calculated to be as high as $2 billion (the net value of the contracts resulting from the bribes)." *Id.* at 13, ¶ 29. But the net value of contracts obtained outside of the United States have no bearing on the money laundering offenses charged to have occurred in the United States.

Polit was not charged with bribery and was not convicted of bribery. The principal focus, then, must be on Polit's alleged conduct related to the offenses he was charged with—money laundering. *See Salgado*, 745 F.3d at 1138.

### 3. At Maximum, the Amount of Laundered Funds Does Not Exceed $5,275,643.

Polit objects to **paragraphs 29, 32, and 41** of the PSI, which calculate the loss amount (*i.e.*, the laundered funds) as approximately $16,510,000.00. ECF#224 at 13–14, 17. Polit further objects to **paragraph 29** of the PSI which states that Polit's loss amount could be calculated as high as $2 billion. ECF#224 at 13.

The Sentencing Guidelines define "laundered funds" as "the property, funds, or monetary instrument involved in the transaction . . . in violation of 18 U.S.C. § 1956 or § 1957." U.S.S.G. § 2S1.1, cmt. n.1. "[T]he inclusion of the modifier 'laundered' before 'funds' indicates that the funds which should be considered for sentencing purposes are those that were actually laundered." *United States v. Paley*, 442 F.3d 1273, 1278 (11th Cir. 2006); *see also United States v. Gross*, 661 F. App'x 1007, 1026 (11th Cir. 2016) (relying on the total amount laundered to determine the loss amount for sentencing purposes). Moreover, the guidelines provide that "the value of the laundered funds, for purposes of subsection (a)(2), is the amount of the criminally derived funds, *not* the total amount of the commingled funds[.]" § 2S1.1, cmt. n.3(B) (emphasis added).

Although the "guidelines do not require a precise determination of loss," the Court must make a "reasonable estimate of the loss, given the available information." *United States v. Moran*, 778 F.3d 942, 973 (11th Cir. 2015) (citation omitted). The government bears the burden to prove the pertinent facts sustaining the loss amount by a preponderance of the evidence, "which must be reliable and specific." *Id.* "However, a court may *not* speculate about the existence of facts that would result in a higher sentence." *Id.* (emphasis added).

The evidence presented at trial does not support a finding that the amount of funds laundered was $16.5 million.[3] This figure is speculative and suggests the highest possible loss amount resulting in a greater sentence in contravention of Eleventh Circuit precedent. *See Moran*, 778 F.3d at 973; *United States v. Melo*, 259 F. App'x 248, 255 (11th Cir. 2007) (finding clear error in attributing a higher loss amount because although "[o]ne could reasonably conclude" the additional funds would've been laundered in the future, it "would require impermissible speculation to infer that" the additional funds were intended to be laundered in that transaction).

Polit objects to **paragraph 29** of the PSI that states the loss amount "that most accurately reflects the crime charged is the full amount of the bribes he received" plus the amount of funds laundered. ECF#224 at 13. This is legally incorrect. The

---

[3] As discussed *supra*, the evidence does not even support a finding that Polit received $16.5 million in bribes, let alone that $16.5 million was laundered in the United States.

loss determination is based only on the number of bribe payments that were later transacted in violation of the money laundering statutes. *Paley*, 442 F.3d at 1278; *Gross*, 661 F. App'x at 1026.

The Court should find a total loss amount of no greater than the verdicts of guilty support: $605,067, which correlates with the amount of criminally derived funds in the substantive money laundering transactions charged in the Indictment that do not relate to Italcom. This is the only amount arguably supported by "reliable and specific" evidence as required for sentencing. *See Moran*, 778 F.3d at 973.

As discussed *supra*, the evidence did not establish that funds transferred from Italcom were proceeds of illicit bribes for Polit when the only Odebrecht representative who knew Polit consistently told authorities he had never heard of Italcom and paid Polit a total of $1.7 million in wires (not $4.1 million). Count 4 should also be excluded from consideration because it was an interest payment made on a loan that the government claimed was connected to the bribery scheme—not criminally derived proceeds. *See* Defendant's Motion for Judgment of Acquittal [ECF#205] at 16 ("[I]nterest earned on criminal proceeds does not itself constitute proceeds of a foreign crime."); *see also* § 2S1.1, cmt. N.3(B) (stating that the "value of laundered funds" should only include the "criminally derived funds, not the total amount of the commingled funds" in a transaction). Additionally, Count 6 should be reduced to reflect only the amount of allegedly criminally derived funds that were

used to improve the Los Pinos home ($305,067), not the entire profit from the sale of the property. *Compare* Indictment [ECF#1] at 9 *with* **Exhibit 1** (Gov. Exh. 12-25); *see also* § 2S1.1.

The loss amount of $605,067 includes the financial transactions in Count 3 for $300,000 and Count 6 reduced to $305,067 and is the appropriate calculation that the Court should adopt at sentencing.[4]

Although Polit maintains that the Italcom transactions should be excluded from consideration at sentencing, even if this Court includes Italcom, the evidence still does not support a loss amount greater than $5,275,643. This number reflects the alleged "criminally derived funds" in the financial transactions identified in Counts 2, 3, 5, and 6 of the Indictment, excluding the legitimate funds in Counts 5 and 6 per the guideline's directive that "laundered funds" involves only the amount of "criminally derived funds, not the total amount of commingled funds[.]" § 2S1.1, cmt. 3(B).

---

[4] Alternatively, the Court should reduce the financial transactions in Counts 5 and 6 to $10,001 respectively because these counts relate to violations of §1957, which require only a monetary transaction in criminally derived property of a value greater than $10,000. *See* Indictment [ECF#1] at 9. Here, the jury's verdict reflects only that at least more than $10,000 in proceeds were involved in Counts 5 and 6, rendering the treatment of the entire amount of the transactions unduly elevated. Verdict [ECF#182] at 2-3. Thus, the loss amount should be further reduced to $320,002, total. Polit preserves this argument notwithstanding that current precedent does not recognize a Sixth Amendment violation in considering a greater loss amount for sentencing that is not supported by the jury's verdict.

The government conceded at trial that although Count 5 charged a transaction totaling $1,375,450, only $1,217,392 of that amount constituted criminally derived funds. *Compare* Indictment [ECF#1] at 9 *with* **Exhibit 2** (Gov. Exh. 12-27). The government also conceded that although Count 6 charged a transaction totaling $3,664,583.61, which was the net proceeds from the sale of the Los Pinos home, only $305,067 of criminally derived funds was used to improve the property. *Compare* Indictment [ECF#1] at 9 *with* **Exhibit 1** (Gov. Exh. 12-25). The following table illustrates how the loss amount could be calculated pursuant to the criminally derived funds in the charged offenses as maintained by the government:

| Counts | Total Amount of Financial Transaction | Criminally Derived Funds |
|--------|----------------------------------------|--------------------------|
| 2 | $300,000.00 | $300,000.00 |
| 3 | $3,453,184.00 | $3,453,184.00 |
| 4 | $34,300.00 | $0 |
| 5 | $1,375,450.00 | $1,217,392.00 |
| 6 | $3,664,583.61 | $305,067.00 |
| **TOTAL:** | | **$5,275,643** |

Thus, in no event is there sufficient evidence to support a loss amount of greater than $5,275,643.

**4. The Evidence Presented at Trial Does not Support a Sophisticated Laundering Enhancement.**

Polit objects to **paragraphs 31–33 and 43** of the PSI, which impose a sophisticated money laundering enhancement under U.S.S.G. § 2S1.1(b)(3). ECF#224 at 14, 15, 17.

"Sophisticated laundering" is "complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense." § 2S1.1(b)(3), cmt. n.5(A). "Sophisticated laundering typically involves the use of— (i) fictitious entities; (ii) shell corporations; (iii) two or more levels (*i.e.,* layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or (iv) offshore financial accounts." *Id.*; *United States v. Bruey*, No. 22-12532, 2023 WL 9016349, at *4 (11th Cir. Dec. 29, 2023). This enhancement "refers only to the act of laundering the proceeds of the" crime and does not consider the conduct of the overall scheme. *United States v. Duran*, 620 F. App'x 687, 692 (11th Cir. 2013) (the "sophisticated laundering" enhancement under § 2S1.1(b)(3) is narrowly applied to the "act of laundering the proceeds"); *United States v. Cabrera*, 635 F. App'x 801, 808 (11th Cir. 2015) ("This enhancement addresses the sophistication of the money laundering Cabrera undertook with Obando's help, not the scheme from which the funds were derived."). Only Polit's personal participation in the charged § 1956 transactions, not the participation of others, should be relevant to the analysis. *See United States v. Puerto*, 392 F. App'x 692, 700–01 (11th Cir. 2010) (enhancement appropriate because the defendant *personally* conducted sophisticated actions); *Cabrera*, 635 F. App'x at 808 (noting that a "sophisticated laundering" enhancement considers the defendant's personal conduct related to the "harm from laundering the proceeds").

There was no evidence of Polit's personal involvement in the § 1956 transactions in the U.S., and thus a sophisticated laundering enhancement cannot be imposed. *See Puerto*, 392 F. App'x at 700–01. In *Puerto*, the defendant argued that "the level of sophistication" in the transactions were "entirely attributable to another individual" and thus the enhancement cannot apply to him. *Id.* at 700. But the Eleventh Circuit found no error in the application of the enhancement because the defendant was personally:

> involved in a wire-transfer scheme involving the circular transfer of funds between various companies to create the illusion of revenues that enabled the perpetuation of the fraud. Hector was one of only three individuals authorized to sign the checks and underlying wire-transfer forms. This cycling of funds constitutes "two or more levels (*i.e.,* layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate," such that the district court did not clearly err in assessing Hector the enhancement.

*Id.* at 701. *See also United States v. Galdos*, 308 F. App'x 346, 362–63 (11th Cir. 2009) (holding sophisticated laundering enhancement appropriate where the defendant himself "participated in offense conduct that was quite sophisticated" including creating a shell corporation and receiving and depositing checks related to the offense).

That is not the case here. Even viewing the evidence in the light most favorable to the government, Polit was not involved in the alleged money laundering transactions—and the PSI's summation of evidence makes that apparent. *See*

ECF#224 at 15, ¶ 33 ("This conspiracy existed between 2010 and 2017, which *primarily involved J. Polit laundering the proceeds of bribes* received by his father, Polit.") (emphasis added).

In assessing role, the PSI acknowledges Polit's lack of involvement in any U.S. transactions because his son handled all the financial affairs:

> In order to conceal that the bribery proceeds were for the benefit of Polit and his family, **J. Polit** offered loans to certain non-U.S. companies (Inmobiliaria Cosani S.A., Plastiquim S.A., and Italcom S.A.) purporting to be from **J. Polit's** U.S. company - Venture Overseas. Polit then directed Odebrecht to transfer his bribe payments directly to those non-U.S. companies, in order to fund the loans that **J. Polit** had offered. Subsequently, those non-U.S. companies transferred the bribery proceeds to **J. Polit's** U.S. company, as repayment of the loans. The bribery proceeds were then used by **J. Polit** to purchase real estate and other assets in the Southern District of Florida and elsewhere for the benefit of Polit and his family.

ECF#224 at 14, ¶ 31 (emphasis added). Polit did not offer loans to the non-U.S. companies, Polit did not receive the loan repayments from the non-U.S. companies, and Polit did not use the alleged bribe proceeds to purchase or improve real estate in the U.S., which constituted the charged money laundering transactions. *Id.* All the financial transactions involved Polit's son, and there was no evidence that Polit knew, coordinated, or oversaw any of his son's financial affairs in the U.S. or had the financial wit to do so.

The PSI also improperly considers the "conduct of the overall scheme" to support application of the "sophisticated laundering" enhancement. *See* ECF#224 at

15, ¶ 33 ("This furtherance of the conspiracy scheme was sophisticated in nature[.]"). To be sure, the only acts by Polit identified by the PSI in the section imposing the "sophisticated laundering" enhancement (¶ 33) relate to Polit's conduct in the alleged bribery scheme, not his participation in the alleged laundering scheme. ECF#224 at 15, ¶ 33 ("Polit then provided this information to Odebrecht as instructions for the transfer of his bribe payments."); *id.* ("J. Polit sent an email from his personal account to Polit's personal email account with wire transfer instructions for an account of Plastiquim."). Both allegations relate to Polit *receiving* alleged bribe proceeds (in accounts outside of the U.S., transactions well beyond the jurisdictional scope of the relevant statutes), not the laundering of those proceeds in the U.S. *See Duran*, 620 F. App'x at 692; *Cabrera*, 635 F. App'x at 808; *see also United States v. Majors*, 196 F.3d 1206, 1212 (11th Cir. 1999) ("Before the primary offense of money laundering can occur, the underlying criminal activity must be complete, generating proceeds to be laundered.").

Moreover, the alleged laundering involved in this case was not sophisticated in nature to warrant an enhancement. This enhancement only applies to the 18 U.S.C. § 1956 offenses, *i.e.,* Counts 2 through 4, which charge concealment money laundering under § 1956(a)(1)(B)(i). *See* U.S.S.G. § 2S1.1, cmt. 5(A) ("'[S]ophisticated laundering' means complex or intricate offense conduct pertaining to the *execution or concealment of* the 18 U.S.C. § 1956 offense."

(Emphasis added)). None of these transactions involved fictitious entities or shell corporations. In fact, the PSI recognizes that the alleged "conspiracy scheme" involved "the purchase of real estate property and the operation of a real estate business, restaurants, and a tile business[.]" ECF#224 at 15, ¶ 33. The PSI asserts that Invecon, the entity identified in Count 2, was "owned and controlled by J. Polit," and employed Daniel Liste, who "worked for Invecon as a project manager." *Id.* at 13, ¶ 27. The PSI further maintains that "Venture Overseas," the entity identified in Counts 3 and 4, was owned by John Polit, and was also involved in the purchase of real estate. *Id.* at 12, ¶ 26. These were legitimate companies actively engaged in real estate investment ventures, not shell corporations. Polit objects to **paragraphs 8 and 33** of the PSI, which incorrectly state that shell corporations were used to launder the alleged proceeds. *Id.* at 7, 15.

The transactions in Counts 2 through 4 also identified Polit family members (*i.e.,* companies connected to John Polit) as recipients/beneficiaries. These transactions effectively made the "ownership" of the proceeds less, not more, concealed, and no layering was involved in these transactions of the type that would warrant a sophisticated laundering enhancement. *See* 18 U.S.C. § 1956(a)(1)(B)(i); § 2S1.1(b)(3), cmt. n.5(A).

These facts do not justify a two-level enhancement because they do not exhibit the level of sophistication required by § 2S1.1(b)(3) and Polit did not engage in any "complex or intricate offense conduct" to execute or conceal these transactions.

### 5. Polit was not an Organizer or Leader in the Money Laundering Offenses and in Fact had a Minor Role.

Polit further objects to **paragraphs 34 and 46** of the PSI, which impose a four-level increase pursuant to U.S.S.G. § 3B1.1(a). ECF#224 at 16, 17.

The Sentencing Guidelines provide for a four-level enhancement if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive[.]" § 3B1.1(a). "'Participant' is defined as 'a person who is *criminally responsible* for the commission of the offense[.]'" *United States v. Williams*, 527 F.3d 1235, 1248 (11th Cir. 2008) (quoting § 3B1.1, cmt. n.2) (emphasis in original).

The Guidelines provide several factors to distinguish a leadership role from other minor roles, which include:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, cmt. n.4.

Notably, role in the offense must be determined "based on the defendant's conduct **in the money laundering offense itself**, not based on his conduct in the offense from which the money that was laundered was obtained[.]" *Salgado*, 745 F.3d at 1138 (emphasis added). Thus, Polit's alleged role in the bribery scheme, if any, is not relevant to the question of Polit's role in the money laundering offenses charged. The PSI improperly conflates the two and fails to follow the *Salgado* instruction.

The government cannot establish by a preponderance of the evidence that Polit was an organizer or leader of a money laundering scheme involving five or more participants. *See United States v. Yates*, 990 F.2d 1179, 1182 (11th Cir. 1993) (noting that it is the government's burden to establish an aggravating role).

First, the PSI fails to identify at least five participants involved in the offenses. The PSI states that "Polit recruited and facilitated the actions of John Polit, Jose Santos, Diego Sanchez, and Sabett Chamoun, to further the scheme" and identified Geraldo De Souza, Olivio Rodrigues, and Tamara Devos as other participants to the scheme. ECF#224 at 16, ¶ 34. But Santos, Chamoun, De Souza, and Rodrigues were in Ecuador or Brazil at all relevant times and their involvement was limited to the underlying bribery scheme alleged by the government. They did not participate, facilitate, or conduct any financial transactions in the United States. None of these witnesses can qualify as "participants" under § 3B1.1 because they were not

"criminally responsible" for the commission of the money laundering offenses charged. *Williams*, 527 F.3d at 1248. At best, only two of the individuals identified in the PSI (John Polit and Tamara Devos) could reasonably qualify as "participants" under § 3B1.1 and Carlos Polit had no leadership role over Tamara Davos or her actions.

Further, the evidence at trial established that Polit did not lead or have organizational apprehension of the financial transactions that constituted the alleged money laundering. There was no evidence that Polit had a hand in determining, conducting, or facilitating the transactions charged in the Indictment. There was also no evidence that Polit recruited accomplices or participated in the planning of the alleged loan agreements and real estate investments that comprise the alleged money laundering scheme. Nor was there evidence that Polit "wielded decision-making authority" with respect to the laundering violations or exercised any degree of control over his son's financial affairs. *Compare United States v. Galindo*, 798 F. App'x 524, 526 (11th Cir. 2020) (recognizing that in most cases where the four-level role enhancement was affirmed on appeal, "there was evidence that the defendant had recruited participants, had instructed participants, or had wielded decision-making authority") (citing *United States v. Shabazz*, 887 F.3d 1204, 1222 (11th Cir. 2018). None of the factors under § 3B1.1, cmt. n.4, are present here.

A leadership role enhancement involves "the exertion of some degree of control, influence, or leadership[,]" *United States v. Aguera*, 281 F. App'x 893, 896 (11th Cir. 2008) (quoting *Yates*, 990 F.2d at 1182), not a hands-off, laissez faire disassociation from the decision whether to conduct transactions in a manner that may violate U.S. law at all.

Thus, not only is a four-level enhancement under §3B1.1(a) unwarranted, but Polit should receive consideration for a minor role adjustment for his minor involvement in the money laundering offenses.

"In determining whether a minor-role adjustment applies, the district court should consider, first, the defendant's role in the relevant conduct for which he has been held accountable at sentencing, and, second, his role as compared to that of other participants in his relevant conduct." *United States v. Moran*, 778 F.3d 942, 980 (11th Cir. 2015). The Sentencing Guidelines provide a non-exhaustive list of factors to consider when determining whether a role reduction is warranted, which include:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii) the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v) the degree to which the defendant stood to benefit from the criminal activity.

*United States v. Ramirez*, No. 22-13216, 2024 WL 1090720, at *3 (11th Cir. Mar. 13, 2024) (quoting § 3B1.2, cmt. n.3(c)).

In light of the evidence presented at trial, Polit had a limited role in the money laundering offenses and thus should receive a two-level reduction pursuant to U.S.S.G. § 3B1.2(b) given the Eleventh Circuit's analysis in *Salgado*.

**6.  The Proposed Adjustment for Abuse of Trust Does not Apply.**

Polit objects to **paragraphs 35 and 45** of the PSI that impose a two-level increase for abuse of trust pursuant to U.S.S.G. § 3B1.3. ECF#224 at 16, 17.

This enhancement applies when "the defendant abused a position of public or private trust . . . in a manner that *significantly facilitated* the commission or concealment *of the offense*[.]" § 3B1.3 (emphasis added). "Public or private trust" means a "position of public or private trust characterized by professional or managerial discretion (*i.e.,* substantial discretionary judgment that is ordinarily given considerable deference)." § 3B1.3, cmt. n.1. But the position of trust "must have contributed in some significant way to facilitating the commission or concealment of the offense" charged. *Id.*; *see also Salgado*, 745 F.3d at 1138

(holding that Chapter Three adjustments are determined by the defendant's conduct in the money laundering offense, not on the conduct underlying the specified unlawful activity). "[O]nly where the defendant has abused discretionary authority entrusted to the defendant by the victim" is this enhancement warranted. *United States v. Garrison*, 133 F.3d 831, 839 (11th Cir. 1998) (emphasis in original removed); *see also United States v. Walker*, 490 F.3d 1282, 1300 (11th Cir. 2007) ("We have also held that this enhancement only applies when the victim conferred the trust.").[5]

The PSI applies this enhancement solely based on Polit's status as a foreign public official in Ecuador. *Id.* at 16, ¶ 35 (Polit "abused his position of public trust to solicit and receive bribes."). Again, Polit is not charged with foreign bribery. Pursuant to *Salgado*, Chapter Three enhancements must be based on the "conduct in the money laundering offense itself[,]" not on the conduct related to the alleged bribery.

Lastly, an abuse of trust enhancement is improper because it relates to the conduct that is the basis of Polit's conviction. *See* § 3B1.3; *United States v. Garrison*, 133 F.3d 831, 843 (11th Cir. 1998). Section 3B1.3 specifically provides that the

---

[5] The PSI acknowledges there were no victims in this case. ECF#224 at 16, ¶ 37; 17, ¶ 44). An abuse of trust enhancement is likely inapplicable on that ground alone. *See United States v. Williams*, 527 F.3d 1235, 1250 (11th Cir. 2008) ("[T]he abuse-of-trust adjustment under § 3B1.1 is justified where the defendant has abused a fiduciary relationship or discretionary authority entrusted by a victim of the crime.").

"adjustment may not be employed if an abuse of trust or skill is included in the base offense level[.]" § 3B1.3. "The conduct that is the basis of the conviction must be independently criminal . . . and not itself the abuse of trust." *Garrison*, 133 F.3d at 843. Polit was charged with conspiracy to money launder and substantive money laundering offenses under §§1956 and 1957. The money laundering offenses were predicated on receiving bribes as a foreign official. *See* ECF#1 at 4, 8, 9 (alleging that the "specified unlawful activity" is "an offense against a foreign nation, specifically Ecuador, involving bribery of a public official"). Thus, the abuse of trust is "included in the base offense level" and an additional enhancement is not appropriate.

**7. Because Polit Qualifies as a Zero-Point Offender under § 4C1.1, his Offense Level Should be Reduced by an Additional two Points.**

Polit objects to the PSI because it fails to provide for a two-level decrease pursuant to § 4C1.1 as he qualifies as a zero-point offender.

**8. The Total Offense Level Should be no More Than 24.**

Polit objects to **paragraph 41** of the PSI, which computes the base offense level as 28 under U.S.S.G. § 2S1.1(a)(2). ECF#224 at 17. Because the amount of laundered funds can be no greater than $5.2 million, and more conservatively estimated at $605,067, Polit's base offense level should be 22 or 26 at most. *See* § 2S1.1(a)(2) (providing for a base offense level of 8, increased by the number of levels corresponding to the value of the laundered funds, according to the §

2B1.1(b)(1) table). *See*, *e.g.*, §2B1.1(b)(1)(J), (K) (adding 18 to the offense level when the loss amount exceeds $3.5 million but is not greater than $9.5 million); § 2B1.1(b)(1)(H), (I) (adding 14 to the offense level when the loss amount exceeds $550,000 but is not greater than $1.5 million).

Polit also objects to the PSI's determination that his total offense level is 38. ECF#224 at 18, ¶ 51. Based on the foregoing, Polit's total offense level should be no greater than 24 (if the Court adopts a $5.2 million loss amount) or 20 (if the Court adopts a $605,067 loss amount).

Polit objects **to paragraph 86**, which determines his guideline imprisonment range as 235 to 293 months. ECF#224 at 26. Because Polit's total offense level should be no greater than 24, Polit's imprisonment range should be no more than 51 through 63 months.

Polit further objects to **paragraph 94** of the PSI. *Id.* The fine range should not exceed $20,000 to $200,000 pursuant to § 5E1.2(c)(4) if the Court applies a total offense level of 24.

### 9.  Additional Objections to the PSI.

Polit objects to **paragraphs 1 and 82** of the PSI, which state that the government is seeking forfeiture in the amount of $16.5 million. ECF#224 at 5, 26. This amount is unsupported by the evidence.

Polit objects to **paragraph 55** of the PSI, which states that he was sentenced to six years and six months in Ecuador. ECF#224 at 18. Polit asserts that he was sentenced to six years imprisonment in Ecuador.

Polit objects to **paragraph 55** on the basis that it includes a transcription by the government of what occurred in Ecuador when Polit was tried in *abstentia*.

Polit also objects to **paragraph 63** on the basis that it incorrectly states that the property located at 801 Brickell Key Boulevard, Apt. 1704, Miami, Florida, was listed as property subject to forfeiture by the government. *Id.* at 23. The government did not seek to forfeit this property. *See* ECF#1 at 10.

Polit further objects to **paragraph 81** of the PSI, which states that Polit did not maintain real estate or bank accounts in his name but "instead kept all his assets in the name of his son, John Polit." *Id.* at 25.

Polit objects to **paragraph 82** of the PSI which incorrectly states that the government is seeking forfeiture of all the properties pledged to secure Polit's pre-trial release. *Id.* At trial, the government only sought forfeiture of the properties located at 301 Altara Avenue and 1902 S.W. 22nd Street.[6] The government did not prevail against 301 Altara Avenue. ECF#188. The rest of the properties identified in paragraph 82 (which were lis pendens filed under ECF#35–43), pertain to the

---

[6] In the Indictment, the government initially alleged it would seek forfeiture of the property located at 1010-30 NW 9th Ct, Miami, Florida 33136, but did not elect to do so at trial.

properties pledged by Polit's family to secure the $14 million personal surety bond for Polit's pre-trial release. The government did not seek forfeiture of these properties.

Respectfully submitted,

**BLACK SREBNICK**
201 South Biscayne Boulevard, Suite 1300
Miami, Florida 33131
Tel. (305) 371-6421

/s/ *Howard Srebnick*
HOWARD SREBNICK, ESQ.
Florida Bar No. 919063
E-mail: HSrebnick@RoyBlack.com

JACKIE PERCZEK, ESQ.
Florida Bar No. 42201
E-mail: JPerczek@RoyBlack.com

JEANELLE GOMEZ, ESQ.
Florida Bar No. 1026021
E-mail: Jgomez@RoyBlack.com