UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CR-20114-KMW

UNITED STATES OF AMERICA

vs.

CARLOS RAMON POLIT FAGGIONI,

Defendant.

_____/

UNITED STATES' RESPONSE TO DEFENDANT'S
OBJECTIONS TO PRESENTENCE REPORT

The United States of America, by and through undersigned counsel, hereby files the following response to the Defendant's Objections to the Presentence Investigation Report [DE 234].

I.      Loss Calculation

The defendant contends that the loss calculation should be significantly lower than the evidence presented at trial. Specifically, the defendant contends that he should be held accountable for only (1) approximately $10 million in bribes (Objections at 3) and (2) approximately $5 million in laundered funds (Objections at 6). Both contentions are without merit. As the Presentence Investigation Report ("PSI") reflects, the appropriate loss calculation for guideline purposes is between $9.5 million and $25 million.

A.  *Evidence Shows that Defendant Received Approximately $16.5 Million in Bribes*

The evidence presented at trial establishes that defendant received approximately $16.5 million in bribes. Specifically, the defendant received approximately $16 million in bribes from Odebrecht and $500,000 in bribes from Diego Sanchez. The defendant does not contest the Sanchez bribe amount and instead argues that the Odebrecht bribe amount should be lower. But

1

the witness testimony, corresponding bribe ledger, and bank records confirm the defendant received $16 million in bribes from Odebrecht.

Jose Santos Filho ("Santos"), Odebrecht country manager for Ecuador, testified that the defendant demanded a $6 million bribe to remove approximately $100 million in fines on Odebrecht's San Francisco project.   Santos testified that Odebrecht paid this amount in cash from 2010 to 2011.  As a result, the comptroller's office lifted the $100 million in fines imposed on the San Francisco project.

Santos testified that, after the San Francisco bribe, the defendant requested a bribe on several other Odebrecht projects, including Duales Vinces, Aqueduto, Poliduto and Refineria del Pacifico, to prevent the imposition of fines from the Comptroller's office.  Santos testified that the defendant initially asked for $6 million for each project.  Santos testified that Odebrecht made payments on every project, but that the amount was determined on a case-by-case basis.

Geraldo de Souza, Odebrecht finance manager for Ecuador, testified that he had responsibility for obtaining cash for bribe payments and for transmitting instructions for wire transfer bribe payments.  De Souza further testified that he maintained a ledger tracking agreed-upon bribes and actual bribe payments to the defendant.  The government introduced those bribe ledgers relating to the defendant at trial.  GX 2-1, 2-3, and 2-4.  As De Souza explained, Government Exhibit 2-1 sets forth the agreed-upon bribe amounts for the defendant for each of the remaining four projects:

- Duales Vinces:  $1.7 million
- Refineria Del Pacifico:  $1.7 million
- Aqueduto:  $2.9 million
- Poliduto:  $3.7 million
- **Total**:  $10.0 million

Government Exhibits 2-1, 2-3, and 2-4 also set forth the individual, periodic payments made to the defendant in cash and in wire transfer by date for each of these projects.   De Souza testified that he made entries tracking the periodic payments either upon delivery of the cash to Santos to pay the defendant or upon sending wire transfer instructions for payment.  The spreadsheets reflect that Odebrecht paid the full $10 million for the above four projects.

The government provided corroborating evidence that the cash and wire transfers did in fact happen as reflected on the bribe ledgers.  As for the cash bribes, the government introduced travel records showing the defendant in Ecuador on the date of every cash payment.  GX 11-4A. As for the wire transfers, the government introduced bank records showing wire transfers of the exact amounts specified in the ledgers on or about the date referenced.  For example, Government Exhibit 2-4 shows a bribe payment to the defendant on April 1, 2014, of $500,000.  Government Exhibit 7-3A shows a wire transfer of $500,000 on April 7, 2014, from one of Odebrecht's bribe-paying shell companies to an account of Cosani in Panama.  Similarly, Government Exhibit 2-4 shows a request on April 28, 2014, for a transfer.  Government Exhibit 7-3A shows a wire transfer of $500,000 on April 29, 2014, from one of Odebrecht's subcontractor's accounts (used for bribery purposes) to an account of Cosani in Panama.

The defendant ignores the evidence presented at trial and instead relies on reports from interviews with Santos to argue that the amount should be a smaller amount.  The defendant contends that Santos previously stated "he paid Polit $6 million in cash for San Francisco, and an additional $4.1 million for subsequent Odebrecht projects."  (Objections at 3).  But as Santos testified, he did not recall the exact amount paid in bribes for each of the post-San Francisco projects, it was at least $6 million combined, and De Souza's ledger would reflect an accurate

accounting.  The defendant has provided no argument, or suggestion, as to why the bribe ledger does not accurately reflect the payments.[1]

      B.  *The Evidence Shows that Defendant Laundered at Least $11.1 Million Into the United States*

The defendant argues that he should be held accountable only for funds laundered into the United States, and specifically, for certain wire-transfer bribes laundered into the United States. This contention is faulty as a legal matter.  Sentencing Courts have broad discretion to consider various kinds of information as relevant conduct in determining sentence.  United States v. Watts, 519 U.S. 148, 151 (1997).  The Guidelines broadly define relevant conduct to consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and those acts and omissions undertaken by co-conspirators that are "within the scope of jointly undertaken activity," "in furtherance of that criminal activity," and "reasonably foreseeable."  U.S.S.G. § 1B1.3(a)(1).

In this case, the defendant conspired with his son — a Miami-based money launderer — to oversee the laundering of his bribery proceeds (approximately $16 million).  As Santos testified, when asked about what he does with the cash, the defendant testified that his son, John Polit, made the money "disappear."  The mere fact that some of this laundering may have occurred in Ecuador does not change this analysis.  Indeed, the Eleventh Circuit has explicitly held that a sentencing court may consider extraterritorial conduct in making its sentencing determination.  United States

---

[1]    The defendant also attempts to question the $2 million in bribe payments made to Italcom. (Objections at 3-4).  The defendant ignores the mountain of evidence presented at trial and instead chooses to focus on one narrow aspect of a prior statement by Santos that he did not recall Italcom, therefore contending the Italcom payments must not be a bribe.  This argument is without merit. De Souza testified that he recalled the Italcom company, and the payments were corroborated by the documents from Odebrecht's bribe paying department, the DSO.  *See, e.g.*, GX 3-4A.  The jury heard additional testimony regarding the DSO payments to Italcom and appropriately convicted the defendant based on payments made from Italcom for the purchase of an office building.

v. Spence, 923 F.3d 929 (11th Cir. 2019) (upholding enhancement for distribution of child pornography that occurred only in Jamaica against extraterritorial challenge); United States v. Zayas, 758 F.3d 986, 989-90 (8th Cir. 2014) (same); United States v. Dawn, 129 F.3d 878, 881 (7th Cir. 1997) (same).

Even if the Court were to limit its loss calculation to the funds laundered into the United States, the result would be the same.   As explained below, the evidence shows that the defendant laundered wire-transfer bribes and cash bribes into South Florida in an amount exceeding $11 million.

As for the wire transfer bribes from Odebrecht, John Polit provided bank accounts to the defendant for the receipt of wire-transferred bribery funds in 2014.  Specifically, the evidence at trial established that John Polit provided the bank accounts of Cosani, Plastiquim, and Italcom in Panama for the receipt of Odebrecht bribe funds in 2014.  Bank records show approximately $4.1 million in funds transferred from Odebrecht bribe-paying shell companies to Cosani, Plastiquim, and Italcom accounts in Panama in 2014.  *See* GX 4-7, 4-7A, 6-3, 6-4, 7-3A, 7-4, and 7-4E.  Representatives of Cosani, Plastiquim, and Italcom testified that John Polit directed the repayment of these bribery-funded loans to an account of Venture Overseas in South Florida.  *See* Testimony of Maria Carmen Del Morla; Mauricio Neme; and Antonio Andretta.  Bank records show that these three companies transferred approximately $3.8 million to the Venture Overseas account in South Florida from 2014 to 2017.[2]  *See* GX 12-1, 12-1B, 12-1C, 12-1E, 12-1I, 12-1M, and 12-15.

---

[2]     The owner of the Plastiquim account, Mauricio Neme, testified that he stopped paying the remaining approximately $350K owed to Venture Overseas because of the arrest of the defendant and John Polit in Ecuador.

As for the cash bribes, John Polit provided bribe payors with bank accounts for the receipt of cash bribery funds.  Two witnesses testified at trial to this.

- Mauricio Neme testified that John Polit provided approximately $395,000 in cash in Ecuador in 2014.  Neme testified that he used these funds as a loan for his business, Tuberias Pacifico, and made repayments to the Venture Overseas account in South Florida at the direction of John Polit.
- Diego Sanchez testified that the defendant provided approximately $800,000 in cash in Ecuador from approximately 2013 to 2014.  Sanchez testified that he sent approximately $398,000 to an attorney escrow account in South Florida at the direction of John Polit.  Sanchez further testified that he purchased an apartment in Quito that cost approximately $400,000 at the direction of the defendant.

John Polit maintained a spreadsheet tracking inflows of funds into Venture Overseas, including the above wire transfer bribes and cash bribes.  *See* GX 8-9, 8-9A.  John Polit sent himself this spreadsheet on his personal email on October 14, 2014.   The spreadsheet contains line items for Plastiquim, Cosani (listed as Pacific Cable), Italcom, Tuberias Pacifico (listed as TUPAC), and Sanchez (listed as Diego).  The amounts listed on the spreadsheet correspond with the amounts of the payments identified above.  In addition, the spreadsheet also lists a few other companies with amounts that each made payments into the Venture Overseas account — Envases De Litoral (listed as Enlit), Jaime Simon, Plasticos de Litoral (listed as Plasticos).  For each of these, there were payments by these companies to Venture Overseas made from 2011 to 2014 without *any* corresponding outflows to the entities.  *See* GX 12-28.

The spreadsheet also contains a list of line items underneath the above bribes that include "House John," "House Charles," and "Apartment Karla," with corresponding amounts of $450,000, $450,000 and $200,000.   GX 8-9A.  John, Charles and Karla are the names of the defendant's three children residing in the United States.  Properties were purchased in South Florida around this time for each of these children.  In short, by a preponderance of evidence, this

spreadsheet represents a chart tracking the incoming bribery funds from various entities and individuals and the use of the bribery funds for the benefit of the defendant's children.

The government's financial analyst Mr. Petron reviewed the bank records of Venture Overseas and identified payments from each of the above entities: Plastiquim, Cosani, Italcom, Envases de Litoral, Jaime Simon, Plasticos del Litoral, Plasticos Continentals, and Tuberias Pacifico.  Mr. Petron testified at trial that his analysis revealed at least $10.2 million in net inflows from these entities.  *See* GX 12-28.  The government also presented evidence that Sanchez paid approximately $398,000 in 2013 and 2014 from cash provided by the defendant into an account of John Polit's lawyer (Casanova Kucera) in South Florida at the direction of John Polit.  *See* GX 10-2A1, 10-2A2.  Finally, the government presented evidence that Sanchez paid approximately $510,000 as a bribe to the defendant in 2015 to an account in South Florida at the direction of John Polit.  *See* GX 10-2A3.  In short, the government has established, by a preponderance of the evidence, the laundering of at least $11.1 million into South Florida thereby placing his loss amount for guideline purposes between $9.5 million and $25 million.

## II.   Sophisticated Laundering Enhancement Applies (§ 2S1.1(b)(3))

The defendant's scheme to launder over $16 million of his bribery proceeds in Miami, Florida was sophisticated.  The defendant was directly involved in layering transactions and directing funds to offshore accounts.  And it was reasonably foreseeable that his co-conspirators — including his son John Polit — would engage in additional sophisticated laundering activities such as using fictitious entities and shell corporations.  As such, the sophisticated laundering enhancement applies.

"Sophisticated laundering typically involves the use of — (i) fictitious entities; (ii) shell corporations; (iii) two or more levels (*i.e.,* layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or (iv)

offshore financial accounts." § 2S1.1(b)(3), cmt. 5.  *See United States v. Reyes*, 781 Fed. App'x 965, 969 (11th Cir. Aug. 26, 2019) (layering funds through various entities and to offshore accounts is sophisticated laundering); *United States v. Feldman*, 931 F.3d 1245, 1263-64 (11th Cir. 2019) (upholding sophisticated laundering enhancement for Section 1956 conviction involving two or more levels (i.e., layering) of transactions); *United States v. Suraneni*, 346 Fed. App'x 416, 419 (11th Cir. Sep. 10, 2009) (sophisticated laundering enhancement appropriate where scheme involved two or more layers of transactions and use of a shell corporation to conceal the source of the illicit funds).  The sophisticated laundering enhancement applies to a defendant in a money laundering conspiracy even where the layering and other sophisticated laundering activities were undertaken by a co-conspirator, if they were reasonably foreseeable to the defendant.  *See, e.g.*, *United States v. Miles*, 360 F.3d 472, 482 (5th Cir. 2004) (applying sophisticated laundering enhancement after finding that layering activities of co-conspirator were reasonably foreseeable to the defendant).

In his objections to the PSI, the defendant repeats his refrain that there is "no evidence" of his involvement in the laundering.  But the evidence adduced at trial — and the jury's verdict — show otherwise.  For example, the defendant received the wire transfer details for the Plastiquim account in Panama from John Polit and passed those to Santos in order to facilitate and promote the bribery scheme.  The defendant directed Sanchez to coordinate with John Polit to make a $500,000 bribe for the benefit of the defendant, which was subsequently covered up by a fake invoice.  In the recorded conversation between the defendant and Santos, the defendant admitted that John Polit managed the accounts Santos paid the wire transfer bribes to and admitted the money wired was "a little" compared to the amount of cash bribes that Odebrecht had paid.  And John Polit's own statement to Federico Gomez that the Plastiquim, Cosani, and Italcom folders —

the bribe-funded wire transfers to Venture Overseas — were the defendant's investments further underscores that the defendant did not somehow release interest in the bribery funds once they were paid.  The defendant retained control while John Polit saw to the day-to-day laundering operations.

The defendant recruited his co-conspirators, including his son John Polit, to assist in moving his bribes into the United States and disguising them as investments in various businesses and properties controlled by John Polit. As the evidence at trial showed, the defendant directed John Polit to make the money disappear, which the defendant and his co-conspirators accomplished by layering the Odebrecht bribery funds through offshore (Panamanian) companies in order to disguise the funds as loan payments and creating fictitious loan agreements and invoices to disguise the bribery proceeds.  The defendant insisted on receiving proceeds from the scheme in cash and evidence at trial showed that the defendant caused these funds to be delivered to third parties who wired the funds back into the United States thereby concealing the source and ownership of the proceeds.

The majority of the defendant's bribery proceeds were transferred to the Venture Overseas account — a Delaware shell company that itself did no business.  And though Venture Overseas was controlled by John Polit, like nearly all of the companies that received transfers of bribery proceeds, Venture Overseas was in the name of someone else, as an additional layer of obfuscation to further conceal the true nature of the funds and accounts.

For example, the evidence at trial showed that after the bribery funds from Plastiquim, Cosani and Sanchez were transferred to Venture Overseas, the funds were then sent to Invecon (controlled by John Polit, but again held in another's name) to upgrade various real estate properties owned by shell companies (controlled by John Polit, but in another's name).  Similarly,

funds from Italcom were transferred to Venture Overseas and then used to purchase real estate in a shell company (controlled by John Polit, but in another's name).

## III.    Organizer / Leader Enhancement Applies (§ 3B1.1)

Under §3B1.1(a) a 4-level increase applies when a defendant is an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.[3]  "[I]n deciding whether individuals were participants in the criminal activity, the court must consider, in addition to the criminal act itself, the individuals' involvement in the events surrounding the criminal act." *Holland*, 22 F.3d at 1046 (vacating sentence and remanding because judge "failed to consider the events surrounding [the defendant's] perjury" including statements other participants made because the defendant "may never have committed perjury absent the willingness of these individuals to engage in sham transactions and the secreting of [the defendant's] assets").

The defendant's argument that the court is limited to considering the defendant's conduct in the downstream money laundering of his bribes is incorrect.  The relevant Guideline for the defendant is § 2S1.1(a)(2) not § 2S1.1(a)(1) because the "offense level for the underlying offense" — here Ecuadorian bribery — "is impossible or impracticable to determine." § 2S1.1, cmt. 3(A). As such, the defendant's reliance on *United States v. Salgado*, 745 F.3d 1135 (11th Cir. 2014) and § 2S1.1, cmt. 2(C) is misplaced because both make clear that the underlying offense conduct is

---

[3] In assessing whether an organization was "otherwise extensive" comment 3 directs that "all persons involved during the course of the entire offense are to be considered.  Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."  Employing this analysis the number of "persons involved" is much greater than five and includes individuals such as the owners and representatives of the Panamanian businesses with whom John Polit entered into the bribery-funded loans (Mauricio Neme, Antonio Andretta, Maria Carmen Del Morla, and Roberto Isaias) as well as John Polit's employees (e.g., Federico Gomez, and Daniel Liste).

omitted from the court's consideration only "in cases in which subsection (a)(1) applies." § 3B1.1, cmt. 2(C) ("[I]n cases in which subsection (a)(1) applies, application of any Chapter Three adjustment shall be determined based on the offense covered by this guideline (i.e., the laundering of criminally derived funds) and not on the underlying offense from which the laundered funds were derived."); *Salgado*, 745 F.3d 1135, 1137 ("Because Salgado was involved in the underlying conspiracy to distribute heroin and there was evidence of the amount of heroin involved, **§ 2S1.1(a)(1) required the PSR** to set his base offense level using the guideline for the underlying conspiracy to distribute heroin.") (emphasis added).  The court should appropriately consider all the defendant's involvement in the "events surrounding the criminal act" in determining whether he was a leader or organizer of the entire course of criminal conduct.[4]

When determining the number of "participants" for the purposes of §3B1.1, the court is not limited to individuals who have been charged or convicted. § 3B1.1, cmt. 1.  Additionally, for purposes of the § 3B1.1 enhancement, the defendant is counted as one of the participants.  *See United States v. Holland*, 22 F.3d 1040, 1045 (11th Cir. 1994).  The money laundering conspiracy had the following participants, among others:

- John Polit was recruited by the defendant to launder $16.5 million in bribery proceeds;
- Santos was recruited by the defendant to pay bribes, including to accounts managed by the defendant's son and told Santos his son made the money "disappear";
- Sanchez was recruited by the defendant to pay a bribe and the defendant directed Sanchez to coordinate with his son in Miami to effectuate the bribe transfer;
- Sanchez was separately recruited by the defendant to launder $800,000 in cash bribes from the defendant by purchasing a condo in Ecuador and by sending funds to accounts in South Florida at John Polit's direction;

---

[4] Even if this Court were to limit its inquiry to purely money laundering conduct — to the exclusion of bribery conduct — the defendant was still a leader or organizer of the scheme, which involved more than five people (including the defendant).

- Sabett Chamoun (defendant's assistant in Ecuador) was recruited by the defendant to deliver bribery proceeds to Sanchez from the defendant;

- Ribas was directed by the defendant to award a contract to IHG so John Polit could collect bribes for the defendant; and

- Devos falsified an invoice that John Polit used to cover up the bribe payment from Sanchez. Section 3B1.1 sets out seven factors for the court to consider: (i) "the exercise of decision making authority"; (ii) "the nature of participation in the commission of the offense"; (iii) "the recruitment of accomplices"; (iv) "the claimed right to a larger share of the fruits of the crime"; (v) "the degree of participation in planning or organizing the offense"; (vi) "the nature and scope of the illegal activity"; and (vii) "the degree of control and authority exercised over others."  Here, all seven factors support a finding that the defendant exercised the role of organizer / leader.  First, the defendant directed bribe payors, including Santos and Sanchez, to send money to specific accounts (not in his name) and to coordinate specific transfers with his son John Polit, a banker in Miami whom he told Santos made the money disappear.  The defendant was the ultimate authority over his bribery proceeds and recruited his son John Polit, as well as Santos, Sanchez, and others into the conspiracy to launder his millions of dollars of bribery proceeds.

The jury heard that John Polit told Federico Gomez that the wire transfer bribes were the defendant's "investments," making clear that the defendant did not relinquish his claim to the bribery proceeds once they were transferred to Miami.  Rather, the defendant designed and orchestrated a scheme to launder his bribe proceeds into the United States in order to create generational wealth for his family residing in Miami, Florida and with the help of his co-conspirators — including his son John Polit — the defendant did just that.[5]

---

[5] There can be more than one leader or organizer of a criminal conspiracy. The enhancement requires that "the defendant exerted some control, influence or decision-making authority over another participant in the criminal activity."  *United States v. LaFontante*, 417 F. App'x 854, 860 (11th Cir. Mar. 9, 2011) (upholding leader/organizer enhancement in money laundering conspiracy

A defendant who recruits others into a money laundering scheme to hide his illicit funds is responsible as a leader or organizer under the Guidelines.  *See United States v. Balsam*, 315 Fed. App'x 114, 120 (11th Cir. Sep. 4, 2008) (upholding leader/organizer enhancement in money laundering conspiracy where defendant recruited people to the scheme and used others to hide his illicit gains); *United States v. Alaniz*, 726 F.3d 586, 621-22 (5th Cir. 2013) (upholding leader/organizer enhancement in money laundering conspiracy where defendant recruited family members into the conspiracy).

The defendant's argument that he had a minor role in the criminal conspiracy misstates the evidence and fundamentally misapplies the Guidelines.  The defendant not only understood the "scope and structure" of the criminal activity, he personally recruited his co-conspirators and was the architect of the scheme by which he solicited bribes and laundered those bribes with the help of his son and co-conspirators in Miami, Florida.  The defendant was one of the most powerful people in Ecuador and he exercised discretion and authority over John Polit and his other co-conspirators throughout the scheme.  Finally, the defendant "stood to benefit" and, in fact, did benefit greatly from his criminal enterprise:  using his laundered bribery proceeds, he and his son created over $40 million in illicit generational wealth for the Polit family in Miami, Florida

## IV.   Abuse of Trust Enhancement Applies (§ 3B1.3)

The abuse of trust enhancement is applicable when the position of trust the defendant abused relates to the underlying specified unlawful act or to the laundering of the illicit funds.  *See United States v. Scott*, 405 F.3d 615, 618 (7th Cir. 2005) (upholding abuse of position of trust

---

where defendant was not the "kingpin" but did more than "merely manag[e] the assets of the conspiracy" because he coordinated and controlled the movements of drug couriers across international borders).  So the fact that John Polit made most of the day to day decisions on how specifically to transfer the funds to best conceal that they were criminal proceeds and how best to invest the criminal proceeds to further grow the defendant's spoils, does not obviate a finding that the defendant — the ultimate beneficiary of the laundered bribes — was also a leader or organizer.

enhancement in money laundering prosecution of former bank employee where abuse of position of trust applied to underlying crime); *United States v. Young*, 266 F.3d 468, 474 (6th Cir. 2001) (abuse of position of trust enhancement appropriately applied in money laundering case where defendant abused his position of trust in relation to specified unlawful act — embezzling public funds); *United States v. Lowder*, 5 F.3d 467 (10th Cir. 1991) (same). *See also United States v. Szekely*, 632 F. App'x 546, 549 (11th Cir. 2015) (upholding enhancement for defendant impersonating a lawyer in order to commit wire fraud and holding that "[t]here must be a nexus between the offense of conviction and the abuse of the position of trust such that the defendant uses the position of trust to give him an advantage in the commission of the offense") (internal quotation omitted).

The defendant's argument that his position of trust did not contribute to facilitating the commission of the charged conduct, strains credulity. The defendant was able to demand over $16 million in bribes from various businesses and people only because he was an extremely powerful government official. He then abused the trust of that position — a position meant to prevent corruption of public funds — in order to create a small fortune for himself and generational wealth for his family. It is that precise fortune that was laundered in Miami, Florida by the defendant, his son, and his other co-conspirators. Not only did the defendant's position of trust as Comptroller General of Ecuador "significantly facilitate" the commission of his money laundering crimes, but for that position of trust he would have no bribes to launder.

Public officials hold a position of trust and such officials who receive bribes abuse that position of trust such that the "abuse of position of trust" enhancement under the Guidelines is appropriate. *See United States v. Clark*, 989 F.2d 447, 448-49 (11th Cir. 1993) (police officer convicted of accepting bribes for protecting cocaine transactions in reverse sting operation

14

appropriately received abuse of position of trust enhancement); *United States v. Gonzalez*, 16 F.3d 985, 991-92 (9th Cir. 1993) (affirming enhancement for abuse of position of trust for INS agent who received a bribe to allow drugs to cross the border).

The defendant cites *United States v. Garrison*, 133 F.3d 831 (11th Cir. 1998) for the proposition that abuse of trust is not applicable. However, the holding of *Garrison* is that the defendant did not have a sufficiently proximate position of trust relative to Medicare. *See Id.* at 841. The Eleventh Circuit has since made clear that the language in *Garrison* regarding the "same conduct" analysis was dicta and is not the law of this Circuit. *See United States v. Bracciale*, 374 F.3d 998, 1007 (11th Cir. 2004). The court in *Bracciale* went on to explain that the "same conduct" analysis employed in *Garrison* was based on a Second Circuit case that is no longer good law in that circuit. *Id.* at 1007-09. *See also United States v. Buck*, 324 F.3d 786 (5th Cir. 2003) (upholding the application of the abuse of trust enhancement to a fraud sentence where defendant employed discretionary authority given by her position in a manner that facilitated or concealed fraud). In *Bracciale* the Eleventh Circuit made clear that the "same conduct" analysis is not a legitimate basis for not applying the § 3B1.3 enhancement for abuse of trust.[6]

Finally, the defendant, in arguing that there are no victims in this case, misstates the PSI claiming that it "acknowledges there were no victims in this case." *See* DE 234, fn 5. This is incorrect. Rather, the PSI states there "no identifiable victims" in this case (DE 224 at ¶ 37), which is correct under the relevant victim compensation statutes, 18 U.S.C. § 3663A and 18 U.S.C. § 3771. The defendant's corruption and money laundering are not victimless crimes.

---

[6] This makes good sense because, taken to its logical conclusion, abuse of trust enhancements would be unavailable in every fraud case. *See, e.g.*, *Buck*, 324 F.3d at 793 (distinguishing between the breach of trust generally necessary to commit fraud and more egregious conduct and discretion necessary to trigger an abuse of trust enhancement).

## V.    Zero-Point Offender Does Not Apply

The defendant is not eligible to receive the two-point reduction under the Criminal History Amendment "zero-point offenders" subsection because, as recommended by probation, he should receive an adjustment under §3B1.1 – aggravating role.  See *supra* at __ (organizer / leader).

## VI.   Responses to Defendant's Additional Objections

As discussed *supra* at **Section I**, the evidence at trial established that the defendant received $16.5 million in bribes and laundered those funds in the United States placing his loss calculation above $9.5 million for the purposes of the Guidelines.

The defendant objects to **paragraph 17** of the PSI on the basis of the "PSR's interpretation" of the recording.  However, the recording and certified translation of the recording were both admitted into evidence at trial and contain the defendant's admission "fue poquito" or "it was a little" when discussing with Santos the bribe payments the defendant received via wire transfer.

The defendant objects to **paragraphs 31 through 33** of the PSI arguing that there was no evidence that the real estate was purchased for the benefit of the defendant.  However, evidence adduced at trial demonstrated how the defendant designed and orchestrated a decade-long scheme to launder his bribery proceeds into the United States in order to create generational wealth for him and his family residing in Miami, Florida.  And with the help of his co-conspirators — including his son John Polit — the defendant succeeded.  For example, the jury heard that John Polit told Federico Gomez that the wire transfer bribes were the defendant's "investments," making clear that the defendant did not relinquish his claim to the bribery proceeds once they were transferred to Miami.  Rather, the

The defendant objects to **paragraph 55** of the PSI because it states that the defendant was sentenced to six years and six months in prison after his conviction in Ecuador and because the transcript quoted is from the defendant's Ecuadorian trial at which he was not present.  The

16

government agrees that the defendant's sentence in Ecuador was six years but does not agree that the transcript is inappropriately considered by this Court as relevant conduct. Though the defendant was not physically present during his Ecuadorian trial — because he fled Ecuador and chose never to return — he was represented by counsel during the entire proceeding. His counsel cross-examined witnesses and put on evidence. In the Ecuadorian judgment itself — of which the government obtained certified copies and produced to defense counsel — the Ecuadorian court noted it had reviewed the procedures of the trial and stated there was no violation of any basic guarantee of due process contained in Article 76 of the Ecuadorian Constitution (including presumption of innocence, exclusion of evidence not legally obtained, prohibition of double jeopardy, right to representation, and trial by an independent, impartial judge) and also found that the trial conformed with international treaties on human rights and administration of justice. The judgment also noted that no such violations were alleged by the parties, including the defendant. See Ex A (Reply 609(a)(2)). As such, there is no reason this Court cannot consider, as relevant conduct, the defendant's prior conviction in Ecuador.

The defendant objects to **paragraph 63** and **paragraph 82** of the PSI wherein it states that the government is seeking forfeiture of all the properties pledged to secure Polit's pre-trial release, including 801 Brickell Key Boulevard, Apartment 1704. Though not listed in the indictment as specific forfeiture, the government has consistently stated — including in the first bond hearing in front of Judge Becerra and most recently during the bond hearing in front of this Court — that it views the properties in the bond as substitute assets and will seek to forfeit these properties to satisfy any forfeiture money judgment. As such, the PSI is not incorrect in stating that the government will seek forfeiture of the properties collateralizing the defendant's personal surety bond.

Finally, the defendant objects to **paragraph 81** of PSI, which states Polit did not maintain real estate or bank accounts in his name but "instead kept all his assets in the name of his son, John Polit." However, the defendant provides no evidence to the contrary. Instead, at the time of his arrest, the defendant told pretrial services he had $147, denied having any other assets anywhere in the world. He denied having a bank account and told pretrial services that his retirement check is deposited onto a debit card. The evidence at trial demonstrated that the defendant used his son John Polit to make the money "disappear." And even in his interview with probation, the defendant refused to provide any information about his finances. There is simply no basis for the defendant's objection to this portion of the PSI.

## VII.    PSI Correctly Calculates Defendant's Guidelines

| | |
|---|---|
| Base Offense Level: | 8 (2S1.1(a)(2)) |
| Value of Laundered Funds Between $9.5MM + $20MM: | +20 (2B1.1(b)(1)(K)) |
| Conviction Under 18 U.S.C. § 1956: | +2 (2S1.1(b)(2)(B)) |
| Sophisticated Laundering: | +2 (2S1.1(b)(2)(3)) |
| Leader / Organizer (5 or More Participants): | +4 (3B1.1(a)) |
| Abuse of Position of Trust: | +2 (3B1.3) |

-------------------------------------------------------

Total: 38

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By: /s/ Michael N. Berger
Michael N. Berger
Senior Litigation Counsel
Court No. A5501557

GLENN S. LEON
CHIEF, FRAUD SECTION
Criminal Division
U.S. Department of Justice

By: /s/ Jil Simon
Jil Simon
Court No. A5502756
Alexander Kramer

18

99 Northeast 4th Street
Miami, Florida 33132
(305) 961-9445
(305) 536-4699 (fax)
Michael.Berger2@usdoj.gov

Fraud Section, Criminal Division
1400 New York Ave. NW
Washington, DC 20005
Tel: (202) 514-3257
Jil.Simon@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

    **I HEREBY CERTIFY** that a true and correct copy of the foregoing was electronically filed with the Court's CM/ECF system on August 28, 2024.

                                      By:    <u>/s/ Jil Simon</u>
                                              DOJ Trial Attorney