### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 22-CR-20114-KMW

UNITED STATES OF AMERICA,

       Plaintiff,

vs.

CARLOS RAMON POLIT FAGGIONI,

       Defendant.

_____/

### <u>DEFENDANT CARLOS POLIT'S SENTENCING MEMORANDUM</u>

Defendant Carlos Polit ("Polit"), through undersigned counsel, respectfully submits the following sentencing memorandum to urge the Court to impose a sentence not greater than six (6) years—the sentence imposed by the Court in Ecuador for the alleged bribery scheme, and that which is sufficient but not greater than necessary to achieve the purposes of 18 U.S.C. § 3553(a).

Carlos Polit is nearly seventy-four (74) years old. The government seeks, and the Presentence Investigation Report (the "PSI Report") proposes, a sentence of more than nineteen (19) years, which is akin to a life sentence for Polit. *See* ECF#224 at 26, ¶ 86; ECF#239 at 18. We urge the Court to impose a sentence of not more than six (6) years because a greater sentence would be overly punitive and unjust,

especially when compared to the penalties (or lack thereof) imposed on the alleged co-conspirators.

While this Court heard a little about Polit over the course of the trial, there is more to his story. A closer look is needed to give the Court a complete picture of who Polit is and why his case warrants a lower sentence.[1]

### a. The Sentencing Guidelines are Advisory and Not Presumptively Reasonable.

While the Sentencing Guidelines may be "the starting point" for the Court, the Guidelines are "not [nearly] the only consideration" for sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007); *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015) (noting that "the advisory guidelines range is but one of many considerations that a court must take into account in exercising its sentencing discretion"). Indeed, the Sentencing Guidelines are "only advisory" and are not presumed reasonable. *Gall*, 552 U.S. at 50; *Hughes v. United States*, 584 U.S. 675, 675 (2018).

The Court must also consider the factors under 18 U.S.C. § 3553(a) to fashion the appropriate sentence. *Hughes*, 584 U.S. at 675. A sentence must be "sufficient, but not greater than necessary," to comply with the purposes listed under §

---

[1] The letters written by friends and family in support of Carlos Polit, which are cited to below, have been submitted to the Probation Officer to include as part of the PSI Report for this Court's review.

3553(a)(2), including the need to reflect the seriousness of the offense, provide just punishment, promote respect for the law, deter criminal conduct, and protect the public from future crimes by the defendant. § 3553(a)(2). Under § 3553(a), the Court must also take into account the "nature and circumstances of the offense," "the history and characteristics of the defendant," and "the need to avoid unwarranted sentence disparities among defendants with similar records." § 3553(a)(1), (6).

"The decision about how much weight to assign a particular sentencing factor is 'committed to the sound discretion of the district court.'" *Rosales-Bruno*, 789 F.3d at 1254 (quoting *United States v. Williams*, 526 F.3d 1312, 1322 (11th Cir. 2008)). Thus, the Court may "attach 'great weight' to one factor over others." *Id.* (quoting *Gall*, 552 U.S. at 57). The overarching instruction, though, is to "impose a sentence sufficient, but not greater than necessary," to fulfill the purposes of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); 18 U.S.C. § 3553(a).

Although Polit's advisory guideline range should be 51 to 63 months (as opposed to the 235 to 293 months proposed by the PSI Report), the Court can impose a lower sentence that accounts for the whole person and the circumstances of the case. In light of the factors under § 3553(a), we respectfully urge the Court to impose a sentence of not more than six (6) years, which is sufficient, but not greater than necessary, to satisfy the purposes of § 3553(a)(2).

### b. Polit's History and Characteristics Warrant a Sentence of no Greater Than Six Years.

Polit was born in 1950 in Bahia de Caraquez, Ecuador. He was the sixth of ten siblings and had to grow up quickly after his father passed away from a heart attack after battling lung disease. Polit was only eight years old. Polit's mother was left with the heavy burden of raising ten children on her own.

Years later, when Polit's mother was diagnosed with Alzheimer's disease, Polit stepped in to do everything possible to preserve her well-being. Polit took on the responsibility of helping care for her. He made her well-being a priority, ensuring she took her medications correctly and attended her doctor's appointments.[2] Polit was there during her difficult episodes and medical emergencies, providing steady support. Polit's sister, Carmen, recalls how patient Polit was with their mom, often helping her with memory exercises. "Carlos was always looking out for her, visiting her whenever he could, making time in his work schedule. During his visits, he would always sit by her bed to talk to her. He would always arrive happy, saying to her: Mommy, I'm here . . . He would ask many things to make her remember. He would rub her legs and pay attention to her medicine. This was very sad for him."[3]

---

[2] *Id.*

[3] *Id.*

Polit often brought his children to visit, demonstrating the importance of patience and care with loved ones.[4]

Medical complications mounted, and when Polit's mother "had a crisis, [Polit] would bring the doctors to the house so they could take care of her, since it was impossible to move her. He would stay overnight to be with her because he didn't know how she would react since the doctors didn't give him much hope."[5] Ultimately Polit's mother had to be intubated and placed on a respirator. Doctors advised she only had four months to live.[6] Polit and his siblings were faced with difficult end-of-life decisions. Carmen describes how Polit brought the family together and persuaded them not to remove the respirator. Polit's mom lived another six years after that.[7]

Polit displayed this same degree of empathy when he encountered someone facing hardship. When Carmen's husband, Polit's brother-in-law, was diagnosed with cancer, Polit showed the same unwavering support and comfort. "He helped me with my husband's cancer, who was a doctor. He always had a very good relationship with my husband and encouraged him a lot and made him happy with

---

[4] Letter of Karla Polit.

[5] Letter of Carmen Polit Faggioni.

[6] *Id.*

[7] *Id.*

conversations. When we found out about his illness, we were very desperate, but my brother Carlos told me, 'Don't worry, do the treatment, I'll support you in whatever you need.'"[8] Polit's support "gave us the strength and peace of mind to face this terrible illness."[9]

When Polit's employee's granddaughter was diagnosed with leukemia, Polit treated the situation as if it were his own family.[10] Polit found an excellent doctor who practiced in another city and covered all the medical and transportation expenses to provide her with the proper treatment:

> He supported her family with this terrible illness. He helped them find a good doctor who was in Quito and the little girl lived in Guayaquil. He paid for all the expenses to transport her to the hospital where the little girl was going to get the treatment she needed in Quito. He also covered medical expenses. Unfortunately, she passed away. I remember my parents helping the family get through that difficult time with support not only financially but emotionally.

Letter of Jeannette Polit.

Polit never shied away from helping those in need. When he lived in Ecuador, Polit had a guard who lost his house during a heavy storm.[11] "I remember that in his house there was a guard, who lived on a hill and due to bad weather and torrential

---

[8] *Id.*

[9] *Id.*

[10] Letter of Jeannette Polit.

[11] Letter of Guillermo Barrera.

rains, his house fell and Carlos gave him the resources that allowed him to build a new house." Sometime later, when the guard's father passed away, "Carlos in a very humanitarian way covered the funeral expenses" so that his friend did not have to bear the financial burden during such a difficult time.[12]

Cecilia Pachay, a longtime friend of Polit, witnessed his generosity firsthand when her husband faced legal issues related to child support that required an attorney.[13] Unable to afford the legal fees, Cecilia and her husband were relieved when Polit stepped in to cover the expenses, enabling her husband to address the matter.

Michael, Polit's son, remembers when Polit helped his friend's family through one of their most trying times. The father of Michael's close friend unexpectedly fell ill and was rushed to the hospital to receive emergency medical care.[14] But without health insurance, the family could not afford the father's treatments because they were already struggling financially. Polit covered all the medical expenses to ensure his friend's father received the necessary care.

The same thing happened when Polit learned that one of his former employees was in such dire financial straits that he was on the verge of selling his car out of

---

[12] *Id.*

[13] Letter of Cecilia Pachay.

[14] Letter of Michael Polit.

necessity. Michael recalls that Polit provided the financial support he needed to avoid selling his car and overcome that difficult season.[15]

"Carlos is a person who helps others without any interest[.]"[16] This is evident in the many instances where Polit helped secure job opportunities for those in need. For Guillermo, Polit supported him during a difficult time when Guillermo was having trouble making ends meet—Polit offered him to work at his office occasionally so that Guillermo could afford to pay his house bills:

> Then I became unemployed and to help me financially he hired me occasionally in the office where he worked, so that I could maintain my house while I got a job, since my children were young and I had a large amount of expenses. At that time I had a great financial need and he was always willing to lend me a hand. He also sent me Christmas baskets on several occasions to share with my family. Then he talked to his brother to give me a stable job.

*See* Letter of Guillermo Barrera.

Polit also helped Marcos Mora obtain employment on two occasions and provided Santiago Lindao's father with a life-changing job opportunity.[17] "My father

---

[15] *Id.*

[16] Letter of Guillermo Barrera.

[17] Letter of Marco Mora; Letter of Santiago Josue Lindao Rugel ("He provided my father with a job that allowed him to give me a better education, a better environment, and overall, a better life.").

went through several tough times at work, and in a country where opportunities are scarce, having someone willing to lend a hand is invaluable."[18]

During his tenure as Comptroller of Ecuador, Polit implemented employment policies to help advance people with disabilities, and he was known for mentoring and helping motivate and guide the younger professionals employed in the office.[19] One of the letters describes how an individual with Down Syndrome was provided the opportunity to work as an administrative assistant at the Comptroller's office during Polit's tenure.[20] During one of his visits to the Guayaquil office, Polit "met my son [] and after greeting him I talked with him for a long time. This gesture of empathy and care towards my son [], motivated the other people who worked in that office to follow his example, to such an extent that to this day, all the people who work in that office treat [my son] with great affection and consideration. For [my son], the workplace is his second home."[21] Polit transformed the inner workings of the Comptroller's office for the better:

> Under Dr. Polit's administration, the institution's standards were significantly elevated through a modern and altruistic vision; he focused on giving staff the respect and tools necessary for the fulfillment of their duties. His first term brought numerous administrative changes that modernized the agency.

---

[18] Letter of Santiago Lindao.

[19] Letter of E.M.

[20] Letter of P.M.J.

[21] *Id.*

> Dr. Polit was always concerned about his staff and their professional development, radically changing training methods to update everyone's skills in the Comptroller's Office and providing equal opportunities for growth. He held merit and opposition contests for hiring new personnel so that older employees could take advantage of their retirement rights, which had often been postponed due to institutional needs.

*See* Letter of E.M.

Polit was deeply committed to his employees and worked hard to create the best working environment despite existing challenges. Prior to his tenure, the Comptroller's office in Guayaquil was housed in a dilapidated building without air conditioning.[22] Polit successfully oversaw and directed its reconstruction, and it is now one of the most modern facilities in Guayaquil. In 2014, Polit also secured salary increases for employees of the Comptroller's office, further improving the working environment.[23]

Polit's interest in public office did not begin with the Comptroller's office. Polit has led a life marked by public service, which began in 2003 when Polit became the Governor of the Province of Guayas in Ecuador. The following year, Polit served as the Minister of Social Administration, and in 2005, Polit became the Secretary General of the President, before eventually becoming Comptroller General in 2007.

---

[22] Letter of Karla Polit.

[23] Letter of J.O.

During his time as Comptroller, Polit was a member of the international Organization of American States ("OAS") and the International Organization of Supreme Audit Institutions ("Intosai").

In 2016, a devastating 7.8 Richter scale earthquake hit Ecuador wreaking havoc on the coastal towns of Bahia de Caraquez and the Maria Auxiliadora communities. The destruction was catastrophic; people were left homeless, hospitals were destroyed, and the towns were without electricity and water for days. Hundreds of people died, and the earthquake was followed by a tsunami warning. Polit's son Charles recalls that his dad was determined to help re-build the communities and ensure the safety of its' people.[24] "Despite all the danger, the lack of security amid the chaos, diseases, hunger, and thefts for survival, my father decided to go, risking his own safety. He said it was his duty as a human to help so many people in need. He went and helped a lot. This act stayed with me, and I am immensely proud of my father for things like this that he always did to help others."[25]

In addition to Polit's dedication to public service, the true hallmark of his life has been his unwavering love and commitment to his wife of fifty-three years. Together, they have five children, fifteen grandchildren, and eight great

---

[24] Letter of Charles Polit.

[25] *Id.*

grandchildren. A common theme among the letters is how dedicated Polit is, not only to caring for and protecting his wife, but also to uniting the family. This is a photograph of Polit and Nancy surrounded by the family they built together:



In 2021, Nancy was diagnosed with Rheumatoid Arthritis and Bronchiectasis. She suffered from chronic pain in her arms, legs, and hands, had weakened strength, and began experiencing difficulty with everyday tasks.[26] Nancy found it nearly impossible to walk or manage stairs. She could no longer open a water bottle, lift her arms, or even handle a towel. But Polit "devoted himself to taking care of me,

---

[26] Letter of Nancy Polit.

never left me alone, encouraged me not to give up, and helped me with the simplest routines. He dressed me, combed my hair, and cooked for me."[27] Polit's eldest daughter, Jeannette, describes Polit's devotion to his wife during this period: Polit educated himself about anti-inflammatory foods and prepared them for Nancy, managed Nancy's household chores, and helped her up and down the stairs each day.[28]

> In 2018, my mother's health began to deteriorate. She had severe joint pain and periodical fevers. A few times my dad had to take her to the emergency room at the hospital in the middle of the night because she couldn't take the pain. I was able to witness my father's unconditional love for her and take care of every need. He even learned to cook special recipes to help reduce the inflammation, do laundry, and clear the house. In the apartment they were living at the time, the bedroom was on the second floor . . . my mother was in constant pain where she couldn't even walk. Sometimes he would even carry her down the stairs.

Letter of Jeanette Polit. It is no surprise that the letters describe Polit as the "pillar" of the family.

Nancy also shared stories of Polit's involvement in non-profit organizations in Ecuador. Polit organized medical brigades to provide free medical care to those in need. He and his wife personally visited low-income homes without running water or electricity to deliver these essential packages. Additionally, Nancy and Polit

---

[27] *Id.*

[28] Letter of Jeannette Polit.

would distribute Christmas baskets, bringing food and gifts to families in need during the holiday season. Polit was also involved in a foundation called Casa de la Vida, a religious organization dedicated to helping pregnant women, children, and individuals with AIDS. Polit and Nancy were also actively involved in their church and would participate in raising funds to support their mission.

The letters submitted by Polit's family and friends speak of Polit's true character—a devoted family man and a deeply caring and empathetic individual who has dedicated his life to the betterment of those around him.

### c. The Nature and Circumstances of the Offense do not Warrant the Sentenced Proposed by the PSI Report.

The PSI Report recommends an extreme sentence of 235 to 293 months. ECF#224 at 26, ¶ 86. For Polit, who is seventy-three years old, this is an excessive *life* sentence that also fails to account for the nature and circumstances of what took place.

Polit was charged and convicted of money laundering offenses in the United States. But as the evidence presented at trial established, and as Polit argued in his post-trial motions (ECF#205, ECF#206), Polit had minimal involvement in the laundering transactions alleged by the government.[29] His participation in the alleged bribery scheme occurred entirely overseas and was not otherwise criminalized by

---

[29] Indeed, the government pursued an aiding and abetting theory at trial.

the United States at the time—notably, Polit was not charged with violations of the Foreign Corrupt Practices Act because the Act does not bring foreign public officials within its ambit. This renders Polit's case unique because of the limited connection to the U.S. Indeed, the PSI Report acknowledges there were no identifiable victims in this case. ECF#224 at 16, ¶ 37.

The issue lies in the fact that the predicate offense, bribery of a foreign public official in Ecuador, has already been punished by the court (and the country) that actually experienced the alleged harm. Polit was sentenced to six years in Ecuador for the same conduct giving rise to the money laundering offenses charged here. Polit's alleged conduct occurred in Ecuador, and any alleged consequent harm was felt there, too. Ecuador decided that six years was an appropriate sentence, and that decision can inform the Court here, as the alleged harm in the U.S. was not greater than the alleged harm in Ecuador.

### d. A Sentence of not More Than Six Years Sufficiently Reflects the Seriousness of the Offense, Promotes Respect for the Law, Provides Adequate Deterrence to Criminal Conduct and Just Punishment for the Offense.

"A sentence must be 'sufficient, but not greater than necessary to . . . reflect the seriousness of the offense, promote respect for the law, provide just punishment, deter criminal conduct, and protect the public from the defendant's future criminal conduct." *United States v. Walker*, 2024 WL 3813210, at *2 (11th Cir. Aug. 14, 2024) (quoting § 3553(a)(2)). But these considerations should not be "viewed as

merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54.

In *Gall*, the Supreme Court recognized that fashioning a sentence "to promote respect for the law" does not invariably point toward harsher sentences. Indeed, the government's own prosecution decisions relating to the alleged co-conspirators in this case (as discussed in subsection (f) below), reflect that prison sentence nearing 20 years is not necessary in this case. It also suggests that such a sentence is not needed to promote respect for the law or to deter criminal conduct. Here, where at least four alleged co-conspirators were given non-prosecution agreements and only one other alleged co-conspirator was sentenced to 51 months (later reduced to 37 months), a prison term as high as the one recommended by the PSI Report "may work to promote not respect, but *derision*, of the law[.]" *Id.* (emphasis added).

A proposed offense level of 38 is excessive and disproportionate and overstates Polit's personal culpability in the alleged offense. To illustrate the disparity, the following table identifies other offenses that the Sentencing Guidelines consider serious enough to warrant a base offense level close to that range:

| Crime | Base Offense Level | Sentencing Guidelines |
|---|---|---|
| Aircraft piracy or attempted aircraft piracy not resulting in death. | 38 | § 2A5.1(a) |
| Distribution or manufacture of a | 38 | § 2D1.1(a)(2) |

| | | |
|---|---|---|
| controlled substance and death or serious bodily injury resulted from the use of the substance. | | |
| Wire fraud causing loss in excess of $550,000,000 without other aggravating characteristics. | 37 | § 2B1.1(a)(1), (b)(1)(P) |
| Selling or buying children for use in the production of pornography. | 38 | § 2G2.3 |
| Receipt, possession, or transportation of firearms or ammunition involving at least 200 or more firearms. | Up to 36 | § 2K2.1(a), (b)(1)(E) |
| Willful tax evasion of more than $550,000,000 of tax loss. | 36 | §§ 2T1.1(a)(1), 2T4.1(P) |

A sentence of not more than six years, consistent with the punishment imposed by Ecuador, will achieve the purposes of § 3553(a)(2), and anything more would be greater than necessary under the facts of this case.

**e.  In Light of the Offense Conduct, a Sentence Greater than Six Years Would be Excessively Punitive for Polit, who is an Elderly Inmate, and is Not Necessary to Protect the Public from Further Crimes.**

By the time this Court sentences Mr. Polit, he will be only weeks away from turning seventy-four years old. He poses no risk of recidivism and no danger to the community.

"According to the Sentencing Commission, 'age is generally a strong factor influencing the likelihood of committing a crime,' with 'older offenders . . . substantially less likely than younger offenders to recidivate following release.'" *United States v. Friedlander*, No. 8:08-CR-318-T-27TGW, 2021 WL 2661109, at *3 (M.D. Fla. June 29, 2021). A 2017 study published by the U.S. Sentencing Commission acknowledges that inmates over the age of sixty are substantially less likely to re-offend in comparison to their younger counterparts.[30] The study followed 25,431 offenders and discovered that over an eight-year period, only 13.4% of offenders aged sixty-five or older were re-arrested compared to the 67.6% of offenders younger than twenty-one that were re-arrested.[31] Moreover, for offenders with a criminal history category of I (like Polit), 53% of offenders younger than

---

[30] U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders,* at pp. 11, 30 (Dec. 2017), https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders.

[31] *The Effects of Aging on Recidivism Among Federal Offenders,* at p. 3.

thirty were re-arrested compared to only 11.3% of offenders aged sixty or older.[32]
*See also United States v. Clarke*, No. 4:92CR4013-WS/CAS, 2019 WL 7498752, at
*3 (N.D. Fla. Sept. 11, 2019) (recognizing that the defendant, at forty-seven years
old, was "currently at an age at which recidivism rates decline substantially");
*Friedlander*, 2021 WL 2661109, at *3 (acknowledging that the defendant's "medical
conditions and age make him statistically less likely to reoffend").

Additionally, elderly offenders also require more medical attention than
younger offenders.[33] While the BOP is "required to provide [inmates] with medically
necessary healthcare[,]" the "recruitment of medical professionals is one of the
BOP's greatest challenges and staffing shortages limit inmate access to medical
care."[34] The Officer of the Inspector General discovered that the BOP's "limited
institution staff and inadequate staff training affect the BOP's ability to address the
needs of aging inmates." *Id.* at i. This is because "the probability of an aging inmate
having a catastrophic medical issue [is] about eight times higher than for a younger

---

[32] *Id.*

[33] U.S. Dep't of Justice Office of the Inspector Gen., *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (2016), at p. i (recognizing that "aging inmates are more costly to incarcerate than their younger counterparts due to increased medical needs"), https://oig.justice.gov/reports/2015/e1505.pdf.

[34] U.S. Dep't of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (2016) (finding that BOP experienced severe medical staff shortages, leading to problems meeting the medical needs of prisoners, requiring the use of outside hospitals, and endangering the safety and security of institutions) https://oig.justice.gov/reports/2016/e1602.pdf.

inmate." *Id.* at 15. Moreover, the "physical infrastructure of BOP institutions cannot adequately house aging inmates" due to the shortage of lower bunks and overcrowding, making it more difficult for elderly inmates. *Id.* at 23–26.

In six years, Polit will be eighty years old. According to the CDC, the life expectancy of males in the United States is 74.8 years.[35] Thus, as he enters his 80s, Polit's health and current heart condition will likely worsen, making a custodial sentence of more than six years more onerous and punitive for Polit to serve, and increasing the likelihood that he will die in prison while serving a sentence for a non-violent money laundering offense.

### f. The Need to Avoid Unwarranted Sentencing Disparities Warrants a Sentence Well Below the Sentence Recommended by the PSI Report.

Section 3553(a)(6) instructs the Court to consider "the need to avoid unwarranted sentence disparities among similarly situated defendants." 18 U.S.C. § 3553(a)(6). Indeed, the goal of avoiding unwarranted sentencing disparities remains a key factor. *See United States v. Owens*, 464 F.3d 1252, 1255 (11th Cir. 2006). At least four alleged co-conspirators remain unindicted and received non-prosecution agreements in the United States. The only co-conspirator who was indicted, Juan Ribas, was sentenced to fifty-one (51) months imprisonment, later reduced to thirty-seven (37) months. The government is seeking an extremely harsh sentence for Polit

---

[35] *See* https://www.cdc.gov/nchs/fastats/life-expectancy.htm.

that is grossly disproportionate to the punishment imposed on the other alleged co-conspirators. This Court has wide discretion to impose a sentence that is proportionate to those cases.

**Jose Santos,** for instance, the key Odebrecht representative that testified he paid Polit bribes in Ecuador and which the government identifies as "Co-Conspirator 2" in the Indictment (ECF#1), received a non-prosecution agreement from the U.S. government. *See* Exhibit 1.[36] But that's not all. As of the date of his testimony, Santos was not punished by either Ecuador (where prosecution of Santos was declined) or Brazil, his home country where he allegedly pled guilty.

Notably, Santos testified that he paid bribes to a *host* of different public officials. The evidence established that Santos was the head Odebrecht representative in Ecuador between 2010 through 2016. In those six years, Santos testified that he paid bribes to Jorge Glas (the vice president of Ecuador), Ciro Moran, Ricardo Rivera, Carlos Pareja, Alexis Mera (the legal secretary to Ecuador's president), Freddy Neuman, along with others. Still, the government agreed not to

---

[36] The government alleged that it "was the purpose of the conspiracy" for Polit to launder bribes that Polit "solicited and received from Co-Conspirator 2 [Santos] and 3, among others, into and through bank accounts in the Southern District of Florida and elsewhere[.]" ECF#1 at 4-5 ("From in or around 2010 to 2014, Co-Conspirator 2 paid approximately $8 million in cash bribes to [Polit] in exchange for using his official position as comptroller to influence official actions by the Ecuador comptroller's office in order to benefit Odebrecht and its business in Ecuador.").

prosecute Santos because he "agreed to [plead] guilty in Brazil for the same conduct." *Id.* at 1.

Ecuador did not prosecute Santos for the same reason. *See* Exhibit 2. Ecuador relied on Santos' "plea bargain agreement" with Brazil, which allegedly included the following sanctions against Santos:

1. A penalty of 8 years in prison;

2. The permanent use of a monitor;

3. 22 hours of community service per month;

4. Payment of 5,165,607.00 (five million one hundred sixty-five thousand six hundred seven [Brazilian] reals);

5. Confiscation of the personal property and real estate received through illicit financial transactions and personal property and real estate acquired from the Structured Operations Sector of Grupo Odebrecht; and

6. Prohibition from contracting with public entities.

*Id.* at 15.

Ecuador decided "not to prosecute" Santos because "he cannot be tried two times for the same acts, considering furthermore that the penalties imposed by the Federative Republic of Brazil are quantifiably higher than those he could receive in Ecuador." *Id.* at 29. Ecuador based its decision on the "universal principle of criminal law, *non bis in idem,*" citing to the Constitution of the Republic of Ecuador, International Covenant on Civil and Political Rights, American Convention on

Human Rights, Inter-American Court of Human Rights, Comprehensive Organic Criminal Code, and the Constitutional Court of Ecuador. *Id.* at 24–28.

Yet, although both the United States and Ecuador promised not to prosecute Santos because of his plea agreement with Brazil, Santos testified that as of that date, eight years after he signed the Brazilian plea agreement, he had yet to serve out any of those terms.

**Geraldo De Souza**, another Odebrecht representative that the government asserted "participated in a bribery and money laundering scheme" involving Polit, was also never prosecuted in the United States, Ecuador, nor Brazil. *See* Exhibit 3 at 1. According to the government, De Souza, the finance manager of Odebrecht for Ecuador, had the "responsibility [of] managing the generation of off-book cash in Ecuador that was used by Conceicao [Santos] to pay bribes on behalf of Odebrecht to certain government officials[.]" *Id.* at 7. Yet, De Souza received a non-prosecution agreement from the U.S. government.

**Olivio Rodrigues,** a senior Odebrecht member dedicated to paying bribes to public officials not just in Ecuador but all over the world, also received a non-prosecution agreement from the U.S., even though Rodriguez he traveled to Miami and had meetings here relating to Odebrecht's bribery operations. *See* Exhibit 4.

**Diego Sanchez**, identified as "Co-Conspirator 3" in the Indictment, was likewise not charged. *See* Exhibit 5. The government asserted that Sanchez directly

"launder[ed] large sums of cash on Polit's behalf" that Sanchez knew was proceeds of criminal activity and paid Polit a bribe by wiring the funds to an account in South Florida. *Id.* at 7. Sanchez also received a non-prosecution agreement from the U.S. government.

**Federico Gomez**, another co-conspirator alleged by the government to be involved in the money laundering, was also given direct-use immunity in exchange for his cooperation. *See* Exhibit 6.

The only alleged co-conspirator that was prosecuted in the U.S. was **Juan Ribas**, the chairman for Ecuador's state-owned insurance company, Seguros Sucre, and advisor to the then-President of Ecuador. *See United States v. Ribas Domenech*, Case No. 20-cr-20179 (ECF#76). Ribas, an Ecuador public official, pled guilty to conspiracy to commit money laundering for his participation in another money laundering scheme that involved Ribas soliciting and receiving millions of dollars in bribes and laundering the proceeds in the U.S., as well as other countries, in exchange for using his official positions to award contracts with Seguros Sucre. *Id.* Ribas was sentenced to fifty-one (51) month's imprisonment, with three years' supervised release, and a $100 special assessment, which was later reduced to thirty-seven (37) months. *See* ECF#224 at 6, ¶ 4; *Ribas Domenech*, Case No. 20-cr-20179 (ECF#94 and ECF#114).

Not only is the sentence sought by the government for Polit unreasonably harsh compared to others involved in this case, but it is also excessive when compared to sentences received in other money laundering cases. In *United States v. Claudia Patricia Diaz Guillen*, for instance, defendant Diaz was the National Treasurer of Venezuela, a high-ranking foreign official accused of receiving over $136 million in bribes, which Diaz and her husband allegedly concealed and laundered. *See* Case No. 18-CR-80160-WPD, at ECF#44 at pp. 14, 17; ECF#363 at pp. 1-2. Defendant Diaz was found guilty of money laundering and conspiracy to commit money laundering at trial. *Id.* at ECF#310. Judge Dimitrouleas sentenced Diaz to fifteen (15) years imprisonment, with a $75,000.00 fine, and ordered forfeiture in the amount of $135,752,007.46. *Id.* at ECF#374 at pp. 2, 6-7. Diaz' sentence was later reduced to twelve (12) years, pursuant to 18 U.S.C. § 3582(c)(2), because the Sentencing Guidelines were subsequently amended to permit a two-level reduction for those that qualify as zero-point offenders under U.S.S.G. § 4C1.1. *See id.* at ECF#422; ECF#448.

Polit, who even by the government's account received *substantially* less in alleged bribes ($16.5 million) that were then allegedly laundered, should be sentenced to a term comparably lower than Diaz.

**g.  The Sentencing Guidelines as Applied to Polit are Overly Punitive and Overstate the Personal Culpability of Polit.**

In this case, the sentencing guidelines and the adjusted offense level recommended by the PSI Report are more punitive than necessary to meet the sentencing factors of § 3553(a). Polit asks that the Court vary downward and sentence Polit below the advisory Guideline range to not more than six years to reflect the true nature of Polit's alleged involvement in the offense of conviction.

## Conclusion

For these reasons, the Court should impose a sentence of no greater than six (6) years, which is consistent with the sentence imposed by Ecuador for the conduct sustaining the charged offenses.

Respectfully submitted,

**BLACK SREBNICK**
201 South Biscayne Boulevard, Suite 1300
Miami, Florida 33131
Tel. (305) 371-6421

/s/ *Howard Srebnick*
HOWARD SREBNICK, ESQ.
Florida Bar No. 919063
E-mail: HSrebnick@RoyBlack.com

JACKIE PERCZEK, ESQ.
Florida Bar No. 42201
E-mail: JPerczek@RoyBlack.com

JEANELLE GOMEZ, ESQ.
Florida Bar No. 1026021
E-mail: Jgomez@RoyBlack.com