**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-CR-20114-KMW**

**UNITED STATES OF AMERICA**

v.

**CARLOS RAMON POLIT FAGGIONI,**

      **Defendant.**

**UNITED STATES' MOTION FOR**
**PRELIMINARY ORDER OF FORFEITURE**

Pursuant to 18 U.S.C. § 982(a)(1) and 21 U.S.C. § 853(p), and the procedures set forth in 21 U.S.C. § 853 and Rule 32.2 of the Federal Rules of Criminal Procedure, the United States moves for the entry of a Preliminary Order of Forfeiture against Defendant Carlos Ramon Polit Faggioni (the "Defendant") in the above-captioned matter.  The United States seeks forfeiture of directly forfeitable property, a forfeiture money judgment in the amount of $16,510,000 in U.S. currency and the forfeiture of certain property in satisfaction thereof.  In support of this motion, the United States provides the attached Declaration of Special Agent Cole Almeida of the Homeland Securities Investigations agency ("Almeida Decl.") and following factual and legal bases.

**I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

On March 24, 2022, a federal grand jury returned an Indictment charging the Defendant in Count 1 with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), in Counts 2-4 with money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and in Counts 5-6 with engaging in transactions in criminally derived property in violation of 18 U.S.C. § 1957.  Indictment, ECF No. 1.  The Indictment also contained forfeiture allegations, which alleged that

upon a conviction of a violation of 18 U.S.C. §§ 1956 or 1957 the Defendant shall forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1). *See id.* at 9-10. The forfeiture allegations also included specific property subject to forfeiture as a result of the alleged offenses including the real property located at 1902 S.W. 22nd Street, Miami, FL 33145. *See id.* at 10.

On April 23, 2024, after a two-week trial, a jury returned a verdict convicting the Defendant on all counts. *See* Trial Minute Entry, ECF No. 180; Jury Verdict, ECF No. 182. On April 23, 2024, the jury also returned a special verdict finding that the real property located at 1902 S.W. 22nd Street, Miami, FL 33145 was "involved in" and traceable to property "involved in" the offenses charged in the indictment. *See* Trial Minute Entries, ECF No. 180; Jury Verdict on Forfeiture, ECF No. 188.

## II.   MEMORANDUM OF LAW

### A.   Directly Forfeitable Property

All property, real or personal "involved in" a violation of 18 U.S.C. § 1956 or § 1957, or any property traceable to such property, is subject to forfeiture to the United States. 18 U.S.C. § 982(a)(1). Property "involved in" a money laundering offense "includes that money or property which was actually laundered ('the corpus'), along with 'any commissions or fees paid to the launderer[ ] and any property used to facilitate the laundering offense.'" *United States v. Seher*, 562 F.3d 1344, 1368 (11th Cir. 2009) (quoting and citing *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003)). Funds that are pooled or commingled "to facilitate or disguise [a defendant's] illegal scheme" are forfeitable. *See id.* (internal quotations omitted).

If a defendant is convicted of such violation, the Court "shall order" the forfeiture of property as part of the sentence. *See* 18 U.S.C. § 982(a)(1). Criminal forfeiture is governed by

2

the preponderance standard.  *See United States v. Hasson*, 333 F.3d 1264, 1277 (11th Cir. 2003).

Upon finding that property is subject to forfeiture by a preponderance, the Court:

> . . . must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property if the government has met the statutory criteria.  The court must enter the order without regard to any third party's interest in the property.  Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c).

Fed. R. Crim. P. 32.2(b)(2)(A).  To the extent there is a third-party interest to any forfeited asset, such claims are addressed after the property is preliminarily forfeited, in third-party ancillary proceedings.  *See* 21 U.S.C. § 853(k), (n); Fed. R. Crim. P. 32.2.

### B.  Forfeiture Money Judgments

A forfeiture order may be sought as a money judgment.  *See* Fed. R. Crim. P. 32.2(b)(1)(A), (2)(A); *see also United States v. Padron*, 527 F.3d 1156, 1162 (11th Cir. 2008) (holding that Federal Rules of Criminal Procedure "explicitly contemplate the entry of money judgments in criminal forfeiture cases").  The forfeiture money judgment is final as to the defendant "[a]t sentencing—or at any time before sentencing if the defendant consents."  *See* Fed. R. Crim. P. 32.2(b)(4)(A).  As additional property is identified to satisfy the forfeiture money judgment, the Court may order the forfeiture of such property.  *See* Fed. R. Crim. P. 32.2(e)(1) ("[T]he court may at any time enter an order of forfeiture or amend an existing order of forfeiture to include property that . . . is subject to forfeiture under an existing order of forfeiture but was located and identified after that order was entered; or . . . is substitute property . . . ."); *see also* Fed. R. Crim. P. 32.2(b)(2)(C).

The amount of the money judgment should represent the full sum of directly forfeitable property, regardless of the defendant's ability to satisfy the judgment at the time of sentencing.

*See United States v. McKay*, 506 F. Supp. 2d 1206, 1211 (S.D. Fla. 2007) (adopting the majority rule); *see also United States v. Blackman*, 746 F.3d 137, 143-44 (4th Cir. 2014) ("The fact that a defendant is indigent or otherwise lacks adequate assets to satisfy a judgment does not operate to frustrate entry of a forfeiture order.").  The Court determines the amount of the money judgment "based on evidence already in the record, including any written plea agreement, and any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B).  The defendant's money judgment amount can be based on a reasonable estimate on the amount of property subject to forfeiture. *See, e.g., United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011); *United States v. Peithman*, 917 F.3d 635, 651 (8th Cir. 2019); *United States v. Vico*, 2016 WL 233407, at *7 (S.D. Fla. Jan. 20, 2016) (calculation of money judgment does not require mathematical exactitude; district court may make a reasonable extrapolation supported by a preponderance of the evidence); *accord United States v. Esformes*, 2023 WL 118497, at *11 (11th Cir. Jan. 6, 2023) (court decides money judgment amount); *United States v. Cingari*, 952 F.3d 1301, 1306 (11th Cir. 2020).

### C.  Substitute Property

If directly forfeitable property is not available, the Court shall order the forfeiture of substitute assets to satisfy a money judgment.  *See* 21 U.S.C. § 853(p); Fed. R. Crim. P. 32.2(e); *United States v. Fleet*, 498 F.3d 1225, 1227-31 (11th Cir. 2007) (any property of the defendant may be forfeited as a substitute asset); *United States v. Knowles*, No. 19-14309, 2020 WL 3583413, at *1 (11th Cir. July 2, 2020) ("We've held that the word 'any' in § 853(p) is a broad word that 'does not mean some or all but a few, but instead means all . . . .'") (citing *Fleet*, 498 F.3d at 1229). Substitute assets are available for forfeiture upon a showing that, due to any act or omission of a defendant, directly forfeitable property:

(A) cannot be located upon the exercise of due diligence;
(B) has been transferred or sold to, or deposited with, a third party;
(C) has been placed beyond the jurisdiction of the court;
(D) has been substantially diminished in value; or
(E) has been commingled with other property which cannot be divided without difficulty.

21 U.S.C. § 853(p).   The government may establish such unavailability through an agent's declaration.   *See United States v. Seher*, 562 F.3d 1344, 1373 (11th Cir. 2009).

### D.  Property Subject to Forfeiture in Instant Criminal Case

From 2007 to 2017, the Defendant was the Comptroller General of Ecuador, a very senior position in the Ecuadorian government with approximately 2,000 people working under him. Presentence Investigation Report ("PSR") ¶ 5.   The Defendant was re-elected to serve as Comptroller General from 2017 to 2022.   *Id*.   However, in May 2017, the Defendant left Ecuador, came to Miami, and never returned to Ecuador.   *Id*.   Shortly thereafter, in June 2017, Ecuadorian authorities executed a search on his residence in Guayaquil, Ecuador.   Ultimately, the Defendant was charged in Ecuador, tried in absentia, was convicted of extortion, and was sentenced to six years in prison, which he did not serve.   *Id*.

The Comptroller General's office in Ecuador was responsible for ensuring the proper use of government resources by government officials and government contractors, including the prevention of fraud and corruption by government officials.   *Id*. ¶ 6.   To make sure public funds were used properly, the Defendant had substantial powers to audit all government officials and government contractors and to prepare reports of the findings from those audits.   *Id*.   The Defendant also had the ability to impose fines and to prepare reports to the Ecuadorian prosecutor's office recommending for criminal prosecution individuals who had misused government resources.   *Id*.   Multiple witnesses testified that the Defendant was one of the most powerful people in Ecuador.   *Id*.

The evidence at trial — witness testimony, bribe ledgers, audio recordings, corroborating emails, and bank records — established that the Defendant received millions of dollars in bribes during his time as Comptroller General.  *Id*. ¶ 8.  Specifically, he received at least $16 million in bribes from the Brazilian construction company Odebrecht and an approximately $510,000 bribe from a reinsurance executive.  *Id*.  These bribes were paid to influence the Defendant to take and to refrain from taking acts within the scope of his role as Comptroller General (for example, to remove fines imposed by his office).  *Id*.  The evidence further established that the Defendant caused the laundering of these bribe funds with the assistance of his son, John Polit ("J. Polit"), through shell companies and ultimately to acquire real estate and other assets in South Florida.  *Id*.

*The Odebrecht Bribery Scheme*

Odebrecht, S.A. ("Odebrecht") was a large Brazilian construction company that obtained various large government contracts in Ecuador to build power plants, refineries, and pipelines.  *Id*. ¶ 9.  Together these projects were valued at approximately $2 billion.  *Id*.  Jose Santos Filho ("Santos") was the country manager for Odebrecht in Ecuador from 2010 to 2015.  *Id*.  Santos testified that when he started as the country manager in Ecuador in 2010, the Comptroller General's office had imposed over $100 million in fines on a specific hydroelectric project built by Odebrecht — the San Francisco project.  *Id*.  Santos testified that he met with the Defendant on multiple occasions to discuss the fines.  *Id*.  These meetings took place at the Defendant's apartment at the Swissotel in Ecuador.  *Id*.  During one of these meetings, the Defendant told Santos that he would remove the $100 million in fines in exchange for a $6 million bribe.  *Id*.  Santos testified that he made the $6 million bribe payments to the Defendant over an 18-month period from June 2010 to December 2011 by delivering cash, either in a carry-on bag or backpack, to the Defendant at his apartment at the Swissotel.  *Id*.  Santos made these deliveries approximately three times a month

during the 18-month period. *Id*. During one of these deliveries, the Defendant told Santos that his son, John Polit ("J. Polit"), a banker in Miami, made the money "disappear." *Id*. In addition, the Defendant talked frequently with Santos about his trips to Miami, such that Santos gave the Defendant the codename "Miami" in Odebrecht's internal systems tracking the bribe payments. *Id*. While the $6 million in bribes were being delivered, the Defendant's office issued a series of Resolutions lifting the $100 million fines. *Id*.; GX 1-1 – 1-9.

Santos further testified that Odebrecht started receiving additional projects from the Ecuadorian government after issues with the San Francisco project were resolved. *Id*. ¶ 10. Santos testified that Odebrecht received the following projects - each worth hundreds of millions of dollars:

- Manduriacu (a hydroelectric plant);
- Duales Vinces (a pipeline project);
- Refineria del Pacifico (a refinery);
- Aqueduto (an aqueduct); and
- Poliducto (a pipeline project).

*Id*. Santos testified that the Defendant approached Santos and asked for $6 million for the Manduriacu project in exchange for a promise that his office would not impose any fines on the project. *Id*. ¶ 11. Santos testified that he negotiated with the Defendant and the Defendant agreed to accept bribe amounts for Manduriacu and each subsequent project on a case-by-case basis. *Id*. Santos testified that he made these additional bribe payments to the Defendant from 2012 to 2015 in order to prevent the imposition of fines on the projects listed above. *Id*. Santos stated that he did not recall the exact total of bribes Odebrecht paid the Defendant on these projects, but that it was at least $6 million. *Id*. Santos said that he made these bribe payments both in cash and via wire transfer. *Id*. Santos stated that he received wire transfer instructions from the Defendant in

7

hard copy detailing where to send the bribe payments. *Id*. Santos recalled receiving from the Defendant wire transfer details for the companies: Inmobilaria Cosani, S.A. ("Cosani") and Plastiquim, S.A. ("Plastiquim"). *Id*. Santos also testified that Odebrecht made wire transfer bribe payments to these companies to benefit the Defendant. *Id*.

Geraldo De Souza ("De Souza") was the head of finance for Odebrecht in Ecuador from 2010 to 2015. *Id*. ¶ 12. De Souza testified that Odebrecht paid bribes in cash and via wire transfer to Carlos Polit, as well as to other officials in Ecuador. *Id*. De Souza testified that he kept track of the bribes paid to the Defendant from 2012 to 2014 on bribe ledgers. *Id*. De Souza maintained copies of these bribe ledgers, and they were introduced into evidence. *Id*.; GX 2-1, 2-2, and 2-4. These bribe ledgers showed that Odebrecht agreed to make bribe payments to the Defendant in the following amounts for the following Odebrecht projects:

- • Duales Vinces: $1.7 million;
- • Refineria Del Pacifico: $1.7 million;
- • Aqueduto: $2.9 million; and
- • Poliduto: $3.7 million.
  **Total: $10.0 million**

*Id*. The entries on the bribe ledgers included the date, the amount, and the specific project for each bribe paid to the Defendant. *Id*. ¶ 13. The government provided corroborating evidence that the cash and wire transfers did in fact happen as reflected on the bribe ledgers. As for the cash bribes, the government presented evidence that the Defendant traveled at least 75 times to and from Miami between 2011 to 2017. *Id*.; GX 11-4A. The Defendant's travel records show that the Defendant was always in Ecuador on the date of the bribe payments (often arriving just before a bribe payment date). *Id*. The bribe ledgers show that the agreed-upon bribe payment amounts were paid in full, and De Souza testified that these payments were made in cash and by wire transfer. *Id*. De Souza explained that the bribe ledgers did not specifically identify which payments were made in cash

and which were made by wire transfer. *Id*. As for the wire transfers, the government introduced bank records showing wire transfers of the exact amounts specified in the ledgers on or about the date referenced. For example, Government Exhibit 2-4 shows a bribe payment to the defendant on April 1, 2014, of $500,000. *See* GX 2-4. Then, Government Exhibit 7-3A shows a wire transfer of $500,000 on April 7, 2014, from one of Odebrecht's bribe-paying shell companies to an account of Cosani in Panama. *See* GX 7-3A. Similarly, Government Exhibit 2-4 shows a request on April 28, 2014, for a transfer of $500,000. *See* GX 2-4. Government Exhibit 7-3A shows a wire transfer of $500,000 on April 29, 2014, from one of Odebrecht's subcontractor's accounts (used for bribery purposes) to an account of Cosani in Panama. See GX7-3A.

De Souza testified that Odebrecht generated the cash used for bribes by overpaying a cement contractor called Diacelec by $648,000 each month and receiving the money back in cash. *Id*. ¶ 14. De Souza stated that he typically received the cash at Odebrecht's office in Quito (right across the street from the Defendant's apartment at the Swissotel) and De Souza would fill the suitcase cash for Santos make the bribe delivery to the Defendant. *Id*. De Souza testified that he was responsible for coordinating the wire transfer bribe payments. *Id*. ¶15. De Souza testified that he received account details from Santos regarding where to send the wire transfer bribes. *Id*. De Souza testified that he directed bribe wire transfers through individuals at Odebrecht's Division of Structured Operations ("DSO" or "bribe paying department") or by Diacelec — the cash generation company — which would in turn use a company called Sarawak to make the bribe payment transfers. *Id*. De Souza recalled the company, Italcom, S.A. ("Italcom"), and that Odebrecht paid bribes via wire transfer to this company.

Olivio Rodrigues ("Rodrigues") worked at the DSO as the owner/operator of various companies the sole purpose of which was to make bribe payments on behalf of Odebrecht. *Id*. ¶

16.   Rodrigues testified about his role and these companies, including Kleinfeld Services and Select Engineering.  *Id*.  Rodrigues testified that any transfer from these companies was a bribe payment made at the direction of Odebrecht.  *Id*.  Rodrigues introduced DSO emails directing him to make certain bribe payment transfers, including to the companies Cosani, Plastiquim, and Italcom.  *Id*.; GX 3-1 – 3-6.  Rodrigues testified that he made bribe payment transfers to these companies.  *Id*.

The government presented evidence that the Defendant received bribe payments via wire transfer totaling approximately $4.1 million.  *Id*. ¶ 17.  These transfers were made to Cosani, Plastiquim, and Italcom (the "Three Intermediary Companies").  *Id*.  The government presented evidence that these funds were controlled by the Defendant.  *Id*.  First, the government showed that J. Polit had received these wire transfer instructions by email before Odebrecht made the bribe payments (GX 4-2, 6-5, 7-1) and, on at least one occasion, directly forwarded these instructions to his father's personal Hotmail account (GX 4-2, 4-3).  *Id*.  Second, the Defendant, in an undercover recording with Santos, acknowledged that he received a "little" in wire transfers and that the accounts of Cosani and Plastiquim were accounts managed by his son, J. Polit.  *Id*.; GX 1-10.  Furthermore, bank records introduced at trial showed that the funds were sent from the Odebrecht shell companies controlled by Rodrigues and Diaselec to the Three Intermediary Companies and then ultimately transferred to an account in Miami controlled by J. Polit's company, Venture Overseas.  *Id*.; GX 12-17.  Finally, Federico Gomez ("Gomez"), who worked for J. Polit, testified that he found manila folders titled Plastiquim, Italcom, and Cosani with amounts totaling approximately $4 million in J. Polit's office.  *Id*.  Gomez testified that J. Polit stated that these funds were his "father's investments."  *Id*.  J. Polit asked Gomez to track the funds in Venture Overseas.  *Id*.  Gomez testified that he was concerned that he was involved in illegal activity.  *Id*.

10

The evidence at trial showed the following transfers from Odebrecht entities to the Three Intermediary Companies (GX 12-17):

- Plastiquim: $700,000 received from Klienfeld Services in 2014;
- Cosani:  $1.5 million received from Klienfeld Services and Sarawak in 2014;
- Italcom:  $1.944 million received form Select Engineering and Sarawak in 2014.

*Id*. ¶ 18.  Representatives from each of these companies testified at trial.  *Id*.  Mauricio Neme ("Neme"), the owner of Plastiquim, testified that J. Polit approached him to ask about his interest in a $700,000 loan.  *Id*.  Neme agreed to the loan and signed a promissory note with Venture Overseas requiring repayment to Venture Overseas *Id*.; GX 4-8.  Neme further testified that J. Polit offered him a cash loan of $400,000 in 2014, which he also accepted for a different company he owned, Tuberias Pacifico.  *Id*.  Neme testified that he received the cash in Ecuador, but that $5,000 was missing, and the loan then was only for $395,000.  *Id*.  Neme testified that he made partial repayment of the loan until 2017, including a transfer of $34,300 from Plastiquim to Venture Overseas on October 7, 2016.  *Id*.; GX 4-6, 4-7, 4-11.  In 2017, Ecuador law enforcement conducted a search warrant on the Plastiquim business relating to the loan from J. Polit.  *Id*.  Neme stated that he came to Miami, and at his cousin's apartment, the Defendant approached him and offered to pay for his legal expenses relating to the investigation in Ecuador.  *Id*.  Neme did not know the loan J. Polit offered him was funded by Odebrecht bribe money for the Defendant.  *Id*. Neme was never charged in Ecuador.  *Id*.

Antonio Andretta ("Andretta") was a director of Italcom during the relevant time.  *Id*. ¶ 20. Andretta testified that Italcom had a loan with Venture Overseas (GX 5-1) for approximately $1.9 million and a separate loan for $1.5 million and that both loans were repaid to Venture Overseas by a wire transfer on March 22, 2016, for $3,453,184 (Count 3 of the Indictment).  *Id*.  Maria Del Morla testified as a representative of Cosani and stated that Cosani had a loan with Venture

Overseas (GX 5-2) and that she interacted with J. Polit relating to this loan. *Id.* Neither Andretta nor Del Morla knew that the loans J. Polit offered were funded by Odebrecht bribe money for the Defendant. *Id.*

John Polit maintained a spreadsheet (the "bribes ledger") tracking inflows of funds into Venture Overseas, including the above wire transfer bribes and cash bribes. *See* GX 8-9, 8-9A. J. Polit sent himself this spreadsheet on his personal email on October 14, 2014. The bribes ledger contains line items for Plastiquim, Cosani (listed as Pacific Cable), Italcom, Tuberias Pacifico (listed as TUPAC), and Sanchez (listed as Diego). The amounts listed on the bribes ledger correspond with the amounts of the payments identified above. In addition, the bribes ledger also lists a few other companies with amounts that each made payments into the Venture Overseas account — Envases De Litoral (listed as Enlit), Jaime Simon, Plasticos de Litoral (listed as Plasticos). For each of these, there were payments by these companies to Venture Overseas made from 2011 to 2014 without any corresponding outflows to the entities. *See* GX 12-28. The bribes ledger also contains a list of line items underneath the above bribes that include "House John," "House Charles," and "Apartment Karla," with corresponding amounts of $450,000, $450,000 and $200,000. GX 8-9A. John, Charles and Karla are the names of the defendant's three children residing in the United States. Properties were purchased in South Florida around this time for each of these children. In short, by a preponderance of evidence, this bribes ledger represents a chart tracking the incoming bribery funds from various entities and individuals and the use of the bribery funds for the benefit of the defendant and his children.

*The Reinsurance Bribery Scheme*

Diego Sanchez ("Sanchez") was an insurance broker in Ecuador. *Id.* ¶ 21. Sanchez testified that he developed a friendship with the Defendant starting in 2011 or 2012. *Id.* Sanchez

testified that the Defendant pressured him to open bank accounts for his insurance business with J. Polit in Miami, which he did. *Id*. Sanchez further testified that the Defendant pressured him to invest with J. Polit's real estate business purchasing and remodeling properties in South Florida, which he did. *Id*. Sanchez testified that he agreed to the Defendant's request that Sanchez receive cash in Ecuador to be deposited in Miami at the direction of J. Polit and to be used to purchase an apartment in Quito. *Id*. Ultimately, Sanchez received approximately $800,000 in cash for the benefit of the Defendant. Sanchez received the cash directly from the Defendant and from Sabett Chamoun, Defendant's administrative sub-comptroller at the Comptroller General's office. *Id*. At the Defendant's request, Sanchez used $400,000 to purchase an apartment in Quito and transferred approximately $398,000 to Miami to various accounts at the direction of J. Polit. *Id*.

Beginning in 2011, Sanchez held reinsurance contracts with Seguros Sucre ("Sucre"), Ecuador's state-owned insurance agency. *Id*. ¶ 21. Sanchez testified that Juan Ribas, the head of Sucre, cancelled Sanchez's contracts in 2013. *Id*. Sanchez spoke with the Defendant about losing these contracts and the Defendant agreed to help Sanchez recover them. *Id*. Sanchez testified that the Comptroller General's office had the power to audit Sucre and Ribas. *Id*. Sanchez met with the Defendant and Pedro Solines ("Solines"), the former Superintendent of Banks and Insurance who became the Secretary of Public Administration, a cabinet-level position. *Id*. Sanchez testified that the Defendant and Solines agreed to help Sanchez recover the contracts. *Id*. The Defendant and Solines later told Sanchez about a meeting they had with Ribas at a coffee shop during which Solines told Ribas that if he met with Sanchez all his problems would go away. *Id*. Sanchez said that the contracts were worth approximately $2.5 million in premiums. Sanchez testified, pursuant to a non-prosecution agreement, by which he forfeited approximately $1.2 million in profits from this transaction. *Id*.

In exchange for their assistance, the Defendant demanded Sanchez pay a bribe of $500,000 and Solines demanded a bribe of $250,000. *Id*. ¶ 23.  Sanchez testified that he paid both bribes. *Id*.  The Defendant instructed Sanchez to coordinate with his J. Polit regarding transfer of the bribe payment. *Id*.  J. Polit contacted Sanchez and told him to pay the $500,000 plus an additional $10,000 to an account in Miami called American Land Investment & Development LLC ("American Land"). *Id*.  Sanchez made this transfer on December 2, 2015. *Id*.  Federico Gomez testified that J. Polit controlled both Venture Overseas and American Land even though they were not in J. Polit's name.  Sanchez testified that J. Polit caused a fake invoice to be issued indicating that the $510,000 transfer was for "technical and auditing advice," which Sanchez said was false. *Id*.  Tamara Devos worked for J. Polit as a bookkeeper, including for American Land. *Id*.  Devos testified that she created the fake invoice in Quickbooks at J. Polit's direction, and that she knew it was fake because American Land did not provide technical or auditing advice, since it was a remodeling company. *Id*.  Sanchez also introduced an undercover recording where he and the defendant discuss an arrest of Juan Ribas ("Ribas") in Miami. *Id*.  In the recording, the Defendant stated that Ribas was "ratting," and the Defendant was "concerned" because he remembered that Solines recommended Sanchez to Ribas. *Id*.

Ribas also testified at trial. *Id*. ¶ 24.  After awarding Sanchez's contracts to another broker, Ribas faced pressure from the Superintendent of Insurance. *Id*.  Ribas testified that Solines visited him and recommended that he meet with Sanchez regarding his issues with the Superintendent of Insurance. *Id*.  Ribas met with Sanchez and agreed to return the contracts to Sanchez; Ribas's issues with the Superintendent of Insurance went away. *Id*.  Ribas said that he also had an issue with an audit from the Defendant's office and that Sanchez agreed to help. *Id*.  Finally, Ribas testified that Solines subsequently contacted him to have a meeting at the Defendants' office. *Id*.

Ribas said he arrived at the Defendant's office, but he was not on the list of persons authorized to enter the building.  *Id*.  Solines contacted Ribas and instructed him to enter through the garage.  *Id*.  Ribas said that he had a meeting with the Defendant and Solines during which the Defendant asked Ribas to award a contract relating to a hydroelectric plant called Coca Codo Sinclair to a specific broker: IHG.  *Id*.  Ribas agreed to do so.  *Id*.  Ribas testified that he subsequently met in Miami with a representative of IHG and J. Polit wherein J. Polit indicated that he was there to collect the bribe for his father related to the IHG insurance contract.  *Id*.

*Laundering the Bribe Funds*

Financial accountant Michael Petron ("Petron") testified, based on his review of bank records, regarding the flow of bribery funds from Odebrecht through the Three Intermediary Companies to Venture Overseas from 2014 to 2017.  *Id*. ¶ 25; (GX 12-17).  Specifically, Petron testified that Odebrecht transferred approximately \$4.1 million to the Three Intermediary Companies in 2014.  *Id*.  Petron testified that the Three Intermediary Companies transferred approximately \$3.8 million to Venture Overseas from 2014 to 2017 — as "repayment" of loans. *Id*.  Petron further testified that Venture Overseas never sent money to the Three Intermediary Companies to fund the loans.  Rather, they were funded by the transfers from the Odebrecht shell companies.  *Id*.

Petron also testified regarding his tracing of the funds used by Venture Overseas and other J. Polit companies in Miami.  *Id*. ¶ 26.  Specifically, Petron testified that at least \$200,000 of the bribe funds was transferred to another J. Polit company called Invecon LLC ("Invecon") and used for renovations of a property at 7233 Los Pinos Boulevard (Los Pinos Home LLC).  *Id*.  Petron testified that this property was sold for approximately \$4.1 million in 2017 resulting in a wire transfer of approximately \$3.6 million in proceeds on April 28, 2017 (Count 6).  *Id*.  Petron also

testified that at least $1.2 million in traceable funds were used for the purchase of an office building at 1902 SW 22 Street in Miami, Florida (1900 Office Building LLC) and that a wire was sent for the purchase of the office building of approximately $1.3 million on May 27, 2016 (Count 5).[1]  *Id*. Petron further testified that the $510,000 bribe was received in the American Land account on December 2, 2015, and there was a subsequent $300,000 transfer to Invecon on December 2, 2015 (Count 2); these funds were also used to renovate 7233 Los Pinos Boulevard.  *Id*.

Daniel Liste testified that he worked for Invecon as a project manager and that Inevcon and Los Pinos Home LLC were both owned and controlled by J. Polit even though Liste is listed on the corporate documents with the Florida Secretary of State.  *Id*. ¶ 27.  Tamara Devos testified that she worked as a manager for 1900 Office Building LLC and that the property is owned and controlled by J. Polit even though Devos is listed on the corporate document with the Florida Secretary of State.  *Id*.

Petron also analyzed the bribes ledger maintained by J. Polit (GX 8-9A) that listed funds from Italcom, Plastiquim, and Cosani, as well $395,000 from the company Tuberias Pacifico and $398,000 from "Diego" [Sanchez].  The spreadsheet also included line items for Envases Del Litoral (enlit), Plasticos, and Jaime Roberto Simon Isaias.  *Id*.  Petron testified that he traced a total of $10.2 million in net inflows from these entities into Venture Overseas.  *Id*.

---

[1] On April 23, 2024, the jury returned a guilty verdict as all counts, including Count Five of the Indictment, which charged a count of engaging in transactions in criminally derived property, pursuant to Title 18, U.S.C. § 1957, related to the purchase of the real property located at 1902 S.W. 22nd Street, Miami, Florida 33145. *See* Trial Minute Entry, ECF No. 180; Jury Verdict, ECF No. 182. Additionally, the jury also returned a special verdict finding that the real property located at 1902 S.W. 22nd Street, Miami, FL 33145, was "involved in" and traceable to property "involved in" the offenses charged in the indictment.  *See* Trial Minute Entries, ECF No. 180; Jury Verdict on Forfeiture, ECF No. 188.

The amount of laundered funds includes the following payments made to the Defendant or for his benefit:

- $6 million (San Francsico project);
- $3.7 million (Poliduct project);
- $2.9 million (Acqueduct project);
- $1.7 million (Duale Vinces project);
- $1.7 million (Refineria del Pacifico project);
- $510,000 (Sanchez reinsurance contracts).
**Total: $16,510,000.00**

*Id*. ¶ 29.

Based on the record in this case, the total value of the property involved in the money laundering conspiracy offenses of conviction is approximately $16,510,000, which sum may be sought as a forfeiture money judgment pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure.

In addition, also based on the record in this case, the following specific property is directly subject to forfeiture, pursuant to 18 U.S.C. § 982(a)(1):

  i.   Real property located at 1902 S.W. 22nd Street, Miami, Florida 33145, including all buildings, fixtures, appurtenances, improvements, attachments, and easements found therein or thereon,

     Also known as: Lots 1, 2, 3, & 4, Block 29, OF THE NEW SHENANDOAH, according to the Plat Book 10, Page 55, of the Public Records of Miami-Dade County, Florida.

     Parcel Identification No. 01-4115-012-0370

The United States has also not been able to locate all of the directly forfeitable property. It is the conclusion of HSI Special Agent Almeida in the attached Declaration [EX 1] that other directly forfeitable property cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property

which cannot be divided without difficulty.  *See* Almeida Decl. ¶ 4.  Thus, pursuant to 21 U.S.C.

§ 853(p), the United States is authorized to forfeit substitute property, and the following property

should be forfeited to satisfy the forfeiture money judgment:

      i.     Real property located at 301 Altara Avenue, Unit 702, Miami, Florida 33146, including all buildings, fixtures, appurtenances, improvements, attachments, and easements found therein or thereon;

            Also known as: Unit 702, of MERRICK MANOR, A CONDOMINIUM, according to the Declaration of Condominium thereof, recorded in Official Book 31383, Page 3897, of the Public Records of Miami-Dade County, Florida, as amended from time to time.

            Parcel Identification No. 03-4120-074-0150.

     ii.     Real property located at 1010-1030 NW 9 Court, Miami, FL 33136, including all buildings, fixtures, appurtenances, improvements, attachments, and easements found therein or thereon;

            Also known as: Lots 3 and 4, Block 7, of MAP OF SPRING GARDEN SUBDIVISIONS NO. 1 AND NO. 2, according to the map or plat thereof, as recorded in Plat Book 5, Page(s) 38 of the Public Records of Miami-Dade, Florida.

            Parcel Identification Nos. 01-3135-027-0320 and 01-3135-027-0322.

    iii.     Real property located at 88 S.W. 7th Street, Unit 1202, Miami, Florida 33130, including all buildings, fixtures, appurtenances, improvements, attachments, and easements found therein or thereon;

            Also known as: Condominium Parcel No. 1202 in RISE CONDOMINIUM, according to the Declaration of Condominium thereof, recorded December 30, 2015 in Official Records Book 29908, Page 132, of the Public Records of Miami-Dade County, Florida, as amended and/or supplemented from time to time, together with an undivided interest in the common elements appurtenant thereto.

            Parcel Identification No. 01-4138-168-0320

    iv.     Real property located at 90 SW 3rd Street, Apt# 503, Miami, Florida 33130, including all buildings, fixtures, appurtenances, improvements, attachments, and easements found therein or thereon;

Also known as: Unit 503 of The Ivy, according to the Declaration of Condominium thereof, as recorded June 4, 2008, in Official Records Book 26412, at Page 2468 of the Public Records of Miami-Dade County, Florida, as amended and/or supplemented from time to time, together with an undivided interest in the common elements appurtenant.

Parcel Identification No. 01-4137-063-4880

v.   Real property located at 801 Brickell Key Blvd, Apt #1704, Miami, Florida 33131, including all buildings, fixtures, appurtenances, improvements, attachments, and easements found therein or thereon;

Also known as: Unit 1704, of COURTS BRICKELL KEY, A CONDOMINIUM, according to the Declaration of Condominium thereof, as recorded in Official Records Book 20725, Page 318, of the Public Records of Miami-Dade County, Florida, together with all amendments thereto and an undivided interest in the common elements appurtenant thereto.

Parcel Identification No. 01-4206-062-0930

vi.   Real property located at 1820 S.W. 3rd Avenue, Miami, Florida 33130, including all buildings, fixtures, appurtenances, improvements, attachments, and easements found therein or thereon;

Also known as: The Northeasterly 50 feet of lot 10, and all of Lot 13, Block 13, of HOLLEMAN PARK, according to the Plat thereof as recorded in the Plat Book 8, Page(s) 23, of the Public Records of Miami-Dade County, Florida TOGETHER WITH an easement of five feet bordering the above along the Southwest side, said five foot strip also known as Southwest 4 feel of Lot 10 and Northeast 1 foot of Lot 11, Block 13.

Parcel Identification No. 01-4138-001-1910

vii.   Real property located at 1830 S.W. 3rd Avenue, Miami, Florida 33130, including all buildings, fixtures, appurtenances, improvements, attachments, and easements found therein or thereon;

Also known as: Lot 11,  less the Northeasterly one (1) foot thereof, and Lot 12, Block 12, HOLLEMAN PARK, a subdivision according to the Plat thereof, as recorded in Plat Book 8, at Page 23, of the Miami-Dade County, Florida, including a perpetual easement in and over a ten (10) foot strip of land, bounding the above described ten (10) foot strip, being described as the Northeasterly one (1) foot of Lot 11, and the Southwesterly nine (9) feet of Lot 10, in Block 13 of HOLLEMAN PARK, a subdivision to the Plat thereof, recorded in Plat Book 8, at Page 23, of the Public Records of Miami-Dade

County, Florida.

Parcel Identification No. 01-4138-001-1920

viii.   Real property located at 8017 Lake Drive, Apt#202, Miami, Florida 33178, including all buildings, fixtures, appurtenances, improvements, attachments, and easements found therein or thereon;

Also known as: Unit No. 104, Building 14, of Phase No. 4, Doral Court, a Condominium, according to the Declaration of Condominium recorded in O.R. Book 13754, Page 2263, and amended in O.R. Book 14839, Page 1799, and all exhibits and amendments thereof, Public Records of Miami-Dade, Florida.

Parcel Identification No. 35-3022-019-0820

ix.   Real property located at 8525 N.W. 109th Court, Miami, Florida 33178, including all buildings, fixtures, appurtenances, improvements, attachments, and easements found therein or thereon;

Also known as: Lot 3, Block 10, of ISLANDS AT DORAL, according to the Plat thereof, as recorded in Plat Book 163 at Page 18, of the Public Records of Miami-Dade County, Florida.
Parcel Identification No. 35-3007-005-0870

x.   Real property located at 9431 S.W. 4th Street, Apt. 206, Miami, Florida 33178, including all buildings, fixtures, appurtenances, improvements, attachments, and easements found therein or thereon;

Also known as: Unit 206, Building 7, VERSAILLES GARDENS I, a Condominium, according to the Declaration of Condominium recorded in Official Records Book 8997, Page 275, and all subsequent amendments thereto, together with its undivided share in the common elements, in the Public Records of Miami-Dade County, Florida.

Parcel Identification No. 30-4004-034-1320; and

xi.   Real property located at 11522 N.W. 83rd Way, Doral, Florida 33178, including all buildings, fixtures, appurtenances, improvements, attachments, and easements found therein or thereon;

Also known as: Lot 14, Block 3, Island at Doral Northwest, according to the map or plat thereof, as recorded in Plat Book 164, Page 34, of the Public Records of Miami-Dade County, Florida.

Parcel Identification No. 35-3007-011-0580.

20

Accordingly, pursuant to 18 U.S.C. § 982(a)(1) and 21 U.S.C. § 853(p), and Fed. R. Crim. P. 32.2, the Court should issue the attached proposed order, which provides for the entry of a forfeiture money judgment against the Defendant; the forfeiture of specific property; the inclusion of the forfeiture as part of the Defendant's sentence and judgment in this case; and permission to conduct discovery to locate assets ordered forfeited.

WHEREFORE, pursuant to 18 U.S.C. § 982(a)(1) and 21 U.S.C. § 853(p), and the procedures set forth in 21 U.S.C. § 853 and Rule 32.2 of the Federal Rules of Criminal Procedure, the United States respectfully requests the entry of the attached order.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:     */s/ Marx. P. Calderón*
        Marx P. Calderón
        Court ID No. A5502700
        Sandra Demirci
        FL Bar No. 1018897
        Assistant United States Attorneys
        99 N.E. 4th Street, 7th Floor
        Miami, FL 33132-2111
        Telephone: (305) 961-9036
        Marx.Calderon@usdoj.gov
        Sandra.Demirci@usdoj.gov

## LOCAL RULE 88.9 CERTIFICATION

Pursuant to Local Rule 88.9, I hereby certify that the undersigned counsel has made reasonable efforts to confer with Defense counsel twice via e-mail on September 5, 2024 and on

September 6, 2024, regarding the Defendant's position on the relief sought, but has been unable to confirm Defense counsel's position.

In the event that Defense counsel requests that the Court hold a separate hearing on the instant motion at some time after the sentencing hearing is held, the United States has no objection. However, the United States respectfully requests that if the Court is inclined to grant such a request, that it enter the attached alternative Preliminary Order of Forfeiture pursuant to Fed. R. Crim. P. 32.2(b)(2)(C), which provides that:

> If, before sentencing, the court cannot identify all the specific property subject to forfeiture or calculate the total amount of the money judgment, the court may enter a forfeiture order that:
>
> (i) lists any identified property;
>
> (ii) describes other property in general terms; and
>
> (iii) states that the order will be amended under Rule 32.2(e)(1) when additional specific property is identified, or the amount of the money judgment has been calculated.

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 22-CR-20114-KMW

UNITED STATES OF AMERICA

v.

**CARLOS POLIT FAGGIONI,**

        **Defendant.**

### DECLARATION OF SPECIAL AGENT COLE ALMEIDA
### IN SUPPORT OF PRELIMINARY ORDER OF FORFEITURE

I, Colberd Almeida, under penalty of perjury, declare:

1.      I am a Supervisory Special Agent with Homeland Security Investigations ("HSI"). I have been employed with HSI for approximately 23 years. Currently, I am a group supervisor for the Violent Gangs and Narcotics Task Force, however, at all times relevant to this affidavit I was assigned to a group that investigated foreign corruption and money laundering. I have previously conducted and assisted in the execution of numerous federal search, seizure, and arrest warrants. In my role as a Special Agent, I have experience and training in analyzing and gathering financial records, electronic data, and other types of evidence related to foreign corruption and money laundering investigations.

2.      The information contained in this declaration is based upon my personal knowledge and my review of documents and records gathered during the course of this investigation, as well as information obtained, directly or indirectly, from other sources and agents, including information provided to me by other agents who are involved in the investigation and from evidence introduced at trial. I make this sworn declaration in support of the United States' Motion for Preliminary Order of Forfeiture. Because this declaration is being submitted for a limited purpose, it does not include all of the facts that I have learned during the course of the investigation.

3.       The evidence at trial for the instant offense presented witness testimony, audio recordings, corroborating emails, and bank records, which established that the Defendant received millions of dollars in bribes during his time as Comptroller General of Ecuador and laundered proceeds to the Southern District of Florida.

4.       In the course of the investigation law enforcement reviewed financial records, queried available databases, and conducted due diligence to locate forfeitable property traceable to the counts of conviction in this case. After investigating the Defendant's assets, it is the conclusion of the declarant that due to the Defendant's acts or omissions, additional directly forfeitable property either cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled so proceeds cannot be divided without difficulty.

Dated on 2/ August, 2024, in Miami, Florida

COLBERD ALMEIDA
SUPERVISORY SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS

2