UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CR-20114-KMW

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

CARLOS RAMON POLIT FAGGIONI,

      Defendant.

_____/

**DEFENDANT'S SUPPLEMENTAL OBJECTIONS TO THE
PRESENTENCE INVESTIGATION REPORT**

**I.**  **The amount of bribes allegedly received is not relevant for sentencing.**

The government expends considerable effort arguing that the evidence at trial established that Polit received $16.5 million in bribes. ECF#239 at 1–4. While this is inconsistent with the government's own position throughout the pendency of the case and even during opening statement (where they asserted $10 million were paid in bribes), the number of bribes Polit allegedly received is not relevant for sentencing.[1] The "downstream money laundering of his bribes," as the government puts it (ECF#239 at 10), is what was charged, not bribery.

---

[1] This figure is also not supported by the trial evidence. The government relies on the "bribe ledgers" drafted by Geraldo De Souza to support the $16.5 million bribe amount. ECF#239 at 2. The government claims that these ledgers indicated the "agreed-upon bribe amounts" and "reflect[ed] that Odebrecht paid the full $10 million for the above four projects." *Id.* at 2-3. But that is not so. The ledgers (reflected in Gov. Exhs. 2-1, 2-2, and 2-4), at *best*, indicate that a total of $7,250,000 were paid for those projects.

**II.  The government incorrectly relies on "relevant conduct" to argue that this Court should consider laundering that allegedly took place outside the jurisdiction of the U.S. to determine the amount of "laundered funds" for sentencing.**

The government urges this Court to consider alleged laundering that took place in Ecuador, outside the jurisdiction of the United States, to determine the amount of "laundered funds" in this case. ECF#239 at 4 ("The mere fact that some of this laundering may have occurred in Ecuador does not change this analysis."). This is legally incorrect, unsupported by case law, and ignores the clear language of the Sentencing Guidelines and Eleventh Circuit precedent to the contrary.

The government relies on *United States v. Watts*, 519 U.S. 148, 151 (1997), for the proposition that district courts have wide discretion to consider "relevant conduct" at sentencing. But *Watts* had nothing to do with calculating the amount of "laundered funds" under U.S.S.G § 2S1.1. Instead, the Supreme Court held that a sentencing court must consider "relevant conduct" in imposing an enhancement under § 2D1.1(b)(1) for possessing a firearm in connection to the drug offense for which the defendant was convicted. *Watts*, 519 U.S. at 151. While "relevant conduct" is appropriately considered in other provisions of the guidelines, it is not applied universally. To be sure, the government quotes the definition of "relevant conduct" under § 1B1.3 but neglects to include the premise preceding that provision: "*Unless otherwise specified,*" base offense levels in Chapter 2 and adjustments under Chapter 3 shall be determined by considering the relevant conduct of the offense. § 1B1.3(a).

Here, § 2S1.1 *does* specify otherwise—it expressly defines "laundered funds" as "the property, funds, or monetary instrument involved in the transaction . . . **in violation of 18 U.S.C. § 1956 or § 1957**." U.S.S.G. § 2S1.1, cmt. n.1 (emphasis added). Alleged money laundering in Ecuador is not "in violation of 18 U.S.C. § 1956 or § 1957" and therefore cannot be considered in determining the amount of laundered funds. And the Eleventh Circuit has made clear that "laundered funds" is narrowly

defined by the funds that were actually laundered: "[T]he inclusion of the modifier 'laundered' before 'funds' indicates that the funds which should be considered for sentencing purposes are those that were actually laundered." *United States v. Paley*, 442 F.3d 1273, 1278 (11th Cir. 2006). The government ignores *Paley* and the clear language of the guidelines and fails to cite to any legal authority to support the argument that "laundered funds" broadly encompasses alleged laundering outside the U.S.[2]

The government's reliance on *United States v. Spence*, 923 F.3d 929 (11th Cir. 2019), is also misplaced. In *Spence*, the Eleventh Circuit considered the extraterritorial application of relevant conduct to impose an enhancement for distribution of child pornography under U.S.S.G. § 2G2.2. 923 F.3d at 932. *Spence* had nothing to do with how to calculate "laundered funds" under the money laundering guideline.

### III. The government's proposed calculation of the amount of funds allegedly laundered in the U.S. is incorrect and unsupported by the evidence.

The government maintains that at least $11.1 million was laundered in the United States. They reach this number by totaling: (1) the $10.2 million inflow into Venture Overseas that was reflected in Gov. Exh. 12-28; (2) the $398,000 that Diego Sanchez testified he allegedly received from Polit and subsequently transferred to an attorney's escrow account in Florida; and (3) the $510,000 alleged bribe payment transferred by Sanchez to an account in Florida. ECF#239 at 7. The government's computation is flawed.

First, the government cannot include the $510,000 alleged bribe payment in its calculation because a bribe payment is not and cannot be considered the laundering. "Because '[m]oney laundering is an offense to be punished separately from the underlying criminal offense,' it cannot occur until *after* 'the predicate crime becomes

---

[2] It's also noteworthy that there was insufficient evidence at trial to support that any laundering occurred outside the U.S. The solicit and payment of a bribe itself cannot constitute money laundering. *United States v. Majors*, 196 F.3d 1206, 1212 (11th Cir. 1999).

a "completed offense."'"" *United States v. Gross*, 661 F. App'x 1007, 1021 (11th Cir. 2016) (emphasis added) (quoting *United States v. Nolan*, 223 F.3d 1311, 1315 (11th Cir. 2000)); *United States v. Christo*, 129 F.3d 578, 579-80 (11th Cir. 1997) (reversing money laundering conviction and holding that proceeds of an offense do not exist until the offense is completed). Here, the $510,000 transfer from Sanchez to an account in Florida, which Sanchez testified was the payment of the bribe itself, cannot constitute "funds" that were "actually laundered." *See Paley*, 442 F.3d at 1278.

Second, the $10.2 million figure is unsupported by the testimony and evidence at trial. The government asks the Court to base the "laundered funds" calculation on *all* unexplained inflows into Venture Overseas because they were allegedly made "without ***any*** corresponding outflows to the entities." ECF#239 at 6 (emphasis in original). The government identifies payments made to Venture Overseas by Envases Del Litoral, Jaime Simon, and Plasticos Del Litoral and relies on a summary exhibit, Gov. Exh. 12-28, to argue that any funds paid to Venture Overseas by these companies must constitute laundering of bribe proceeds. But no witness testified at trial about payments made by these entities to Venture Overseas, or about the source of the funds or why those payments were made. Indeed, Mr. Petron, the government's summary witness / financial analyst, testified that he did *not* review any bank statements or documents related to the companies identified in the white entries indicated in Gov. Exh. 12-28, reproduced below:

| Selected Entity | Inflows | Outflows | Net |
|---|---|---|---|
| Italcom | $ 3,971,791 | $ (1,500,000) | $ 2,471,791 |
| Envases Del Litoral | 3,743,521 | - | 3,743,521 |
| Cosani | 1,499,980 | - | 1,499,980 |
| Plasticos Del Litoral Plastlit | 1,011,727 | - | 1,011,727 |
| Plasticos Continentales Plasconti | 753,722 | - | 753,722 |
| Tuberias Pacifico | 249,500 | - | 249,500 |
| Plastiquim | 210,485 | - | 210,485 |
| Jaime Roberto Simon Isaias | 195,395 | - | 195,395 |
| Tuberias Pacifico | 136,443 | - | 136,443 |
| Total | $ 11,772,563 | $ (1,500,000) | $ 10,272,563 |

*See* Exhibit 1.

According to the ROIs provided by the government, the companies highlighted in white—Envases Del Litoral, Plasticos Del Litoral Plaslit, Plasticos Continentales Plasconti—were owned by Jaime Roberto Simon Isaias. But Jaime Roberto is deceased, so he did not testify at the trial, and nobody else testified in his absence with respect to these companies, let alone about the payments these companies made to Venture Overseas.

Reliance on the payments to Venture Overseas in the white entries in Gov. Exh. 12-28 to calculate the loss amount would violate the established rule that the Court may not speculate about the amount of laundered funds to impose a higher sentence, and would also impermissibly shift the burden of proof to Polit to explain the payments by Envases Del Litoral, Plasticos Del Litoral Plaslit, Plasticos Continentales Plasconti, and Jaime Roberto Simon Isaias. *See United States v. Moran*, 778 F.3d 942, 973 (11th Cir. 2015) (citation omitted). The burden is on *the government* to prove the pertinent facts sustaining the loss amount by a preponderance of the evidence, "which must be reliable and specific" and not based on speculation. *Id.* ("[A] court may not speculate about the existence of facts that would result in a higher sentence.").

At best, the amount of "laundered funds" may be based on the blue entries in Gov. Exh. 12-28 above, which total $4,431,756.

Lastly, there was insufficient evidence at trial to establish that the $398,000 transfer from Sanchez to an account in Florida constituted the laundering of illicit bribe proceeds.[3] But even if the Court includes this amount in the calculation, the $4,431,756 from Gov. Exh. 12-28 combined with this amount totals $4,829,756. The laundered amount would still be below the $9.5 million threshold.

IV. **Polit was not involved in any sophisticated transactions that warrant imposition of the sophisticated laundering enhancement.**

Regarding the allegation that Polit was a sophisticated money launderer, the government again conflates acts of bribery with acts of laundering. The sophisticated laundering enhancement does not apply to any alleged sophistication in the design between Polit and the alleged bribers for transferring the bribe payments to either Polit or to the entity the government contends was designated by his son who, according to the government, handled the money. The crucial distinction that the Eleventh Circuit has drawn between the manner and means of commission of the underlying offense—in this case, accepting/receiving bribe payments—and what is done with those proceeds must be given effect in order to distinguish sophisticated laundering from sophisticated bribery.

Even if accepting cash bribes or asking that deposits be made to specific accounts were considered sophisticated bribery at all, the involvement Polit allegedly

---

[3] The government argues that because there was testimony that Polit allegedly received cash bribes in Ecuador, the Court should conclude that the cash that Polit allegedly gave Sanchez that was transferred to the United States must have been cash from bribes. But there was no proof of this and no witness testified as to the source of the cash that Polit allegedly gave Sanchez. The government's argument fails the *Moran* standard of "reliable and specific" evidence that this amount constitutes "funds" that were "actually laundered" pursuant to *Paley* and also impermissibly shifts the burden of proof to Polit to prove the source of the cash that he allegedly gave Sanchez.

had cannot be seen as sophisticated in allegedly leaving the entire matter in the hands of a family member once the proceeds (the core starting point for laundering) exist.

Once the alleged bribes were paid, the government's evidence showed that Polit had no involvement in or control over what was allegedly done by John Polit; the government did not adduce evidence that Polit supervised or overrode investment decisions by John Polit. Indeed, the evidence showed that Polit did not have control of the wired funds. Nor were the post-proceeds actions allegedly taken by John Polit particularly sophisticated. Transfers were made from and to an entity, Venture Overseas, which served multiple financial investment purposes, and thus was not a shell corporation. And for laundering purposes, the government has never contested the fact that because Venture Overseas was directly linked to John Polit (the signatory on the Venture accounts was John Polit's father-in-law), transfers to that entity made the funds less concealed, not more concealed. Such transactions are definitionally not sophisticated laundering. Venture Overseas was an investment company. It held assets and then invested them in real estate or other matters. That is not layering conduct, but simple direct transfers and purchases.

The government appears to want to use the guidelines to punish alleged foreign bribes that the guidelines do not punish. The sophisticated laundering enhancement deals with what happens to the proceeds after they hit the defendant's hands. The laundering, which must occur later in time, was out of Polit's hands by the government's own account. No sophisticated money laundering enhancement applies to him.

V. **The government improperly conflates Polit's alleged role in the underlying bribery scheme with his alleged role in the money laundering offense.**

The government does not address *United States v. Gross*, 661 F. App'x 1007, 1026 (11th Cir. 2016), which acknowledged application of *United States v. Salgado*, 745 F.3d 1135 (11th Cir. 2014), to offense levels calculations under § 2S1.1(a)(2). In

*Gross*, the Eleventh Circuit held that the sentencing court properly applied the money laundering guideline under U.S.S.G. § 2S1.1(a)(2), and also considered the defendant's argument "that he was not a leader with respect to any money laundering activity" pursuant to *Salgado*. *Id.* at 1026. The Eleventh Circuit found no clear error by the lower court in finding that the defendant had a leadership role in the money laundering offense charged, not only in the predicate offense.

The government's position, that *Salgado* applies only to offense levels calculated under § 2S1.1(a)(1), also defies reason. Section 2S1.1 applies to all money laundering offenses. The government emphasizes the commentary of that section, application note 2(C), which specifies that where "subsection (a)(1) applies, application of any Chapter Three adjustment shall be determined based on the offense covered by this guideline (*i.e.,* the laundering of criminally derived funds) and not on the underlying offense from which the laundered funds were derived." But the government ignores the purpose behind it. The only reason to single out subsection (a)(1) is because (a)(1) directs a cross-reference to the guideline provision applicable to the underlying offense in order to determine the base offense level. *See* § 2S1.1(a)(1) (stating that the base offense level is the "offense level for the underlying offense from which the laundered funds were derived"). Under § 1B1.5, the guidelines provide that an "instruction to use the offense level from another offense guideline refers to the offense level from the entire offense guideline" and as such, "Chapter Three (Adjustments) also are determined in respect to the referenced offense guideline, *except as otherwise expressly provided.*" § 1B1.5(b)(1), (c). Hence the need for the commentary in § 2S1.1 relating to subsection (a)(2) and the *Salgado* decision.

But subsection (a)(2), on the other hand, does not direct you to cross-reference the "underlying offense"—it only directs you to use the table in § 2B1.1 to calculate the number of levels based on the amount of laundered funds. And § 1B1.5(c) states that an "instruction to use a particular subsection *or table* from another offense

guideline refers only to the particular subsection or table referenced, *and not* to the entire offense guideline." § 1B1.5(c). Thus, there is no need for the commentary to provide the same instruction with regard to subsection (a)(2).

*United States v. Balsam*, 315 F. App'x 114, 120 (11th Cir. 2008), cited by the government, does not state otherwise. First, *Balsam* was decided pre-*Salgado*, so any argument that it supports a leadership enhancement based only on conduct underlying the money laundering offense does not hold up under current law. The Eleventh Circuit also overruled the defendant's objection to a role enhancement, in part, because the "PSR makes it clear that he [the defendant] led and organized money laundering activities." *Id.* The same cannot be said here.

The government maintains that even if this Court considers just Polit's conduct in the charged money laundering offenses, a leader role enhancement is still appropriate. Yet, the government actually identifies Polit's conduct in Ecuador with respect to receiving bribes: Polit "was one of the most powerful people in Ecuador," Polit "recruited" Santos and Sanchez "to pay bribes" and "recruited" Sabett Chamoun to "deliver bribery proceeds," Polit "directed" Ribas to award a contract to IHG for a bribe, and Polit "directed bribe payors . . . to coordinate specific transfers with his son." ECF#239 at 11–13. A leadership role enhancement involves more than being, in the government's view, a beneficiary of the laundering organized and conducted by others. It requires "the exertion of some degree of control, influence, or leadership" in the charged offense that is simply absent here. *United States v. Aguera*, 281 F. App'x 893, 896 (11th Cir. 2008) (citation omitted).

**VI.   An abuse of trust enhancement is inapplicable where the alleged conduct giving rise to the enhancement occurred outside the U.S. and there was no abuse of trust involved in the charged laundering offenses.**

The government also cannot use the guidelines enhancements to punish foreign bribery conduct that is not covered by the guidelines. Yet in this case, the government

tries to do so either by treating a bribe receipt as the laundering event or by treating the acceptance of a bribe as the abuse of trust owed to Ecuador. But the fact remains that there was no position of trust held by Polit with regard to the alleged money laundering. The government fails to cite any binding authority imposing an abuse of trust (Chapter Three) enhancement in the money laundering offense guideline under § 2S1.1 where the abuse of trust related to the underlying offense, not the laundering. *See* ECF#239 at 14 (citing *United States v. Szekely*, 632 F. App'x 546, 549 (11th Cir. 2015) (imposing enhancement in a wire fraud case not governed by § 2S1.1) and *United States v. Clark*, 989 F.2d 447, 448 (11th Cir. 1993) (imposing enhancement in extortion case governed by § 2C1.1, not the money laundering guideline)).

Lastly, the government cited the Seventh Circuit's decision in *United States v. Scott*, 405 F.3d 615, 618 (7th Cir. 2005), to argue that imposing the abuse of trust enhancement in a money laundering case is proper even though the abuse of trust was connected only to the underlying offense. ECF#239 at 13-14. But eight years later, in *United States v. Rushton*, 738 F.3d 854, 859 (7th Cir. 2013), the Seventh Circuit stated that "It is permissible [to impose an abuse of trust enhancement] in a money laundering case—but only when the abuse of trust relates to the money laundering itself rather than to the underlying offense (the offense that generated the money that the defendant laundered)."

The government cannot overcome *Salgado*, which clearly instructs that Chapter Three enhancements, such as abuse of trust, are only applied when they pertain to the laundering offense, not the underlying predicate offense.

Respectfully submitted,

**BLACK SREBNICK**
201 South Biscayne Boulevard, Suite 1300
Miami, Florida 33131
Tel. (305) 371-6421

/s/ *Howard Srebnick*
HOWARD SREBNICK, ESQ.
Florida Bar No. 919063
E-mail: HSrebnick@RoyBlack.com

JACKIE PERCZEK, ESQ.
Florida Bar No. 42201
E-mail: JPerczek@RoyBlack.com

JEANELLE GOMEZ, ESQ.
Florida Bar No. 1026021
E-mail: Jgomez@RoyBlack.com